1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                      )
4    SINGULAR COMPUTING LLC,           )
                                       )
5            Plaintiff,                )
                                       )    Civil Action
6    v.                                )    No. 1:19-cv-12551-FDS
                                       )
7    GOOGLE LLC                        )
                                       )
8            Defendant.                )
                                       )
9

10

11            BEFORE THE HONORABLE DONALD L. CABELL
                UNITED STATES MAGISTRATE JUDGE
12

13                        MOTION HEARING
                        By Videoconference
14

15                      January 19, 2021
                          3:02 p.m.
16

17          John J. Moakley United States Courthouse
                     One Courthouse Way
18               Boston, Massachusetts 02210

19

20

21

22              Linda Walsh, RPR, CRR
                   Official Court Reporter
23          John J. Moakley United States Courthouse
              One Courthouse Way, Room 5205
24             Boston, Massachusetts 02210
                   lwalshsteno@gmail.com
25

```
 1    APPEARANCES:

 2   On Behalf of the Plaintiff:

 3        PRINCE LOBEL TYE LLP
          By: Paul J. Hayes, Esq.
 4            Brian M. Seeve, Esq.
              One International Place, Suite 3700
 5        Boston, Massachusetts 02110
          617-456-8000
 6        phayes@princelobel.com

 7
     On Behalf of the Defendant:
 8
          KEKER, VAN NEST & PETERS LLP
 9        By: Deeva Shah, Esq.
          633 Battery Street
10        San Francisco, California 94111
          451-351-9400
11        dshah@keker.com

12

13                    Proceedings reported and produced
                       by computer-aided stenography.
14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                  P R O C E E D I N G S

 2          THE CLERK:  This is the case of *Singular Computing LLC*

 3   *versus Google LLC*, Civil Action Number 19-12551, which will now

 4   be heard before this Court.

 5          Would counsel please identify themselves for the

 6   record.

 7          MR. HAYES:  Paul Hayes, Prince Lobel, for the

 8   plaintiff.

 9          THE COURT:  Good afternoon.

10          MS. SHAH:  Your Honor, this is Deeva Shah from Keker

11   Van Nest & Peters for defendant, Google.

12          THE COURT:  And good afternoon to you.

13          MS. SHAH:  Good afternoon.

14          THE COURT:  All right.  Okay.  So first I start with a

15   question -- possibly a hopeful question.  But when I was

16   reading the parties' papers, it seemed that both sides sort of

17   suggested this was an issue that could have been benefited or

18   maybe could benefit from more conversation between the parties.

19   And so -- and I note this was -- the motion to compel was filed

20   back in mid-November.

21          So let me just ask.  Since then have any of the issues

22   been narrowed or resolved or affected by any subsequent

23   conversations between the parties?

24          MR. HAYES:  Your Honor, for the plaintiff, the answer

25   is simply no.
</pre>

 1          THE COURT:  Okay.

 2          MS. SHAH:  Your Honor, we've heard nothing further in

 3  terms of the last offer that we provided.

 4          THE COURT:  Okay.  Well, all right.  So let's begin

 5  there.  And to Singular, maybe you can just help me understand

 6  what the issue here is.  I understand what Google is offering

 7  here, and they say, look, we can give you some nonfunctional or

 8  nonoperational devices on a board so you can see what this

 9  looks like, and we can also give you access to a program so you

10  can run simulations.

11          So one question I have for you is what's wrong with

12  that?  And then I have sort of a related question, which is,

13  well, if you get copies of the devices and nothing more, so

14  none of the cooling equipment that they say is necessary or the

15  power source that you would need to run this, would you be

16  content with just getting copies of the devices and nothing

17  more?

18          MR. HAYES:  From our point of view, Judge, we would be

19  content in getting copies of the boards.  There's two of them,

20  B1 and B2 --

21          THE COURT:  Right.

22          MR. HAYES:  -- as they are used by Google in their

23  environment.  Now, obviously if they have a cooling system

24  that's hooked up to it, so be it, then I don't want the cooling

25  system.  But the reason we need the board with all the stuff in

1    it, the chip, et cetera, is in Google's brief they said, well,

2    they don't sell boards, but this is -- this case here is

3    infringement based on use; it's not based on sale.

4          And obviously what I want to do is take a look at the

5    board, have my expert take a look at the board, and I want to

6    show the jury the board with the chip.  And I don't want any

7    notion of my expert examining a board that effectively was

8    never used.  That's what they're -- they don't want to give me

9    the chip.

10          And then -- so, I mean, my position is real simple.

11    They're obligated to give it.  They agreed to give it by the by

12    and then they reneged.  After they agreed to give it, told

13    Judge Saylor they'd give it to me, I gave them something in

14    return, which we did, and then they reneged on it two days

15    later.  So I don't need the cooling apparatus, but I certainly

16    need the accused board, which, by the way, obviously will fit

17    in a briefcase.  So there's no reason not to do it.  And we

18    have a pretty draconian, what do you call, protective order --

19          THE COURT:  Right.

20          MR. HAYES:  -- protecting all this stuff.  So, I mean,

21    there's really no excuse not to give it to me.

22          THE COURT:  So, Ms. Shah, we've got a local rule that

23    says you have got to give this unless it's impractical.  You

24    say it's impractical, but what we're hearing is, look, we don't

25    want the rest of the universe that goes along with this.  We

1   want just the small part that can fit in a banker's box.

2   That's the term everyone is using.  I have to say, I never

3   really know what a banker's box looks like, but I'm imaging

4   it's not huge.  So there's an argument that it's not

5   impractical, and so, therefore, the rules should govern.  And

6   on top of that we've got a draconian protective order here in

7   place that would, you know, protect the proprietary concerns or

8   any of the other concerns regarding the disclosure of sensitive

9   material.  So what's the big deal?

10          MS. SHAH:  So, Your Honor, if I can answer that

11   question in two parts.  I'll start first with the local rule.

12   We don't think that the local rule simply allows for Singular

13   to define this product as some broad TPU board and also compel

14   production of something that wouldn't be an exemplary product.

15          Singular focuses on Section (d)(4)(B), but what

16   (d)(2)(B) says specifically is it must be an exemplary product

17   or an exemplary sample, and here in this case, a nonworking TPU

18   board or chip is not exemplary because if Your Honor looks at

19   the complaint, looks at the infringement contentions, what's

20   relevant is the non -- is the operation that's run on chips,

21   not the architecture of the board or the chip itself.  This

22   case isn't about chip architecture or how things are arranged,

23   and therefore, even under Singular's own stated purposes for

24   why they need this sample, an exemplary sample would be able to

25   run test code, otherwise it's simply not relevant.

```
 1          THE COURT:  Why can't they?  Why can't they do that?
 2          MS. SHAH:  Well, the TPU chip is inside of a board
 3     that's in Google's data centers, and these -- what's required
 4     in order to run them is not just this cooling equipment but
 5     also they're coded specifically to Google's phone servers and
 6     to Google's software.  And so without all of those things --
 7     and also, I think of significantly a large power supply, I
 8     don't believe the TPU board, as far as we've been told from
 9     engineering, can run outside of that setup.
10          THE COURT:  Hang on for one second.  So let's put
11     aside the power source for a minute.
12          Mr. Hayes, to the extent that Ms. Shah is talking
13     about these other aspects that would need to be included that
14     you are not going to have, what do you say to that?
15          MR. HAYES:  Well, I mean, that's fine, Judge.  What
16     you have to understand with her argument, first of all, is
17     what's the accused product is the board.  What is not accused
18     is the chip.  It's the board.  That's spelled out in the brief
19     or it's spelled out in the complaint.  Its spelled out
20     everywhere.  So effectively we need the board.  We need the
21     board to test it in a variety of ways, not just simply to plug
22     it into the cooling system and all the rest.
23          They've offered -- we need, in addition -- and
24     hopefully after we go through all this, I don't have to come
25     back to get their source code.  But, I mean, I'm starting -- I
```

1    started this whole process in October to try to get this thing,

2    but I just need the board.  I mean, this is the accused

3    product.  This is what they used in their device.  And the fact

4    that it doesn't have the cooling system, so be it.  I'll live

5    with it.

6              THE COURT:  And so the source code is not on the

7    board.  Is that something that would have to be provided in

8    addition to?

9              MR. HAYES:  The source code, Judge, is in the --

10   embedded with the -- embedded in the chip.  But they've already

11   seen the source code that's in the chip, but you're not -- and

12   they've offered to test somehow this, but that's a different

13   ball of wax.  I mean, I just need the physical product, and

14   there's no -- I mean, under the rule there is no, as I can see

15   it, no legitimate reason other than they just don't want to

16   give it to me.

17             THE COURT:  No, no, no.  That I understand.  What I'm

18   trying to understand, just as a factual matter, and Ms. Shah

19   appeared to be -- or I interpreted what you were saying to

20   mean, getting the board without anything more isn't going to

21   allow you to do what you want to do, and that's aside -- that's

22   independent of the cooling, independent of the power.  There

23   are other things that you are going to need from us in order to

24   do what you want to do.

25             MR. HAYES:  Right, in addition to that, but I assume,

1    once this is worked out, we'll be able to get that.  Your

2    Honor, there is a whole bunch of things that we will do with

3    the board just as is.  And Brian Seeve is our computer guru at

4    Prince here, who -- I don't know what he's going to do.  Paint

5    it and play frisbee with it.

6            Brian, why don't you tell the Judge what we'll do with

7    the board just as is.

8            THE COURT:  Well, hang on.  Before you do that -- hang

9    on.  Hang on.  Let me go incrementally here.  I want to make

10   sure I understand exactly what you're seeking to compel the

11   production of.  You are just seeking to compel the production

12   of the board which will have the chip which will have the

13   source code embedded in it?

14           MR. HAYES:  Correct.

15           THE COURT:  Not seeking anything more through the

16   motion to compel; is that correct or is that incorrect?

17           MR. HAYES:  That's correct.

18           THE COURT:  Okay.  Now, Ms. Shah --

19           MR. SEEVE:  Your Honor --

20           THE COURT:  Hang on, Mr. Seeve.

21           -- are you saying if they get that it still is not

22   going to work, they still are not going to be able to use it

23   for anything, there is still things independent of the cooling

24   component and the power component that they will need from

25   Google?  Because if the answer to that is yes, then obviously

1    that needs to be talked about in the context of this motion.

2    So what else are you saying they would need?  Because they may

3    disagree with you.  You know, they may say, look, that's our

4    problem, not yours.

5         What else are you saying they would need to make this

6    something that wouldn't just be a futile exercise?

7         MS. SHAH:  Well, Your Honor, what else -- I know that

8    they would need dedicated servers.  The board is coded to

9    Google-specific servers, and so those servers are also within

10   Google's data centers.

11        THE COURT:  So you are saying, look, if you don't like

12   our offer of giving you access to something on the cloud where

13   you can run simulations and giving you a board that you can

14   kind of just look at, you have to do this in one of our data

15   centers or else that board, that piece of hardware that you

16   have got is useless; is that what you are saying?

17        MS. SHAH:  No, Your Honor.  I think actually even

18   going to our data centers wouldn't allow them to test at the

19   data center.  Even Google's own engineers test this code

20   virtually through the same cloud TPU portal that we're offering

21   Singular to do the testing from.

22        The testing for -- it's why the architecture here

23   isn't in fact relevant because the testing all happens off site

24   virtually.  Going to a data center, having the chip in hand or

25   the board in hand simply wouldn't allow for the kind of testing

1    that I believe Singular has at least told us thus far is their

2    stated purpose for seeking this board.

3           THE COURT:  Okay.  So if they don't need the data

4    center -- I don't mean this to sound flippant -- so then what

5    do you care that they want a copy of the board that the local

6    rule appears to entitle them to?

7           MS. SHAH:  Well, Your Honor, I think -- we have two

8    concerns here, and first was what I mentioned.  We don't

9    actually think the local rule says that they just get whatever

10   it is that they have now decided is the accused product.  It's

11   not what they've claimed before as the accused product.

12          But, second, we have a concern here under the

13   protective order that hasn't been addressed, and we weren't

14   able to address it because the first time that counsel brought

15   up this argument was in reply, that they intend to disassemble

16   this board and that they intend to take it apart.  And the

17   issue here is not only does the protective order not cover

18   disassembly, it also doesn't cover the storage or inspection of

19   any physical specimen.  It simply does not have the safeguards

20   in place which are particularly important because this isn't

21   commercially available and this really isn't relevant.  There

22   are no portions of the architecture that are relevant to the

23   claim.

24          THE COURT:  Okay.  You are mixing, though, at this

25   point, two different objections, the latter being relevance;

```
 1    the first being you think they'd be violating the protective
 2    order.  Let's try to keep these separate for the moment.  I'm
 3    still -- I mean, I'll hear from Mr. Seeve, because clearly he
 4    wants to tell me things.  But I have to tell you, you know, the
 5    part I'm having issues with right now is it's your position
 6    that the local rules don't seem to provide for this to be
 7    disclosed to the plaintiff.  But I'll hear more on that in a
 8    minute after Mr. Seeve enlightens us.
 9              MR. SEEVE:  I apologize, Your Honor.  Further, I was
10    trying to clarify one thing, which is that this is an issue
11    that's independent of the source code.  The source code is not
12    going to be on the board, and we don't expect it to be on the
13    board.
14              THE COURT:  Okay.  Okay.
15              MR. SEEVE:  That's all I wanted to clarify.  As to
16    what we would use --
17              THE COURT:  All right.  So maybe as part of your --
18    what you are going to be telling me then, you can help me, and
19    I think this is what Mr. Hayes wanted to do, you can walk me
20    through what is it that you want to do with this, and help
21    Ms. Shah understand why you getting the sample board that you
22    are looking for is going to be sufficient.
23              MR. SEEVE:  So it's definitely possible to make
24    various inferences about how a product works, how a particular
25    chip works just by looking at it.  You don't need to run it.
```

1    You don't need to have the cooling system or the software or

2    all of the environment that you need to actually operate the

3    chip in the manner intended.  Sometimes you just need a

4    magnifying glass.  Or, you know, you just need to look at where

5    the components are relative to each other.  And just with like

6    a cursory examination like that, you can learn important things

7    about how a product works.

8           There are tools that don't disassemble, that don't

9    harm boards like this but that can sort of look inside them, to

10   an extent possible, to shine light at them and then see how

11   translucent they are, and other physical properties of the chip

12   that may well be relevant to infringement in this case.

13          And I think, you know, the final answer is mostly that

14   we don't know.  You know, as Ms. Shah pointed out, this is a

15   board that's not commercially available.  This is a board that

16   only Google pretty much ever -- has ever seen.  And maybe

17   Google theoretically could be right, that we won't learn

18   anything useful from the board.  We don't know.  But we have no

19   reason to believe that, and we hesitate to think that we should

20   take Google's word for that when there's really no harm that

21   could arise from just getting one or two of these sample boards

22   and examining it in the way I just described.

23          THE COURT:  One of the things Ms. Shah just talked

24   about is them learning that you plan to do some things with it

25   that may violate the protective order.  So I assume the concern

1    is you will learn some things that you shouldn't be learning if

2    you take it apart and start doing things.  I mean, do you have

3    any thoughts on that or is that something that you and

4    Mr. Hayes have thought about?

5         MR. SEEVE:  The parties have discussed that issue.  I

6    can speak to my own memory, which is that Google was concerned

7    that any kind of analysis that involved third parties that we

8    performed on the board, that might expose the secrets of their

9    engineering to an overbroad audience and we wouldn't be able to

10   sort of keep that kind of thing secret.  You know, there's a

11   very small number of people that do this kind of analysis, and

12   I think they were worried that this information falling into

13   the wrong hands could spread quickly.

14        In response, we very clearly agreed that we would not

15   give this board to third parties as part of our analysis, that

16   we would not let anyone who's outside the protective order in

17   any way have any kind of access to the board.  We're surprised

18   to hear that this issue is coming up again now because we

19   thought, and I think confirmed in writing, that there was an

20   agreement between the parties that no such actions would be

21   taken.

22        THE COURT:  Okay.  Ms. Shah?

23        MS. SHAH:  Your Honor, I have two concerns here, and

24   first is that to the extent that Mr. Seeve contends that there

25   might be inferences that they could make about the chip by

1    simply looking at it, we've not only provided the chip design

2    code but we've provided the specifications that give far more

3    information than anything that would be visible by looking at

4    the chip.  They have all the specifications of how this chip is

5    set up and how it functions and what parts are next to which

6    specific parts that we're not even sure would be relevant.  To

7    the extent that they are concerned about that, they have the

8    ability and have been able to look at that information since

9    our production in October.  We're just not sure at this point

10   what information they need that they don't already have that

11   would require looking at the chip.

12          Moreover, with regard to this argument that we've

13   discussed not turning over the chip to third parties, we hadn't

14   talked about disassembly, and we don't believe that disassembly

15   is something that can occur without the involvement of a third

16   party for this kind of board or chip.  And there's also --

17          THE COURT:  Hang on.  Hang on.  You say that you don't

18   think that can happen.  You've got the plaintiffs right here.

19   Let's have them comment on it.

20          MS. SHAH:  Sure.

21          THE COURT:  Mr. Seeve, a moment ago you just said your

22   analysis would not involve a third party.  Google has concerns

23   that you can't disassemble and do the sort of analysis you want

24   to do without involving a third party.  So how unequivocal can

25   you be that getting this board and doing what you want to do to

1    it is something that can be accomplished in house, so to speak,

2    without involving third parties?

3         MR. SEEVE:  When it comes to third parties, I can be

4    totally unequivocal.  We have no intention of giving any third

5    party access to the sample board, period.

6         As to how much we can learn from the board, again, we

7    don't know, which is one of the reasons we're seeking the board

8    in the first place.

9         Disassembly is a word that can mean a lot of things.

10   It can mean unscrewing a component and peering under it or it

11   can mean putting the component under an electron microscope and

12   taking tiny slices of it.  I mean, there's a whole range of

13   stuff that that word could comprise.  Could we unscrew a

14   component from the board?  Maybe.  I don't know because we

15   haven't seen the board.  That might be useful.  We probably

16   could not put it under an electron microscope.  We don't have

17   one of those lying around the firm.

18         THE COURT:  Okay.  So, Ms. Shah, I guess -- you know,

19   obviously whenever we have a hearing we go back and we reread

20   everything and we talk about it, but I'm still kind of

21   struggling to figure out what's the big deal here.  I know

22   we've got -- we'll have to look at two aspects of the local

23   rules.  But there is a provision that does seem to contemplate

24   that in a case like this samples should be provided of the

25   accused infringing product.  And, at least spiritually, it

```
 1    would seem the rules would be calling for Google to make this
 2    available.  And then to the extent you say, look, you're going
 3    to have trouble doing much without certain hardware and
 4    components, that's their issue.  You know, the chip apparently
 5    is a nonissue.  And possible issues with respect to violation
 6    of the protective order is a concern, but they say you don't
 7    have to worry here.  We're not going to be involving third
 8    parties.
 9          So, again, I'll go back and look, but I'm having a
10    hard time trying to understand where Google's main problem with
11    this is.
12          MS. SHAH:  Your Honor, I'll start first with the
13    protective order, and I want to be clear, there's a third party
14    in terms of what Singular is intending to do here, including
15    naming a chip manufacturer or a chip disassembler as a third
16    party expert.  If they intend to name that individual as an
17    expert under the protective order, then it would effectively
18    circumvent the exact concerns here that we're bringing up about
19    providing information that may not be relevant to this case.
20          THE COURT:  Well, I have not looked at the protective
21    order.  I don't know what it says.  You know, obviously an
22    expert that's retained by a party is kind of viewed as being
23    the party.  So I don't know sort of what line becomes an
24    independent entity that we can call the third party --
25          MS. SHAH:  Sure.
```

1          THE COURT:  -- as opposed to their expert.  And I

2     don't know if you're trying to suggest in an -- in your way

3     that anybody they bring in from the outside, any professional

4     should be deemed to be a third party.

5          MS. SHAH:  No, Your Honor.  I just want to clarify

6     that to the extent that they would be providing this to an

7     expert, it would be someone who -- or someone that they would

8     label as an expert, it would be under the procedures available

9     in the protective order for disclosing an expert prior to

10    providing something that would be of course marked highly

11    confidential and attorneys' eyes only.

12         THE COURT:  Well, clearly by raising it here in this

13    context, it's on the radar.  And, again, we've got the

14    plaintiff saying they recognize that being a concern and they

15    don't intend to try to be cute to do anything to circumvent

16    that.  I mean, that's what I'm hearing them to be saying.  And

17    if ever anything were to happen, there is no doubt you've

18    raised this as a concern now.  Nobody can later come back and

19    say we didn't know this was a potential issue.

20         MS. SHAH:  Understood, Your Honor.

21         And with regard to -- I have one other point on the

22    protective order, so I'll start there, but then I would like to

23    address your question about overall the local rules and what

24    they say.

25         On the protective order even our requirements for

1   source code are more significant than the requirements that

2   currently exist for physical specimens, such as these boards or

3   chips.  And it's unclear to me why they would need the entire

4   board because I believe it's the chip at most that would be at

5   issue, and so we'd ask whether the chip would be sufficient

6   here instead of the entire board but also --

7           THE COURT:  Isn't that something that's actually -- I

8   don't mean to cut you off.  I just thought that was something

9   the parties pretty much made clear.  Plaintiff says no, it's

10  the board.  It's not just the chip.  And they say -- you know,

11  I don't have the stuff in front of me -- but they say, look,

12  it's been clear that we have viewed that as the infringing

13  product all along, not just the chip.  So if that's the

14  issue -- I'll go back and I'll look, but I'm not sure it favors

15  you here when they have made it pretty clear what their concern

16  is.

17          MS. SHAH:  Your Honor, they only provided the first

18  page of their infringement contentions.  However, the remaining

19  pages of the infringement contentions only refer to the TPU

20  chips and the core.  We provided that along with the Kamber

21  declaration, and we believe that it's the chip or the core

22  that's actually at issue here, not the board entirely, which is

23  not something I believe is made apparent by only that first

24  page.

25          THE COURT:  Okay.

1          MR. HAYES:  Your Honor?

2          THE COURT:  Go ahead, Mr. Hayes.

3          MR. HAYES:  Your Honor, if I could just address that

4    because it seems to be a mantra.  What is accused of

5    infringement in this case are the two boards.  We gave you the

6    brief.  I gave you the complaint.  I gave you the allegations

7    in the complaint, the denial, et cetera.  That's it.

8          The claim, if you look at the claim of the patent,

9    that calls for a device, not a chip, a device.  The claim, the

10   patent describes it including a processor endeavor, to wit a

11   computer.  That is exactly what my guy built.  That's exactly

12   what they gave to Google and Google knocked off.  So that's

13   what the subject of the case is.  They want it to be the chip

14   but it isn't.

15         So, I mean, at least as a plaintiff I certainly get to

16   nominate what I think is the infringing product, not Google.

17   So for that argument, I mean, I just think that's it, Judge.  I

18   want to just make that entirely clear, that that's the accused

19   product, that's what we are going to show to the jury, that's

20   what we're going -- and another thing, I know when we do tests

21   or whatever we do on this board, but I want it to make -- I

22   want it as a pilot to make a demonstrative of the actual board

23   with the chip and the whole thing for the jury to see, not a

24   hodgepodge that she may give to me and on cross say, well,

25   there's a chip there that actually does it in the board that

1  Mr. Hayes showed you?  No.  Boom, there we go.  Now we have

2  motions in limine and who knows what happens.  I mean, I don't

3  understand what the problem is of just giving me the board.

4  They have got like a million of these.

5       THE COURT:  So, Mr. Hayes, let me ask you this -- this

6  is the question I sort of asked at the beginning, but it's apt

7  to ask it again.  If you get what you're asking for, so if you

8  get a copy of the two boards at issue with nothing more,

9  including no longer the offer of access to a program where you

10 can run simulations, are you fine with that?

11      MR. HAYES:  No, not at all.

12      THE COURT:  So what in addition --

13      MR. HAYES:  They offered for us to allow to test the

14 product, right, in vis-a-vis the cloud portal or whatever.  And

15 we in the brief accepted that, but that does not then preclude

16 me from showing the jury what the accused product is and

17 photographing it and all the rest.

18      THE COURT:  I understand that.  That's not my

19 question.  My question -- I just want to make sure if I were to

20 allow your motion and compel what it is you are seeking, are

21 you just seeking that they provide you with copies of the

22 boards with the chips or are you also saying and I want you to

23 compel them to continue to offer us this access to --

24      MR. HAYES:  No, no.  The motion is solely with respect

25 to the board that's before the Court.

1          THE COURT:  Okay.

2          MR. HAYES:  I assume that once that's decided that

3    they will -- everybody will sort of get along a little better

4    and move on, but I mean, that's the motion.  That's all before

5    you right now, Judge.

6          THE COURT:  Okay.  Thank you.  All right.  So,

7    Ms. Shah, back to you to comment on that.

8          MS. SHAH:  Your Honor, I think we're in agreement that

9    this motion is only about the board and not about the offer

10   that we believe Singular has rejected but we're not sure really

11   at this point because we really didn't get a response about it.

12   But to the extent that we believe that if this Court orders us

13   to provide the boards, this motion to compel only covers the

14   boards, and to that extent we would ask the Court to implement

15   either similar requirements to the protective order that cover

16   the board, so inspection occurring in a controlled environment

17   similar to source code, since we believe this would be akin to

18   source code.

19         THE COURT:  Why would I have to implement something

20   special?  Doesn't the protective order already apply to the

21   case writ large such that any discovery would be subject to any

22   aspect of the protective order that would relate to the

23   treatment of discovery or materials provided by one side to the

24   other?

25         MS. SHAH:  Your Honor, both Rule 16 and the protective

1   order allow for further procedures to -- it's specific to

2   whatever element of discovery we're discussing here.  And the

3   protective order actually does not involve any discussion of

4   physical specimens of this kind.  That simply wasn't

5   contemplated when the protective order was being drafted, and

6   so even --

7           THE COURT:  Well, let me just stop you there because

8   ten minutes ago you said it would violate the protective order.

9   So now I hear you saying the protective order doesn't address

10  it.  So help me understand there what the problem is.

11          MS. SHAH:  Yes, Your Honor.  The violation was with

12  regard to the third-party concern that we had, which does not

13  appear to be a concern anymore.

14          THE COURT:  Okay.

15          MS. SHAH:  Separately, our concern is that the

16  protective order does not specifically talk about how samples

17  will be kept, in what location, whether inspection will occur

18  in a controlled environment.  In the same way that source code

19  has its own provision in the protective order, we would ask

20  that either the parties be allowed to confer and amend the

21  protective order to cover physical specimens such as the boards

22  or that Your Honor provide further guidance in your order.

23          THE COURT:  You think way too highly of me if you

24  think that I can offer you words that will address that.  I

25  mean, you guys are in the best position to understand what

1  really are the concerns here if this sort of material is

2  provided.

3          So Mr. Hayes and Mr. Seeve, I have got you guys here.

4  That aspect of it seems reasonable, which is I can compel the

5  production of it, but at the same time everybody should have a

6  comfort level that this material is going to be handled

7  appropriately.

8          So we have got a protective order that may not address

9  how to handle material like this.  I don't know whether it's

10  better to have an understanding between counsel through written

11  communications or to amend and supplement the protective order.

12  But Mr. Hayes or Mr. Seeve, do you have any thoughts about

13  that?

14          MR. HAYES:  I do, Your Honor.  That's going to

15  cause -- we're agreeable, as we said, not to send it to a third

16  party.  But what my -- what my opponent -- I was going to call

17  her my brother but unfortunately she's my sister.  In that

18  sense, what she's trying to do is to make it such that the only

19  way we're going to get these boards is we fly out to

20  California, and we have to inspect them and touch them only

21  there.  That's not -- you do that with source code, and

22  everybody was happy doing it.  You don't go with physical

23  objects.

24          I need that board in house at Prince to photograph, to

25  make the demonstratives of it, all of that, and I don't need to

1    get permission from my opponent as to what I'm going to do.  I

2    mean, I don't need to give her all the exhibits before we even

3    get to the trial.  So, I mean, I think in my view, it should be

4    ordered to be produced, and the caveat that you should probably

5    put in your order so that everybody is happy is that where the

6    parties are agreeable that in fact it's not going to be sent

7    out to a third party to cut up.  That's it.

8            The rest is just another delay because if you just

9    ordered it regular, subject to this protective order thing,

10   it's going to take me six more months to get it, three months

11   of negotiating the protective order, coming back to you and

12   we'll be back here, and by that time discovery is over and

13   we're done, and that's exactly the Google way.  So I can't do

14   that.

15           MS. SHAH:  May I respond?

16           THE COURT:  Ms. Shah, were you in your own way

17   suggesting or trying to get to a point where they'd have to go

18   all the way out to California and examine this in a controlled

19   environment of your own choosing?

20           MS. SHAH:  No, Your Honor.  In fact, even with the

21   source code, as Singular is aware, we've allowed them to

22   inspect it at Wolf Greenfield's offices there in Boston.  We

23   understand that there's a pandemic going on.  We would not

24   require them to come to California.  Ideally, we would prefer

25   that the controlled environment would be at Wolf Greenfield,

1   but if that's not amenable, we would at least want assurances

2   that the controlled environment that they have at Prince Lobel

3   is secure and perhaps some knowledge of what kind of security

4   is in place to ensure that this noncommercially available

5   proprietary material is kept safe.

6           THE COURT:  Again, I'm not sure -- I mean, that's --

7   that may be a valid concern.  I'm not sure, you know, it

8   applies to the issue we're dealing with here today.  And I

9   don't hear you saying, yeah, they're not going to get a copy of

10  this that they can possess and keep themselves, and so that

11  doesn't seem to be an issue.  So -- well, here's I guess what I

12  would ask is -- I mean, I'm just musing at this point.  But if

13  you think there's language -- we're not talking about amending

14  the protective order, but if there's language that you think if

15  I were going to compel the production of these boards to

16  Singular that should accompany it so that they and anybody else

17  would understand -- well, I'm not sure how to complete that

18  sentence, but basically know of what you can't do with it in

19  broad terms.  I'm not talking about microscripting because you

20  don't know everything they are going to do, and they are not

21  going to tell you.

22          MS. SHAH:  Yes, Your Honor.

23          THE COURT:  But, for example, we know that sharing

24  information with an outside third party is of concern, and we

25  have got a protective order that generally talks about that.

1    If you think there's other stuff, broadly speaking, that should

2    be in there, just so everybody is on notice, I suppose you can

3    make that known, and I can consider putting it in the order.

4    But right now my inclination is to order Google to produce

5    these boards to the plaintiff.  And I think that, generally

6    speaking, the rules don't contemplate the Court playing this

7    continuing referee, looking over the shoulder of them, to make

8    sure they're handling it okay.

9         I think there's a presumption that unless there is a

10   problem, it is being handled appropriately.  So I'm not -- I'm

11   still toying with this idea.  I'm really thinking that there's

12   something big picture that you think -- for example, a concept

13   that's in the protective order that you think by analogy should

14   carry over to the treatment of these boards and you have a view

15   that the boards themselves are not really reflected in the

16   protective order, then that's something to consider, but

17   otherwise, I'm loath to kind of start rewriting what parties

18   can do with materials once they've received them through

19   discovery.  I think that's in your domain.  All right.

20        MS. SHAH:  Would it be all right to provide the Court

21   with proposed language perhaps by the end of this week that --

22        THE COURT:  Yes, that's fine, understanding I may

23   choose to, you know, ignore it.  I may choose to think about

24   it.  I may choose to include some.  And if I think I'm -- I

25   might include some, what I'll do very quickly is let the

1    plaintiff know I'm thinking of incorporating this or including

2    this and letting them comment, and then with that I can

3    finalize the order.  But you should presume otherwise the

4    motion to compel is allowed and the order will follow once I

5    hear from you and proceed accordingly.

6              MS. SHAH:  Yes, Your Honor.  Understood.

7              THE COURT:  Okay.  All right.  Now, I know, aside from

8    that, Google itself just filed a motion to compel.  That has

9    not been fully briefed and so that is not something we're going

10   to address today, and I don't assume the parties are prepared

11   to address that today.

12             So with that, is there anything else from Singular

13   that you think we should be addressing before --

14             MR. HAYES:  Nothing, Judge.  I just apologize for not

15   having a tie on.  I didn't know it was a Zoom -- a video Zoom,

16   but other than that, nothing.

17             THE COURT:  Well, you kind of outed yourself.  Because

18   you are wearing all black, I can't tell whether you have a

19   black suit, black shirt, and black tie, which is what I

20   presumed.  I didn't know otherwise, and the transcript will

21   reflect that.

22             MR. HAYES:  We'll leave it at that, Judge.  I'll

23   strike the last comment.

24             THE COURT:  Okay.  Ms. Shah, anything else before we

25   recess?

1          MS. SHAH:  No, Your Honor.  Thank you very much.

2          THE COURT:  All right.  Thank you, everybody.  Stay

3     safe.  And we'll be in recess.

4               (Adjourned at 3:40 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9           Dated this 29th day of January, 2021.

10

11

12                    /s/ Linda Walsh

13                    Linda Walsh, RPR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25