# EXHIBIT A

1           UNITED STATES DISTRICT COURT
2             DISTRICT OF MASSACHUSETTS
3
4    _____
                                    )
5    SINGULAR COMPUTING LLC,        )
                                    )
6             Plaintiff,            )
                                    )
7        vs.                        )Civil Action No.
                                    )1:19-cv-12551-FDS
8    GOOGLE LLC,                    )
                                    )
9             Defendant.            )
     _____)
10
11
12
13       VIDEOCONFERENCE DEPOSITION OF SUNIL KHATRI
14             Friday, March 12, 2021
15                  Volume I
16
17
18
19
20
21
22   Reported by:
     KATHLEEN E. BARNEY
23   CSR No. 5698
24   Job No. 4483047
25   PAGES 1 - 165

                                           Page 1

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4

 5         PRINCE LOBEL TYE LLP

 6         BY:  BRIAN SEEVE

 7              MATTHEW VELLA

 8         One International Place

 9         Boston, Massachusetts 02110

10         bseeve@princelobel.com

11

12    For Defendant:

13

14         KEKER VAN NEST & PETERS

15         BY:  MATTHIAS KAMBER

16              JAY RAPAPORT

17         633 Battery Street

18         San Francisco, California 94111

19         mkamer@keker.com

20

21    Videographer:

22

23         OLIVER GOODMAN-WATERS

24

25
```

Page 3

```
 1    it, it's on page 7.  And I think maybe starting on
 2    page 6, in paragraph 27 that you discuss that, if
 3    you want to refresh your recollection.
 4        A    Hold on.  Let me get that.  You said what
 5    page?                                              12:17:15
 6        Q    It starts on 6, but you quote the claim
 7    language at the top of page 7.
 8        A    Got it.  I see that, yes.
 9        Q    So let me go back to the question I posed.
10             For this claim, this claim language, does  12:17:31
11    this language about the statistical mean over
12    repeated execution provide the test for measuring
13    whether the LPHDR execution unit's operation is
14    sufficiently different from exact mathematical
15    calculations?                                       12:17:53
16        A    Can you repeat the question, please?
17        Q    Sure.  Let me just look at my realtime.
18        A    I have the access to that too.
19        Q    Okay.  Does the quoted language about the
20    statistical mean over repeated execution supply the 12:18:12
21    test for measuring whether the LPHDR execution
22    unit's operation is sufficiently different from the
23    exact mathematical calculations?
24             MR. SEEVE:  Objection.  Vague.  Calls for a
25    legal conclusion.  Assumes facts not in evidence.  12:18:29
```

Page 16

1          THE WITNESS:  So, you know, as I say in my --

2      in the declaration, it says -- in the highlighted

3      part it says:

4                "The statistical mean over

5           repeated execution of the first          12:18:43

6           operation on each specified input of

7           the numerical values represented by

8           the first output signal of the LPHDR

9           unit executing the first operation on

10          that input differs by at least Y=0.05%    12:19:09

11          from the result of an exact

12          mathematical calculation of the first

13          operation on the numerical values of

14          that same input."

15         So the claim language as it stands is      12:19:27

16     completely precise and it gives a person of ordinary

17     skill in the art, you know, guidance as to how to do

18     the test.

19     BY MR. KAMBER:

20        Q   Dr. Khatri, it's telling you to compare some   12:19:43

21     output value to some reference value, correct?

22         MR. SEEVE:  Objection.  Vague.

23         THE WITNESS:  The language is asking us to

24     compare the numerical values represented by the

25     first output signal of the LPHDR unit when it        12:20:01

```
 1    executes the first operation of that input.  And we

 2    are comparing that with the exact mathematical

 3    calculation of the first operation on the numerical

 4    values of the same input, as the language suggests.

 5    BY MR. KAMBER:                                    12:20:19

 6        Q   And you just said in your answer that you

 7    compare the numerical values represented by the

 8    first output.  But really you're comparing the

 9    statistical mean over repeated execution of the

10    outputs of that first operation, correct?         12:20:34

11            MR. SEEVE:  Objection.  Mischaracterizes the

12    witness's testimony.  Calls for a legal conclusion.

13    Vague.

14            THE WITNESS:  So it is as the claim language

15    reads.  I mean, I read out that portion to you.  So  12:20:48

16    it's basically exactly, you know, the claim language

17    which I read out in the beginning of my answer.

18    BY MR. KAMBER:

19        Q   But in your other answer you just said that

20    you compared the numerical values represented by the  12:21:00

21    first output signal.  And I'm asking for

22    clarification.

23            Do you compare the values, the numerical

24    values of the first output signal or do you compare

25    the statistical mean over repeated execution of the  12:21:13
```

Page 18

1    output values of that first operation?

2        A    So --

3            MR. SEEVE:   Objection.   Mischaracterizes the

4    witness's testimony.   Asked and answered.   Vague.

5    Calls for a legal conclusion.                          12:21:27

6            THE WITNESS:   So to clarify any doubt, I'm

7    going to just say that, you know, the answer I gave

8    in the first instance, which is basically reading

9    the entire, you know, excerpt of the claim language,

10   is basically what one has to do.   And that's pretty    12:21:42

11   clear.   It's in the plain -- it's clear in the plain

12   language of the claim.

13   BY MR. KAMBER:

14       Q    So tell me, what does a person of skill in

15   the art have to do?                                    12:21:59

16           MR. SEEVE:   Objection.   Vague.

17   BY MR. KAMBER:

18       Q    You just said it's pretty simple.   So can you

19   explain?

20       A    The person of ordinary skill in the art just   12:22:04

21   has to read this claim and do what the claim

22   suggests, which is clearly expressed in the claim

23   language of the claim.

24       Q    And what they have to do, Dr. Khatri, is to

25   compare the statistical mean over repeated execution    12:22:20

                                                    Page 19

1    of the first operation of those outputs and compare

2    that against the result of an exact mathematical

3    calculation for those -- for the numerical values of

4    the same input, correct?

5         MR. SEEVE:  Objection.  Vague.                  12:22:42

6         THE WITNESS:  So what the -- there are some

7    dots -- there are three dots in the excerpted claim

8    language.  If you fill out those dots -- and you

9    basically -- you know, it gives a very clear

10   guidance to the person of ordinary skill in the art   12:23:06

11   as to what needs to be done.

12        And if I look at the -- if we look at the

13   '273 patent, I can show you what -- and read out

14   some of the missing dots and explain to you the --

15   you know, what the person of ordinary skill in the    12:23:19

16   art would need to do.

17   BY MR. KAMBER:

18      Q   Let me step back, Dr. Khatri.

19        You have to compare one thing to another

20   thing in order to figure out whether you meet this    12:23:29

21   claim element language, correct?

22        MR. SEEVE:  Objection.  Vague.  Calls for a

23   legal conclusion.

24        THE WITNESS:  As the claim language suggests,

25   there's -- you know, you have to follow the explicit  12:23:43

                                              Page 20

```
 1    sort of text in the claim language.  And I can read

 2    that to you and explain that to you if you wish.

 3         Go to the '273 patent.  Let's see.  I guess

 4    your Exhibit 1000.  And in the -- let's go to that

 5    exhibit.  And we're going to 53, I think, yes?         12:24:09

 6         I'm trying to look for Claim 53.  I don't

 7    see -- Claim 53 is not the exact same one as this.

 8    Is there a numbering issue here?  It's the '273

 9    patent, correct?

10    BY MR. KAMBER:

11       Q   The '273 patent, Claim 53 is a dependent

12    claim.  So I believe the way that you wrote it,

13    there are limitations of the prior independent

14    claim.

15       A   I remember now, yeah.  Thank you.            12:24:42

16         So I think independent claim from the -- just

17    a second.

18         So 53 depends on 43.  And 36 is the

19    independent claim.

20       Q   That's correct.                             12:25:06

21       A   Yes.  If I look at line -- sorry, column 32,

22    line -- I guess it's 3 -- let's see if I can

23    highlight that.  It says:

24              "For at least X=5% of the

25              possible valid inputs to the first        12:25:36
```

Page 21

```
 1          operation, the statistical mean, over

 2          repeated execution of that first

 3          operation on each input from the at

 4          least X percent of the possible valid

 5          inputs to the first operation, of the      12:25:55

 6          numerical values represented by the

 7          first output signal of the LPHDR unit

 8          executing the first operation on that

 9          input differs by at least Y=0.05% from

10          the exact result" --                       12:26:25

11      Hold on a second.  It switched documents for

12  some reason.  It jumped to the other document

13  instantaneously.

14          All right.  I'm back.  Let's see where I was.

15          Of the exact result -- of -- sorry.        12:26:57

16              "...from the result of an exact

17          mathematical calculation of the first

18          operation on the numerical values of

19          that same input."

20          So that's a pretty clear and unambiguous test  12:27:08

21  that the person of ordinary skill in the art must

22  conduct.

23      Q   Dr. Khatri, my question was, does this claim

24  just require a comparison of one thing to another?

25          MR. SEEVE:  Objection.  Vague.  Calls for a   12:27:23
```

Page 22

1    legal conclusion.  Asked and answered.

2          THE WITNESS:  So, you know, it's -- I

3    answered this more than once.

4          It's basically in the express language of the

5    claim is the test where, you know, what -- that the      12:27:36

6    person of ordinary skill in the art needs to do.

7    BY MR. KAMBER:

8       Q   Does the test require a comparison?

9          MR. SEEVE:  Objection.  Calls for a legal

10   conclusion.  Vague.                                       12:27:48

11         THE WITNESS:  This -- this language very

12   precisely describes what needs to be done.  And, you

13   know, I don't see where -- you know, like I'm not

14   able to understand your question because I've

15   already answered the question and, you know, sort of    12:28:13

16   more than once, so I'm trying to understand.

17         If you can rephrase your question, that might

18   help.

19   BY MR. KAMBER:

20      Q   Sure.  There's language in the claim that         12:28:21

21   talks about "differs by."

22         Do you see that?

23      A   Yes.

24      Q   I'm just asking if there's a comparison being

25   made between one thing and another thing?                12:28:34

Page 23

```
 1            MR. SEEVE:  Objection.  Vague.  Calls for a
 2    legal conclusion.  Asked and answered many times.
 3            THE WITNESS:  Let me just -- let me look at
 4    this thing.  So the "differs by," you know, language
 5    would just say that you need, you know, for the at      12:28:57
 6    least X percent of possible valid inputs, you know,
 7    you apply, you know, each of those valid inputs to
 8    the LPHDR unit.
 9            And the numerical values represented by the
10    first output signal of the LPHDR unit executing this   12:29:18
11    operation must be different by -- differs by at
12    least Y percent, which is .05 here, from the
13    exact -- of the exact mathematical calculation of
14    that first operation.
15    BY MR. KAMBER:                                          12:29:37
16      Q   So you can't tell me if that would involve a
17    comparison of one number to another number?
18            MR. SEEVE:  Objection.  Mischaracterizes the
19    witness's testimony.  Asked and answered.  Vague.
20    Calls for a legal conclusion.                           12:29:47
21            THE WITNESS:  So I've already answered this
22    more than once.  And I don't understand why -- you
23    know, I guess I don't understand the question
24    because I've sort of answered the question
25    specifically using the language of the claim.          12:30:00
```

Page 24

```
 1   BY MR. KAMBER:

 2      Q   And I'm just asking -- I'm not trying to make

 3   this more complicated than it seems, Dr. Khatri.

 4   I'm really just asking -- I mean, we've talked about

 5   the claim language, and it uses "differs by."  There      12:30:14

 6   is some analysis of comparing an output result from

 7   the LPHDR execution unit to the output of an exact

 8   mathematical calculation, correct?

 9          MR. SEEVE:  Objection.  Mischaracterizes the

10   claim.  Asked and answered.  Vague.                       12:30:33

11          THE WITNESS:  So, again, you know, there's

12   language that I've read out to you and that's very,

13   very clear.  And there's a test that wants to be

14   done, and that test asks the person of ordinary

15   skill in the art to see if, you know, the numerical       12:30:51

16   values of the first output when they're executing

17   that first operation differ by a certain amount.

18          Now, that's the plain language and that's

19   basically quite clear as to what the person of

20   ordinary skill in the art needs to do here.               12:31:10

21   BY MR. KAMBER:

22      Q   Can you tell whether a number differs from

23   another number without comparing them?

24          MR. SEEVE:  Objection.  Incomplete

25   hypothetical.  Vague.                                     12:31:20
```

Page 25

```
 1           THE WITNESS:  I haven't studied this patent
 2      in that context.  There may be other ways, you know,
 3      I'm not prepared to give you an opinion on right
 4      now.  There may be other ways to check if
 5      something -- if something differs from something      12:31:34
 6      else.
 7           That's why I like to be precise and stick
 8      with the language of the claim, which is -- which
 9      is, you know, completely precise and clear.  And
10      says that, you know, the -- as I read out to you      12:31:44
11      this fragment of the claim.
12      BY MR. KAMBER:
13        Q   But you're saying -- if I understand your
14      testimony just generally, you're saying a person of
15      skill in the art wouldn't necessarily compare one     12:31:57
16      number to another number in order to see whether or
17      not they fall within this claim language?
18        A   I don't --
19           MR. SEEVE:  Objection -- objection.  Vague.
20      Not a question.  Mischaracterizes the witness's       12:32:10
21      prior testimony.
22           THE WITNESS:  I don't recall saying that.
23      BY MR. KAMBER:
24        Q   Do you think a person of skill in the art, in
25      order to see whether or not they meet this claim      12:32:20
```

Page 26

1    language, would compare one number to another

2    number?

3            MR. SEEVE:  Objection.  Calls for

4    speculation.  Asked and answered.  Vague.  Calls for

5    a legal conclusion.                              12:32:30

6            THE WITNESS:  Once again, I've answered that

7    question.  And, you know, the person of ordinary

8    skill in the art would perform the test that is

9    shown in this -- in this portion of the claim.  And

10   that's as clear as it can get.  The -- you know, the  12:32:45

11   language in the -- the claim language is as clear as

12   it can be.

13   BY MR. KAMBER:

14   Q    Let me try this one last time, Dr. Khatri.

15        If I understand your testimony correctly --   12:32:57

16   well, let me strike that.

17        Would a person of skill in the art who is

18   trying to determine whether they fall within or

19   outside the bounds of this claim language compare

20   the outputs of the LPHDR execution unit to the      12:33:14

21   results of the -- an exact mathematical calculation

22   for the same numerical inputs?

23           MR. SEEVE:  Objection.  Asked and answered

24   many, many times.  It's vague.  Calls for a legal

25   conclusion.  It mischaracterizes the text of the    12:33:39

Page 27

1    claim.

2         THE WITNESS:  So, like I said, you know, the

3    person of ordinary skill in the art would practice

4    what is stated in, you know, column 32, line 1

5    through, like, 12.  And there's really no ambiguity        12:33:54

6    in that.  They need to do it -- they need to do the

7    test that is shown in those -- in column 32, lines 1

8    through 12.  And that's what they need to do.

9    BY MR. KAMBER:

10    Q   And the test does not necessarily involve a          12:34:07

11   comparison of two numbers of the outputs versus the

12   exact mathematical calculation?

13    A   That's not what I said.

14         MR. SEEVE:  Objection.  Mischaracterizes

15   testimony.  Not a question.  And, again, asked and       12:34:19

16   answered over and over again, Matthias.

17         THE WITNESS:  That's not what I've said.

18   BY MR. KAMBER:

19    Q   Let me -- what, if any, comparison needs to

20   be made in order to determine whether or not a           12:34:37

21   person or a processor infringes this claim element?

22         MR. SEEVE:  Objection.  Compound question.

23   Vague.  Mischaracterizes claim language.

24         THE WITNESS:  I mean, once again, so the --

25   the language in column 32, lines 1 through 12, has        12:34:57

Page 28

1    to be tested.  And that's as clear as daylight

2    because it says that in the claim language.

3    BY MR. KAMBER:

4        Q   Does the term "repeated execution" have any

5    practical effect with respect to a digital          12:35:16

6    embodiment?

7            MR. SEEVE:  Objection.  Calls for

8    speculation.  It goes outside the opinions presented

9    in the declaration at issue here.

10           THE WITNESS:  So I would request you to point  12:35:32

11   me to a portion of my declaration where you're

12   referring to for this question.

13   BY MR. KAMBER:

14       Q   Your declaration says that -- does an

15   analysis with respect to analog embodiments,         12:35:46

16   correct?

17       A   Once again, can you show me the specific

18   language, please?

19       Q   The language of what?

20       A   That you're referring to from my declaration.  12:35:58

21   Like the paragraph that you want -- that you're

22   referring to.

23           THE VIDEOGRAPHER:  Dr. Khatri, could you

24   please adjust your camera so you're more in the

25   center of the picture?                               12:36:15

                                              Page 29

```
 1            THE WITNESS:  Of course.

 2     BY MR. KAMBER:

 3        Q    So paragraph 33 you talk about -- you start:

 4              "As the Singular patent

 5         specification explains, devices that        12:36:28

 6         use analog signals to represent

 7         numbers," quote, "introduce noise into

 8         their computations."

 9         Do you see that?

10        A    Hang on a second.                       12:36:39

11         Yes, I see that.

12        Q    Is it your understanding that Claim 53 of the

13     '273 patent that we were just looking at encompasses

14     analog embodiments?

15            MR. SEEVE:  Objection.  Calls for a legal   12:36:53

16     conclusion.  Calls for speculation.  Calls for

17     expert opinions that go outside the scope of

18     Dr. Khatri's declaration.

19            THE WITNESS:  So, you know, when I formed my

20     opinion for this declaration -- when I was asked to   12:37:15

21     provide my opinion for this declaration, it was in a

22     very narrow context, in the context of the, you

23     know, repeated execution language.

24            So, you know, whether or not Claim 53 is

25     applicable to analog -- you know, analog embodiments  12:37:31
```

Page 30

```
 1    is not something I've studied directly for this --

 2    for the purpose of writing this declaration.

 3    BY MR. KAMBER:

 4       Q   So to the extent that Dr. Wei opined on that

 5    issue, you don't provide any -- any responsive          12:37:50

 6    commentary as to whether or not the claims encompass

 7    analog, digital, or both types of embodiments; is

 8    that correct?

 9          MR. SEEVE:  Objection.  Mischaracterizes the

10    witness's testimony.  It's argumentative.  It's         12:38:05

11    asking Dr. Khatri to speculate about a document that

12    is not in front of him right now.

13          While I'm objecting, Dr. Khatri, there is a

14    little bit of lag between when a person begins

15    speaking and when the audio actually comes through.     12:38:21

16    So I would just like to ask you to give me just a

17    moment more than you otherwise would to object just

18    because of this latency that we're experiencing.

19          THE WITNESS:  Understood.  Thanks.

20          Now I forgot what -- oh, yeah.  I'm going to      12:38:38

21    read your question, Matthias.

22          Is that how I pronounce your name, by the

23    way?

24    BY MR. KAMBER:

25       Q   It's Matthias.                                   12:38:48
```

Page 31

```
1        A    Matthias.  Okay.  Sorry about that.

2             So my response to it is that, you know, my

3    declaration is tailored narrowly to the aspect of

4    whether -- of the repeated execution language in the

5    claim.  And so, therefore, anything else that I          12:39:18

6    say or that I don't say does not necessarily mean

7    that I have -- you know, I agree with any opinion on

8    the -- on part of Dr. Wei or Google or anybody else.

9             So the fact that I don't speak to a certain

10   aspect like the one you just described means nothing    12:39:38

11   in terms of my agreement or disagreement to that

12   aspect of the patent.

13        Q    Fair enough.

14             Dr. Khatri, is it fair to say you've offered

15   no opinion with respect to whether or not the claims    12:39:51

16   encompass an analog or digital or hybrid

17   embodiments?

18             MR. SEEVE:  Objection.  Vague.  Compound

19   question.  Mischaracterizes the witness's testimony.

20   Asked and answered.                                     12:40:07

21             THE WITNESS:  So, like I said, my -- my

22   declaration is tailored towards the repeated

23   execution aspect of the patent claims and, you know,

24   that's kind of -- that's what the declaration is

25   about.                                                  12:40:29
```

Page 32

```
 1            MR. KAMBER:  Brian, just -- just object,

 2    please.  Just object.

 3            MR. SEEVE:  I am doing that right now, but --

 4            MR. KAMBER:  Thanks.

 5            MR. SEEVE:  -- at a certain point --        12:44:25

 6            MR. KAMBER:  Hey, I'm working on a clock

 7    here, Brian.  I'm trying to be respectful of the

 8    clock.  But just let me ask my questions.

 9            MR. SEEVE:  I would ask you to be respectful

10    of Dr. Khatri as well as the clock, please.        12:44:34

11    BY MR. KAMBER:

12      Q   Dr. Khatri, let me go back to my question.

13            In formulating your opinions about the

14    language "repeated execution" in the claims, did you

15    not consider how it would operate in the context of  12:44:53

16    an analog embodiment?

17      A   You know, my opinion in the -- in my

18    declaration is about repeated execution.  And, you

19    know, if you -- and, like I said, if you have any

20    other documents you'd like to show me which describe  12:45:15

21    this repeated execution claim words in the context

22    of an analog embodiment, I'd be happy to look at

23    that and give you my opinion based on -- based on if

24    I read that document.

25      Q   So you can't say whether you evaluated the    12:45:30
```

Page 36

```
 1   operation of the repeated execution language in the

 2   context of a digital embodiment?

 3         MR. SEEVE:  Objection.  Mischaracterizes the

 4   witness's testimony.  Asked and answered.  Badgering

 5   the witness.  Argumentative.  Vague.              12:45:45

 6         THE WITNESS:  So this repeated execution

 7   language is as clear as it can be.  It could be

 8   applied to, you know, any embodiment.  It's as --

 9   you know, it's as described in my declaration.  And

10   I don't know if it needs to be clarified any        12:46:00

11   further.

12         And if you do want me to clarify it further,

13   point me to a part of my declaration that, you know,

14   that you have a question about and I'll be happy to

15   answer that.                                        12:46:13

16   BY MR. KAMBER:

17     Q   Well, your declaration talks about analog

18   embodiments and I guess I'm wondering why if you're

19   not trying to address the operation of the language

20   "repeated execution" in the context of an analog    12:46:26

21   embodiment.

22         MR. SEEVE:  Objection.  Vague.  Not a

23   question.  Mischaracterizes the witness's testimony.

24   Mischaracterizes the witness's declaration.

25         THE WITNESS:  Can you ask that as a question, 12:46:38
```

Page 37

```
 1    please?

 2    BY MR. KAMBER:

 3        Q    Let me ask a slightly different question,

 4    Dr. Khatri.

 5            Do you agree that the asserted patents        12:47:02

 6    encompass both digital and analog embodiments?

 7            MR. SEEVE:  Objection.  Asked and answered.

 8    Calls for speculation.  Calls for a legal

 9    conclusion.  Calls for opinions beyond the scope of

10    Dr. Khatri's declaration.                            12:47:14

11            THE WITNESS:  Once again, that's not part of

12    what I had -- you know, as part of the scope of my

13    declaration that I've provided.

14    BY MR. KAMBER:

15        Q    So you don't agree?                          12:47:27

16            MR. SEEVE:  Objection.  Vague.

17    Argumentative.  Asked and answered.  Calls for a

18    legal conclusion.  The document speaks for itself.

19            THE WITNESS:  I mean, I don't know how you

20    got that conclusion.  I absolutely didn't say I      12:47:40

21    don't agree or I agree.  I just said that the scope

22    of my declaration does not include that.

23    BY MR. KAMBER:

24        Q    You offer no opinions as to whether or not

25    the asserted patents encompass both digital and      12:47:54
```

Page 38

 1   analog embodiments in the declaration you provided

 2   for purposes of claim construction issues, correct?

 3         MR. SEEVE:  Objection.  The document speaks

 4   for itself.  Asked and answered.  Mischaracterizes

 5   the witness's testimony.  Mischaracterizes the            12:48:06

 6   witness's declaration.

 7         THE WITNESS:  Matthias, as I've said before,

 8   my -- my declaration is with respect to the repeated

 9   execution language in the asserted claims.  And

10   that's as clear as it can be.                             12:48:26

11   BY MR. KAMBER:

12     Q   So the answer to my question is no, correct?

13         MR. SEEVE:  Objection.  Objection.  Vague.

14   Asked and answered.  Badgering the witness.

15         Again, Matthias, you know, this is getting to       12:48:43

16   the point where you're starting to sort of harass

17   Dr. Khatri by asking the same question over and over

18   again when you don't get the answer that you

19   apparently want.

20         MR. KAMBER:  Brian, stop.  I'm just asking a        12:48:56

21   question about the declaration.

22   BY MR. KAMBER:

23     Q   You offer no opinion as to whether or not the

24   asserted claims encompass both digital and analog

25   embodiments in the declaration that you provided for      12:49:05

                                                              Page 39

1    purposes of the claim construction issues, correct?

2    Yes or no?

3         MR. SEEVE:  Objection.  Mischaracterizes the

4    witness's declaration.  Calls for speculation.

5    Calls for a legal conclusion.  Calls for opinions        12:49:16

6    outside the scope of the declaration.

7    Mischaracterizes the witness's testimony.

8         THE WITNESS:  My answer is that the scope of

9    my declaration is the repeated execution language of

10   the asserted claims.  I don't know how it could be        12:49:34

11   any clearer.

12   BY MR. KAMBER:

13      Q   Let me ask the question in reverse.

14         Point me to a place where you address the

15   issue of whether or not the patents encompass both        12:49:43

16   digital and analog embodiments.  It's Exhibit 1001.

17         MR. SEEVE:  Objection.  Calls for -- sorry,

18   just one second.  Let me get my objection in.

19         Objection.  Calls for a legal conclusion.

20   Asks for speculation.  Argumentative.  Asked and          12:49:58

21   answered.  Mischaracterizes the witness's testimony

22   and the witness's declaration.

23   BY MR. KAMBER:

24      Q   Dr. Khatri, the question is please point me

25   to any place in your declaration where you address        12:50:10

Page 40

```
 1   whether or not the patents encompass both digital

 2   and analog embodiments.

 3          MR. SEEVE:  Objection.

 4          THE WITNESS:  And my answer is that my

 5   declaration is as it is.  It's in front of you.  And    12:50:29

 6   it is narrowly focused on the repeated execution

 7   language.  That's what its focus is.  So if that's

 8   what its focus is, you know, that's all I can say,

 9   right?

10          I mean, you're saying now if the focus is        12:50:48

11   something, show me where your declaration talks

12   about something else.  And I don't know how you can

13   answer that.  It's an unanswerable question that

14   you're asking me.

15   BY MR. KAMBER:                                          12:50:59

16      Q   Well, then, the question I asked before is,

17   isn't it true your declaration doesn't address that,

18   but you -- so let me ask that again.

19          Isn't it true, Dr. Khatri, that your

20   declaration does not address whether or not the         12:51:10

21   asserted patents encompass both digital and analog

22   embodiments?

23          MR. SEEVE:  Objection.  Matthias, this has

24   been asked and answered now many, many times.

25   You're asking about something a document does not       12:51:22
```

Page 41

```
1        Q   And when you're referring to a fluctuating

2    arithmetic average, I'm just asking if the

3    statistical mean of the results after repeated

4    execution is going to shift; it might be above the

5    claimed degree of inaccuracy or it might be below      01:14:53

6    the degree of inaccuracy claimed in the patents?

7         MR. SEEVE:  Objection.  Vague.

8    Mischaracterizes the testimony.  Mischaracterizes

9    the declaration.  Mischaracterizes the claim.

10        THE WITNESS:  So what line 2 means is that        01:15:09

11   when you perform the same operation twice -- so if

12   you apply the same exact inputs, right, then there

13   is statistical variation in the output values.  So

14   that's -- you know, based on that initially, we --

15   the arithmetic average would be varying, it would     01:15:34

16   fluctuate, is what this line explains.

17   BY MR. KAMBER:

18        Q   And when you say that it fluctuates, that

19   might mean it's above or it might be sometimes below

20   the claimed degree of inaccuracy, correct?            01:15:50

21        MR. SEEVE:  Objection.  Mischaracterizes the

22   witness's testimony.  Mischaracterizes the

23   declaration.

24        THE WITNESS:  I mean, it says it will

25   fluctuate.  This -- this line in and of itself        01:16:00
```

Page 52

1   says -- has no sort of reference to any, you know,

2   to any other sort of like level of accuracy or level

3   of inaccuracy that you're referring to.  This line

4   in and of itself just says that the arithmetic

5   average will fluctuate.                              01:16:19

6   BY MR. KAMBER:

7      Q   What, if any, distinction is there between a

8   mean and a statistical mean?

9          MR. SEEVE:  Objection.  Mischaracterizes the

10  declaration.  Assumes facts not in evidence.         01:16:31

11  Mischaracterizes the witness's testimony.  Compound.

12         THE WITNESS:  So if you -- if you want to ask

13  me this question, I would request you to show me the

14  context.  Because this would depend on context.  And

15  so if you give me context, I can give you a good      01:16:46

16  answer.

17  BY MR. KAMBER:

18     Q   If you look at paragraph 27, you refer to --

19  you quote in language the term "the statistical

20  mean."                                               01:17:12

21         Do you see that?

22     A   Is this the -- this is page 6 you're talking

23  about?

24     Q   Correct.

25     A   And this is like the fifth line in the        01:17:18

Page 53

1    paragraph?  Is that what you're referring to?

2       Q    Correct.

3       A    Let me read that line.

4       Q    Sure.

5       A    Okay.  I've read that.                        01:17:27

6       Q    And you quote here, "the statistical mean."

7    What, if any, difference is there between the

8    statistical mean and a just, quote, mean?

9            MR. SEEVE:  Objection.  Assumes facts not in

10   evidence.  Mischaracterizes the witness's testimony.   01:17:56

11   Beyond the scope.

12           THE WITNESS:  My answer to that would be, you

13   know, I say in my -- in this paragraph, paragraph

14   27, you know, the -- you know, I talk about the

15   statistical mean and the statistical mean of the      01:18:13

16   numerical values of the output.

17           So the context of this statement is the claim

18   language, which refers to the claim language which

19   is shown on the next page where it talks about the

20   statistical mean.  There is no -- in this context     01:18:30

21   there is no language of just plain mean compared to

22   the statistical mean.  So I don't have an opinion on

23   that because it's not part of my declaration.  Your

24   question basically falls outside the scope of my

25   declaration.                                          01:18:52

Page 54

```
 1    BY MR. KAMBER:
 2       Q   How would one of skill in the art calculate a
 3    statistical mean of the outputs?
 4            MR. SEEVE:  Objection.  Vague.
 5    Mischaracterizes witness's prior testimony.  Assumes    01:19:02
 6    facts not in evidence.  Mischaracterizes the patent.
 7            THE WITNESS:  So, you know, as it says in my
 8    declaration -- and I'm trying to find the location
 9    of that.
10            Yeah, so maybe one part of this                 01:19:29
11    declaration -- there may be others also, but if you
12    look at paragraph 28, and that's the last sentence
13    in that paragraph, which reads:
14                "Based on this elementary
15            knowledge, a POSITA would know that             01:19:50
16            the statistical mean over repeated
17            execution of the numerical values
18            represented by the first output signal
19            would require them to conduct a large
20            enough number of repetitions until the          01:20:02
21            statistical mean reached its stable
22            value."
23            So this is basically, you know, what the
24    POSITA would -- the experiment that the POSITA would
25    conduct, that is to find the statistical mean, you      01:20:23
```

Page 55

1    know, for repeated executions until that statistical

2    mean reached a stable value.

3    BY MR. KAMBER:

4        Q   As a matter of mechanics, how would the

5    person of skill in the art calculate the statistical       01:20:39

6    mean?

7            MR. SEEVE:  Objection.  Mischaracterizes the

8    testimony.  Assumes facts not in evidence.

9            THE WITNESS:  There are multiple ways to

10   calculate the statistical mean.                           01:20:50

11   BY MR. KAMBER:

12       Q   Can you give one example?

13       A   If you're, you know, computing the mean of a

14   number of -- you know, for example, a number of

15   numerical values, you can compute them one of many        01:21:10

16   ways.  You can compute a rolling mean or you can

17   compute the mean, you know, by adding all those

18   values and dividing by the number of values.  There

19   are multiple mechanisms by which one could compute

20   this.                                                     01:21:31

21       Q   So if I understand correctly, one of the ways

22   in which to compute the mean would be to add all of

23   the output values and then divide them by the --

24   divide the sum of that by the total number of

25   outputs, correct?                                         01:21:46

Page 56

1          MR. SEEVE:  Objection.  Mischaracterizes the

2     witness's testimony.

3          THE WITNESS:  That's not what I said.

4     BY MR. KAMBER:

5     Q    Okay.  I guess what did I get wrong about the     01:21:53

6     math and what I just described?

7          MR. SEEVE:  Objection.  Vague.  Calls for

8     speculation.

9          THE WITNESS:  I'll repeat my answer, right?

10         So if you wanted to -- one of the ways to         01:22:09

11    compute the statistical mean of, let's say, N

12    numerical values would be to add all those N

13    numerical values up and take the resulting sum and

14    divide it by N.

15    BY MR. KAMBER:                                         01:22:33

16    Q    And that's how you would calculate a

17    statistical mean, correct?

18         MR. SEEVE:  Objection.  Calls for

19    speculation.  Calls for a legal conclusion.  Calls

20    for an opinion about a claim term that Dr. Khatri     01:22:49

21    was not asked to opine about.

22         THE WITNESS:  I don't think that -- that's

23    not what I said.  So what you just said is not what

24    I -- sorry, let me rephrase this.

25         Your question was -- let me read it back.        01:23:09

Page 57

1    BY MR. KAMBER:

2        Q    Dr. Khatri, let me strike the question and

3    just ask -- pose a different one.

4        A    Certainly.

5        Q    One of the ways to calculate the statistical        01:23:27

6    mean of N numerical values would be to sum the

7    numerical values and divide the resulting sum by N,

8    correct?

9            MR. SEEVE:   Objection.  Calls for a legal

10   conclusion.  Calls for an opinion.  Beyond the scope       01:23:44

11   of Dr. Khatri's declaration.  Calls for an opinion

12   about a claim term that is not in dispute in this

13   Markman proceeding.

14           THE WITNESS:   So that's not what I said.  I

15   said, you know, this is one of the ways -- your           01:23:57

16   question was, if I recall correctly, you know, how

17   does one compute an average.  And I said there are

18   multiple ways to do that.  And now you're replacing

19   that language, average, with statistical mean, which

20   is misleading because statistical mean -- the             01:24:14

21   statistical mean is a claim term at issue in this

22   patent.  And I'm not referring to statistical mean,

23   you know, when I give you this definition of the

24   average.

25           In terms of the definition of statistical         01:24:28

Page 58

1    mean, I have opined on it explicitly in my report.

2    And that's the language I read out to you a little

3    while ago which read, "Based on this" -- this is the

4    bottom of paragraph 28, the last line:

5            "Based on this elementary                    01:24:44

6        knowledge, a POSITA would know that

7        the statistical mean for repeated

8        execution of the numerical value

9        represented by the first output signal

10       would require them to conduct a large        01:24:56

11       enough number of repetitions until the

12       statistical mean reached a stable

13       value."

14       So in the context of the patent, there is --

15   you know, the language of statistical mean is          01:25:09

16   coupled with this repeated execution language.  And

17   this is conducted until the statistical mean reaches

18   a stable value.

19   BY MR. KAMBER:

20     Q   As a matter of mathematics, is a statistical    01:25:27

21   mean different from an arithmetic mean or different

22   from a mean?

23       MR. SEEVE:  Objection.  Calls for

24   speculation.  Goes beyond the scope of Dr. Khatri's

25   declaration.  Calls for an opinion about a claim       01:25:40

                                                    Page 59

```
 1    term that is not in dispute in this proceeding and

 2    about which Dr. Khatri has not offered an opinion.

 3              THE WITNESS:  Again, you know, I'm -- my

 4    opinion is restricted and limited to the claim terms

 5    that are in this patent in the Claim 53 in this          01:25:53

 6    case, right, and I'm not prepared to give you an

 7    opinion about the distinction between, you know, the

 8    different terms that you asked about because they're

 9    not pertinent to the inquiry that I was conducting

10    in writing this report, in writing my declaration.       01:26:13

11    BY MR. KAMBER:

12       Q   So you can't say how a person of skill in the

13    art would interpret those terms, correct?

14              MR. SEEVE:  Objection.  Mischaracterizes the

15    witness's testimony.  Again, calls for testimony         01:26:26

16    outside the scope of this deposition and outside the

17    scope of Dr. Khatri's opinions in this matter.

18              THE WITNESS:  My answer is I'd like to be

19    accurate and faithful to the claim terms at issue

20    here, and so therefore I would restrict my opinions      01:26:41

21    to those claim terms absent any other context that

22    you provide.

23    BY MR. KAMBER:

24       Q   Is the term statistical mean, as used in the

25    asserted patents, the same as the population mean?       01:26:55
```

Page 60

1              MR. SEEVE:  Objection.  Calls for an opinion

2     about a claim term that is not in dispute in this

3     Markman proceeding and that Dr. Khatri has

4     not offered an opinion on --

5              THE REPORTER:  I'm sorry.  I'm sorry.  Is not

6     in dispute in this?

7              MR. SEEVE:  Markman.  It's M-A-R-K-M-A-N.

8              THE REPORTER:  And then what was the rest of

9     it?

10             MR. SEEVE:  And is not -- I can't remember      01:27:23

11    exactly what I said, but I think that it's --

12             (Technical difficulties.)

13             (Record read.)

14             MR. SEEVE:  Can you hear me?

15             THE REPORTER:  Yes.

16             MR. SEEVE:  And about which Dr. Khatri has

17    not offered an opinion in his declaration.

18             THE WITNESS:  Can you repeat your question,

19    please?

20    BY MR. KAMBER:                                          01:28:01

21      Q   If I can find it.

22             Is the term statistical mean, as used in the

23    asserted patents, the same as a population mean?

24             MR. SEEVE:  Objection.

25             THE WITNESS:  So if you look at paragraph 29    01:28:20

                                                    Page 61

```
 1      of my declaration and if you look at the last line,

 2      the last line reads:

 3                  "A POSITA would understand that,"

 4            in quotes, "statistical mean, in the

 5            context of the asserted claims, refers        01:28:34

 6            to the population mean."

 7      BY MR. KAMBER:

 8        Q   So you address the term "statistical mean" in

 9      your declaration, correct?

10            MR. SEEVE:  Objection.  Mischaracterizes the  01:28:49

11      witness's testimony.  Mischaracterizes the witness's

12      declaration.

13            THE WITNESS:  I don't understand your

14      question, because a minute ago your question was

15      about the population mean and now you're saying      01:29:01

16      something about I'm addressing the statistical mean.

17      So --

18      BY MR. KAMBER:

19        Q   I'm just asking a question --

20        A   Please let me finish.                          01:29:10

21        Q   I'm sorry.

22        A   Can you clarify your question for me, please?

23      Thank you.

24        Q   You have provided an opinion about how a

25      person of skill in the art would understand the term 01:29:18
```

Page 62

1    "statistical mean" in this patent, correct?

2        A    That's correct.

3             MR. SEEVE:  Objection.

4             THE WITNESS:  In the context of this patent,

5    I have provided information about what the            01:29:27

6    statistical mean would be, you know.  And the fact

7    that the person of ordinary skill in the art would

8    conduct a large enough number of repetitions until

9    such a statistical mean reached its stable value.

10   And that part I was just quoting from the bottom of   01:29:47

11   paragraph 28.

12   BY MR. KAMBER:

13       Q    And at the bottom of paragraph 29 you provide

14   your opinion as to how a person of skill in the art

15   would understand the term "statistical mean" refers   01:29:58

16   to a population mean, correct?

17       A    That's what the language of the bottom of

18   paragraph 29 says, yes.  And I read it out to you a

19   minute ago.

20       Q    If it's done ten times, if you were to repeat  01:30:15

21   a calculation ten times, and you were to calculate

22   the population mean, then you would add the outputs

23   and divide by ten, correct?

24            MR. SEEVE:  Objection.  Incomplete

25   hypothetical.  Based on facts not in evidence.       01:30:34

Page 63

```
 1     Based on a false premise.  Mischaracterizes the

 2     witness's testimony and mischaracterizes the

 3     witness's declaration.

 4          THE WITNESS:  That's not true.

 5     BY MR. KAMBER:                                    01:30:45

 6       Q   Let me ask it this way.  Is one way to

 7     calculate the population mean for ten repeated

 8     executions to add the outputs and divide by ten?

 9       A   That --

10          MR. SEEVE:  Objection.  Beyond the scope.    01:30:57

11          THE WITNESS:  That is an ill-formed question.

12     The question doesn't make sense.

13     BY MR. KAMBER:

14       Q   Why doesn't the question make sense,

15     Dr. Khatri?                                       01:31:08

16          MR. SEEVE:  Objection.  Vague.  Calls for

17     speculation.

18          THE WITNESS:  Because the population mean --

19     because of the definition of what the population

20     mean is.  A population mean is necessarily stable.   01:31:20

21     BY MR. KAMBER:

22       Q   A population mean is necessarily stable?

23          MR. SEEVE:  Objection.  Form.  Vague.

24          THE WITNESS:  Was that a question?

25     ////
```

Page 64

```
 1        A    Yes, I see that.  Yeah.

 2        Q    How would one of skill in the art be able to

 3   determine if they had done enough repeated

 4   executions if the values didn't stabilize?

 5           MR. SEEVE:  Objection.  Mischaracterizes the      02:21:29

 6   witness's testimony.  Assumes facts not in evidence.

 7   Mischaracterizes the claims.

 8           THE WITNESS:  Okay.  So, you know, that's

 9   something that I referred to in my declaration as

10   well.  And I'm going to have to find that spot.  So      02:21:41

11   give me a few seconds and I'll look for it.

12           Yeah.  So the answer is sort of in two parts

13   again.  And it -- it comes from two paragraphs in

14   the declaration.  One paragraph is 36 and one

15   paragraph is 35.                                         02:22:49

16           You know, in paragraph 36, for example, you

17   know, it's clearly stated that a person of ordinary

18   skill in the art would understand that if there were

19   devices where, you know, there was no stable

20   statistical mean for any reason, right, like you're     02:23:10

21   proposing, but in this paragraph it talks about the

22   reason being as heat, right?  So a person of

23   ordinary skill in the art would understand that such

24   a device would not satisfy the repeated execution

25   limitation of the asserted claim because they just      02:23:27
```

Page 92

```
 1    simply -- this device would simply not serve a

 2    useful purpose as an execution unit.  So the

 3    question simply becomes moot.

 4         In other words, if we have a device which has

 5    no stable execution, like, you know, like I've          02:23:51

 6    discussed, then that device is simply not useful.

 7    It simply doesn't serve a useful purpose as an

 8    execution unit and it's simply something you

 9    wouldn't be able to sell if you were a manufacturer.

10         So, you know, for something to be a device,       02:24:11

11    you know, and to have a useful purpose, it should

12    have this -- you know, this stable statistical mean.

13         And, again, I'll come back to paragraph 35,

14    which is in the paper that Dr. Wei himself had, he

15    talks about the analog devices, right, which have      02:24:34

16    this stable statistical average that he talks about

17    in this paper.  So this was well known even to

18    Dr. Wei and to persons of skill in the art that, you

19    know, devices for them to be useful have to have

20    this, you know, stable -- you know, stable behavior    02:24:52

21    with repeated executions.

22    BY MR. KAMBER:

23    Q   In order to get it to that stable behavior,

24    don't engineers sometimes add heat sinks or fans or

25    other cooling to a device?                             02:25:18
```

Page 93

```
 1           THE WITNESS:  You know, if there's a specific
 2      part of the claims that you want to show me that,
 3      you know, tell your point, I'm happy to look at
 4      that.
 5      BY MR. KAMBER:                                    02:29:15
 6         Q    Sure.  Again, Claim 36 of the '273 patent,
 7      Exhibit 1000.
 8         A    Okay.  Hold on.  Let me go there.  You said
 9      Claim 36, yes?
10         Q    Correct.                                  02:29:30
11         A    And the question is?
12         Q    Is there any part of this claim that refers
13      to the law of large numbers?
14         A    Okay.  I'm --
15           MR. SEEVE:  Same objections.                 02:29:39
16           THE WITNESS:  I'm going to check real quick
17      and let you know.  It's sometimes hard to zoom this
18      thing.
19           Okay, got it.
20           I don't see any reference to the law of large 02:30:22
21      numbers in Claim 36 of the '273 patent.
22      BY MR. KAMBER:
23         Q    Do you remember -- I don't need you to review
24      the whole thing right now, but do you recall if the
25      specification makes any reference to the law of     02:30:56
```

Page 97

```
 1    large numbers?

 2         MR. SEEVE:  Objection.  Calls for

 3    speculation.

 4         THE WITNESS:  I don't recall because the

 5    specification is something like 30 paragraphs.  But    02:31:05

 6    this law of large numbers is known to a person of

 7    ordinary skill in the art, as I've discussed in my

 8    declaration.

 9    BY MR. KAMBER:

10    Q    So regardless of whether the claims or the        02:31:20

11    specification or the prosecution history reference

12    that, it's your opinion that a person of skill in

13    the art would just know that the patent incorporates

14    the law of large numbers, correct?

15         MR. SEEVE:  Objection.  Argumentative.            02:31:35

16    Mischaracterizes the witness's testimony.

17    Mischaracterizes the witness's declaration.  It

18    calls for a legal conclusion.  Beyond the scope.

19         THE WITNESS:  Honestly, I don't know where

20    you got that idea from.  So, I mean, you know,         02:31:49

21    there's -- I mean, I've never said that the patent

22    incorporates the law of large numbers in it.

23    BY MR. KAMBER:

24    Q    That wasn't my question, Dr. Khatri.

25    A    Please repeat your question.                      02:32:07
```

Page 98

```
 1        Q   My question was, it's your opinion that a
 2   person of skill in the art would know that the --
 3   would know that the claims incorporate the law of
 4   large numbers -- I'm going to strike that.  Let me
 5   strike that and withdraw the question, Dr. Khatri.      02:32:27
 6        A   Okay.
 7        Q   Is it fair to say that it's your opinion that
 8   a person of skill in the art would read the claims
 9   in light of the law of large numbers?
10        MR. SEEVE:  Objection.  Vague.  Calls for a        02:32:46
11   legal conclusion.  Calls for speculation.
12        THE WITNESS:  A person of ordinary skill in
13   the art -- I think I've seen that in my -- let me
14   read that to you from my declaration.  It's early on
15   in the declaration.  It's paragraph 26 on page 6 of    02:33:08
16   my declaration, which says that:
17             "A person of ordinary skill in
18        the art would have an undergraduate
19        degree in electrical engineering or
20        equivalent field, which would include      02:33:31
21        a course in statistics."
22        So based on all the undergraduate
23   institutions that I've been in, including the one
24   that I studied in, a course in statistics would
25   start either in the second or the third year of       02:33:46
```

Page 99

```
 1    the -- most usually the second year.  And it's one

 2    of the most basic laws of statistics.  So it's

 3    something that a person, having done a course in

 4    statistics, would simply know this.

 5    BY MR. KAMBER:                                    02:34:01

 6        Q   The patent specification has some examples of

 7    doing repeated executions of particular operations,

 8    correct?

 9            MR. SEEVE:  Objection.  Mischaracterizes the

10    patent.  Calls for speculation.                   02:34:15

11            THE WITNESS:  Can you point me to exactly

12    what you're referring to?

13    BY MR. KAMBER:

14        Q   Yes.  Column 19 of the '273 patent.

15        A   Let me go there.                          02:34:29

16            MR. SEEVE:  Same objections.

17    BY MR. KAMBER:

18        Q   Starting at about line 21, there's a

19    description of the results for a, quote, FP plus

20    noise, end quote, test.                           02:34:42

21        A   And what was the --

22        Q   Do you see that?

23        A   I see the -- I see the paragraph that begins:

24            "The first results are for FP

25            plus noise."                               02:34:55
```

                                                  Page 100

```
 1    BY MR. KAMBER:

 2        Q    Turning to the prior paragraph, paragraph 33,

 3    about six or seven lines down, there's a colon, and

 4    you say:

 5               "For the computer to be usable,        02:52:17

 6          it must exhibit the following

 7          statistical behavior."

 8          And quoting from your report, quote:

 9               "The average of those output

10          values, over repeated executions, goes     02:52:27

11          from being an arithmetic average that

12          potentially has an unstable value when

13          computed based on a small number of

14          executions to a stable statistical

15          mean that does not meaningfully            02:52:42

16          fluctuate."

17          Do you see that?

18        A    I see that language, yes.

19        Q    That's your opinion, correct?

20        A    That's the language I used in my report, yes.  02:52:50

21    That's my opinion.

22        Q    I'd like to unpack the language slightly.

23          At what point does it go from one to the

24    other, that is, an unstable value computed based on

25    a small number of executions to a stable statistical  02:53:07
```

Veritext Legal Solutions
866 299-5127

```
 1    mean that does not meaningfully fluctuate?

 2          MR. SEEVE:  Objection.  Asked and answered.

 3          THE WITNESS:  I think I've asked and answered

 4    that, and I've said that this is context dependent,

 5    and it doesn't have a universal global answer that I    02:53:21

 6    can give you, you know, for all circuits and all

 7    statistics that you might encounter.  And a person

 8    of ordinary skill in the art would know for their

 9    circuit when that happens.

10          So that's -- it's not -- it's something that    02:53:43

11    they would know because of -- because they would

12    know the circuits, they would know the circuits

13    they're working with, the application, the

14    statistics of the outputs.  And so this is something

15    that a person of ordinary skill in the art would    02:53:54

16    easily be able to glean.  And I've provided the

17    chart on paragraph 34.

18    BY MR. KAMBER:

19      Q   Is there any objective measure that one of

20    skill in the art could apply to determine whether    02:54:18

21    they had an unstable value based on two few

22    executions versus a stable statistical mean based on

23    sufficient executions?

24          MR. SEEVE:  Objection.  Vague.

25    Mischaracterizes the witness's declaration.    02:54:37
```

                                                  Page 110

```
 1    Mischaracterizes his prior testimony.  Assumes facts

 2    not in evidence.

 3         THE WITNESS:  I think I've -- I've answered

 4    that already, you know, more than once.

 5    BY MR. KAMBER:                                    02:54:52

 6      Q   And if you'll indulge me, Dr. Khatri, what is

 7    the answer?

 8         MR. SEEVE:  Same objections.

 9         THE WITNESS:  The answer is that there is no

10    single size answer to that.  It depends on the      02:55:03

11    circuit.  It depends on the technology in which the

12    circuit was implemented.  It depends on the nature

13    of the application.  Depends on the statistics of

14    the output signal.

15         And all of this, someone who is working on      02:55:17

16    that circuit, a person of ordinary skill in the art,

17    once they have all this context, it would be quite

18    clear to them as to when they're -- when they're

19    seeing a stable value and when the value is still

20    fluctuating.                                        02:55:33

21         So this is something that cannot be answered

22    universally as you wish me to do because it wouldn't

23    be -- it wouldn't be accurate for me to answer that

24    question universally.

25    ////
```

Page 111

```
 1    BY MR. KAMBER:

 2        Q   I recognize that the circuits themselves

 3    might be different, but how would one of skill in

 4    the art objectively know that they've crossed the

 5    threshold from an unstable value to a stable value?    02:55:54

 6            MR. SEEVE:  Objection.  Mischaracterizes the

 7    witness's declaration.

 8            THE WITNESS:  Once again, the person of skill

 9    in the art, since they're intimately familiar with

10    the circuit and the application and the technology,    02:56:10

11    they would know when that value has reached a

12    stable -- when the -- you know, when that stable

13    statistical mean that does not meaningfully

14    fluctuate has been accomplished or has been reached.

15    BY MR. KAMBER:                                          02:56:29

16        Q   So it's like the Supreme Court's test on

17    pornography, you know it when you see it?

18        A   I'm not a lawyer --

19            MR. SEEVE:  Objection.  Argumentative.  I'm

20    sorry, that question is objectionable.                  02:56:37

21            THE WITNESS:  I'm not a lawyer.  I'm not

22    aware of that test.  So, I'm sorry, I can't answer

23    that.

24    BY MR. KAMBER:

25        Q   How does -- what is the distinction that        02:56:44
```

Page 112

```
 1    you're making in that sentence between a meaningful

 2    fluctuation and one that is not meaningful?

 3         MR. SEEVE:  Objection.

 4         THE WITNESS:  The meaningfulness, as I've

 5    said more than once before, is known to the person      02:57:00

 6    of ordinary skill in the art who is designing the

 7    circuit.  They know for that application what

 8    meaningful is.  And that's something that is known

 9    to the person.

10         It's very specific to the context.  And you       02:57:14

11    continuously give me no context and you try to get

12    an answer from me.  And that's simply impossible.

13         And beyond that, to throw in some Supreme

14    Court cases which I'm not familiar with, not being a

15    lawyer, I think that was not appreciated.  If you      02:57:29

16    want to explain that case, go ahead.  I'd enjoy

17    learning about it, but I don't think it's part of --

18    it's not part of my declaration.

19    BY MR. KAMBER:

20       Q   I'm still stuck on the meaningful

21    fluctuation.  You say it depends on the context, but

22    setting aside context, the context can change.  How

23    would the person of skill in the art know in any

24    particular context whether a fluctuation was

25    meaningful or not meaningful?  What would you -- let   02:58:07
```

Page 113

```
 1   that a first input signal does not have a dynamic
 2   range.  That's the extent of what I'm talking about.
 3   That's the extent to which I'm, you know, giving an
 4   opinion in my declaration.
 5        This -- this assertion of Google, that first        03:11:21
 6   input signal does not have a dynamic range, you
 7   know, is simply technically incorrect.  Signals
 8   absolutely do have dynamic ranges, and we deal with
 9   them as circuit designers all the time, you know.
10   And so this is a technically unfounded statement        03:11:39
11   that a signal -- that a first signal -- a first
12   input signal does not have a dynamic range.
13        That's what I'm saying in paragraph 37.
14   That's the extent to which I'm offering this
15   opinion.  And I think it's -- it's misleading and       03:11:54
16   incorrect of you to say that, you know, I'm saying
17   something about some claim in the patent.  You know,
18   my opinion is pretty precisely illustrated in the
19   language I use in paragraph 37.
20   BY MR. KAMBER:                                           03:12:14
21      Q   So --
22      A   Sorry.  Go ahead.
23      Q   You're not saying that the range of the input
24   signal is from one over a million to one million?
25        MR. SEEVE:  Objection.  Asked and answered.        03:12:32
```

1    Mischaracterizes the witness's testimony and his

2    declaration.

3         THE WITNESS:  I think that mischaracterizes

4    what I wrote in paragraph 37.  What I said in

5    paragraph 37 is pretty explicit and pretty clear and   03:12:43

6    unambiguous.  If you have questions about that

7    specifically, by all means, ask me.  But otherwise I

8    can explain paragraph 37 to you if you wish.

9    BY MR. KAMBER:

10     Q   The dynamic range as claimed in Claim 53 is    03:12:59

11   of input values, correct?

12        MR. SEEVE:  Objection.  Calls for

13   speculation.  Calls for a legal conclusion.  Beyond

14   the scope of the witness's declaration.  Vague.

15        THE WITNESS:  So I haven't looked at Claim 53   03:13:15

16   in this context, and so I don't -- I'm not ready to

17   sit here and give you an opinion about, you know,

18   what the language of Claim 53 specifically means.

19        I'm here to give you an opinion about my

20   declaration.  And specifically paragraph 37           03:13:28

21   refutes -- doesn't have anything to do with Claim 53

22   or it doesn't have any mention of Claim 53 in it.

23   It has to do with an incorrect assertion that a

24   first input signal does not have a dynamic range.

25   This is a simply technically flawed comment.  And     03:13:49

                                            Page 125

```
1              by those voltages," et cetera.

2              Do you see that?

3      A    Let me read that.

4      Q    Sure.

5      A    Yes, I do see that.                    03:21:16

6      Q    Is that a correct statement?

7              MR. SEEVE:  Objection.  Vague.

8              THE WITNESS:  I don't know what you mean by a

9      correct statement.

10     BY MR. KAMBER:                              03:21:24

11       Q    So you don't know if that is a correct

12     statement in your declaration, Dr. Khatri?

13       A    I mean --

14             MR. SEEVE:  Objection.  Objection.

15     Mischaracterizes the witness's testimony and    03:21:32

16     argumentative.

17             THE WITNESS:  It is a statement in my

18     declaration and I wrote it, and so I -- you know, I

19     stand by it.

20     BY MR. KAMBER:                              03:21:41

21       Q    Okay.  So the invention is about performing

22     LPHDR arithmetic on the numbers represented by those

23     voltages, correct?

24             MR. SEEVE:  Objection.  Mischaracterizes the

25     declaration.  Mischaracterize the witness's    03:21:52
```

Page 131

1        A    I mean, but it was not before this case.   It

2    was as part of this case when I first talked to him.

3        Q    And had you heard of Dr. Bates before this

4    case?

5        A    No, I hadn't.                              03:46:14

6            MR. KAMBER:  No further questions.

7            MR. SEEVE:  Okay.  So I think before we

8    decide whether we have any questions for Dr. Khatri,

9    I think it probably makes sense to take a break so

10   we can review the Live Note, et cetera.  If we could   03:46:33

11   go off the record and return.  I don't think longer

12   than five minutes will be necessary for this.  I

13   don't want to keep everyone late.

14           MR. KAMBER:  Sure.  However you want to do

15   it, Brian.                                          03:46:49

16           MR. SEEVE:  Okay.  Sure.  Let's go off the

17   record and plan to come back in five minutes.

18           THE VIDEOGRAPHER:  This marks the end of

19   Media Unit No. 6.  The time is 5:47 p.m.  We are off

20   the record.                                         03:47:08

21           (Recess.)

22           THE VIDEOGRAPHER:  This marks the beginning

23   of Media Unit No. 7.  The time is 6:06 p.m.  We are

24   on the record.

25

                                            Page 142

```
 1                  "However, a POSITA would

 2          understand that the output values of

 3          repeated executions of the same

 4          operation must exhibit the following

 5          statistical behavior for the computer      04:15:28

 6          to be usable.  The average of those

 7          output values, over repeated

 8          executions, goes from being an

 9          arithmetic average that potentially

10          has an unstable value when computed        04:15:35

11          based on a small number of executions

12          to a stable statistical mean that does

13          not meaningfully fluctuate."

14          Do you see that statement, Dr. Khatri?

15     A    Yes, I do see it.                          04:15:49

16     Q    I'm going to ask you some questions about

17   that last pair of words, "meaningfully fluctuate."

18          Earlier today in response to one of

19   Mr. Kamber's questions, you responded that how much

20   fluctuation is meaningful is a matter of context.   04:16:02

21   And I just want to make sure that I'm correctly

22   understanding your testimony.

23          That's correct, right?

24     A    That is, yes.

25     Q    Can you explain that a little further?  Can  04:16:12
```

                                                      Page 150

1    you give us some examples of context that would

2    affect the determination for a person of ordinary

3    skill in the art as to whether or not a certain

4    level of fluctuation is meaningful?

5         MR. KAMBER:  Objection.  Compound and calls    04:16:27

6    for a narrative.

7         THE WITNESS:  So I have responded to that.  I

8    think I was asked this many times and I responded to

9    it many times.

10        But, for example, I might give you, you know,    04:16:39

11   this whole -- the -- the way a POSITA would look at

12   the meaning of the word "meaningfully fluctuate" --

13   or the two words, "meaningfully fluctuate" would

14   depend on context, like I said.  And that means, for

15   example, it would depend on the purpose of the    04:17:01

16   circuit that -- that you're talking about.

17        For example, now, if you have a circuit that

18   was -- you know, was being sent from here to, like,

19   Mars, right, a circuit in one of the Mars Rovers or

20   something like this, so for a circuit like that, you    04:17:16

21   know, variations can mean small errors might

22   basically make it go to Jupiter instead of Mars or

23   some such, right?  So basically there the meaningful

24   variations would be actually much, much smaller.

25        Now, again, this is based on the context.    04:17:35

```
 1    The context is this is a circuit that's going to
 2    Mars.  It's a -- you know, it's a circuit that is
 3    meant for space.  So the meaningful variations there
 4    would be much smaller compared to a circuit which
 5    was a terrestrial circuit.  And let's say this          04:17:47
 6    circuit was in a radio-controlled car or something,
 7    which, you know, in some sense is definitely more
 8    dispensable than a Mars Rover.  So in something like
 9    that, the variations in a terrestrial application,
10    such as electronics that goes into a                    04:18:05
11    radio-controlled car, you know, the magnitude of
12    that meaningful variations might be just larger.
13          So all of this would be based on the purpose
14    of the circuit.  And, you know, a person of ordinary
15    skill in the art knowing the purpose of the circuit    04:18:22
16    would have no trouble figuring this out.  Especially
17    when they have the specification of the circuit with
18    them.
19    BY MR. SEEVE:
20      Q   Now I'm going to ask you a question about the     04:18:37
21    very next sentence, which I'm going to read to you
22    right now.  It says:
23              "Moreover, once a number of
24          repeated executions have occurred,
25          that statistical mean no longer               04:18:45
```

1

2

3        I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6            That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   record of the proceedings was made by me using

11   machine shorthand which was thereafter transcribed

12   under my direction; further, that the foregoing is

13   an accurate transcription thereof.

14           I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: March 14, 2021

21

22

23   _____

                 KATHLEEN E. BARNEY

24               CSR No. 5698

25

                                              Page 165