1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4    SINGULAR COMPUTING LLC,              )
                                          )
5                        Plaintiff        )  Civil Action
                                          )
6                                         )  No. 19-12551-FDS
     vs.                                  )
7                                         )
     GOOGLE LLC,                          )
8                        Defendant        )

9

10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11

12                   MARKMAN HEARING CONDUCTED BY ZOOM

13

14

15          John Joseph Moakley United States Courthouse
                          1 Courthouse Way
16                        Boston, MA 02210

17

18                        March 31, 2021
                           9:00 a.m.
19

20

21

22

23             Valerie A. O'Hara, FCRR, RPR
                   Official Court Reporter
24       John Joseph Moakley United States Courthouse
                      1 Courthouse Way
25                   Boston, MA 02210
                 E-mail: vaohara@gmail.com

1    APPEARANCES VIA ZOOM:

2    For The Plaintiff:

3        Prince, Lobel, Tye, LLP, by PAUL J. HAYES, ESQ.,
     BRIAN M. SEEVE, ESQ., and KEVIN GANNON, ESQ.,
4    One International Place, Boston, Massachusetts 02110;

5        Prince, Lobel, Tye LLP, by MATTHEW D. VELLA, ESQ.,
     357 S. Coast Highway, Suite 200
6    Laguna Beach, CA 92651;

7    For the Defendant:

8        Wolf, Greenfield & Sacks, P.C., by NATHAN R. SPEED, ESQ.,
     600 Atlantic Avenue, Boston, Massachusetts 02210;
9
         Kwun, Bhansali, Lazarus LLP, by ASIM M. BHANSALI, ESQ.,
10   555 Montgomery Street, Suite 750, San Francisco, California
     94111;
11
         Keker, Van Nest & Peters LLP, by MATTHIAS A. KAMBER, ESQ.,
12   633 Battery March Street, San Francisco, California 94111.

13       Keker, Van Nest & Peters LLP, by MICHELLE YBARRA,
     ATTORNEY, 633 Battery March Street,
14   San Francisco, California 94111.

15

16

17

18

19

20

21

22

23

24

25

1                    PROCEEDINGS

2          THE CLERK:  Court is now in session in the matter of

3    Singular Computing vs. Google, LLC, Matter Number 19-12551.

4          Participants are reminded that photographing,

5    recording or rebroadcasting of this hearing is prohibited and

6    may result in sanctions.

7          Would counsel please identify themselves for the

8    record, starting with the plaintiff.

9          MR. HAYES:  Paul Hayes for Prince, Lobel.

09:00AM 10          MR. VELLA:  Matthew Vella, Prince, Lobel.

11          MR. GANNON:  Kevin Gannon, Prince, Lobel.

12          MR. SEEVE:  Brian Seeve, Prince, Lobel.

13          THE COURT:  Good morning, all.

14          ALL PLAINTIFF'S COUNSEL:  Good morning.

15          MR. SPEED:  Good morning, your Honor, Nathan Speed.

16    I'm joined by Matthias Kamber and Michelle Ybarra from Keker,

17    Van Nest and Asim M. Bhansali from Kwun, Bhansali, Lazarus.

18          MR. BHANSALI:  Good morning, your Honor.

19          MR. KAMBER:  Good morning, your Honor.

09:00AM 20          THE COURT:  All right.  This is the Markman Hearing

21    in this proceeding.  I'm not sure what makes sense in terms

22    of who to go first, so I'll go with Singular unless someone

23    thinks that's a bad idea.

24          So, Mr. Hayes, the floor is yours.  I think I may

25    have told you, I have a proceeding, actually a Zoom call with

1    the Bar at noon where I've had up to 1200 people on this call

2    in the past.  It's an update on COVID.

3            That's my absolute drop dead, and my only chance for

4    lunch is to try to grab something between 11:45 and 12:00

5    because of the rest of my schedule today, so let's see if we

6    can't get this done in some reasonably prompt time.

7            Having said that, as I think I said last time, don't

8    be worried talking down to me or putting this in baby talk.

9    I will not resent it, I will appreciate it.

09:02AM 10            Mr. Hayes or your team, the floor is yours.

11            MR. HAYES:  Thank you, Judge.  I think that the

12    parties, which we proposed, worked out some schedule, which I

13    have agreed to with the other side where I'll address the

14    proposed construction that we put forth and their first one,

15    and then they're going to be able to address everything and

16    then I'll reply.

17            THE COURT:  That's fine.

18            MR. HAYES:  Okay, thanks.  We might as well start.

19    Do you have the actual slide deck?

09:02AM 20            THE COURT:  I don't have it in front of me.  I

21    received it, but I don't have it in front of me.

22            MR. HAYES:  We'll put them up on the screen then.

23    All right.  Okay.

24            THE COURT:  Okay.

25            MR. HAYES:  Here we go.  All right.  In any event,

1    that one doesn't tell us much, if anything.  The next slide,

2    please, slide 2.  Okay.  In any event, Judge, this is the

3    word or the phrase that we're asking for construction is the

4    term "execution unit."

5         Now, the reason I've given you this entire three

6    lines is to give you some idea the context in which this is

7    used so we're not just taking words here, there, and

8    everywhere.

9         As you can see from the claimed invention, as Bates

09:03AM 10    claimed it, this execution unit is adapted to execute a first

11    operation on a first input signal, so that's what we're

12    talking about when we're talking about, "an execution unit."

13         The next slide.  Now, our proposal is that the

14    execution unit be construed to mean "a processing element

15    that's comprising a memory circuit paired to an arithmetic

16    circuit."  And "paired" means connected, obviously.

17         Now, and Google's proposed construction basically is

18    not -- I mean, they disagree here, there, everywhere, but

19    there's not an affirmative proposed construction, so if we

09:04AM 20    look at it, to go through this pretty quickly, on the next

21    slide, we got it here, Google from the briefing has conceded

22    that the term "execution unit" comprises a processing

23    element, as we suggested, paired to an arithmetic operation,

24    and that's conceded in their briefs, which we cite here for

25    you.

1          So that leaves the only issue here on my argument is

2     whether to include memory and circuit, as we suggest, so the

3     issue has been paired down pretty good for us and for

4     everybody.

5          Now, the next slide, moving on, on the issue of

6     memory and circuit is this obviously comes from the patent,

7     and so we have to look to the patent to see what, if

8     anything, a processing element is because Google has already

9     conceded that, in fact, the execution unit is a processing

09:06AM 10    element.

11         So if we look to see, okay, if we know that, what is

12    it, and it says here for the purposes of discussion, we call

13    each unit, which pairs memory with the arithmetic a

14    processing element or PE.

15         And that's why we ask the Court to, when they

16    construe the term "execution unit" to be a processing

17    element, as Google concedes, that is paired with arithmetic,

18    which Google concedes, but it's also paired with memory, and,

19    clearly, I don't think Google is going to really argue, have

09:06AM 20    the hutzpah, so to speak, to argue that these things aren't

21    circuits.

22         As you can look at it, that's a circuit as you can

23    see in Fig. 4, and as you can see, the processing element,

24    Fig. 4 is the processing element.

25         Now, that's something I think you should note

1    because later on Google is somehow trying to confuse Fig. 4

2    and Fig. 6.  Fig. 6 is the arithmetic element.  The

3    processing element that we're all talking about is Fig. 4,

4    period, and the arithmetic unit, you can see it if you look

5    straight at it, and you see where it says 408.  That's the

6    arithmetic unit, not the processing element, and it's clear

7    as a bell in the patents and the briefs and the rest, and I

8    think they agree that's the processing element for now.

9         Now, as you can see what this is doing in the

09:07AM 10    processing element, you add an arithmetic unit right there in

11    the middle, 408, and that's paired to a register, and a

12    register is a memory.  There's no dispute about that, so

13    that's consistent in the intrinsic evidence, and it's

14    consistent, obviously, with what is described and we put in

15    the slide here in the patent, et cetera.

16         And as for the idea that's a circuit, I mean, our

17    position is you just look at it.  Anyone skilled in the art

18    knows we're talking about a circuit here, and if you look

19    further in the patent, it says the physical implementation of

09:08AM 20    the PEA, that's a processing element array, e.g. chip could

21    be replicated, e.g. tiled on a circuit board.

22         Obviously, you have circuit boards, and you have

23    circuits on chips, and that's what we're talking about here,

24    so that's why we suggest basically that's the way to go.

25         Now, to briefly go through, first of all, Google

1   argues, next thing, that there's no circuit because it says

2   there's no circuit should be construed into the claim because

3   the claim is directed to software embodiments.  That

4   affirmative argument by Google is just simply incorrect, at

5   best.

6         The claim, as you can read, is directed to an

7   execution unit.  That's a thing.  It's directed to a

8   processing element as construed.  That's a thing, it's not a

9   software, and the processing element is described throughout

09:09AM 10   the patent and the claim as having inputs and outputs,

11   signals and the rest, so this thing is not directed to

12   software on any stretch of the imagination, and what is

13   directed to software, paragraphs -- excuse me, claims 33 and

14   68, which I put in this slide to just show you what happens

15   when you want to claim something directed to software, you

16   say so, and they did, but the difference here is that they're

17   not asserted, so I think it's fairly clear that that argument

18   by Google is not particularly a good one.

19         Now, their next argument, moving on, is they say

09:10AM 20   that, well, if you want the word "memory" into the claim,

21   then there's no difference between claim 53, which is the

22   claim at issue and claim 25, which is some dependent claim

23   somewhere.  Well, the problem with that, that is incorrect on

24   its face.

25         Claim 25 calls for basically, as you can see, a

1    device includes memory locally accessible, so it's talking

2    about a local accessible memory.  A local accessible memory

3    is not a memory.  Obviously, memory is broader, and thus the

4    notion that the scope of 53 and 25 are the same is just

5    simply the argument factually is incorrect.  It's also

6    legally, as we put in the brief, irrelevant anyways, but the

7    fact is what I want to point out is that the underlying

8    factor is incorrect on the claim.

9        The next one, their next argument they make is they

09:11AM 10   say not all embodiments in the patent have memory paired,

11   have a paired memory.  They affirmatively say that.  That

12   statement is false.  Every embodiment in this patent has a

13   paired memory, period.

14       Now, what do they do in the brief and everywhere,

15   they say look at Fig. 6, and they say Fig. 6, there's no

16   memory paired to Fig. 6.  True.  Well, the point is -- well,

17   actually there is, but so what?  Fig. 6 is not the execution

18   unit, Fig. 6 is not the processing element, Fig. 6 is the

19   arithmetic unit, and the claim is talking about an execution

09:12AM 20   unit, and that's what we're construing, so that argument just

21   simply isn't there, and, finally, even if it were, which it

22   isn't, that's the log down the bottom that obviously you

23   could have multiple embodiments, and each claim doesn't have

24   to cover every embodiment, so I think legally but, more

25   importantly, factually, the argument is just misstating given

1    the intrinsic evidence as we see it, and then we have that.

2         Well, that's it for the term as we see it, Judge.

3    We've gone over our argument, which we believe is based on

4    the intrinsic evidence as to why memory should be there, our

5    argument why circuits should be there, and I've gone over

6    every one of Google's arguments, which I pointed out are

7    factually wrong, given the intrinsic evidence as set forth

8    right on the screen, so that's our argument on the claim

9    construction of execution unit.

09:13AM 10        Now, pursuant to this, what do you call it, an

11   agreement, we'll go to Google's first claim of how they want

12   to construe something in the claim, and if we look at the

13   term that they want to construe, the language is on the top

14   with the blue background.  It says, "Low-Precision High

15   Dynamic Range Execution Unit."

16        Now, our construction is we say that that

17   construction, there's no needed construction for this other

18   than the term execution unit, which I just went over, and

19   otherwise it's plain and ordinary.

09:14AM 20        Now, what's interesting is Google's construction in

21   the IPR.  They have an IPR, and in the IPR what they

22   represented to the patent office is that this identical

23   phrase need no construction, plain and ordinary.

24        So they go to the Patent Office and say this

25   construction is fine, it needs no construction, this term

1   plain and ordinary, and now they come into the District Court

2   500 miles north and rewrite the claim, as we will see, which,

3   obviously, they can't do, and I'll show you why.

4        The next slide is indeed the language where it says,

5   "Low precision high-dynamic range (LPHDR) execution unit,"

6   and I've highlighted in yellow all of the sentence so that

7   you take it in context.  We can't start taking words here and

8   there and pick them out of context, and the execution unit,

9   what is this low-precision high-dynamic execution unit?  What

09:15AM 10   does it do?  What it does, it says it's adapted to execute a

11   first operation on a first input signal.  That's exactly how

12   it's claimed, and that's the context of the phrase that we're

13   going to talk about right now.

14        So what do we have here?  From a legal point of

15   view, it's obviously bedrock principle of construction, as

16   they've got here, the construction begins with the language

17   of the claim.  And the claims, and it's also bedrock black

18   letter law the courts do not rewrite claims.  Instead, you

19   give effect to the terms chosen by the patentee, and as clear

09:16AM 20   as a bell, the claim as written and allowed and described in

21   the patent shows that this execution unit is adapted to

22   execute a first operation on a first input signal, period.

23        That's exactly how it's claimed, and they cannot

24   just come in here and try to rewrite the claim because they

25   don't like it and try to gin up, which is all that this is,

1       to gin up some non-infringement argument.

2               So we get the next slide, and the next slide is

3       there to basically show you how they are indeed trying to

4       rewrite this claim, and, most importantly, and I'll get to

5       this in a second, but, most importantly, in their attempt to

6       rewrite the claim on this level, what do they do?  They

7       delete the term "signal."  They get rid of it.  Well, you

8       can't just delete the way it's claimed because you don't like

9       it.  That's the way it's claimed, and that's it.

09:17AM 10              You could try to prove it invalid in the sense of

11      obviousness or whatever you want or you could try to prove

12      you don't infringe, but you can't start changing the

13      parameters of the claim, so if we look at that, and this next

14      slide basically says it all.  This is exactly under the law

15      what you can't do.

16              First, they delete LPHDR, which modifies the

17      execution unit, so they get rid of that.  For what reason?

18      There is no reason.  First of all, you can't do it.  They

19      change the word cutely from "designed to" to "adapted to."

09:18AM 20      Then they say it's designed to perform, however, the claim

21      doesn't say it's designed to perform, it says they got

22      adapted to execute, right, so it should say designed to

23      perform, I mean, adapted to perform, and what do they got,

24      "adapted to execute," so they cutely change the word

25      "perform" to "execute," and then they say what?  They add in

1    "designed to perform arithmetic operations," adding that in,

2    "to execute a first operation," which is exactly not what the

3    claim says.

4            And, lastly, in rewriting the claim, it says

5    "designed to perform arithmetic operations on numerical

6    values," right?  Well, the claim is talking about signals

7    specifically, and as you can see here, in no uncertain terms,

8    what they have done is changed like 80 percent of the words

9    of this phrase to take it all out of context, and then they

09:19AM 10    will gin up some type of non-infringement, and what they're

11    trying to do is when they say, "final result, designed to

12    perform arithmetic operations on numerical values," et

13    cetera, that's not what the processing element does.

14           The processing element processes a signal as

15    specifically claimed, and, most importantly, on this issue,

16    Judge, most importantly on this issue, and I think this is

17    the key, this is the same claim that Google represented to

18    the Patent Office, the PTAB, needs absolutely no

19    construction, plain and ordinary, and now as you can see from

09:20AM 20    this list of changes by Google, what they're trying to do is

21    rewrite the claim.  This is rewriting the claim that they

22    presently represented needs no construction.

23           I think what they're doing, they should not be

24    allowed as a matter of law to do any of this because it just

25    doesn't make any sense whatsoever.

1          So, the next one is moving onto with that, we can

2     see from the intrinsic evidence that, in fact, the claim is

3     directed to the execution unit processing signals.  The input

4     is a signal, and that's exactly how it's described in the

5     patent.  It says on the top right, the input and intermediate

6     values received by output, by and operated on by the PE400.

7     The PE400 is the processing element, made, for example, take

8     the form of electrical signals representing numerical values.

9          That's precisely how it's claimed.  It's claimed in

09:21AM 10     terms of an input being an electrical signal, an output,

11     being an electrical signal, each representing a numerical

12     value, but the input and output are signals, period, and so

13     that's, obviously, I point that out because the claim is

14     obviously consistent, exactly, almost, with the prosecution,

15     with the specification, as you can see.

16          Now, the next one, it's not a tutorial, but to me,

17     it's almost self-apparent, but the claimed invention is an

18     electronic device.  That's what it is.  We know that, and it

19     operates on input and output electronic signals because it's

09:22AM 20     trying to process, for example, artificial intelligence, a

21     signal representing an artificial intelligence issue comes

22     in, and it comes in as an input signal, and it goes out as an

23     electronic output signal.

24          To change that is, I think, a ludicy, but, in any

25     event, numerical values, they don't travel on wires.  They

1    don't.  They just hang in the air and travel around the

2    circuit.

3           What travels around a circuit and what an input to a

4    circuit is is a signal.  That's how it works, and we have the

5    unrebutted testimony of our expert, and particularly pointing

6    out the difference between signals and values, and, most

7    importantly, indicating that they're not necessarily the

8    same, all contrary to the arguments by Google, to begin with,

9    and that is unrebutted because notably their expert says

09:23AM 10    nothing about signals, values or anything.

11           They can have lawyers, have lawyer arguments to you

12    until the cows come home, however, this is actually

13    unrebutted evidence, and it is what it is, Judge, so, I

14    mean...

15           And the next thing is they make an argument in their

16    brief, and this was in the original brief, saying an input

17    signal cannot be high-dynamic range, because the claims calls

18    for the input signal to be a high-dynamic range, and they

19    say, well, that can't be.

09:24AM 20           This is, again, the unrebutted testimony of our

21    expert indicating that, indeed, signals can be high-dynamic

22    range, exactly opposite, so we have lawyer argument saying

23    they can't, and then we have actual unrebutted evidence

24    saying they can, and, to boot, if you talk about that, you

25    talk about extrinsic evidence, their expert did none of this.

1          The bottom line is now I believe this is true, and

2     Google can respond to it, but from my reading of the briefs,

3     they now finally concede that an input signal can be of

4     high-dynamic range, and that's the way I read their brief to

5     be, if I'm reading it incorrectly, I don't think I'm reading

6     it in incorrectly, and I'm not in the business of cropping

7     quotes or anything to that effect.

8          But irrespective of what they argue, they argue it's

9     all attorney argument because this is unrebutted expert

09:25AM 10    testimony about what a high dynamic range can be, can a

11    signal be then?  Answer, yes.

12         So, all that said and done, I would ask the Court to

13    just simply find given what we presented here today that on

14    Google's proposed construction that it be denied and that the

15    Court just find that it's plain and ordinary, which is

16    precisely what they represented to the Patent Office.

17         We're not asking for any more than what they told

18    the United States Patent Office probably a few months ago, so

19    that's our take on this, Judge, on our position with respect

09:26AM 20    to what an execution unit is and memory, et cetera, and their

21    first proposal.

22              THE COURT:  All right.

23              MR. HAYES:  I think what we agreed to now, you know,

24    they get to do what they do.

25              THE COURT:  Okay.

1          MR. HAYES:  Thanks, Judge.

2          THE COURT:  Thank you.  Who is going to take the

3     lead for Google?

4          MR. KAMBER:  Your Honor, Matthias Kamber for Google.

5     I'll start with a bit of a tutorial, and then Ms. Ybarra will

6     handle the term "repeated execution" and then Mr. Bhasali

7     will address the LPHDR execution unit term we just talked

8     about and the first input signal representing the first

9     numerical value phrase as well.

09:26AM 10          THE COURT:  All right.

11          MR. KAMBER:  Let me just queue up the slides here.

12     Hopefully everybody can see those.  Your Honor, for getting

13     ready for today, I imagine you probably realized the claim

14     language is rather dense to get through, and we hoped to be

15     able to address that a little bit by providing context for

16     two particular parts of the claim, in particular, this "low

17     precision high-dynamic range," what do those terms really

18     mean, what is low-precision, what is high-dynamic range?

19     They're clearly sort of being compared to something with

09:27AM 20     their comparative language, "low and high," and we want to

21     provide a little bit of background on that, and then the

22     other issue is signals representing numerical values, and

23     specifically we'd like to talk about how computers use

24     signals, how computers use values, and what the distinction

25     is between signals and values as they are used in a computer

1    chip.

2            So let me take the first of those.  This issue about

3    precision and range and start maybe not at the level of baby

4    talk but at the level of just basic numbers and how numbers

5    are used, and probably the most basic form that you're

6    familiar with is just an integer.

7            That's a whole number, no fractional component, that

8    is sort of no decimal point, and these numbers, examples are

9    zero or 26 or negative 2065, and numbers like this can be

09:28AM 10    used to express something, but they only have so much

11    precision if you're trying to express something that's in

12    between 26 and 27.  You can't do it with an integer, you kind

13    of have to round to the nearest whole number.

14            For that reason, there's something known as a fixed

15    point number, and those are used, those have some degree of

16    precision.  They are real numbers that have some fractional

17    component where there's a fixed number of digits after the

18    decimal point, and the example that we have here has two, has

19    that fixed point in a place where it allows for two decimals

09:29AM 20    in the fraction part of the number, 123.45, so 45-hundredths

21    there is the fractional part, and this allows you to express

22    numbers with some greater degree of precision because you're

23    not limited to integers.

24            And, finally, there is what's known as floating

25    point number format, and this is something you may or may not

1    remember from the 101 briefing.  It's similar to scientific

2    notation.  It allows you -- it's a real number that has a

3    fractional component and a varying number of digits after the

4    decimal point or after the -- yes, after the decimal point,

5    and so this allows you to express numbers with a greater

6    degree of range because you're multiplying it by 10 to some

7    power, 10 to the second power would be 100 here.

8         And in the examples here, we also have 10 to the

9    5th, so 10 to the 5th would be 10,000s, and the number would

09:31AM 10    be expressed in that way.

11         So these are the three different types of formats,

12    integers, fixed point numbers, floating point numbers, and

13    they kind of set up what I think is the discussion really

14    about precision and range.

15         Now, here's an example of the distinction.  Range is

16    really I think can be simplified to the decimals to the left

17    of the decimal point, and precision is really the fractional

18    part to the right of the decimal point, and here we have an

19    example of a number, 47,582,473 is the integer part of this,

09:31AM 20    and that is the range part.

21         The range can go all the way up to, you could

22    imagine with this type of number, 99,999,999, so you have an

23    equal number of decimals to the right and left of the decimal

24    place here, you have 8 to the left, you have 8 to the right,

25    and you can express a certain range and a certain amount of

precision by making that choice between as to where you put the decimal point.

Of course, you could make a different choice, as we show here on slide 6.  Here's another example.  Same total number of decimals, that is 16, but 4 are, only 4 are used for precision, whereas 12 here are used for range, and, of course, that allows you to express a much larger range of numbers up to I believe 999 trillion in this particular case, but it only lets you get down to a more limited fractional component, so you would say that this number has higher range but lower precision as compared to the one that we saw on the prior slide.

Conversely, you could have the decimal point in a place where there's more precision and less range, so this would be a higher precision compared to slide 5 but lower range.  The range would only go up to 99,999 in this particular case.  You'd not be in the trillions, but you could express, if you needed to, a number with a greater degree of precision, that is, you could get down to the level of the hundred-billionths in terms of the precision in which you express it.

I was just showing, was using decimals, of course, and computers and decimals are really 0 to 9, right, the numbers, the decimal numbers, but in a computer, numbers are expressed typically a little differently.  Things are

digital, as I'm sure you've heard, and that means it's 0s and

1s.  They are bits, and they are just 0s and 1s, and you have

to represent numbers differently with bits, and here's just

an example.

I don't think you necessarily need to know the

expression for everything, but it does help set up I think

the next few slides.

So, for example, the number 10 is expressed in

binary notation by 1010.  It's not 10, it's just 1010.  6,

for example, is expressed as 110 in terms of the actual bits,

and so to get to higher numbers, you need more bits, and

that's how bits are used to represent numbers that we

traditionally think of in the decimal format.

So let me talk about base-2 floating-point numbers.

Because it's just two options, as we just talked about,

0 and 1, you can't really represent numbers in the scientific

notation that you might be more familiar with.  That's

Base 10, remember, scientific notation is Base 10, but,

instead, in computers, people talk about or think about it as

being in Base 2, and that has a format that looks a lot like

this.

There is a fractional component to the number.

There is an exponent component to the number, and that 1 at

the very beginning is sometimes referred to as a hidden bit.

It's sort of just assumed by the computer that that 1 is

1    there.  You don't have to express it, and every number is

2    essentially expressed as 1. something times 2 to the

3    something, and I want to complain that in just a minute, but

4    this is the format that a lot of computers, it's relatively

5    standardized that computers use this type of format.  It's a

6    little bit confusing, but let me try to go through and

7    explain it with one or two examples.

8            Let's take the decimal number 8, just the

9    traditional number 8.  Now, the way to express that in this

09:36AM 10   Base 2 notation and decimal, that would be 1 times 2 to the

11   third, 2 to the 3rd is 2 times 2 times 2, and that is 8.  So,

12   1 times 8 is a way of expressing that decimal number 8, and

13   the way that you might express that in Base 2 format, Base 2

14   notation, you take the binary fractional part of that, which

15   would be 0, which corresponds to the binary numbers 0 and the

16   exponent.  There's actually something called an offset in

17   these exponents typically.  I don't think we really need to

18   get into that, but it's just the explanation for why the

19   binary equivalent for 3 is not like you saw a few slides ago.

09:37AM 20           Then sometimes there's what's known as a sign bit.

21   Most number formats or most computers use a sign bit, not all

22   do, depending on the context, but a bit might be used for the

23   sign, but you see here again the hidden bit, you see the

24   fractional component, and you see the exponent.

25           Here's another example with the decimal number 3.

1    Now, in this particular case in order to make the number 3 in

2    a computer with this Base 2 format, you would say, well, 3 is

3    1.5 times to 2 to the first.  That works out to 3.  So you

4    figure out what your fractional part is in binary form.  The

5    half fractions is actually expressed by .100, so we show that

6    here, and the exponent, again, it would just be 1, but

7    because of the offset, it shows as something slightly

8    different, and the sign bit here would be 0.

9         So let me pause to say that I don't think you need

09:38AM 10  to internalize this Base 2 format, really it's just

11   background for something else that I think is important and

12   it's relatively easy to understand, and that is there are

13   standardized number formats that are known and used.

14        This is an example of the IEEE single precision

15   floating point format.  This format was standardized back in

16   1985, and it uses 32 bits to express a number in that Base 2

17   floating point notion that we just talked about.  That means

18   that there's some number of bits that's dedicated to the

19   exponent and some number of bits that are dedicated to

09:39AM 20  expressing the fractional part of that particular number, and

21   then there's a sign bit as well, as we just talked about, so

22   in this example, and really this standard and perhaps most

23   common format, single precision floating point format, there

24   is -- there are eight bits of exponent and 23 bits of

25   fraction, one sign bit for a total of 32 bits, and that's

1    just used to express the exponent is in effect the range that

2    lets you get how far out you can get the numbers, the

3    exponent, right, is the part like that scientific notation,

4    and it tells you how much range you have and the fraction, of

5    course, as we've been talking about is in effect the degree

6    of precision you get.  The more bits you dedicate to the

7    fractional part, the more precision you can have.

8         THE COURT:  And the sign is either negative or

9    positive, is that what that means?

09:40AM 10        MR. KAMBER:  That's correct, your Honor, so I

11   believe 0 is the positive, and 1 is the negative, but I'm not

12   entirely sure, but it's essentially just that one bit is

13   expressing whether it's positive or negative.

14        So, in about 2008, right around when this patent was

15   applied for, the IEEE had standardized or was standardizing

16   what was known as the half precision floating point format.

17   This is addressed in the patent itself.  It's talking about

18   where it talks about graphics processing units, GPUs and a

19   16 bit format that was being developed by Industrial Light &

09:41AM 20   Magic, this is what the patent is referring to, this half

21   precision floating point format.

22        Now, this was lower precision, that is, the fraction

23   is 10 bits as compared to the 23 bits that are used for the

24   standard single precision format.  It was also lower range.

25   They used fewer bits to express the exponent, 5 bits instead

of 8 bits, so this is what you might term a lower precision,

lower range type of number as compared to the single

precision.

There's also, by the way, the double precision

format.  This is a 64-bit format that has higher range and

higher precision than, or, I should say, more range and more

precision really.  There's 11 bits for the exponent instead

of 8 and 52 bits for the fraction instead of 23, so this is

what you would call I'd say a high-precision high-dynamic

09:42AM range type number.

And what you'll hear about perhaps later in this

case is that the bfloat16 floating point format that's used

by Google and others in the industry, and this has an 8-bit

exponent, so the same exponent as the IEEE single precision

format, but it takes away 16 of the bits from the precision

or from the fraction, I should say, and has a 7-bit fraction,

so a total of 16 bits, similar to the half precision format,

but it trades some exponent bits for some fractions bits as

part of the way that it's designed.

09:43AM And that's really I think the main point to take

away from this, your Honor, is that people, designers trade

precision for range.  This is from a textbook, Patterson and

Hennessey, *Computer Organization and Design*.  It's the fifth

design, but this statement is in prior editions as well.

It's relatively well-known that there is some

1  compromise being made between the size of the fractions and

2  the size of the exponent, and, by the way, that blue text on

3  the slide is actually original.  That is in the textbook.

4  It's called out.

5       And as this textbook points out, the trade-off is

6  one between precision and range, increasing the size of the

7  fraction enhances the precision of the fraction, while

8  increasing the size of the exponent increases the range of

9  numbers that can be represented, so it's really just a

09:44AM 10  choice.  It's a tradeoff that designers are making sometimes

11  in systems between precision and range, how many bits they

12  are using to express the exponent vs. the fraction in terms

13  of the numbers that they are using.

14       Your Honor, unless you have questions about that, I

15  was going to move onto the signals and values and how those

16  are used in computers.

17       THE COURT:  Go ahead.

18       MR. KAMBER:  So in the customary sort of

19  silicon-based world of computer processors, there are in

09:45AM 20  effect two different types of signals, analog signals and

21  digital signals.  Of course, everything at some point really

22  has to go on a wire in the context of these computer chips,

23  but there are known analog computer types, there are known

24  digital computer types, and there are hybrid analog digital

25  systems as well, and I want to just show or illustrate here

an analog signal waveform.

You see this here.  It has different amplitudes, you could think of this as perhaps different voltages that are coming in to being read, and they're being sampled on some particular time interval, whatever it might be.  The time intervals are sometimes small, and the amplitude of the voltage can really represent anything.

If you -- let's say this voltage here on the left, on the Y access, 8 volts could represent the number 100, they could represent the number 1,000, they could represent the number 1 million, however, the designer of the system might want it to work.

There is some conversion in effect between the physical, the voltage, and what it represents in terms of a particular value in the system, but let's just take the basic example where it would be 1 to 1, and you would try to be representing just the decimals here, and as the waveform comes in, it is read, and it matches up to the waveform 05185605, so that comes as being read.  Those voltages are being read off, and those can represent whatever it might be.

In contrast, digital waveforms really have only two states, sort of what we talked about before, this binary number system.  You really are only using a 0 or a 1, on or off, and so this is what people sometimes call a perfect waveform.  Of course, it takes some amount of time to go from

1    0 to the 1, so there's a little bit of a slant there, but

2    this is a perfect square wave in this representation, and

3    most of the time, the 0 isn't an exact 0 either, but you're

4    essentially trying to show a high and a low state in a

5    digital signal to represent that 0 and the 1.

6           Now, digital signal waveforms because of the way

7    that they are formed -- by the way, this gets, as they comes

8    in, of course, it's being read as the series of either

9    01001101.  As it comes in, it's being read as the one state

09:48AM 10   or the other state, the on or the off.

11          And for that reason, your Honor, those types of

12   signals, digital signals, are a lot less susceptible to

13   disruption, to noise.  Imagine a cell phone being nearby

14   causing interference or heat or any number of things.  It

15   might throw off the signal slightly, as is illustrated here

16   in slide 21, but it's not going to throw it off in a way that

17   should generally affect the performance of the computer and

18   how that's read.

19          Something close to a 0 will still be interpreted as

09:49AM 20   a 0, something close to 1 will be interpreted as a 1, and so

21   the noise here, unless it's really extreme, will not impact

22   how those numbers are interpreted by the computer, those

23   digital signals are then interpreted by a computer.

24          It's not true, however, for analog signals.  Analog

25   signals are, again, it's the example of the noise from

1   perhaps a cell phone.  They are susceptible to this type of

2   noise.  Their waves are more affected, and because you're

3   actually reading the amplitudes, the voltage directly,

4   there's a direct correspondence to the value that it's meant

5   to represent.  It is more susceptible to noise.

6        Heat is a form of noise.  Of course, processors

7   generate heat.  They have to be cooled in some shape or form

8   most of the time in order to operate properly, so here you

9   see an example where the heat changes this waveform

09:50AM 10   significantly, and because of it, readings like what should

11   read as 5 or 8 are impacted in such a way that they are,

12   pardon me, below 5 or below 8 or at different levels than one

13   might expect, and so analog systems are just known to -- and

14   the experts agreed on this, by the way, in this case -- that

15   analog signals are susceptible to noise.  Repeated results

16   for that reason are difficult to have because of that noise

17   feature.

18        And with that, your Honor, unless you have

19   questions, I'd like to turn it over to Ms. Ybarra to talk

09:50AM 20   about the indefiniteness issue with respect to repeated

21   execution.

22        THE COURT:  All right.

23        MS. YBARRA:  Good morning, your Honor,

24   Michelle Ybarra from Keker, Van Nest & Peters for Google.

25   We'd like to start our argument with the term, "repeated

1  execution" because it's case dispositive, so should the Court

2  find the term to be indefinite, as we think it should, all of

3  the asserted claims are invalid, and here's why we believe

4  you should find repeated execution is indefinite.

5      Matthias, could we go to the next slide, please.

6  Repeated execution appears in all of the asserted claims and

7  appears specifically in the claim language that provides the

8  test for determining whether a device infringes.

9      If we could go to the next slide.  We're looking

09:51AM 10  here specifically at claim 1 of the '273 patent, and this is

11  the test.  It's kind of dense, but I'm going to drill down on

12  this briefly.

13      The claims cover an LPHDR unit that after repeated

14  execution of an operation produces results that differ on

15  average by a certain degree from the results of an exact

16  mathematical calculation of that same operation.

17      If we could go to the next slide.  This is kind of

18  isolating the language that's doing the work here, and I

19  think it's helpful to hone in on this.  This says, "A device

09:52AM 20  falls within the scope of the claim if the statistical mean

21  of the output values over a repeated execution of an

22  operation differ by at least .05 percent from the exact

23  calculation."

24      So the claimed invention doesn't evaluate results on

25  an execution by execution basis, but it's looking at the

1    average of results after repeated execution of an operation

2    and compares that average to the results of an exact

3    mathematical calculation.  In that way, infringement is

4    defined primarily not by how the device operates but by the

5    results it produces, and this test has particular

6    consequences for analog systems, which are susceptible to

7    noise that can cause the system to generate different results

8    for the same inputs, as Mr. Kamber was just explaining.

9         In an analog embodiment, noise will cause the

09:53AM 10   results to vary, therefore, the number of times an operation

11   is repeated will shift the average of the statistical mean

12   with each execution of the operation.

13        If we could go to the next slide.  And that therein

14   lies the problem.  The claim language that supplies the test

15   doesn't answer the fundamental question how many times must

16   one repeat the operation in order to average the output and

17   compare the results to an exact mathematical calculation, so

18   the claim language creates a zone of uncertainty about the

19   scope of the invention and the circumstances under which a

09:54AM 20   device infringes.

21        Nautilus makes clear that the claims when read in

22   the light of the specification and the prosecution history

23   have to provide reasonable certainty for those skilled in the

24   art about the scope of the invention, so it's not sufficient

25   that the claims capable of interpretation, as we believe

1    Singular suggests.

2         There's no doubt that repeated execution here means

3    more than one, but that tells you nothing about how many

4    executions are necessary such that you can calculate the

5    statistical average of the output values and compare that

6    average to the result of an exact mathematical calculation to

7    figure out whether those figures differ by the minimum amount

8    claimed in the patents, and it's the basis of that comparison

9    that tells you whether a device infringes, but there's

09:55AM 10    nothing in the claims, the specification or the prosecution

11    history that provides any kind of objective anchor that makes

12    the term definite.

13         If we could go to the next slide.  As I mentioned

14    before, this is particularly consequential in the context of

15    an analog embodiment where the same testing can lead to

16    different results.

17         Google's expert, Dr. Wei, demonstrated when noise is

18    a factor, as it is in analog embodiments, performing the same

19    operation with the same inputs will yield different results,

09:55AM 20    the average of which may fall above or below the claimed

21    error threshold described in the patents.

22         And Singular's expert, Dr. Khatri, agrees.  He says

23    in paragraph 33 of his declaration devices that using analog

24    signals to represent numbers introduce noise in their

25    computations and performing the same operation twice with

1    identical inputs will statistically produce different output

2    values and initially a fluctuating arithmetic average.

3         In his own experiment reflected in the graph at

4    paragraph 34 of his declaration, he describes the arithmetic

5    average as unstable and one that fluctuates significantly

6    over short periods of time, so what that means is that the

7    average will potentially drift above and below the claimed

8    error threshold and will sometimes satisfy the claim

9    language, the test in the claimed language and sometimes

09:57AM 10   won't.

11        THE COURT:  Let me just make sure I understand.  So

12   we're talking only -- let me put aside the analog hybrid,

13   whatever that is, so we're talking about analog signals and

14   we're talking about a short period of time, correct?

15        MS. YBARRA:  Yes.

16        THE COURT:  In other words, over time, this, I don't

17   know what the right word is, but flattens out or this noise

18   business becomes less important, in other words, if you

19   perform this 10 million times, it's different from 10 times?

09:57AM 20   MS. YBARRA:  That's what Dr. Khatri contends, and

21   that's what his graph shows.

22        THE COURT:  Okay.

23        MS. YBARRA:  Exactly what is a short period of time,

24   he does not define or specify.

25        THE COURT:  Okay.

1          MS. YBARRA:  If we could go to slide 29.  I'm sorry,

2     we are on slide 29.  Slide 30 then.  So, as I was saying, how

3     many times one performs repeated executions of this same

4     operation is critical to whether or not the test is

5     satisfied, but there's nothing in the spec. or the

6     prosecution history that provides guidance on how many

7     repeated executions are necessary.

8          That's not just Google's position but Singular

9     itself fails to cite any intrinsic evidence on this point.

09:58AM 10     Instead, Singular relies entirely on the opinion of his

11     expert, Dr. Khatri, who offers nothing more than an opinion

12     based on his subjective experience.

13          And here's how Singular frames it on slide 30:

14     Singular says you can't look at repeated execution in

15     isolation because the whole point of performing repeated

16     executions of an operation is to obtain the statistical mean

17     of the output values.

18          And, again, relying entirely on Dr. Khatri's opinion

19     without citing any support in the spec., Dr. Khatri opines

09:59AM 20     that a person of skill in the art would rely on the law of

21     large numbers to understand the scope of the claim, and law

22     of large numbers states that the average of the results

23     obtained from a large number of trials should be close to the

24     true or expected value and will tend to get closer to that

25     value the more trials you perform, so this is the line

1        flattening out that you just referenced, your Honor.

2            Dr. Khatri argues that a person of skill in the art

3        would know the law of large numbers, and, therefore, would

4        understand that executing an operation enough times will

5        yield a stapled population mean, where the average won't

6        meaningfully fluctuate, and you can determine whether

7        invention satisfies the claims.  What if no staple mean ever

8        emerges?  Dr. Khatri argues then the repeated execution

9        limitation is never met.

10:00AM 10           And if we could break this down because none of this

11        is derived from the specification of the prosecution history.

12        These are entirely Dr. Khatri's opinions, and he concedes

13        that how many repeated operations or repeated executions of

14        the operation are necessary to satisfy the claim language is

15        a completely subjective standard.

16            So going to slide 31, first, as to the law of large

17        numbers, which Dr. Khatri contends a person of skill in the

18        art would apply when interpreting the claim language, he

19        can't point to anything in the claims or the specification or

10:00AM 20        the prosecution history that references the law of large

21        numbers, and he, in fact, rejects the notion that the skilled

22        artisan would know the patent incorporates the law of large

23        numbers, saying I don't know where you got that idea from, I

24        never said that.

25            If you look at his declaration, paragraphs 27 to 36

of his declaration, Dr. Khatri fails to cite any intrinsic evidence on the number of required executions, so he can't identify any guidance as to the number of repeated operations necessary to satisfy the claim language.

If we could go to the next slide, please.  Instead, Dr. Khatri says you perform enough repeated executions until the statistical mean is stable, and how many executions are required to reach a stable statistical mean?  Well, remember, Dr. Khatri admits that in an analog system, performing the same operation will produce different output values, and initially a fluctuating average due to noise.

And I want to make clear in reference to the question you asked earlier, your Honor, it's not the noise, noise doesn't change or go away over time, it's just that it averages out, the line flattens out, so Dr. Khatri says initially you get a fluctuating average.  He doesn't identify the point where the average stops fluctuating, but he says at some point, the average will stabilize, and it's at that point you've performed enough repeated executions that you could compare the new stable average to the results of an exact mathematical calculation and determine whether a device infringes the asserted claims, and the problem with Dr. Khatri's interpretation, and he concedes this, is that what he deems as stable a statistical average or what he deems is a stable statistical mean is entirely subjective.

1           He describes a stable statistical mean as an average

2      that never materially changes again and does not meaningfully

3      fluctuate or has ceased to fluctuate significantly.  All of

4      those determinations, whether the average doesn't materially

5      change again or meaningfully fluctuate or ceases to fluctuate

6      significantly are subjective determinations that according to

7      Dr. Khatri are context dependent.

8           If we could go to the next slide, please.  At his

9      deposition, Dr. Khatri was asked multiple times how a person

10:03AM 10  of skill in the art would know when an average is stabilized,

11     and his answer was always some version of what you see on

12     slide 33.

13          For example, he says a person of skill in the art

14     familiar with a particular circuit, application and

15     technology would know when an average doesn't meaningfully

16     fluctuate, and they would know for certain application what

17     meaningful is in terms of meaningfully fluctuating, and a

18     person of skill in the art would know for their circuit when

19     that happens, when that was reached.

10:04AM 20       This is precisely what the Federal Circuit says you

21     can't do.  In the *Datamize* case that we cite in our

22     supplemental claim construction brief and the opening brief,

23     the Federal Circuit says, "The scope of the claim language

24     cannot depend solely on the unrestrained subjective opinion

25     of a particular individual purportedly practicing the

1    invention."

2         Nowhere does Dr. Khatri offer any objective indicia

3    by which a person of skill in the art would make this

4    determination that's sufficient repeated executions have been

5    performed to calculate those statistical mean.  It's always

6    context dependent, according to him.

7         If we could go to the next slide, please.

8    Dr. Khatri even gave this example about a circuit that is

9    designed to operate on Mars.  For that circuit, he said,

10:05AM 10   "What is a meaningful variation in the average of the outputs

11   that would differ from a circuit operating on Mars, between a

12   circuit operating on Mars and a circuit operating on earth?"

13   In the Mars circuit, the meaningful variations would be much

14   smaller as compared to the earth circuit, where the

15   meaningful variations might be just larger.

16        So, his position on how many repeated executions are

17   necessary to achieve a stable statistical mean is basically,

18   it depends.  It's exactly -- this is exactly counter to what

19   we are taught in *Nautilus*, the Supreme Courts says in

10:05AM 20   *Nautilus,* and his answer doesn't provide any objective

21   guidance to a person of skill in the art about the scope of

22   the invention, as the patent statute requires.

23        There's an additional problem with Dr. Khatri's

24   position.  This is we're talking about an apparatus claim

25   here, which either infringes or doesn't but is not

1    contextually dependent, so because Dr. Khatri's opinion is

2    based solely on his experience and is not tethered to any

3    supporting evidence in the intrinsic evidentiary record, it

4    does nothing to answer the question that we're still left

5    with, which is how many repeated executions of an operation

6    are necessary and the context of the asserted claims.

7           So the metes and the bounds of the claims are not

8    clear, and the claim is indefinite.  If we can go to the next

9    slide, please.

10:06AM  10           Singular alternatively argues that this is not a

11   dispute that the Court can resolve now because there are

12   disputes of fact that preclude deciding this issue at claim

13   construction, and it should go to the jury, but there are no

14   disputes of fact here, and we elaborate on this on

15   pages 1 to 3 of our supplemental claim construction brief,

16   and we distill those points here on slide 35.

17          There's no dispute that repeated executions applies

18   the test, no dispute that the spec. and the prosecution

19   history fail to provide guidance about how many executions

10:07AM  20   are required, and neither Singular nor Dr. Khatri can point

21   to any intrinsic evidence on the number of repeated

22   executions required or discussing the law of large numbers or

23   in support of Dr. Khatri's theory that enough repeated

24   executions will produce a stable statistical mean that a

25   person of skill in the art will know when they see.

1           There's also no dispute the asserted patents cover

2      analog systems that will produce inconsistent results each

3      time you execute an operation, meaning the average of those

4      outputs will shift depending on the number of executions

5      performed, leaving you with a mean that can drift above or

6      below the claimed error threshold.

7           The only disputes between the parties are over the

8      legal conclusions drawn from these facts, but it's not about

9      the facts themselves, and the dispute over the legal

10     conclusion drawing these facts is a question for the Court

11     that the Court can and should decide now because Google has

12     met its burden with clear and convincing evidence to show

13     repeated execution is indefinite.  We believe the Court

14     should so find.  I'll stop there.  If you have any questions,

15     your Honor.

16           THE COURT:  No.  Okay.

17           MR. BHANSALI:  Good morning, your Honor.

18     Asim Bhansali of Kwun, Bhansali, Lazarus, and for Google, I'm

19     going to address the two remaining terms, and I'll start with

20     "low precision high-dynamic range execution unit" term, and

21     if we could go to the next slide.

22           So before talking about the intrinsic evidence, your

23     Honor, I just want to address this point that Mr. Hayes

24     mentioned a few times about Google's position on this term in

25     the Patent Office in the IPR that we're waiting for the

1    institution decision that we're going to get in the next

2    month and a half or so.

3         There's nothing, he hasn't pointed to any

4    inconsistency between the position we've taken there and what

5    we're saying here.  It's not at all unusual for a petitioner

6    not to seek a construction in the PTAB where the petitioner

7    doesn't believe that that construction is necessary to map

8    the prior art onto the claims.

9         So it's not really that we're taking at all an

10:10AM 10   inconsistent position, they haven't pointed to any

11   inconsistency, it's just the construction in our view wasn't

12   necessary at the petition stage to show that the prior art

13   maps to the claims.

14        And the other thing I would say, your Honor, is we

15   also heard a lot from Mr. Hayes about how Google is

16   purportedly rewriting the claim language, but here we put, to

17   start on this term, our proposed construction on the right

18   and Singular's on the left.

19        And as you can see, and as we'll see in a moment

10:10AM 20   when we look at the claim language, our proposed construction

21   is actually much more faithful to the claim language than

22   Singular's is.  Low-precision high-dynamic range comes right

23   out of the claim language.

24        The processing element, we both agree, this is a

25   processing element.  The performance of arithmetic operations

1    is something we also both agree that the unit does and is

2    also in the claim language and the use of numeric values,

3    being what the arithmetic operations are performed on, as

4    we'll see is very much supported by the spec. and is also

5    referenced in the claim language.

6         By contrast, it's Singular that is seeking to read a

7    hardware limitation into these claims, and so with that, let

8    me just briefly indicate what the three, what I think the

9    three areas of dispute are here, and then I'll kind of

10:11AM 10  address those in turn.

11        The first is, as I said, whether or not the claim

12   should be construed to, as the claim language requires,

13   include this low-precision and high-dynamic range as part of

14   the execution unit.

15        The second dispute is whether or not, as Singular

16   proposes, this hardware limitation, the arithmetic circuit

17   and the memory circuit should be read into the claim.

18        And the third dispute is whether or not this claim,

19   this term should be construed such that arithmetic operations

10:12AM 20  are performed on numeric values as opposed to on the physical

21   signal.

22        That last point actually comes up also in the

23   context of the next term, and so just for kind of efficiency,

24   I'll address that in the context of the next term because

25   both, in both terms, the question is whether the arithmetic

1    operation is performed on numeric values.

2           So let me start with the first issue, and if we

3    could go to the next slide.  The question is whether the

4    execution unit should be construed, whether the term to be

5    construed should be the "low-precision high-dynamic range

6    execution unit," and we would posit, your Honor, that our

7    position comes straight out of the claim.

8           If we look at the first line of the claim, what's

9    being claimed is a "low-precision high-dynamic range

10   execution unit."  Singular would propose to read that out of

11   the claim and simply have an "execution unit" rather than

12   an LP --

13          THE COURT:  I'm not sure, to me, those are

14   adjectives that modify execution unit, so if you put it back

15   in, if you define execution unit to be low-precision

16   high-dynamic range execution unit, isn't it then redundant,

17   wouldn't that claim read, "At least one first low-precision

18   high-dynamic range, low-precision high dynamic range

19   execution unit"?

20          MR. BHANSALI:  If you were to do it that way, your

21   Honor, but we're not -- we're not proposing, to be clear,

22   we're not proposing that because I guess there's a difference

23   between the term we're proposing to be construed and what

24   Singular is proposing to be construed.

25          The term we're proposing is "LPHDR execution unit,"

1    right, so that redundancy that your Honor is positing

2    wouldn't be there, and I think this is actually an important

3    point because the reason why we're proposing to construe

4    LPHDR execution unit is twofold.

5         First, if we go to the last element that we see on

6    this slide, it says, "Wherein the number of LPHDR execution

7    units in the device exceeds by at least 100," and then it has

8    further language of describing that, so the fact-finder is

9    going have to -- is going to have to find that there are 100

10:15AM 10   of these LPHDR units, so in the first element, they have to

11   map that and say, okay, what's the LPHDR execution unit, and

12   then at the end, they have to say, okay, there are 100 of

13   these, and so that's why it's important that the whole phrase

14   be defined so that when applying the claim, one can be sure

15   that what we're mapping the first part of the claim on is

16   also where we're finding 100 of these LPHDR execution units.

17        The only thing, the other point, your Honor, is that

18   Singular's response is, well, we don't need to construe this

19   to include low-precision high-dynamic range because the

10:16AM 20   second clause, that wherein the dynamic range clause defines

21   the low-precision and the high-dynamic range, and we don't

22   necessarily disagree that this defines the dynamic range and

23   an error level, but the point is the claim is on not just an

24   execution unit that executes this way, it's on a

25   low-precision high-dynamic range execution unit, and if we

1    look at the other claims in the patent, the other claims in

2    the patent actually have different -- there are other claims

3    in the patent that have different dynamic ranges and

4    different error levels.

5         In fact, other dependent claims that depend from the

6    same independent claim in the '273 patent that claim 53

7    depends from, such as claims 47, 48 and 49, have a different

8    dynamic range and a different error level, but, importantly,

9    they all claim the same low-precision high-dynamic range

10:17AM 10   execution unit, so that low-precision high-dynamic range

11   execution unit broadly covers all of those dynamic ranges and

12   error levels, and that's why, that's the second reason why

13   it's important that we're construing this entire concept of

14   the LPHDR execution unit rather than just execution unit,

15   which is actually, you know, a term that is just, you know,

16   just like a processing element.

17         THE COURT:  So 53 is a dependent claim?

18         MR. BHANSALI:  Yes, your Honor.

19         THE COURT:  It depends from what claim?

10:17AM 20         MR. BHANSALI:  It depends from claim 36.  It

21   actually has like a sub-dependency, so let me just make sure

22   I state this exactly correctly, your Honor.  I have the

23   patent up here.  If I could just have one second to scroll to

24   it.

25         So, 53 depends from 43, your Honor, and 43 then

1    depends from 36, and so 36 has kind of like most of the

2    language except that it has a different dynamic range and

3    doesn't include that part at the end about the 100 units.

4              THE COURT:  Okay.

5              MR. BHANSALI:  Then 43 adds the 100 units, and then

6    53 changes the dynamic from 1 over 65,000 to 65,000 to what

7    you see here, which is 1 over 1,000,000 to 1,000,000.

8              THE COURT:  Okay.  Can I ask what I'm sure is a

9    stupid and irrelevant question, but I'm going to ask it

10   anyway.  It says, "Exceeds by at least 100 to non-negative

11   integer number of execution units."  How could that number be

12   below zero?  In other words, why does it have to say

13   nonnegative?  I'm not sure I follow that.  If you don't know

14   why --

15             MR. BHANSALI:  Of course, Dr. Bates wrote the claim,

16   so I can't speak to that.

17             THE COURT:  I mean, we're talking about a physical

18   thing, right?  Are we not?  "Non-negative integer number of

19   execution units."

20             MR. BHANSALI:  Well, your Honor, that gets to the

21   next point.  The execution unit can be implemented in

22   software, but it is, I mean, even software has an embodiment,

23   right, it does exist, and so the way we read this claim is

24   that what this is sort of claiming is this idea of the

25   parallel processing and that there are 100 of the LPHDR

1    execution units.

2          The non-integer part, as I think your Honor sees,

3    that's the number of units that are adapted to execute -- is

4    the operation that are at least 32 bits wide.

5          THE COURT:  Okay.  It's an idle and curious point.

6    I didn't mean to interrupt you.  Go ahead.

7          MR. BHANSALI:  I completely understand, your Honor.

8    That's actually a good segue though, as I said, to the next

9    point, which is whether we should be reading this hardware

10:20AM 10   limitation of the circuit into the claim, and so there, as

11   your Honor heard, they want to read both an arithmetic

12   circuit and a memory circuit into the claim, so let me start

13   with that in general, just the idea of reading the hardware

14   in the claim.

15         There's nothing in the claim language here that

16   supports reading a hardware requirement into the execution

17   unit.  On that basis alone, the attempt to narrow the claim

18   to a hardware embodiment should be rejected.

19         Now, Mr. Hayes said, well, it's a thing, an

10:21AM 20   execution unit is a thing and suggesting that that is a

21   limitation to a hardware embodiment, but as the specification

22   states and as Singular concedes in the briefing, the

23   specification discloses a software embodiment, which means

24   the claims should be construed to cover that software

25   embodiment, and Singular has offered no basis for why any

1    particular claim should be construed in a way that reads out

2    that software embodiment.

3          Moreover, the claim that Singular --

4          THE COURT:  Does the software embodiment have an

5    execution unit?

6          MR. BHANSALI:  Yes, your Honor.

7          THE COURT:  Okay.

8          MR. BHANSALI:  Yes, your Honor.  Well, of the LPHDR

9    execution unit.  It is an execution unit, but, again, it's

10:22AM 10   the execution unit that's claimed in the patent, not just a

11   generic execution unit.

12         And if we could go to the next slide, please.  So,

13   Singular, and we saw this same claim actually reproduced in

14   Mr. Hayes' slide, Singular says, oh, no, wait a minute, we

15   have other claims, unasserted claims, that claim the software

16   embodiment so it's okay to read the software embodiment out

17   of the asserted claims.

18         Well, the problem with that is actually these other

19   claims support our view that you can't read the software

10:22AM 20   embodiment out of the term we're seeking to construe, which

21   is the LPHDR execution unit, so claim 68 is the claim that

22   they cite for having the software embodiment, and, in fact,

23   if you look at the preamble, it refers to a computer readable

24   memory storing computer program instructions, also could be

25   described as software, and then where it says it's emulating

1    this device.

2            Now, what's important here is that this claim, which

3    is the one they identify as the so-called software claim,

4    claims the exact same low-precision high-dynamic range

5    execution unit as in the asserted claim.

6            If we could quickly go back to the last slide.  So

7    here we see highlighted in the first, "Comprising at least

8    one first low-precision high-dynamic range execution unit,"

9    okay.  If we go to the next slide, back.  Again, "One first

10:23AM 10    low-precision high-dynamic range execution unit," so the

11    point is whether it's the claim that Singular itself is

12    saying is the software claim or the asserted claim, the LPHDR

13    execution unit, we'll take Singular's term, the "execution

14    unit" is exactly the same, so you can't construe it in one

15    claim to have a hardware limitation and then say at another

16    claim, it's only embodied in software.

17            The claim has to be construed consistently across

18    the patent, and, in fact, the family of patents, and so this

19    claim, the very fact that it has a software embodiment of the

10:24AM 20    same LPHDR execution unit that's in the asserted claim

21    supports and, in fact, requires that the LPHDR execution unit

22    in the asserted claim be broad enough to cover software.

23            So, for that reason, the hardware limitation

24    shouldn't be included at all.

25            THE COURT:  Let me make sure I understand.  But

1   they're saying they're emulating a second device comprising

2   this execution unit, so isn't that different from saying

3   there is going to be a second device, right?  I want to make

4   sure I understand this argument because --

5          MR. BHANSALI:  Yes, your Honor.

6          THE COURT:  -- what I think I heard you say is you

7   can't construe 53 to have a hardware limitation because then

8   68 doesn't make sense.

9          MR. BHANSALI:  Yes, your Honor.

10:25AM 10          THE COURT:  But isn't 68 saying it's a software that

11   emulates a hardware device, I'm being very simplistic here,

12   but isn't that what 68 says?

13          MR. BHANSALI:  Yes, your Honor, and so that's the

14   software embodiment.  In other words, it doesn't -- to be

15   clear, it doesn't say software that emulates a hardware

16   device, it says software that emulates the low-precision

17   high-dynamic range execution unit, and so in this claim,

18   emulation is the way that the software embodiment of the

19   low-precision high-dynamic range execution unit is

10:26AM 20   implemented, and so in order for that embodiment to work, the

21   LPHDR execution unit has to be broad enough to cover

22   software.

23          So, I mean, I think the emulator is just -- that's

24   just a way that the software is -- because it's not like a

25   software application, right, it's software that's performing

1    this execution.

2            THE COURT:  And, again, we're probably spending too

3    much time on this point, but let's say that claim 53 covers

4    an abacus and it's a physical thing, and then claim 68 says

5    software that emulates an abacus.  That doesn't necessarily

6    mean an abacus isn't a physical thing, it means you are

7    claiming an abacus and you are claiming software that

8    emulates an abacus, right?  I don't see how those are

9    inconsistent.

10:27AM 10            MR. BHANSALI:  Yes, your Honor.  If it had claimed

11    an abacus, I think that would be the case, but I think the

12    difference here is they are just claiming the idea of a

13    low-precision high-dynamic range execution unit, and an

14    execution unit is not inherently hardware, it's just, I mean,

15    software is often referred to as having units, right, so, in

16    other words, this isn't a scenario where their term is itself

17    on its face limited to a physical device.  It's actually

18    something that could be implemented in software, and they

19    have claims that are doing so, and the specification also

10:28AM 20    refers to having the execution unit embodied in software.

21            THE COURT:  Okay.

22            MR. BHANSALI:  Your Honor, if I could just read from

23    the spec., just, for example, the language here, they have,

24    "Moreover, generally, any of the techniques described above

25    may be implemented, for example, in hardware, software

1    tangibly stored on a computer readable medium, firmware or

2    any combination thereof."

3         So, they're making clear in the specification that

4    these techniques, the LPHDR execution can be implemented in

5    hardware or software.  Just to kind of reaffirm the point of

6    why this is different from kind of an abacus, because they

7    are referring to an execution unit that could be a software

8    unit.

9         THE COURT:  Okay.

10:29AM 10    (A recess was taken.)

11        THE COURT:  Are we ready to resume?

12        MR. BHANSALI:  Your Honor, I'm ready.

13        THE COURT:  Mr. Bhansali, go ahead.

14        MR. BHANSALI:  So where we left off was we talked

15   about just the problem generally with limiting the term

16   "LPHDR execution unit" to a "hardware embodiment," but

17   there's a further problem with Singular's attempt to read in

18   this idea of a paired memory into that term, and to be clear,

19   what Singular is asking the Court to do is to read the term

10:39AM 20   "execution unit" as a person of ordinary skill in the art

21   would understand it to require a paired memory circuit.

22        They are not saying that this is a means plus

23   function claim where we're limited to a particular structure

24   disclosed in the patent.  That's not what they're arguing,

25   what they're arguing is "execution unit," just as that term

generally would be construed has to include a paired memory
circuit.

Well, not only is that not supported by the
extrinsic evidence of how a person of ordinary skill in the
art would understand processing element, as I'll show in a
moment, it's also not supported by the specification.

Here, we have language from the specification that
talks about the embodiment where the embodiments, plural,
where they are including memory as part of their model, and
we see here, for example, they say our model of machine, and
then they reference it providing a small amount of memory
local to each arithmetic unit, and then further down below,
if we could stay on that slide for a minute, the prior slide.

Then further down at the bottom, they talk about,
they say of which signal is only an instance, and then for
purposes of discussion below, we call each unit which pairs
memory with arithmetic a processing element, but,
importantly, in this entire discussion, they have the
language, which is sort of consistent with what a person of
ordinary skill in the art would understand an execution unit
to be that these are not limitations of the present
invention.

In other words, the description in the
specification, the one place that they are pointing to where
it says that memory is paired with arithmetic, that's part of

1  a description of an embodiment that the inventor himself,

2  Dr. Bates, said that's not a limitation of the invention, so

3  at the time they wrote the patent, they said this is not a

4  limitation of the invention, but now they're coming into

5  court and saying, oh, well, wait a minute, the LPHDR

6  execution unit has to be paired with a memory.

7  But that's not simply not the case, not only because

8  they say that here in the spec., but if we could go to slide

9  43, so slide 43 is -- your Honor mentioned reading a computer

10:42AM 10  science treatise at the break.

11  This is actually a computer science book that we

12  cited in our papers from the time, actually, prior to the

13  time of the patent, referring to DSP integrated circuits, and

14  it defines this notion of a processing element, and it kind

15  of describes the different elements, and it says this is what

16  a processing element is, and then it says, "We use the more

17  general term "processor" with its internal memory and control

18  circuitry," so the point is here that extrinsic evidence also

19  confirms what we see in the extrinsic evidence.

10:43AM 20  You, obviously, look to the intrinsic evidence

21  first, as the Court knows, and then the extrinsic evidence,

22  and the extrinsic evidence says, "which is that a processing

23  element does not have to include memory," and so if we can

24  now go back to slide 41, so this is a description on the

25  left, we see the asserted claims, and on the right, we see

1     certain dependent claims that actually are dependent from the

2     independent claims that are asserted, and so the asserted

3     claims do not have a memory requirement.  That's not

4     described in those claims.  By contrast --

5          THE COURT:  What does the locally accessible part of

6     it mean?  I mean, that suggests to me that there's some other

7     kind of memory that's not locally accessible, in other words,

8     that there's a broad of category of memory, a subset of which

9     is memory that's locally accessible.  Is that wrong?

10:44AM 10     MR. BHANSALI:  Your Honor, the locally accessible

11     certainly is a description of memory, but the asserted claims

12     don't refer to memory at all, so, in other words, it's not as

13     if the asserted claims say wherein the device includes

14     memory, and then the dependent claims come in and say wherein

15     that memory is locally accessible.

16          The asserted claims don't refer to memory at all,

17     and this is actually one of the problems with the

18     interpretation that Singular is offering.  Well, they say,

19     Well, paired with memory, but they don't actually offer any

10:45AM 20     extrinsic evidence or any language from the spec. that says,

21     well, paired memory is different from locally accessible

22     memory.

23          For example, paired memory Mr. Hayes said today,

24     well, that just means connected to, but there's actually

25     nothing, there's no language where they are saying, well,

1    paired memory is somehow different from locally accessible

2    memory, or if we can go back to the prior slide for a moment,

3    for example, shared memory, so the spec. here actually refers

4    to the possibility that you can have a design that includes

5    shared memory, so you can have shared memory, you can have

6    paired memory, you can have locally accessible memory, which

7    may be paired, it may be shared.

8            The point, your Honor, is that there's no limitation

9    on an execution unit is not limited to any particular kind of

10:46AM 10   memory, it's just an execution unit.  And that's clear both

11   from the extrinsic evidence, the treatise we saw, as well as

12   here in the spec. where it says that that's not a limitation

13   of the invention, and so the fact that there are dependent

14   claims that refer to locally accessible memory just simply

15   confirm that the independent claim has to be broader, and

16   they haven't offered any evidence from the spec. or expert

17   declaration or extrinsic treatise evidence that would suggest

18   that somehow paired memory is broader than the local

19   accessible memory, or, for that matter, any support in the

10:47AM 20   spec. for limiting the execution unit to one that has paired

21   memory because they would be limiting it to, at best, it

22   would be limiting it to a particular embodiment where the

23   specification says that embodiment is not a limitation of the

24   invention.

25           And with that, your Honor, unless your Honor has

questions on this term, I would move onto the last term that
we'd be arguing.

THE COURT:  Okay.  Go ahead.

MR. BHANSALI:  If we could go to slide 44, just
briefly.  So this next term is the "first input signal
representing a first numerical value."

MR. HAYES:  Your Honor, this is Hayes.  To be fair
to my Brother here, it appears he's going to run out of time
in five minutes.  I'm just going to give him a heads-up.

THE COURT:  I've been interrupting him.  Let's see
how quickly you can get this done.

MR. BHANSALI:  Your Honor, I'll be fairly prompt,
but I, obviously, welcome the opportunity to answer your
Honor's questions.

THE COURT:  Understood.

MR. BHANSALI:  So, there are two issues, your Honor,
with respect to this term.  The first issue is, and I think I
mentioned that this also applies to the prior term, whether
or not the LPHDR execution unit operates on values, numerical
values, or whether it operates on signals.

Singular says they're relying on plain, ordinary
meaning, but if you look at their briefing, and, in fact,
Mr. Hayes' argument, they're suggesting that somehow the
arithmetic operation is taking place on a signal, and then
the second dispute is whether we should refer here to a

1  digital or analog representation to clarify what the signal

2  is referring to.

3          So, turning to the first dispute, your Honor, this

4  is just crystal clear from the specification that what the

5  claim is referring to in the claim language is it's saying

6  that there are arithmetic operations that are taking place on

7  numerical values, and those numerical values are physically

8  represented by a signal.  That's the first input signal

9  representing a first numerical value.

10:49AM 10          If we could go to the next slide.  So, this we have

11  four different citations from the specification here, all of

12  which confirm that the arithmetic operations are being

13  performed on numerical values.  It refers to perform

14  arithmetic operations on numerical values.  It says that

15  processing elements are designed to perform arithmetic

16  operation on numerical values, the input values operated on

17  by the processing element.

18          Take the form of electrical signals.  This is what

19  we're saying.  There are electrical signals, but "the values

10:50AM 20  are what are operated on," and then it says, "implementations

21  may vary in dynamic range of space of the values that they

22  process," but you don't have to just take our word for it,

23  your Honor, Singular's own admissions show that they

24  understand that actually the arithmetic operations take place

25  on numeric values.

1          Let's go to the next slide, please.  Here's an

2     excerpt from somewhat Singular told the U.S. Patent Office in

3     the parallel IPR proceeding just about a month, a little more

4     than a month ago, February 24th, 2021:

5          "Moreover, whether the numbers are physically

6     represented -- " physically represented.  That's our signal.

7     "-- using charges, voltages, various forms of spikes or other

8     forms or a combination of digital and analog

9     representations --" note that that language also follows our

10:51AM 10     claim construction "-- has no bearing on the invention, which

11     operates on the values represented, not their physical

12     representation."

13          So what Singular is telling the PTAB in this

14     statement, and, remember, under Federal Circuit precedent,

15     this statement that they've made in the IPR is now part of

16     the prosecution history of the patent, which the Court can

17     take into account under the *Phillips* case to interpret the

18     claims, they're saying the invention, the LPHDR execution

19     unit, operates on the values presented, values represented,

10:52AM 20     not on the physical representation, and they go on to say

21     that the digital and analog representations are that physical

22     representation.  That's how we're proposing to construe the

23     signal.

24          So, this statement that they made to the PTAB

25     precisely confirms our proposed claim construction, and if we

1    could go to the next slide, please.

2          Not only that, but Singular admitted in its

3    complaint in this case that the patent claims operation,

4    arithmetic operations on numeric values.  These are all parts

5    of the claim that we've cited in our briefing.

6          Again, it refers to operation on an input numerical

7    value.  It refers to manipulating numbers, and, again, in the

8    last bullet, it couldn't be clearer.  Dr. Bates' LPHDR

9    processing elements, frequently generate in response to

10   request to perform arithmetic operations on high-dynamic

11   range numbers, so, again, this is in their complaint, they're

12   referring to the patent as requiring operation on numeric

13   values.

14         Now, Singular, nonetheless, takes the position that

15   we're somehow rewriting the claim and reading signals out of

16   it, but the language that they cite from the spec., again,

17   actually supports our interpretation, which if we could go to

18   the next slide, which doesn't read signals out of the claim

19   but puts them in the proper context which is that the signals

20   are the physical representation, but it's the values that are

21   being operated on, so this was language that Singular cited

22   and Mr. Hayes referenced in his presentation, and it's the

23   part at the end that he referred to, which is that it's

24   saying that values take the form of electrical signals

25   representing numerical values, but it's clear from the

1    context of this statement that it's talking about the

2    arithmetic operations, and it's referring to the input,

3    output and intermediate values that are received by, output

4    by, and, importantly, for this claim construction, operated

5    on by the PE, the processing element, so, again, the

6    specification, the language that they're citing is saying

7    that it's the values that are being operated on, and those

8    values are represented by signals.

9          We're not reading the term signals out of the claim,

10   we're simply saying that the signals are the physical

11   representation, but it's the values that are operated on.

12         THE COURT:  I'm struggling to understand what the

13   point of this is or what you're even fighting about.  I mean,

14   I am very far from a person of ordinary skill in the art, but

15   I read this, you know, a value is an abstract thing, the

16   number 5, that's a value, it's abstract.

17         In a computer, that takes the form of an electrical

18   signal, right, which is whatever it is, 101.  I don't know

19   how that's done, electrical charge or something, but that's a

10:55AM 20   signal, and it represents a numerical value, which is 5, and

21   I'm not sure what you're fighting about.  I'm not sure what

22   your construction adds to that.

23         MR. BHANSALI:  Yes, your Honor.  And I actually

24   think the next slide may help to answer that question.  So,

25   the important thing here is that this first input signal

1    representing the first numerical value, that ends up being

2    the antecedent to another part of the claim, so if we can

3    show the highlighting here on this slide and the next one as

4    well.

5         Okay.  So we have the first input signal

6    representing a first numerical value, and then there's a

7    dynamic range of the possible valid inputs, so the possible

8    valid inputs, the antecedent basis of that are the inputs,

9    the input signals representing the first numerical value, and

10:56AM 10   this is where the issue comes in because what we're saying is

11   that those inputs have to be numerical values.

12        They can't be signals, and the reason for that, as

13   we'll show on the next slide, is because the possible valid

14   inputs, they're expressed in terms of a dynamic range of

15   numbers, not a dynamic range of signals.  And so for the

16   claim to make any sense and for the fact finder to be able to

17   determine whether or not the dynamic range is met and

18   ultimately how the error is calculated, what we have to be

19   looking at are numerical values that are being input to the

10:57AM 20   arithmetic operation, not the physical signals that those

21   numerical values are represented by.

22        So, if I could go to the next slide.  So just a

23   quick reminder of Mr. Kamber's tutorial, and your Honor said

24   this a moment ago, so maybe I'm repeating it, so you've got a

25   numerical value, and then that's represented by a physical

1    input signal.

2         So, if we posit a scenario where, as Singular seems

3    to be suggesting, the arithmetic operation itself is being

4    performed on an input signal, and if we could follow the bill

5    there, we would basically be saying the dynamic range of the

6    possible valid input signals to the first operation is at

7    least as wide as 1 over 1,000,000 to 1,000,000.

8         Well, that doesn't make any sense because you can't

9    express an input signal that way by describing it as

10   1,000,000 to 1,000,000.  By contrast, you can express a

11   numerical value that way, and so if you take our

12   construction, which is the dynamic range of the possible

13   valid numerical values to the first operation is at least as

14   wide as from 1 over 1,000,000 to 1,000,000, then that part of

15   the claim makes sense.

16        So, your Honor, to answer your question as to why

17   there's a fight here, it's because we think it's very

18   important to understand that these inputs to the arithmetic

19   operation are numerical values, they are not the physical

20   representation because this part of the claim only makes

21   sense if those inputs are, in fact, numeric values.

22        Now, if we could go to the next slide.  And so they

23   pointed to their expert's position about signals and values,

24   but I want to just make one point here on the experts.  Our

25   expert was only opining on indefiniteness, and, notably, they

1    did not put in any expert declaration in the opening brief on

2    this term.  They only put in an expert declaration in the

3    responsive brief, and so we did not then have a subsequent

4    expert response to that, but I think the important point here

5    is if you look at their expert's deposition testimony, he

6    admits that 1 over 1,000,000 to a million is not something

7    that he is saying is the input range of an input signal.

8         Again, that's just confirming that the way that

9    dynamic range is described is actually the way you describe

11:00AM 10  numeric values, not the way that you would describe the

11   dynamic range of a signal.

12        If we could go to the next slide, please.  This is a

13   longer answer after he says, you know, that's not what he's

14   saying, he kind of is saying a point that Google made about

15   dynamic range, but he's making it clear that that point that

16   he's refuting is actually not saying anything about the

17   patent.

18        In other words, he's not in any way disputing that

19   the claim language in the patent is expressing ranges in a

11:01AM 20  way that relates to numerical values rather than signals.

21        And that really gets to one of the -- I think the

22   key point here, your Honor.  We're not disputing that

23   numerical values in the claim are represented by signals.

24        There are --

25        (Court reporter couldn't hear)

1          THE COURT:  I can hear you fine.  Mr. Bhansali, why

2     don't you back up a bit.

3          MR. BHANSALI:  Yes, your Honor.  I was just saying

4     that we're not saying that signals are not part of this

5     claim.  In fact, we agree that signals are part of the claim,

6     but the signals are used to represent referred to in the

7     claim are, as the specification values, they're not the

8     physical signals.  That's not only what the specification

9     says, but, as I said, is also what Singular told the patent

11:02AM 10     office.

11          So, lastly, unless your Honor has more questions on

12     this issue, I just want to turn to the last part of this

13     construction, which is the language where we say that signals

14     should be construed consistent actually with the position

15     that Singular has taken as the digital and/or analog

16     representation.  That's the other part of this claim term.

17          And there, your Honor, all that we're doing with our

18     construction is, again, clarifying the language that the

19     signal is referring to the representation of the values, and

11:03AM 20     in this instance, these are a digital and/or analog

21     representation.

22          That's consistent with the specification.  We have

23     two places from the specification cited here that refer to

24     implementation in digital or analog.  There's some others

25     that we cited in our briefing.

1        And, furthermore, Singular's only response to this

2    is, well, Google would be improperly limiting the claim to

3    some embodiments, but the problem with that position is they

4    haven't identified any embodiment in the specification or

5    that their expert has identified or that might exist that

6    would be limited, that would be read out by our claim

7    construction.

8        So, we're not actually excluding any potential

9    embodiments, all we're doing is clarifying the language of

10   the claim in a way that makes clear this very point that

11   we've been talking about, the distinction between the values,

12   which is what the arithmetic operation is performed on, and

13   the signals, which are the physical input in the claim, and I

14   would just say it's pretty ironic for Singular to be saying,

15   to be opposing this part of the construction because they're

16   on the one hand saying we're reading the word "signal" out of

17   the claim, but then they're opposing this part of the

18   construction, which actually sort of describes the signal in

19   a way that's consistent with what the specification says and

11:05AM 20   actually what they told the patent office in the excerpt from

21   the IPR proceeding that we saw.

22        THE COURT:  Okay.

23        MR. BHANSALI:  With that, your Honor, I don't have

24   anything further on these terms.

25        THE COURT:  Let me go back then to Mr. Hayes.  If

1    you think that you need more time than the time you have

2    remaining, you can say so.  One advantage of Zoom as opposed

3    to getting on an airplane from San Francisco, it's not

4    terribly inconvenient for us to continue this hearing.  Today

5    doesn't work, but, you know, either later this week or maybe

6    spilling into next week.

7            MR. HAYES:  I think, Judge, I can wrap it up pretty

8    quickly.

9            THE COURT:  All right, Mr. Hayes.

11:06AM 10            MR. HAYES:  To start off, anyways, to start off a

11    little bit where my Brother left off, we've got a lot to go

12    over, but he keeps saying that he's not trying to read out

13    the term, "signal."  That is absolutely incorrect.  The claim

14    says, "A first operation on a first input signal,

15    representing a first numerical value."

16            In his construction, if you adopt his construction,

17    I don't get why they're doing this because the claim doesn't

18    say a first multiplication on a value, it says a first

19    operation on an input signal, which means you've got an input

11:07AM 20    signal coming in and a bunch of things can happen to that

21    signal before it's multiplied.  That's exactly how it's

22    claimed.

23            And if you look at, for example, Fig. 4, and Fig. 4

24    is what the processor is.  That's what the PE is and what it

25    does, and they just don't go to the multiplier for

1    willy-nilly execution.  They do other stuff, and that's

2    exactly what he wants to change.  He wants to say that

3    there's no input signal, that what it really is, a value.

4    The value skips right to the multiplier, and we don't do

5    that.  That's what you're going to hear, but that's not how

6    it's written.  I can say this forever, but if this isn't

7    trying to rewrite the claim, nothing is.

8          And then if we could go to the argument, locally

9    accessible, I don't think I have to spend much time on that.

11:08AM 10   We all know memory and locally accessible memory are

11   different.  One is local, one isn't.  One could be somewhere

12   that's not even in a room, and one could be right on the

13   chip, whatever, so, I mean, that's not even a "issue" that

14   they argue.

15         Then they argue this issue about the -- oh, it must

16   cover, what did they say, it must cover a software.  It

17   doesn't cover software.  This is a device, that's what it

18   says, a device having what?  A processing element.  That's a

19   thing.

11:08AM 20        The processing element having what?  An input.

21   That's a thing.  The processing element having an output.

22   That's a thing.  And if you look at how you claim software,

23   you say emulate all of that.  Nothing of that nature is in

24   there, so, I mean, that's just a few things.

25         And also one thing my Brother says, oh, we did

1      nothing inconsistent in the Patent Office.  Give me a break.

2      In the Patent Office, both of these terms are plain and

3      ordinary.  "Here, we're going to change the whole thing."

4           So, in that sense, Judge, they are rewriting.  And

5      another thing I'd like to bring up, I forgot the first time,

6      if we look at slide 13 because sometimes this is interesting.

7      If you see that, this is the final result --

8           THE COURT:  Hold on, it's not up yet.

9           MR. HAYES:  This is the final result of what their

10     machinations do.  It says, "Designed to perform arithmetic

11     operations," perform, not execute, "arithmetic operations,

12     not on signals on numerical values adapted to execute a first

13     operation on a first input signal."  That makes absolutely

14     zero sense to begin with just from English.

15          No one is going to know even what it means, and

16     that's why you don't rewrite a claim, real simple.  That's

17     why I submit it's plain and ordinary.

18          Now, if we go to his argument, the argument if you

19     pull up again slide 19, this is their second attempt here

11:10AM 20  that my Brother emulated.  He's tried to say, oh, we're going

21     to rewrite this term, and this is exactly -- you got the

22     wrong thing.  19.  Okay, here we go.  Sorry.

23          Look at what we have here.  They add analog to the

24     claim.  Analog is not in the claim.  They add digital to the

25     claim.  They add and/or to the claim.  They delete first,

1   they delete input signal.  That's gone.  They delete that the

2   input signal is representative of anything, and they change

3   signal to value.

4         This, again, is the same claim that they

5   represented, which is an admission, to the patent office.  It

6   needs no construction.  Come on.  You can't rewrite the

7   claim, and I think, Judge, that's about as easy to conclude

8   as follows:

9         Now, before I get into repeated execution, which is

11:11AM 10   the last thing, I would like to comment on a few of what my

11   Brother said.  Also, if we could pull up slide 19 of theirs,

12   of Google's.

13         ( A recess was taken.)

14         THE COURT:  Mr. Hayes.  And, again, if you need more

15   time, I'll give it to you.

16         MR. HAYES:  Are we going to 12?

17         THE COURT:  Again, I've got a call with about 1,000

18   people starting at 12, so how about 11:50?

19         MR. HAYES:  Okay, I can do that.  Anyways, claim 19,

11:17AM 20   my Brother puts that up as an analog signal.  That's not an

21   analog.  They withdrew that.  If you look at the patent and

22   specifically column 14, lines 58 to I believe 60, 59 and 60,

23   they're talking about an analog, typical analog signal itself

24   modulates and then comes to stability over time period before

25   it's even, before you even start going in and taking the

1    statistical mean thereof.

2            It doesn't vary like this.  If it varied like that

3    and that thing to the right was a TV, nothing would work,

4    your phone wouldn't work, nothing would work.  If you look at

5    the column 14, yeah, I bring it up now, but 59 and 60,

6    they're talking about the variants of the signal

7    approximately 1 percent.  That's hardly 1 percent.  That's

8    just makeup to extend it.

9            Next my Brother uses -- you can take that off.  Next

10   my Brother uses -- you can take that off.  Next, my Brother

11   uses a slide, we'll just say, oh, this is heat.  Who cares?

12   If it's hot, you left your phone out for two days and it

13   doesn't work, so what?  We're talking about workable signals,

14   et cetera, and so, I mean, that has nothing to do with the

15   price of bread.

16           Let me see what else.  If we look at slide 29, if

17   you look at slide 29, they spend some time on that saying,

18   oh, our expert confessed to something to that effect about

19   fluctuation.  That's cropped, Judge.  Both of those two

11:19AM 20   portions of the declaration are cropped.

21           In fact, if you read the next sentence on 33, it

22   either goes along, it explains how it comes down to a stable

23   situation that anybody who took second year calculus with a

24   little statistics can figure out.  The same thing here on the

25   bottom line, 34, that's grossly cropped.  The "..." is

1    exactly opposite what they cited it for, and I point that out

2    just simply because, you know, this is a consistent way, I

3    can't go through every single thing that they cropped, but I

4    think a few uncrops, a few cropped will sort of make my

5    point.

6        Then someone said that, oh, there's no support in

7    the spec. for the law of large numbers.  Of course, there is.

8    It says the idea is they get a statistical mean.  A

9    statistical mean by definition in a situation such as this

11:20AM 10   where they are doing one billion executions a second is a

11   statistical.  I mean, the law of large numbers is exactly how

12   you do it.

13       THE COURT:  But that's the question, right, I mean,

14   it gets back to repeated execution.  Are we talking about a

15   billion or a trillion or are we talking two or three?

16       MR. HAYES:  No, we're not talking about any number,

17   per se.  You can't have a specific number.  Why?  Because all

18   of the systems are different, all of the perturbations are

19   different, and analog signals are going to have a different

11:21AM 20   analog signal.  The idea, if you do repeated executions, as

21   we put in the declaration, pursuant to the law of large

22   numbers, which, indeed, then flattens out exactly at a

23   number, and that's exactly why if you look at the claim,

24   you're not comparing an exact number to a number, a result.

25   You're comparing to a statistical mean that is representative

1      of the population.  That's the way it works.

2             And to sort of put that to bed, let me just show

3      you.

4             THE COURT:  But what you're saying is that a person

5      of ordinary skill in the art would read that and interpret it

6      as such, right?

7             MR. HAYES:  Absolutely, Judge, and, by the way, in

8      my slides.  Go to slide 25.  Slide 25, all of these, what I

9      just said there, are all supported in spades by our expert's

11:22AM 10   declaration, and, interestingly, their expert, who they put

11     their thing and doesn't even mention the words "statistical

12     mean."

13            What he does is take the average, the average of 10

14     perturbations, right, and then divides, et cetera, to get an

15     average.  That is like saying this is a sytem that's

16     operating at illiops a second.  That's like saying I want to

17     count everybody in China, and we're going to figure out how

18     tall they are on average.  We're going to take the first 10

19     guys off the street and a few women, and, boom, that's the

20     answer.

21            And that is, as my expert said, not only absurd but

22     is technically incompetent basically, and to do that, you've

23     got the next one, 25.

24            Yes, 26, and this right there, I won't go through

25     it, but that's the law of large numbers, et cetera, but

1          that's unrebutted, unrebutted, period.

2                 Next slide 26, same again, what a person of ordinary

3          skill in the art would understand.  Same again, unrebutted

4          expert testimony as opposed to what do we have, attorney

5          argument on one side, and the notion that they couldn't have

6          submitted an expert report, sure, they could.  All they had

7          to do is ask leave to do it.

8                 But, in any event, the next one, the next slide,

9          this is, again, unrebutted, taking the average of a few

11:24AM 10  samples, well, I guess Lee thinks that's okay.

11                And, anyways, if we look at slide, 28 okay.  Now we

12         get down to the nitty-gritty.  The first thing that Google --

13         the reason their argument is technically erroneous is they

14         ignore the term "statistical mean."  That's in the claim,

15         it's not arithmetic average.

16                One skilled in the art would not think they're going

17         to rely upon a number on that red box.  Come on, do you know

18         how long it takes to get that graph run where you get a flat

19         statistical mean under the yellow box?  That's less than one

11:25AM 20  millionth of one second, period, and on the left, it is

21         irrelevant.  On the right is what one skilled in the art

22         figures out.  That's exactly how it's claimed.

23                You don't have to know that it's Number 12023 and

24         put that in the claim.  If that's the case maybe, what, one

25         human alive would have traced, so to speak.  That's not how

1    you do statistics, and that's what they ignore.  They ignore

2    both of those, and as we can see, Judge, this happens here

3    over and over, and the law of large numbers, that's like

4    saying, oh, there's no support.  Of course, there's support

5    for the word "statistical," and we gave the definition of

6    "statistical," et cetera.  But that's like saying there's no

7    support for a mechanical case, F equals MA, there's no

8    support for gravity.

9         This has been around since I -- of course, it's been

11:25AM 10   awhile -- went to engineering school, and our position is

11   relatively simple.  It's that one of ordinary skill in the

12   art, who obviously would have taken, gone to college, would

13   be an engineer, he would at least have taken a basic

14   statistic course showing the law of large numbers, and he

15   would be able to determine the statistical mean in

16   one-millionth of a second, assuming, you know, assuming that

17   he didn't skip that class.

18        But, in any event, then I want to give you this.

19   Judge, the reason I put this in is to just show you how one

11:27AM 20   of ordinary skill in the art would determine infringement,

21   that it's not indefinite, it can be done ASAP.  Let's assume

22   now, if you can see, the red blocks are just multipliers in

23   the system.  You got A and B going into the blocks.  Out

24   comes the first answer, let's assume it's an analog signal,

25   as they say, and it's 4.1.  The next one, you do the same

1    thing, and what is it, 4.3.  The next one and the next one,

2    and you get down to like A4, and it's C, 4.34, so you do

3    that, and what you do is you do it pursuant to law of large

4    numbers, if that's what you've been taught, and what do you

5    get, you get a statistical mean at approximately 4.2.  That's

6    what you get.

7         Now, how do you know if it infringes or it doesn't

8    infringe?  Well, the first thing you do, according to the

9    claim, is you multiply 2 times 2 because that's the exact

11:28AM 10  mathematical input.  You got the 4.  Then you take the 4.2,

11   which is the statistical mean, you subtract from it the 4,

12   and you get .2, and then that is 5 percent, so that

13   calculation is wrong.  It's off by 5 percent.

14        All right.  You know that.  Then what you do is you

15   repeat and do this.  Is there another slide?  Then what you

16   do is you repeat this for all valid inputs, right, and then

17   at the end of the day, if 5 percent of the executions are

18   mathematically wrong by at least 5 percent, then you

19   infringe.  That is exactly how it's done.  That's exactly how

11:29AM 20  it's done in the complaint, by the way, et cetera, and this

21   is it.

22        Anybody skilled in the art could do this without any

23   concern, and now, Judge, I think with all due respect,

24   hopefully you'll have time for lunch.

25        THE COURT:  All right.

1          MR. HAYES:  Thank you.

2          THE COURT:  All right.  Thank you.  Do you want to

3     do a quick response of any kind, I guess, Google, rather than

4     naming any of the three lawyers, do you want to do a quick

5     response?

6          MS. YBARRA:  Yes, your Honor, I think I can do my

7     response in about 10 minutes, if that's okay with, so you can

8     have time for lunch.

9          THE COURT:  All right.

11:29AM 10        MS. YBARRA:  So, starting with a couple of points

11     that Mr. Hayes made, he said Dr. Wei doesn't mention

12     statistical mean in his declaration.  That's not so.  Dr. Wei

13     discusses how the statistical mean overrepeated execution is

14     indefinite, and Mr. Hayes said statistical mean, anybody

15     would know what that means.  That's not accurate either.

16          Dr. Khatri was asked multiple times in his

17     deposition whether statistical mean differed from arithmetic

18     mean in any way, and he refused to provide an answer and then

19     said it was outside the scope of his opinion, and that's his

11:30AM 20     testimony on that point is Exhibit A to our supplemental

21     claim construction brief at page 54, line 6 through 25.

22          If we could pull up, Matthias, the last slide of our

23     deck, Dr. Khatri's declaration at paragraph 34 that Mr. Hayes

24     was just discussing.  This is the graph as it's presented in

25     Dr. Khatri's declaration, and he says the red box is meant to

1    zoom in on the graph below, and that graph plus the results

2    of repeated execution of a multiplication operation, 2 times

3    1, and the blue line shows the average of the output value,

4    and, Matthias, if we could do the animation there.

5            We were just kind of zooming in on Dr. Khatri's own

6    figures here.  I think there's one more animation there.

7    This is in Google's rebuttal slides.

8            MR. HAYES:  There is no animation.  You didn't send

9    an animation to us, counsel.

11:32AM 10        THE COURT:  Well, let's see it.

11            MS. YBARRA:  All of the visuals are depicted on the

12   slides that we sent you, but on the left side of the graph,

13   the arithmetic average of the output is unstable and

14   fluctuates significantly over short periods of time, as shown

15   in the red box.

16            This is Dr. Khatri's language.  This is from his

17   declaration, and he says it begins to stabilize, the average

18   begins to stabilize with more repeated executions of that

19   single operation.

11:32AM 20        So as you move to the right, more time has past and

21   more executions of the execution are repeated, and he says

22   the magnified portion of the graph in the yellow box on the

23   right represents the statistical mean over repeated execution

24   were cited in the claims.  So he says on the left side,

25   that's not the stable statistical mean; on the right side, it

1   is.

2          But to be clear, it's not that the noise stabilizes,

3   it's not that the noise flattens out, all Singular is saying

4   is once you have a large enough number of samples, additional

5   repeated executions are not going to impact the average, and

6   that's just the law of large numbers, but the processor

7   itself, the device itself is not stabilizing.

8          And every part of the blue line here reflects the

9   statistical mean of a repeated execution, and that line

11:33AM 10   drifts above and below the error threshold claimed by claim 1

11   of the '273 patent, which is the example we're using, and I

12   think if you could do the last animation, Matthias.  That is

13   in this calculation of 2 times 1, the error threshold would

14   be at 2.001.

15          And you can see there's a difference between the

16   left and the right whether you are falling above or below the

17   line.  Dr. Khatri says ignore the left part of the line,

18   ignore everything in the red box.  He says it's only what's

19   in the yellow box that's on the right side of the box that

11:34AM 20   counts.  Only this is the claimed statistical mean, and you

21   just heard Mr. Hayes repeat the same thing that the left side

22   of the graph is irrelevant, but that's just based on

23   Dr. Khatri's opinion but nothing else.  He can't point to --

24          THE COURT:  I think, if I understand the argument

25   right, he's saying it isn't just his opinion but this is what

1   a person of skill in the art would understand that you don't

2   look at the red box, you need to get to the yellow box.  It's

3   not his personal opinion, I think, I mean, I have to go back

4   and look at it, I think that was the point that he's saying

5   that a person of skill in the art would understand.

6          MS. YBARRA:  He is saying a person of skill in the

7   art would understand that, but that's not enough.  He can't

8   come in and make that statement without pointing to any

9   objective guidance in the specification just say, and we cite

11:35AM  10   case after case in our briefs for that very proposition.

11   It's not sufficient for him to say -- the specification has

12   to give guidance to someone else looking at this to know what

13   the scope of the claim is, and the blue line is the

14   statistical, it represents the statistical mean of repeated

15   execution all the way through, not just on the right side.

16          A different person of skill in the art might

17   conclude that the statistical means stabilizes, or as

18   Dr. Khatri refers to it, ceases to fluctuate significantly or

19   doesn't meaningfully fluctuate at a different point than the

11:36AM  20   yellow box on the right.

21          Someone else might conclude it happens towards the

22   right side of the graph in the red box, which is flattening

23   out there as well.  Dr. Khatri says that this graph

24   demonstrates the lack of a need to identify the precise

25   number of executions necessary to ascertain the claims of

1    statistical means, but actually it just shows the opposite:

2    How does one skilled in the art know at what point on the

3    graph the statistical mean has stabilized?  That's our whole

4    point.  There's nothing in the intrinsic evidence, looking at

5    the intrinsic evidence record that provides any guidance

6    about when you've reached stabilization.  Is it, you know,

7    the right side of the red box?  Is it the yellow box?  Is it

8    somewhere in between because the line on Singular's graph, if

9    you look at Dr. Khatri's chart, is flat for most of the way

11:37AM 10    through.

11         One other point on this, and then I want to go to the

12    last slide that Mr. Hayes had pulled up.  Paragraph 36 of

13    Dr. Khatri's declaration, he acknowledges that the line will

14    not always flatten out in all circumstances.  He implicitly

15    concedes that heat is generating noise, the line won't flatten,

16    the average won't stabilize, but he just dismisses that by

17    saying, well, that device that produced such a result wouldn't

18    be useful, which is not really helpful here.

19         If we could go to the last slide that Mr. Hayes was

11:37AM 20    just looking at, and this was in Singular's deck, and I'll be

21    brief here.  First of all, this blue box here and the text in

22    the blue box is incorrect insofar as it's tended to reflect

23    the claim language.  The blue box says it's 5 percent of all

24    executions are mathematically wrong by .05 percent, the

25    device infringes.  That's not what the claims say.  The

1    claims say for at least 5 percent of the possible valid

2    inference to the first operation, the statistical mean of a

3    repeated execution must differ from the exact mathematical

4    result by at least .05 percent.

5         I just want to clear that up, but this chart also

6    really illustrates Google's point on indefiniteness.

7    Mr. Hayes says that he uses four different examples of an

8    operation and then gets to end.  An end here is doing all of

9    the work.  Whether or not the claim language is met will

11:38AM 10    depend on N, and Singular shows you four calculations and

11    then says after doing enough, you arrive at 4.2, which is

12    presumably the stable statistical mean, but we saw with

13    Dr. Khatri's testimony, he can't tell us how to figure out N,

14    how many repeated executions does one need to perform.

15    There's no objective guidance anywhere in the patent record

16    on that and none on this slide either.  I think that is all

17    from us --

18         THE COURT:  Okay.

19         MS. YBARRA:  -- unless you have any further

11:39AM 20    questions.

21         THE COURT:  All right.  Mr. Hayes, last word.

22         MR. HAYES:  Yes, your Honor.  If you can pull up

23    that slide that my Sister just referenced.  She indicated all

24    we did is take four numbers, et cetera.  This is an example,

25    obviously, A to the N does not -- it means it just keeps

1    going.

2          Secondly, the blue box is not incorrect, it says

3    repeat for all valid inputs, so that's a misstatement.

4          Third, when she keeps talking about Dr. Khatri and

5    our expert, your Honor, I just suggest that the clerk read

6    the quotes that she quotes because, believe it or not, 90

7    percent are indeed miscited.

8          Now, if you can give me the slide before that.  Your

9    Honor, I really believe that one of ordinary skill in the art

11:40AM 10   would not, even Dr. Wei would not assume over there on the

11   far left red box where it's bouncing around like that is a

12   statistical mean of anything, and, frankly, if you look at

13   what he did there, his calculations probably don't even get

14   past the red line.

15         Don't forget, he did eight of them, and you can do

16   1500 one millionth of a second.  I mean, I just think the

17   argument that was made, now, from a factual point of view,

18   his graph, as in the declaration of our expert, is exactly on

19   the exact parameters given by Dr. Wei.  The only difference

11:41AM 20   is it complies with the law of large numbers and then

21   generates a statistical mean as such.  That's it, Judge,

22   thank you.

23         THE COURT:  All right.  Thank you.  We'll pause

24   there.  I know that sometimes after a Markman Hearing, the

25   parties want to do follow-up, you know, supplemental

1   briefings either to correct or to respond to something.  I

2   will permit that, but let's get that in let's say close of

3   business a week from today, and I won't limit you.  If you

4   think you have something to say, I'll let you say it.  You

5   won't have to file anything.  I won't put a page limit on it,

6   but remember the first rule, which is to have mercy on the

7   Judge and the law clerk, but I'll give you that opportunity

8   to respond if you want to take it or correct something,

9   supplement something, what have you.  Thank you.  This has

11:42AM 10   all been very helpful, well argued, and unless there's

11   anything further, we'll stand in recess.  Thank you.

12          MR. BHANSALI:  Thank you very much, your Honor.

13          MR. HAYES:  Thank you, your Honor.

14          THE COURT:  Thank you.

15          (Whereupon, the hearing was adjourned at 11:42 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8    Pages 1 through 85 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Civil

10   Action No. 19-12551 -FDS, SINGULAR COMPUTING LLC vs. GOOGLE LLC

11   and thereafter by me reduced to typewriting and is a true and

12   accurate record of the proceedings.

13             Dated April 3, 2021.

14

15                         s/s Valerie A. O'Hara

16             _____

17                         VALERIE A. O'HARA

18                         OFFICIAL COURT REPORTER

19

20

21

22

23

24

25