1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    SINGULAR COMPUTING LLC,              )
                                          )
5                        Plaintiff        )  Civil Action
                                          )
6                                         )  No. 19-12551-FDS
     vs.                                  )
7                                         )
     GOOGLE LLC,                          )
8                        Defendant        )

9

10   BEFORE: MAGISTRATE JUDGE DONALD L. CABELL

11

12
          STATUS CONFERENCE CONDUCTED BY VIDEO CONFERENCE
13

14

15         John Joseph Moakley United States Courthouse
                        1 Courthouse Way
16                      Boston, MA 02210

17

18                      July 22, 2021
                         1:30 p.m.
19

20

21

22

23           Valerie A. O'Hara, FCRR, RPR
                  Official Court Reporter
24     John Joseph Moakley United States Courthouse
                   1 Courthouse Way
25                 Boston, MA 02210
              E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The Plaintiff:

3         Prince, Lobel, Tye, LLP, by MICHAEL ERCOLINI, ESQ.,
     KEVIN GANNON, ESQ., One International Place, Boston,
4    Massachusetts 02110;

5         McCarter & English, LLP, by BRIAN M. SEEVE, ESQ.,
     and THOMAS R. FULFORD, ESQ., 265 Franklin Street, Boston,
6    Massachsuetts 02110

7    For the Defendant:

8         Keker, Van Nest & Peters LLP, by MATTHIAS A. KAMBER,
     ESQ., MICHELLE YBARRA, ATTORNEY, and ANNA PORTO,
9    ATTORNEY, 633 Battery March Street, San Francisco,
     California 94111.

10

          Wolf, Greenfield & Sacks, P.C., by NATHAN R. SPEED,
11   ESQ., 600 Atlantic Avenue, Boston, Massachusetts 02210;

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  This is the case of Singular

3    Computing, LLC vs. Google, LLC, Civil Action

4    Number 19-12551 will now be heard before this court.

5          Would counsel please identify themselves for the

6    record.

7          THE COURT:  Starting with plaintiff.

8          MR. SEEVE:  This is Brian Seeve of Prince,

9    Lobel, Tye representing plaintiff Singular Computing, LLC

11:01AM 10   in this matter, and I believe I'm joined by several

11   colleagues.  I'm not sure if they've joined the call yet.

12          MR. GANNON:  Your Honor, Kevin Gannon, no video,

13   but I'm on as well.

14          MR. FULFORD:  Tom Fulford.

15          THE COURT:  I'm sorry, could you repeat your

16   name again.  We have a court reporter, so I want to be --

17   I want to make sure she's able to capture everything.  So

18   who was that?  Oh, Tom Fulford, F-u-l-f-o-r-d.  All

19   right.  Good morning.

11:01AM 20          MR. GANNON:  Yes, I'm Kevin Gannon on as well

21   for Singular.

22          THE COURT:  All right.  That sounded a little

23   garbled, it sounds, but the screen that lit up was Kevin

24   Gannon.

25          MR. ERCOLINI:  Michael Ercolini for Singular.

         1              THE COURT:  Good morning.

         2              MR. ERCOLINI:  Good morning, your Honor.

         3              MR. KAMBER:  As for us, your Honor,

         4   Matthias Kamber of Keker, Van Nest & Peters on behalf of

         5   Google.

         6              THE COURT:  Good morning.

         7              MR. KAMBER:  Good morning.

         8              MS. YBARRA:  Good morning, your Honor,

         9   Michelle Ybarra, Keker, Van Nest & Peters also on behalf

11:02AM 10   of Google.

        11              THE COURT:  Good morning.

        12              MR. SPEED:  Good morning, your Honor,

        13   Nathan Speed from Wolf, Greenfield & Sacks also on behalf

        14   of Google.

        15              THE COURT:  Good morning.

        16              MS. PORTO:  Good morning, your Honor, Anna Porto

        17   also on behalf of Google.

        18              THE COURT:  Good morning to you.  Okay.  Let me

        19   just set the stage for this.  This all began with us

11:02AM 20   getting an e-mail from you folks I think starting from

        21   Singular, and Google has weighed in, and it does give me

        22   occasion to maybe reaffirm or restate something that I

        23   said last time we got an e-mail from you guys, I'm fine

        24   with getting e-mails asking for opportunities to sit and

        25   talk to see if we can help the parties work through

1   matters, but, again, when we typically do that, it's

2   usually for something that's much smaller, much more

3   bite-sized, much simpler than what we've got going on

4   here.

5           Usually it arises in a context where counsel

6   realizes in talking that they may have a disagreement on

7   something, nobody wants to file a motion, per se, so they

8   say let's talk to the Court and maybe getting a third

9   person weighing in or something like that.

11:03AM 10           What we got here is more involved in that.  It

11   does appear to relate in part to prior rulings I've made,

12   but it also suggests there are anticipated issues that

13   the parties may have some concerns about as well, so it's

14   kind of a multi-part beast.

15           So the informal, off the record type conferences

16   that we are willing to have are not suitable for things

17   like that.  So I asked Ms. Russo to make this a

18   conference.  This is somewhere in between what I usually

19   envision at a contested hearing where there's a pending

11:03AM 20   motion.  We do not have a pending motion.  I do know that

21   Google filed a motion for protective order, but there's

22   really no pending motion before me, so this is somewhere

23   in the middle.

24           We do have a court reporter, so this is on the

25   record, so I want there to be a certain amount of order

1    to this.  We don't have unlimited time, so we're going to

2    get to it in a moment because we have other matters going

3    on, but to the extent any of our conversations implicate

4    prior rulings of mine, I think it's perfectly appropriate

5    for us to talk about those.

6         The parties can remind me of things I may have

7    said or done or how I ruled, and I will try to act

8    consistent with anything that I've said or done in the

9    past or understandings that the parties have had.

11:04AM 10    If we're talking about future stuff, well, I'm

11    not sure we'd get into that today, particularly since

12    Google has filed a motion for protective order.  I looked

13    at that just very quickly before I got on screen, and the

14    essence of that though appears to be actually

15    straightforward, which is really just make everybody play

16    by whatever our prior understandings and rulings

17    suggested, so maybe we get to that, maybe not, but

18    Singular, let me start with you, and let's start by

19    trying to frame things in terms of something that you

11:05AM 20    think is going on in this case that is contrary to

21    something I said or a ruling I made previously, and then

22    we'll see where the conversation takes us from there.

23         MR. ERCOLINI:  If it's limited to that, your

24    Honor, I think we have two issues, although it does

25    implicate the motion to compel, the third issue, and

1    that's actually a very brief issue to talk about, but

2    basically in the past week, Google has effectively failed

3    to appear for three depositions.

4         The rule on this is pretty straightforward.  If

5    the deposition is noticed, you need to appear, you can't

6    refuse to appear on account of your objections, and the

7    witness has to be prepared to testify as to the notice

8    topics, and a failure to prepare is tantamount to a

9    failure to appear -- so, failure to prepare, excuse me,

11:06AM 10   is tantamount to a failure to appear, as is the failure

11   to designate a witness, so the only exception is if you

12   have a protective order or if the motion for protective

13   order is pending.  Neither is the case.

14        Last Friday, after about nine months of pursuing

15   a 30(b)(6) witness from Google on damages, Google showed

16   up with a witness who was not prepared to testify on the

17   topics for which he was designated.  Instead, Google had

18   decided it was going to basically insert its own topic,

19   and that's what the witness would be prepared to testify

11:06AM 20   on.

21        This was not only in spite of there being no

22   protective order, more importantly, it was in defiance of

23   what the Court instructed Google to do in response to

24   Singular's motion to compel on June 30th.

25        Specifically, Google was to provide testimony on

1    any financial analysis or any analysis as to the value of

2    the accused TPUs, to other business units, including ads,

3    search, YouTube.

4         Google even claimed at the hearing that it

5    didn't object to providing that information to the extent

6    it existed, so we expected to get a witness who was going

7    to testify on that.

8         Instead, during the hearing, and to be clear, we

9    moved to compel on that topic.  But I'll just read that

11:07AM 10   topic so everyone is clear on what it isn't, that it

11   actually lines up with what the Court instructed Google

12   to do because I don't want there to be any ambiguity

13   about it.

14        Just a moment.  So, I'm just pulling the topic

15   up.  So, quantifications, evaluations, estimates of the

16   value to Google of the benefits of using the accused

17   products is tied directly to the accused products,

18   including but not limited to improved search results,

19   advertising placements, increases in volume of search and

11:08AM 20   advertising, increased revenues, profits, advertising

21   rates, click-through rates, so we expected to get a

22   witness who could testify on this.  I think it's pretty

23   clear that's within the scope of what Google said it was

24   going to provide.

25        Instead, Ms. Ybarra during the deposition when

1    the witness, Mr. Patil, was asked whether he was prepared

2    to testify on that topic, Ms. Ybarra responded.  I just

3    want to pull up the quote so I'm not mischaracterizing

4    what Ms. Ybarra said.

5         Apologies, I have this highlighted, I just want

6    to make sure I get the right person in the transcript.

7    Bear with me just a moment.  I'm sorry.  Okay.  So, when

8    we asked about the topic and what Mr. Patil did to

9    prepare, Ms. Ybarra objected and said Google agreed to

11:09AM 10   present Dr. Patil on this topic to testify about

11   comparisons between the accused v2 and TPU v3 and I'll

12   turn it into machine learning.

13        That was exactly what they had objected in the

14   responses and objections to the original notice, and we

15   had moved to compel after they had given this objection,

16   so Google brought its own topic to the deposition.  The

17   witness wasn't prepared to testify.  That's one of a host

18   of topics that basically followed this same pattern.

19        So we had another deposition on Tuesday, another

11:10AM 20   30(b)(6) witness, and the expectation was that he was

21   going to be prepared to testify, but after Friday, we

22   thought we should get confirmation on exactly what he was

23   prepared to testify on and what he wouldn't be.  So we

24   sent Google an e-mail the day before, listed the topics

25   and asked them to confirm that he'd be prepared to

1    testify as to the scope of those topics, and if he

2    wasn't, what portions of the topics he would be prepared

3    to testify to and what portions he would not.

4         We asked three separate times for that

5    information.  We did not get it, and the third time we

6    asked, Google threatened to cancel the deposition.  They

7    then actually canceled the deposition and withdrew the

8    witness when we would not agree to accept their scope of

9    topics that they had imposed.

11:10AM 10         So we told them we were going to show up for the

11    deposition.  They showed up for the deposition at 9:15,

12    and I will just read from the record what Ms. Ybarra said

13    before we started the deposition because we did not get

14    to ask a single question, but this was the demand that

15    Google made of us before we asked a single question.

16         We were prepared to proceed with the deposition

17    today only upon Singular's confirmation that Mr. Ercolini

18    will limit his questions properly to the scope of the

19    topics as agreed and discussed with the Court and not

11:11AM 20    seek additional time with Mr. Shafiei or any 30(b)(6)

21    witness on those same topics, so the expectation was we

22    were to waive any rights to seek further testimony from

23    Mr. Shafiei without asking the question about whether he

24    was prepared about any of the topics and to waive any

25    further questions on those 30(b)(6) topics regardless of

1     whether or not the witness was prepared.

2          THE COURT:  Hang on.  I'm not sure I processed

3     that statement that way.  I thought the way you said it

4     was you were asking to confirm that you were going to be

5     limiting your questions to those topics that had been

6     agreed to either in court or by the Court, which is to

7     say we fought about this, we reached some equilibrium,

8     some agreement on what would be fair game, and we're

9     trying to get you to agree ahead of time you're going to

11:12AM 10     stay within the parameters of what we agreed to.  Is that

11     incorrect?

12          MR. ERCOLINI:  The problem was that there was a

13     clear disconnect on what the parties agreed to, and we

14     knew that based on the date of the Friday deposition and

15     the night before that they would not confirm what he was

16     prepared to testify on and what he would not be, and it

17     was clearly not an agreement with what the Court had

18     instructed them to provide a witness on.

19          THE COURT:  So now going to this phrase about

11:12AM 20     what I had instructed because I know that we not too long

21     ago had a get-together that was kind of the informal

22     conference where it was just kind of us talking, and we

23     may have -- there may have been some understandings

24     reached then as distinguished from prior rulings of mine,

25     so what you're concerned about now, does it flow from an

1    actual ruling, or does it flow from some sort of informal

2    agreement that the parties reached when we last convened

3    on Zoom?

4              MR. ERCOLINI:  There were two instructions

5    during that hearing.  The first instruction was that --

6              THE COURT:  When you say the hearing, I'm sorry.

7              MR. ERCOLINI:  The hearing on June 30th that we

8    had.  I can pull the transcript on that.

9              THE COURT:  Let's not call that a hearing unless

11:13AM 10   it truly was.  It says motion hearing, okay, actually,

11   all right, so that was the hearing.

12             MR. ERCOLINI:  That's correct.

13             THE COURT:  You're saying there were rulings

14   that I made.  Let's focus on the rulings, and then let's

15   go back and tie this very briefly to what happened, and

16   then I want to hear either from Mr. Ercolini or

17   Ms. Ybarra about this.

18             MR. ERCOLINI:  Okay.  So the two rulings, the

19   two instructions were, and we discussed the topics

11:13AM 20   broadly because, as you said, we didn't have time to get

21   into the nitty-gritty of all of them.

22             THE COURT:  Right.

23             MR. ERCOLINI:  The instruction was to the extent

24   it existed, there was to be testimony, documents produced

25   showing the -- and I'd like to just get your language so

1    that it's clear in what Google agreed to so that I'm not

2    mischaracterizing.  Just a moment.

3         So it was the analysis for the matter of the

4    value of these TPU products to the businesses, so to the

5    different business units, and I think again we read

6    Topic 32.  That was within the scope.

7         The other topic was average costs for data

8    center, and that was in limits, so to speak.  So we had a

9    number of topics that all fell under that umbrella, in

11:14AM 10   particular, fell under that umbrella.  We knew on Friday

11   that they had not prepared a witness for it, so we sought

12   confirmation, and the following date -- I understand that

13   the Court may not parse what Ms. Ybarra said, but it's

14   conjunctive, and there was a requirement to do both, to

15   both confirm that we would not seek additional time with

16   Mr. Shafiei or any 30(b)(6) witness on these topics

17   later.

18        If there's any ambiguity, I can tell you, your

19   Honor, based on past experience, I know how any agreement

11:15AM 20   that was subject to past agreements would have been

21   characterized in a motion.  We were not going to waive

22   the right to seek additional testimony on a witness that

23   we hadn't confirmed was prepared.

24        THE COURT:  Okay.  I think I've got the picture,

25   and I want to hear from Google, but let me just offer one

1    thought to things that you've said, which is the easy

2    part, which is, you know, this idea of requiring lawyers

3    or deponents or whomever to agree to conditions that, you

4    know, you won't seek to do something in the future, you

5    know, generally those are unattractive because nobody

6    knows what's going to happen in the course of a

7    proceeding, nobody knows whether there's going to be good

8    grounds to revisit a prior deposition, new information

9    becomes available, the deponent makes a statement that

11:16AM 10    reveals new information that comes up for the first time

11    or they say something that's inconsistent with some

12    discovery that's been produced, and to ask somebody at

13    the outset of a deposition to agree that there will be no

14    further inquiries, to me, I would be weary of that from

15    the beginning.  I don't think they're necessary.

16         I understand the concern you have, you want to

17    make sure this is not an exercise of perpetuity, but

18    there are other ways to go around it.  The rules provide

19    the mechanics and the guiding principles when somebody

11:16AM 20    says I want go back and ask more questions to somebody

21    about a certain subject.

22         Usually if there are protections to be provided,

23    they are pretty well set out in the rules, and I'm not a

24    fan of these, you know, essentially these limitations

25    that you're being asked to sign onto at the beginning, so

1    that's my thoughts on that.

2         Let's go to the essence on this.  So, Mr. Kamber

3    or Ms. Ybarra, let me hear from you.  You guys always

4    have the advantage in that you're dealing with not only

5    well-versed in way more facts and science than I, but I

6    tend to look at this big picture, so I know when I made

7    those rulings that Mr. Ercolini is talking about, you

8    know, those were kind of the two major points about which

9    we were having some conversation, and it struck me as

11:17AM 10   reasonable, Mr. Kamber, that they ought to be able to try

11   to explore what the overall value, the benefit to Google

12   of being able to use these components was or is, and

13   beyond that, I didn't feel like I was capable of getting

14   into the weeds to work out what that meant, so what's the

15   issue from your perspective?

16        It sounds like what Mr. Ercolini is saying is

17   these were questions that kind of fell safely into that

18   as well as trying to figure out what the cost of a data

19   center is, and thus, again, trying to be able to figure

11:18AM 20   out what the benefit and the value to Google was in this

21   case of these components.  So what was problematic here?

22        MS. YBARRA:  Your Honor, if I could start by

23   saying we completely agree with you that this issue is a

24   serious one and probably too complicated to fully resolve

25   here.  We think we have a real serious dispute over the

1    scope of testimony that Google is obligated to provide

2    pursuant to Singular's 30(b)(6) notice, which, as your

3    Honor knows, has been the subject of months of meet and

4    confer, multiple status updates to the Court, multiple

5    motions to compel.

6         We think those disputes were resolved at the

7    June 30th hearing by the rulings your Honor made from the

8    bench, and I disagree with Mr. Ercolini's

9    characterization of events regarding the depositions last

11:19AM 10   Friday and this Tuesday, of course.

11        As you noted, we filed a motion for protective

12   order last night submitting a written record, letters and

13   e-mails and the transcript of Mr. Shafiei's deposition.

14   I think that contradicts what you just heard from

15   Mr. Ercolini.

16        Google did not unilaterally terminate the

17   deposition and did not fail to prepare a witness on the

18   topics for which the witness was designated, and if

19   you'll permit me to explain I think how we got here, I'd

11:19AM 20   like the opportunity to correct the record.

21        THE COURT:  Well, that's fine, but what I really

22   want somebody to do is to give me a very concrete example

23   of a question that was put to the deponent or an area

24   where is clear we're going to be asking questions on this

25   subject matter, and Google said no, either the deponent

1    said I'm not prepared to answer that or Google said we're

2    not going to have the person answer that, just so I can

3    try to understand where the disconnect is here because

4    you seem to be saying he's got it all wrong, so help me

5    understand as you see it why there's no problem here.

6            MS. YBARRA:  Well, your Honor, so

7    Dr. Nishant Patil is one of Google's Rule 30(b)(6)

8    witnesses.  He was deposed last Friday.  I don't believe

9    Dr. Patil answered in that manner to any of the topics

11:20AM 10    for which he was designated, and I say the topics for

11    which he was designated, as we discussed at the June 30th

12    hearing and as, you know, consistent with your Honor's

13    rulings on the record, Dr. Patil was Google's designee on

14    Topics 13.  That topic concerns analyses prepared by

15    Google regarding the benefits of the accused TPUs or the

16    benefits attributable to the accused TPUs.

17            We talked about that at length at the hearing --

18            THE COURT:  Right.

19            MS. YBARRA:  -- and we presented Dr. Patil on

11:21AM 20    that topic, and he was prepared to testify and did answer

21    questions related to that topic.

22            I think the problem we have here is your Honor

23    made rulings, your Honor ordered Google to provide

24    30(b)(6) testimony consistent with what it had already

25    offered Singular by the time we got to the June 30th

1    hearing.  You basically told us to make good on the

2    offers to compromise that we had memorialized in our

3    opposition brief, and in addition to that, you ordered

4    Google to provide a witness to testify about analyses

5    regarding the benefits attributable to the accused TPUs

6    as well as the average cost to build and maintain a data

7    center.

8            That latter topic, Google's 30(b)(6) witness who

9    was supposed to testify, Mr. Shafiei, was prepared to

11:22AM 10   testify on.  You know, following the June 30th hearing,

11   Google wrote Singular twice, and in one of those is a

12   July 6th lengthy letter memorializing our understanding

13   of our obligations and commitments coming out of the

14   hearing citing your Honor's rulings from the bench.

15           Singular never disagreed with that.  They didn't

16   disagree with your rulings at the hearing, and you asked

17   Mr. Ercolini multiple times have we resolved all of your

18   issues, have we resolved all the issues, have we talked

19   about everything you want to discuss?

11:22AM 20          So, the night before Mr. Shafiei's deposition

21   this past deposition at 4 p.m., Mr. Ercolini sent Google

22   an e-mail demanding that Mr. Shafiei, who was designated

23   on 14 topics, that Mr. Shafiei be prepared to testify as

24   to a quote, "the complete scope of those topics as

25   originally drafted."

1          Those topics include topics that your Honor

2     explicitly said were overbroad or were improper at the

3     hearing, and we had a number of exchanges with

4     Mr. Ercolini where he reiterated anything less than the

5     complete scope of the topics as drafted Singular will

6     consider a failure to appear.

7          It was clear from the night before that we had a

8     huge disagreement about what Google's obligations were

9     and what the thrust of your Honor's rulings of the

11:23AM 10    June 30th hearing meant regarding those obligations, and

11    we feel like Singular is acting like the hearing never

12    happened and the, you know, the agreements that we

13    reached with the Court or the rulings that the Court made

14    from the bench never happened, and it's seeking testimony

15    on the full scope of its original topics as drafted,

16    which is not what we left the June 30th hearing

17    understanding our obligations to be.

18          We asked --

19          THE COURT:  Take me back, not to cut you off,

11:24AM 20    take me back to Friday for a minute.  I'm still trying to

21    understand what happened with Dr. Patil I think you said

22    his name is that was problematic.  They say it was an

23    inadequate deposition.

24          As I listened to you, I didn't hear you suggest

25    that there were any problems with that deposition.  You

1   say he was prepared to talk about everything that was in

2   I think it was Topic Number 17, which kind of represented

3   really the essence of what we were all talking about and

4   how to value the TPUs and the like, so do you disagree

5   with this assertion that he was -- that he performed

6   inadequately, that he was not prepared to talk about all

7   of the areas that the parties had agreed would be fair

8   game at that deposition?

9           MS. YBARRA:  I absolutely disagree.  Dr. Patil

11:25AM 10   was extremely prepared, and he testified at length about

11   documents and analyses assessing the value of the accused

12   TPUs to Google.

13           He testified on numerous of those exhibits, and,

14   frankly, I mean he both prepared for the deposition as a

15   30(b)(6), and that is as he testified, it's part of his

16   every day job to be working with those kinds of analyses

17   and assessments.

18           THE COURT:  So what did you understand

19   Singular's gripe about the Friday deposition to be as we

11:25AM 20   sit here right now?

21           MS. YBARRA:  Your Honor, Singular did not object

22   that Dr. Patil was inadequately prepared at the time.

23   They deposed him for nearly the full seven hours.  I

24   think it was 15 minutes less than that.  They did not

25   hold the deposition open.

1          The first time that we heard that Singular

2     contends Dr. Patil was not adequately prepared was

3     Mr. Ercolini's 4 p.m. e-mail on Monday night.

4          It's really I think about after the fact, after

5     the deposition, they realized they hadn't gotten the

6     complete scope of their original topics as drafted and

7     are now coming back and bring us back to square 1 really,

8     and that is how we got to the instant at Mr. Shafiei's

9     deposition.

11:26AM 10          You know, we asked Singular, we suggested that

11     the parties postpone the depo so that we could seek

12     guidance from the Court because it's clear we had a big

13     disagreement here, and Singular refused and insisted that

14     we show up with Dr. Shafiei at 9 a.m. on Tuesday morning,

15     and so Mr. Shafiei appeared on Tuesday morning, and at

16     the start of the deposition, I attempted to state our

17     objections on the record to Singular's insistence that it

18     could spend the day questioning Mr. Shafiei by asking him

19     questions on topics that the Court had deemed improper

11:27AM 20     that we did not agree to provide, you know, Dr. Shafiei

21     as a witness on.

22          Mr. Ercolini suggested that I was contending

23     that, you know, we'd only let Mr. Shafiei testify if

24     Singular agreed to not ask for extra time.  That's not

25     quite right, your Honor.  This was about we were not

1    going to put Mr. Shafiei up, have Singular ask him, you

2    know, badgering questions all day about topics for which

3    he was not supposed to be testifying and then go back to

4    the Court and seek the complete scope of the topics.

5         Mr. Shafiei was not a 30(b)(1) deponent, he's

6    only testifying as a corporate witness, and so it would

7    be completely improper.  Mr. Ercolini did not really

8    allow me to even get my objections on the record.  He

9    consistently talked over and interrupted me.

11:28AM 10         THE COURT:  So do we even know that there's

11   going to be an issue with respect to Mr. Shafiei?  I

12   mean, no questions were even put to him, right?

13         MS. YBARRA:  No, we do, we do know there's going

14   to be an issue because Mr. Ercolini made very clear that

15   he intended to examine Mr. Shafiei on the full scope of

16   Singular's topics as drafted, and that includes, for

17   example, the full scope of Topic 18.

18         This was a topic specifically discussed at the

19   June 30th hearing that your Honor said that's too broad,

11:29AM 20   we're not going to do that, and Mr. Ercolini did not

21   agree that the Court limited Singular's 30(b)(6) topics

22   in any way at the June 30th hearing, which I find really

23   astounding.

24         THE COURT:  Hang on, Mr. Ercolini.  I don't have

25   any of the paperwork in front of me.  I can go back with

1    my clerks and my staff, and we can try to reverse

2    engineer, and, you know, we can sort of remember things

3    that we said, but help me understand from your

4    perspective, Ms. Ybarra, what was it that I said in my

5    view, this is not proper, this is overbroad?

6         I do recall saying that, I just don't have the

7    stuff here in front of me to read, but I do know that I

8    was looking at some of this, and I was saying, yeah, I

9    think this doesn't get to the nub of it, so what did I

11:29AM 10   say was overbroad?

11         MS. YBARRA:  Your Honor, it was in the context

12   of talking about the topics seeking broad financial

13   discovery into all of Google's unaccused products and

14   services, like search and ads and things like that.

15         THE COURT:  Okay.

16         MS. YBARRA:  And we had talked specifically

17   about Topic 18, although it wasn't identified by name,

18   but, you know, it was recited almost verbatim into the

19   record, and you expressed your opinion that that was

11:30AM 20   overbroad and too sweeping, and after some discussion

21   with Mr. Ercolini on the record, you ordered Google to

22   produce a witness to testify about the value and benefits

23   of TPUs and/or analyses about, yeah, value and benefit of

24   TPUs.  We agreed to do that.

25         You ordered Google to produce a witness on all

24

1    of the compromised offers that Google identified in

2    Exhibit D to its opposition brief and on the data center

3    topics, you also agreed the full scope of the data center

4    topics seeking detailed financial discovery into, you

5    know, costs and projections related to data center.  You

6    said those were also overbroad.  You said we're not going

7    to get into, you know, how much for concrete, how much

8    for this.  You said, Google, produce a witness on the

9    average cost to build and maintain a data center, and

11:31AM 10    Mr. Shafiei was prepared to testify on that.

11         Mr. Ercolini was very clear about his intent to

12    examine Mr. Shafiei not just on that data center topic

13    but a whole host of others that your Honor had said no,

14    those are too much, and that's where we get into --

15    that's how we got here.

16         THE COURT:  Okay.  So, Mr. Ercolini, hang on,

17    let me go back to you because I'm really trying to do

18    this in a way that I can actually understand as we're

19    going along.

11:31AM 20         So we've got the issue with Dr. Patil on Friday

21    where Google is saying they're kind of shocked to hear

22    that you're saying that there was something improper or

23    unsatisfactory about the way that was done, and then

24    we've got the Tuesday deposition with Mr. Shafiei where

25    it seems to me really we're arguing about the scope as

1   much as anything else.

2          So let me go back to Dr. Patil for a minute.

3   What is it that you say was improper about the way that

4   Google and Dr. Patil behaved at that deposition?

5          MR. ERCOLINI:  So Topic 32, again, to go back to

6   that, that topic was squarely within, and I'll just say

7   with respect to Ms. Ybarra's comments, I tried to read

8   from the record, a number of the things that she said are

9   factually incorrect, and I'd really like while we're all

11:32AM 10   in the light of day to make sure that those things are

11   run down so they don't just pass as accepted.

12          I did not demand that he be prepared for every

13   single topic.  What I asked him was to confirm what

14   portions of the topics they would be preparing him for

15   and what they would not because Mr. Patil testified on

16   Friday we had an understanding of what the scope was

17   based on your Honor's rulings, and that extended to other

18   businesses, the benefits to other businesses, and

19   Topic 32 is squarely within that, and Google, Ms. Ybarra

11:33AM 20   said on the record that he would not be prepared to

21   testify on that.  They made their own rendition of the

22   topic, which was a comparison of TPU v2 and TUP v3 vs.

23   other machine learning hardware.

24          THE COURT:  Hang on, when we talked on

25   June 30th, did we talk specifically about topic

1    Number 32?  I mean, did we use that number, or did we

2    talk more about what's in Topic 32?

3           MR. ERCOLINI:  We talked about really exactly

4    what was in Topic 32.

5           THE COURT:  All right.  So I did not make a

6    specific ruling 32 is in, 32 is out, but you say I said

7    the things that are mentioned in 32 I said would be fair

8    game?

9           MR. ERCOLINI:  I think there was only one topic

11:34AM 10    that was explicitly discussed.  We had a number of

11    topics, and because we were short on time, we talked

12    about how much we were going to get into other business

13    units, and your Honor said yes, full Roth financials for

14    those other businesses are overbroad, but if Google has

15    done the analysis on other business units, if there are

16    benefits to other business units and they're tied to the

17    invention, that's within limits, and Topic 32 is squarely

18    within that.

19           THE COURT:  All right.  Did you try to ask

11:34AM 20    questions and were told I'm not prepared to answer, or

21    was this something at the outset you were told he's not

22    going to be answering anything in that area, and, thus,

23    you never broached it?

24           MR. ERCOLINI:  Well, your Honor, we were

25    somewhat thrown for a loop by that and other topics.

1   Other topics Google had said that we had modified the

2   topic because we identified the portion of the topic that

3   was disputed, and that was now modified somehow in our

4   motion.

5        There were a number of other topics that

6   basically Google took the chart that Ms. Ybarra actually

7   said during Mr. Shafiei's deposition that the Court

8   prepared and said that we're prepared to testify in

9   accordance with this chart, which they said was agreed to

11:35AM 10   long ago during meet and confers.

11        Mr. Kamber said during that hearing that we

12   hadn't even met and conferred, but that topic, Topic 32

13   was squarely within.  We had concerns over that and other

14   topics during that deposition that Mr. Shafiei, who was

15   to appear on Tuesday, and, again, we're three days out

16   from the close of fact discovery.

17        THE COURT:  Okay.  But listen, hang on, hang on,

18   you're kind of bouncing around.  I'm focusing on Patil,

19   right, because Ms. Ybarra came to this imaginary that the

11:35AM 20   deposition came and went, and they didn't know until

21   Monday that you had a problem with what went on last

22   Friday.

23        What I'm trying to figure out is in your view,

24   was that wrong?  Was there something on Friday that

25   happened where you said, hey, this is not compatible with

1    whatever we were talking about with Cabell, or this was

2    ruled to be an appropriate area of inquiry, and he's

3    telling us that he's not ready to talk about this?  Was

4    there an event like that, or was this more upon

5    reflection following the deposition, you had this kind of

6    epiphany that it hadn't been as fulsome as you understood

7    it to be?

8            MR. ERCOLINI:  No, your Honor, they told us that

9    he was not prepared to testify on that topic, and

11:36AM 10   questioning the witness beyond that, you know, we could

11   do that, but why are we going to do it when he says he's

12   not prepared?

13           THE COURT:  When you say that topic, you're

14   talking about 32?

15           MR. ERCOLINI:  I'm talking about 32.  I have

16   gone through other topics.  Basically it was Google's

17   rendition of what it took from the hearing, which was

18   really a narrow version of that and what it said it

19   agreed to, but that topic in particular is a glaring

11:37AM 20   example of we're squarely within what the Court decided.

21           We asked about it.  They told us he was not

22   prepared to testify on it, he wouldn't be testifying on

23   it, and Google substituted its own topic, which was much

24   narrower and really kind of tangential to that topic.

25           THE COURT:  All right.  So, what is it you

1    wanted to explore with Dr. Patil that you were unable to

2    explore because either he wasn't prepared or they told

3    you he wasn't going to be answering questions in that

4    area?

5          MR. ERCOLINI:  So, specifically any estimates of

6    the value of Google to the benefits of using the accused

7    products, including accrued search results, and we know

8    they've done that analysis, advertising placement,

9    increases in volume of search and advertising, increased

11:37AM 10   revenues attributable to the TPU, accused TPUs, profits,

11   advertising rates, and click-through rates.

12         We've seen analysis on that in documents.  We

13   did not get a witness who could testify on that.

14         THE COURT:  Now, Mr. Kamber or Ms. Ybarra, I do

15   recall saying that if there were analyses that already

16   been done, then it seemed to me fair on balance to have a

17   witness prepared to talk about them.  Mr. Ercolini is

18   saying, hey, these are things that were done, so why

19   wasn't Dr. Patil ready to answer questions about those

11:38AM 20   subjects?

21         MS. YBARRA:  Your Honor, Dr. Patil was prepared

22   to answer questions about analyses of the benefits

23   attributable to the accused TPUs, and he did testify

24   about that topic and several documents related to that

25   topic at length, and I want to be clear, there's a

1   distinction here between what I'm saying, analyses

2   regarding the benefits attributable to the accused TPUs.

3   That is Topic 17.

4         Mr. Ercolini is focusing on Topic 32, which is

5   about quantifications and estimates of the value of the

6   accused TPU, but then he goes on, including, you know,

7   improved search results, ad placement, increased volume

8   in search.  It gets into the weeds on exactly what we

9   discussed at the hearing, gets into the weeds on Google's

11:39AM 10   unaccused products and business lines, but Dr. Patil did

11   testify about what we told the Court we would produce a

12   witness on at the hearing.

13         THE COURT:  I'm not sure I'm following what you

14   said because I agree with you, I wouldn't have been

15   interested in green lighting inquiries into areas that

16   really related more to nonaccused products, but you

17   started by saying and he started, Mr. Ercolini started by

18   explaining these were, he was just sort of probing in a

19   logical way and going as far as he could in trying to

11:40AM 20   quantify the benefit and the value and the gain to Google

21   from using the accused products, and so if it turns out

22   that we are a more efficient company, we are a more

23   powerful company, our products work better and faster and

24   we can quantify that, our advertising revenues go up

25   because of this, and we can quantify that, that would

1    have fallen within the heartland of what I would have
2    thought to be fair.
3            So I'm hearing you say, you know, maybe some of
4    this is really detail oriented, and reasonable people
5    want to have mercy on a human being so they don't get
6    overloaded with too much minutia, but as areas of
7    inquiry, I thought I was suggesting that that was
8    appropriate.
9            MR. KAMBER:  Your Honor, if I could just
11:41AM 10   interject here briefly, and then I'll turn it over to
11    Ms. Ybarra because you mentioned me, and I said that at
12    the June 30th hearing.
13            It's true, and I referred, I didn't refer to
14    Mr. Patil specifically, but I said we have a witness who
15    works on this stuff at Google, we will produce him as a
16    30(b)(6) witness.
17            That's on the record, and I said and we will
18    produce the documents that he has that are analyses on
19    these issues, the value, the quantifications, and
11:41AM 20   subsequent to that hearing, we did produce those,
21    including the impact on the ads business and other
22    businesses.
23            That material has been produced, and I'll let
24    Ms. Ybarra address the issue, but he was examined on
25    those documents and those things that I said we would be

1       putting him up on, so I'll turn it over to her.

2              THE COURT:  Before you do, is this semantics?  I

3       mean, are you saying, well, he was questioned on this,

4       but this is all missing the point here, which is they say

5       that there were areas we would have wanted to ask him

6       about where we couldn't because he wasn't prepared?

7              Now, one response to that is we produced the

8       universe of what existed.  There might be some stuff that

9       he just doesn't know of because an analysis hasn't been

11:42AM 10      done in a certain area, so fairly he cannot be compelled

11      to answer something he doesn't know, but are you saying

12      that anything that's out there we produced and he was

13      ready to talk about anything like that?

14             Now, there might have been some areas where

15      Singular might have been interested in getting

16      information, but you know what, we just don't have

17      complete information in that area, and, therefore,

18      Dr. Patil couldn't be in a position to talk in an

19      educated way about it?

11:43AM 20             I guess I'm trying to understand where is the

21      point where we have the disconnect here where they say

22      this is an area we understood he was supposed to be

23      answering questions regarding, but for some reason, he

24      wasn't because the way you guys are continuing to pitch

25      this, he answered all the questions that were put to him?

1          MS. YBARRA:  Your Honor, I think he did.  I

2     think maybe where the disconnect is that we agreed that

3     Dr. Patil would be the designee in this area on this

4     topic under Topic 17.  Topic 32 is worded differently.

5     It goes into more detail.  We didn't agree, you know, we

6     didn't ever say Dr. Patil wasn't prepared to testify on

7     that topic, we said Google didn't agree to produce

8     Dr. Patil as a designee on that topic.

9          We thought that the Court's order related to

11:44AM 10    Topic 17, and this was the analyses about the benefits

11    and value of TPUs were captured under that.  As counsel,

12    the examining counsel for Dr. Patil's deposition was not

13    Mr. Ercolini, it was Mr. McGonagle, went through topic by

14    topic and said you're prepared to testify on X, right?

15    That is where I objected, and said no, that's not what we

16    agreed to on Topic 32, but we did agree to provide that

17    information on Topic 17, and Dr. Patil did testify.

18          THE COURT:  Let me own the snafu here, all

19    right.  I'll take it because I certainly would have said,

11:44AM 20    if we want to use 32 as a shorthand, that that seems to

21    me to be fair as well because we're still talking big

22    picture about how Google benefited from having these

23    accused alleged products and being able to make use of

24    them.

25          I would certainly be sensitive to an objection

1    or a concern that the amount of detail that one person

2    would have to master in order to be able to answer all of

3    these questions is just going to be too much, so burden

4    and the onerousness, but that's different from

5    categorically speaking.

6              Categorically speaking, I think this still falls

7    under the broad penumbra of benefit to Google, gain to

8    Google from using these products, and, again, I go back

9    to the conversation Mr. Kamber and I had, and he just

11:45AM 10    acknowledged if there are analyses that have been done,

11    and that includes an area like revenue and advertising

12    and efficiency, I was assuming that what I was conveying

13    was that the witness should be able to answer questions

14    in those areas as well.

15              So if we had been talking about numbers, and it

16    had really been sort of keyed up for me that way, I

17    probably would have said, well, 17 and things related to

18    17 to the extent that they would allow Singular to have a

19    better sense of how Google has benefited or how just

11:46AM 20    generally the use of these products has affected what

21    Google does, and then we could have fought about how far

22    that goes and, you know, the like.

23              MR. KAMBER:  I'm sorry.

24              THE COURT:  No, go ahead.

25              MR. KAMBER:  I just want to say, to be clear,

1    that's what I heard you say.  That's what we heard you

2    say.

3              THE COURT:  All right.

4              MR. KAMBER:  And we were talking about it, I

5    think, in the context of 17.  We're not saying we didn't

6    make a commitment on 32 or what have you.  I think the

7    point that we're making is we agreed to 32 sort of

8    collapsing it with 17 to the same extent, that is, we've

9    produced those quantifications.

11:47AM 10         Dr. Patil talked about those quantifications to

11   the extent they exist.  He's the person that does this.

12   We're not sitting here today saying we made no commitment

13   on Number 32 or we didn't hear you say explicitly you

14   also have to do 32.  That's very much within our

15   understanding that we needed to present somebody on that

16   topic.

17              I think the issue or the disconnect, as

18   Ms. Ybarra said, is how are we now interpreting that?

19   We're interpreting it the way that we talked about it at

11:47AM 20   the June 30th hearing, whereas Mr. Ercolini in the

21   written correspondence has said we needed somebody on

22   the, quote, "full scope of the topic as noticed," as

23   though none of the other things had come to pass.

24              THE COURT:  Okay.  So I guess I'm still not sure

25   whether there's a "there" there as it relates to last

1    Friday.  So, Mr. Ercolini, what I'm hearing collectively

2    from Mr. Kamber and Ms. Ybarra is, yeah, 32 was fair

3    game, and if you knew about it, I mean, if we had data

4    and analyses and studies and information, then he could

5    answer questions that related to that, so that really

6    there is no issue with respect to that deposition last

7    Friday because all of the topics that were considered

8    appropriate were able to be explored.  What do you say to

9    that?

11:48AM 10          MR. ERCOLINI:  Your Honor, we were given -- we

11   gave a topic that was specific as to those things.

12   Analyses of the benefits of TPUs is a much broader topic,

13   and it's very easy for counsel to object to that topic as

14   being outside the scope or as potentially including

15   anything.  We were very specific.

16          THE COURT:  Hang on.  They're not saying it's

17   outside the scope, that's where I'm getting a little

18   frustrated.  He's not saying it's outside the scope, he's

19   saying it's within the scope.  He's saying maybe we

11:49AM 20   weren't calling it 32, maybe we were collapsing 17 and

21   32, but we understand what the Court big picture was

22   saying would be fair game.  We had the person ready to

23   talk about it, and we didn't throw up any roadblocks.

24          Where are you saying the roadblock came in?

25          MR. KAMBER:  So, your Honor, if I could

1    interject.

2           THE COURT:  We can only have one person speaking

3    at a time.  Mr. Seeve, if you want to take this, that's

4    fine, but what I don't want to do is trying to have a

5    whole bunch of folks talking at one time.

6           MR. ERCOLINI:  I do want to respond, your Honor,

7    that Topic 32 was specifically the topic, and actually I

8    will let Mr. Seeve speak because he actually was present

9    at the deposition.  We identified the topic, we asked him

11:50AM 10   what he had done to prepare.  They said he was not being

11   presented on that topic.  They're saying it was a

12   disconnect, it was subsumed under a larger topic.  I

13   don't know why that would be, but there was an objection

14   to scope to every question that followed, and the witness

15   was not prepared to testify.

16          The witness merely answered, "That is what the

17   document says," "That is what the document says," "That's

18   what the document says."

19          THE COURT:  So maybe what we explore, and I'll

11:50AM 20   hear from Mr. Seeve in a minute, but maybe what we

21   explore is just a supplemental, you know, we resume it

22   for, you know, two hours or something like that and

23   everybody goes in focused on something, but Mr. Seeve,

24   let me hear you.

25          This sounds to me like these are things that

1    happened, and these are things that can be dealt with

2    again usually by the parties just getting back together

3    for a very focused, limited no second bite type of

4    exercise, but, Mr. Seeve, let me hear you.

5         MR. SEEVE:  Thank you, your Honor, and good

6    morning.  I witnessed at least part of the deposition of

7    Dr. Patil, and so I think I can maybe bridge the divide

8    between what you're hearing from my colleague,

9    Mr. Ercolini, and what you're hearing from Mr. Kamber and

11:51AM 10    Ms. Ybarra about the deposition that he was prepared to

11    testify and did testify about all these topics.

12         I don't think you could call what Dr. Patil

13    offered last Friday testimony.  The exhibits to the

14    deposition largely consisted of documents on which

15    Mr. Patil was a co-author, often the first listed author,

16    and he was asked about the contents of those documents,

17    and the most he would offer in response is this canned

18    response, "That is what the document states."

19         And we asked him, "Well, do you believe that to

11:51AM 20    be true?"  He said, "Well, that's subjective," even on

21    documents for which he was the author, and I also want to

22    say that every single one of these questions drew a scope

23    objection from Ms. Ybarra, so to the extent that Google

24    is now saying that they didn't object to the scope and

25    that Dr. Patil's testimony was within bounds, as they

1  understood those bounds, Ms. Ybarra didn't agree with

2  that last Friday because every single question was

3  objected on the basis of scope.  I wanted to clear that

4  up.

5         THE COURT:  We've got problem-solving sleeves

6  rolled up here.  As long as that objection to scope was

7  not followed by an instruction not to answer, I'm not

8  going to be too worried about it, but go on because,

9  again, I'm trying to focus on, okay, how do we deal with

11:52AM 10  this?  Go on, Mr. Seeve.

11         MR. SEEVE:  Understood.  And, your Honor, I just

12  wanted to make it clear what we were talking about when

13  we were saying that Dr. Patil was not fully prepared to

14  answer these questions.  It was just that he was giving

15  these sort of canned nonanswers.  To the extent he was

16  prepared to testify about these topics, he didn't, and

17  that's where we're coming from.

18         THE COURT:  Here's what I propose, and I know

19  you guys are sort of bumping up against some dates, and

11:52AM 20  what I need to do is speak to Judge Saylor just to talk

21  about some of this, but it does seem to me that it's

22  probably appropriate under the circumstances to authorize

23  another session with Dr. Patil but a limited session, one

24  that really goes to addressing what may have been a good

25  faith misunderstanding between the parties, so I'm not

1    prepared to make any findings here that one side has

2    acted improperly as it relates to this, one side has gone

3    outside the scope of what was authorized or that the

4    witness was instructed to answer in a way that ran

5    counter to the spirit of what I would have ruled, but

6    logistically is this something that can be arranged on

7    relatively short notice, that is, another session where

8    Dr. Patil is able to be corralled for maybe like four

9    hours and then counsel is given a chance then to explore

11:53AM 10    these areas where it may turn out they get the same

11    answers?

12             MS. YBARRA:  Your Honor --

13             THE COURT:  Go ahead.

14             MS. YBARRA:  -- could I respond, please?  So

15    Mr. Seeve was not present for the whole deposition.

16    Mr. Ercolini was not present, and I disagree that I

17    improperly objected on scope grounds.

18             The questions Dr. Patil was asked for hours

19    consisted largely of Mr. McGonagle's, Singular's counsel,

11:54AM 20    reading a sentence from a document and saying, "Do you

21    agree with it?"  "That's Google position, isn't it?"  And

22    sentence by sentence.

23             They were not proper deposition questions.  They

24    were a waste of time.  It's not Dr. Patil's fault.  He

25    prepared for that deposition extensively, and I know

41

1    because I was there, and he is a senior engineer at

2    Google, and he took a lot of time out for this.  If we're

3    going to be ordered to make Dr. Patil available for

4    deposition again, I'd ask that we have the opportunity to

5    brief this and your Honor can see the transcript and you

6    can see how Singular elected to spend seven hours with

7    Dr. Patil on the record because it was not a productive

8    day, and that's not the fault of Dr. Patil's.

9             THE COURT:  Okay.  Under the circumstances and

11:55AM 10   given time, here's how I'm going to have to deal with

11   this because, again, there's no pending motion before me.

12   What I'm hearing from Google is they don't believe they

13   have acted in any way that's inconsistent with the ruling

14   I've made.  I can't make a finding one way or the other.

15   I wasn't there.  I'm hearing the parties.

16            I do think that the easiest way to do this

17   honestly, old school days, you get the person back in the

18   room and you just ask some more questions, both sides

19   proceed in good faith, both sides try to make the

11:55AM 20   exercise as efficient as possible and try to figure out

21   what the problem is the first time and steer around that

22   and then with we're all done, but if we can't do that,

23   there is no pending motion, I don't have a record in

24   front of me, I don't have a transcript.

25            I think Singular, if you want to seek relief

1    from this, if you're going to want an opportunity to

2    re-question Dr. Patil in a manner that you think is

3    consistent with my rulings and what he should have been

4    prepared to do, I think you're going to have to file a

5    motion.

6         You can do it on up an expedited basis, and I

7    would make Google respond on an expedited basis, and we

8    would just deal with this down and dirty, but I think

9    that's the only way we're going to be able to get past

11:56AM 10   this, so either it's that was a lesson that we don't have

11   to re-learn or we will move on or we will seek relief

12   from the Court and an opportunity to question Dr. Patil

13   similar because it sounds like Google is saying they're

14   not wild about this idea of everybody sitting back down

15   together for a few hours, so that's how I would deal with

16   that.

17        Now let's talk about Shafiei for a quick minute

18   as it related to Tuesday, and, again, from what I heard

19   half an hour ago, it sounded more like tempers may have

11:57AM 20   escalated or passions may have escalated fairly quickly

21   before anybody knew it, the deposition just kind of blew

22   up even before it got started.

23        So, what can we do that's constructive here to

24   deal with Shafiei and that deposition and to make it

25   happen?

1          MR. ERCOLINI:  Make sure just that it happens

2     immediately, your Honor, because we have three days left,

3     two days left until the close of fact discovery, and

4     we've been pursuing this for nine months.

5          You know, at the time of the deposition, there

6     was no motion for protective order, there was no

7     protective order.  They can make their scope objections

8     during the deposition, but pulling the witness was

9     completely inappropriate, and we want to make sure we get

11:57AM 10   the witness because those topics are very important to

11    us.

12         THE COURT:  So, Google, you don't have any

13    objection to producing the witness for examination,

14    right?

15         MS. YBARRA:  We don't have any objection to

16    producing Mr. Shafiei for examination on the topics that

17    your Honor ordered Google to produce a witness on at the

18    June 30th hearing.  What we do object to is sending

19    Mr. Shafiei in so that Mr. Ercolini can examine him on

11:58AM 20   the complete scope of topics that the Court already

21    deemed objectionable, and that's why we suspended the

22    deposition.  We did it pursuant to Rule 30(d) and so we

23    seek relief.

24         THE COURT:  Okay.  Don't do that.  All right.

25    Here's the way you deal with it.  You produce the

1    witness, you've got everybody there.  It's costing money.

2    You have your witness there, and you have him answer the

3    questions that you deem to be proper.  You instruct him

4    not to answer the questions you deem to be improper.  If

5    they don't like those instructions not to answer, they

6    can then seek relief from the Court, and we can fight

7    about whether they were outside the scope of the like,

8    but I think that's the better course to do, the better

9    course to follow, but really the issue is it seems to me

11:59AM 10   a disagreement over what the scope is going into the

11   deposition of what is permissible and what is not.

12         Is there anything that we can talk about now so

13   the parties leave with a mutual understanding of what

14   would be in bounds and what would be out of bounds for a

15   deposition of this individual?

16         MR. ERCOLINI:  So, your Honor, I will say from

17   experience, you hear scope objections all the time during

18   a deposition.  That's usually an objection to whether a

19   question is within the bounds of a notice topic.  It's

11:59AM 20   not an objection to -- it's not within the bounds of or

21   it's outside the bounds of the topic that we substituted

22   for the topic that you noticed.

23         They can make -- this is the one vehicle of

24   discovery that is unique in this regard is that you have

25   to produce the witness prepared because it's costing

1    money because people have prepared, people are attending.

2    It's time, it's money that you are expected to file a

3    motion for protective order for the topics if you deem

4    them improper.

5           THE COURT:  Sure.  We're actually, hang on,

6    we're past that point.  That's not responsive to what I

7    was asking.  I agree with everything you just said.  My

8    question is we're here now, so let's talk.  Let's make

9    sure there's a mutual testimony if we're going to go into

12:00PM 10    that room and have that deposition of what's fair and

11    what's not fair.  Can we do that?

12           We got all these smart people, reasonable people

13    here who know what the real issues are in this case.  I

14    mean, I like to think if I turn it over to you guys just

15    to start talking, we can figure out really quickly either

16    there's no disagreement or here are the few areas where

17    we have disagreement.

18           Somebody help me understand.  You know, imagine

19    ourselves in the room, the deposition is starting, you're

12:01PM 20    asking the questions.  Where are we likely to have that

21    first instance where somebody is -- where Google is

22    saying objection as to scope?

23           MS. YBARRA:  So, your Honor, I think on the

24    several topics that Mr. Ercolini was intending to

25    question Mr. Shafiei on regarding detailed financial

1    discovery into data centers, your Honor ordered Google to

2    produce a witness on one data center topic, the average

3    cost to build and maintain a data center, and we were

4    prepared to do that.  As soon as Mr. Ercolini gets beyond

5    that, we're going to have a problem.

6          THE COURT:  Okay.  No, no, you're not incorrect,

7    but I fear that you're putting way too much into a

8    shorthanded way of me articulating what I thought was

9    reasonable.  What I said was and what I tried to convey

12:02PM 10    was if you can generally come up with an average cost for

11    building one center because we know not every center is

12    created equal, there's always going to be different needs

13    and different requirements and the like, and just, you

14    know, the real estate part of it is going to drive some

15    differences, but I thought that would be a fair proxy to

16    help Singular understand and to help people quantify this

17    part of it in trying to understand the benefit or the

18    gain or the effect to Google on Google of being able to

19    use the accused products.

12:02PM 20          Beyond being able to come up with an average

21    amount, obviously, if there was more information there

22    that is not at the level, the granular level of how much

23    did we spend on nails and hammers but somewhere in the

24    middle without me trying to define what that was.  I was

25    trying to convey -- I'm not here to say that that's out

1     of bounds.

2          I mean, they have a right to explore how Google

3     benefited from the use of these products, and if that can

4     be accomplished by providing some information and helps

5     one generally to understand, you know, we had to build

6     five less of these types of buildings and building other

7     types of buildings or constructs that we would have had

8     to work on, we could do it for half the cost.

9          I mean, so I think this is going to be more than

12:03PM 10    somebody saying here's what the average cost of a center

11    is, and I was leaving it to you guys as creatures of

12    reason to kind of figure out a mid-point where Singular

13    gets generally this information so they can quantify the

14    potential on damages and harm but nobody has to worry

15    about getting receipts from Home Depot about what the

16    price of concrete was.  I mean, that's what I was trying

17    to convey.

18          MS. YBARRA:  Your Honor, I think we've --

19          MR. ERCOLINI:  If I may, your Honor, we can

12:04PM 20    actually I think short-circuit this because Google has

21    already done that analysis through and through on

22    megawatt requirements.

23          We've received a number of documents on that,

24    documents that we've recently produced that we've been

25    requesting through discovery.  We have those.  We have

1    detailed financials on the data centers, on their power

2    draw, on their space requirements.

3           Those documents it appears were prepared in a

4    number of cases for the litigation, so I think that those

5    documents that have recently been produced should be

6    within bounds, and I think that's a good midpoint.  A lot

7    of those are detailed analyses on the financial benefits

8    of the TPUs, how many they have deployed, what the power

9    draw is, so I think that that's probably a good midpoint

12:05PM 10   where we're not asking about the nails, how much concrete

11   was poured, and those are really the main issues that

12   we're concerned with in the litigation because those are

13   the main benefits that are derived by the invention.

14          It is reduced power, and it is reduced

15   footprint, and so I think based on the documents that

16   they've produced, I think those should be within the

17   scope of what they're offering, and that was exactly my

18   concern, your Honor, was that all we were going to hear

19   about was what's the average cost for a data center

12:05PM 20   because they've given us detailed information that's a

21   lot more granular than that, and it really does vary.  It

22   varies by county.  It varies by where the real estate is.

23          There is no quote, unquote, "average data

24   center."  There's only 10 at issue.  It's not like we're

25   going to be all over the map on this.  It's pretty

1    drilled down and really the spreadsheets are one sheet

2    apiece for the most part.

3            THE COURT:  In your opinion, Mr. Ercolini, how

4    much time do you think you would need to explore this in

5    a deposition?

6            MR. ERCOLINI:  Mr. Shafiei is a 30(b)(6).  We've

7    got I think seven hours with him.

8            THE COURT:  I know you've got seven hours.  I'm

9    just curious how long do you think it would take to

12:06PM 10   explore all this stuff?

11           MR. ERCOLINI:  It depends on what the objections

12   look like, to be honest.  We're going to be very

13   straightforward.  We don't want to waste time on this.

14   To be honest, we would have loved to have gotten done

15   last week, and, you know, we will be as efficient as

16   possible because we are dealing with a deadline, and I

17   think there are maybe a dozen depositions due to take

18   place over the next two days.  It's not like we have the

19   resources to just be, you know, keeping him in the chair.

12:06PM 20   Nobody wants to do that.

21           MS. YBARRA:  Your Honor, can I please respond to

22   Mr. Ercolini's comments and your comments, your Honor?

23   You're exactly right, there is a middle ground, and the

24   documents that Mr. Ercolini is referring to are documents

25   that Mr. Shafiei was prepared to testify about.

1        Google's, you know, spreadsheets on capital

2   expenses for data centers, operating expenses, retrofit

3   costs.  He prepared extensively to testify on those, and

4   we will put him up on those.

5        We weren't interpreting your Honor's order that

6   we produce a witness on the average cost to, you know,

7   build and maintain a data center narrowly, we were doing

8   it in good faith, and we have the witness ready to go.

9        Where we're going to run into a problem, where

12:07PM 10   the fundamental dispute will be is when Mr. Ercolini asks

11   the witness are you prepared to testify on the full scope

12   of Topic X as drafted, and the witness, you know, when

13   the question is asked ignores everything that we're

14   discussing here.

15        THE COURT:  So why does that need to be asked?

16   Why do you need to ask a question like that?  Why can't

17   you just get into these areas, and, you know, I'm trying

18   to come up with a great analogy, and, you know, that's

19   the problem trying to coming up with one, but, you know,

12:08PM 20   we can all find many examples where you ask the question

21   you didn't really need to ask and thus created an issue

22   that may not have been there because I'm listening to

23   both sides.

24        Honestly, I'm not hearing that there really is

25   an issue, I'm hearing there's concern about this language

1    that has -- the witness that he or she is really supposed

2    to be prepared to talk about everything that's ever

3    happened at every time, but I hear Mr. Ercolini saying

4    that's not our interest, we don't want to do that, so why

5    can't we just have an understanding that here, the scope

6    of what we're talking about here, questions that are

7    based not only on what we talked about, the general cost

8    of these centers but also reasonable questions that flow

9    from the information that has already been provided by

12:09PM 10    Google to Singular on these topics so there's no chance

11    of a surprise by being shown a document that they haven't

12    seen before?

13         This is all kind of coming out of things that

14    strikes me Google will know the witness is likely to be

15    asked and thus will be prepared to answer.  Can we just

16    agree to proceed that way?

17         MS. YBARRA:  I would hope so, your Honor, but

18    Mr. Ercolini's rhetoric and his e-mail comments the night

19    before threatened to seek sanctions if the witness

12:09PM 20    testified he was not prepared to testify on the full

21    scope of the topics as drafted, and that is the backdrop

22    against which we're having this conversation.

23         THE COURT:  I can say that sanctions, I mean,

24    it's always, you know, a volatile word to bring up, but

25    sanctions would really only be appropriate in a context

1   like this if the witness was refusing to answer whether

2   on instruction or not questions in an area where it was

3   already clear either from the Court ruling or from the

4   parties' understanding that that was going to be an

5   appropriate area of inquiry.

6          Now, we're here, it seems to me we got some

7   consensus as to what those appropriate areas are if we

8   for the moment, you know, Singular, I'm thinking, you

9   know what, I'm not going to go in and somehow for some

12:10PM 10   reason try to get the witness to sign something or agree

11   that, yes, I'm going to be prepared to answer in all of

12   these areas, and Google is going in and thinking we need

13   to have this person ready to answer fair questions in all

14   of these areas.

15          Maybe Google would decide at the end or maybe

16   Google can go in, even know there's a motion for

17   protective order pending and saying, you know, we can

18   hold that in abeyance, and Singular can say we will hold

19   in abeyance our potential concerns that we're going to

12:11PM 20   get blind-sided by a surprise objection and maybe an

21   instruction not to answer because it could be that

22   neither of those concerns rears its head in this

23   deposition and this deposition goes without issue.

24          Can we just try to get this on board and start

25   this and see how it goes?  You've got seven hours, right?

53

1   And I know when we have meetings like this, I mean, it's

2   on everybody's radar screen.  I think everybody is going

3   to be now highly vigilant about exploring those areas

4   that are fair and kind of staying on point and just

5   moving along and letting Mr. Shafiei then get back on

6   with his life.

7       If we were going to proceed that way, when can

8   we get that deposition to take place?  It was going to be

9   on Tuesday.  That didn't happen.  When can it happen?

12:12PM 10       MR. ERCOLINI:  If the witness is prepared, we

11   can do Friday.  We want to do it before discovery closes.

12       THE COURT:  I mean, obviously, I have to talk to

13   Judge Saylor whose deadline that is, but I think that,

14   you know, where we're talking about this, we can probably

15   assume that if it has to spill over into next week or

16   something like that, that's not going to be an issue.

17       Still, we should be looking to do this as soon

18   as practical.  Google, when can you have Mr. Shafiei

19   ready to be deposed?

12:12PM 20       MS. YBARRA:  Your Honor, certainly not tomorrow,

21   I think just owing to his schedule, but Judge Saylor did

22   say it was okay with him if depositions spilled over to

23   July 31st.  I need to check with the witness and find out

24   when he's available, but we'd aim to do it within that

25   time frame.

1          THE COURT:  Okay.  I would say to the witness

2     only because I've been here before, not with you guys,

3     but in many cases, sometimes they may need to be made to

4     understand they may need to alter their schedule, and

5     that's not really a power argument as much as it is a

6     moving train, and everybody's got to play their part, so

7     I'm sympathetic.

8          We are in the heart of vacation season.  We're

9     encountering this issue a lot, but if you do talk to him,

12:13PM 10     just help him understand the sooner he does this, the

11     better it is for everybody, the case moves along.

12          MS. YBARRA:  I don't think we'll have a problem

13     on that front, I just don't want to commit to a specific

14     day on the record here where I haven't checked with him

15     at all.

16          THE COURT:  All right.  I'm just going to leave

17     that to the parties then to solve the logistics on that.

18          Now, let me go back for a quick minute to

19     Dr. Patil.  I'm not going to revisit all that, but I am

12:13PM 20     going to say that that, I think, Singular, the ball is in

21     your camp.  If you do think that things went so poorly

22     that there should be an opportunity for a redo, you're

23     just going to have to file something ASAP and we'll deal

24     with it that way, otherwise unless you guys talk and/or

25     you conclude that on balance it's not necessary for you

1    or worthy for you to go back and try to do that one

2    again.

3         MR. SEEVE:  Understood, your Honor.  Thank you.

4    We'll confer, and we'll decide whether or not we think

5    it's egregious enough to file something, but that makes

6    sense to us, your Honor.

7         THE COURT:  Okay.  So those are the obviously,

8    you know, our two big things.  I don't have the e-mail in

9    front of me.  I looked at it quickly.  We've been going

12:14PM 10   for an hour and 15 minutes.  We don't have too much

11   longer.  We're probably over the time we allotted, but is

12   there anything looming that you think in a few minutes we

13   can do something productive on?

14        MR. ERCOLINI:  Your Honor, there are just a

15   couple of topics, and I think we can make this very

16   quick.  We'll be very pragmatic about it.

17        There were a number of topics for which

18   designations were not provided.  We're not going to get

19   into the rule, but one of those is Google's return on

12:15PM 20   investment policy.

21        This is a very key issue in this case because,

22   you know, based on the capital expenditures that Google

23   has made on the TPUs, the return that they're suggesting

24   is -- it's sort of astonishing, but its corporate return

25   on investment policy, what it expends, and they produced

1    CapEx, they produced OPEX.

2         In terms of what it expects to get in a return

3    and profits, we should know about that because they had

4    this project going for several years.  It's a key part of

5    most damages analysis nowadays, and so we would like to

6    get that topic designated, and we're not sure why it was

7    left off.  There are a number of others one, but just to

8    be pragmatic that one is very important to us.

9         THE COURT:  All right.  So you've designated

12:16PM 10   somebody to talk about that.  Google, do you have

11   problems with that, or is this just something you haven't

12   gotten to?

13        MS. YBARRA:  Your Honor, this is one of the

14   subjects raised in our motion for protective order.  We

15   have told Singular that Google does not have an official

16   corporate ROI policy, and that's why we're unable to

17   designate a witness on that.  We've had that conversation

18   multiple times now.

19        As to the other topics for which Google did not

12:16PM 20   designate a witness, those were agreements -- those were

21   agreements reached with Singular in prior meet and

22   confers that memorialized in our opposition to Singular's

23   motion to compel that we feel like Singular has reneged

24   on in the last 48 hours, and so I think there's still

25   issues in the protective order need to be addressed, and

1    that's one of them.

2         THE COURT:  I think those then will have to be

3    subject of motions, I just don't know that we're going to

4    be able to sort of go through and work through --

5         MR. ERCOLINI:  I can make this very simple, your

6    Honor.  If their contention is that that corporate return

7    on investment policy does not exist, then have someone

8    say it under oath that it doesn't exist, and it's as

9    simple as that, then we have it under oath, and we have

12:17PM 10    that response from Google.

11         THE COURT:  Let me ask you a question.  Why

12    can't -- I mean, did you ask it in an interrogatory?  I

13    mean, those are usually signed by somebody that can bind

14    the company.  Wouldn't that give you the same?  I don't

15    know that we want to force people to all come together

16    and spend all that money just to have somebody say that

17    under oath if you can do the same by getting it in a

18    written interrogatory.

19         MR. ERCOLINI:  Well, there's a 30(b)(6) witness

12:17PM 20    coming up.  It seems like it would be very easy to

21    prepare him on that topic, but we are past the

22    interrogatory deadline.  We're well past the deadline for

23    written discovery, and we had a limited number.  You

24    know, we've gone back and forth on a number of those.

25    It's the only vehicle, and it's the vehicle that we

1    chose, and, you know, we basically --

2         THE COURT:  I mean, I guess I don't know how I

3    feel about that, and so I don't want to say something off

4    the cuff that I later, you know, change, but I'm a little

5    bothered by it because when you've got counsel making a

6    statement say in response to a discovery request that we

7    don't a policy on this, usually you're not entitled to

8    then say, do you know what, bring somebody in under oath

9    and let me ask the question, just prove it.

12:18PM 10        Now, here's the asterisk.  If you've got a basis

11   to suspect that answer is incorrect and thus it does

12   warrant further exploration, that's different.  I don't

13   know enough about the details here, you know, to know one

14   way or the other whether that's something you should just

15   be accepting as a statement either from counsel or,

16   again, if it were in response to an interrogatory, I

17   understand you didn't ask it in an interrogatory, but I

18   guess, Google, you know, on the practical side of things,

19   if there are going to be other depositions, why can't you

12:19PM 20   just have somebody as part of that say, you know, by the

21   way, I am here to tell you we don't have an ROI policy,

22   and that way they've got it under oath, you're not

23   wasting time by having a whole lot of questions put to

24   somebody in that area, but if it turns out later that

25   that's incorrect, well, Singular has established that for

1    the record, and if it turns out it is correct, then it's

2    neither here nor there, and it took five minutes to

3    establish that.

4         MS. YBARRA:  Your Honor, just to be clear, we

5    told Singular that Google does not have an official

6    corporate ROI policy on May 14th.  That was 10 days

7    before the deadline to serve written discovery, and

8    Singular in fact served interrogatories after that date.

9    They didn't ask this question.  They also didn't move to

12:20PM 10   compel testimony on this topic.

11        This is part of a larger problem that we reached

12   agreements on several topics on Singular's 30(b)(6)

13   notice that they have now abandoned at the eleventh hour

14   and are saying that Google has somehow acted improperly.

15   That's really a larger fundamental problem we're having

16   here with Singular's --

17        THE COURT:  I don't think anybody is saying

18   they're acting improperly.  Let me ask you, on May 14th,

19   when you made that representation, was that a

12:20PM 20   representation by counsel, or was that -- I mean, how was

21   that conveyed?

22        MS. YBARRA:  That was conveyed by counsel in a

23   meet and confer on Singular's 30(b)(6) topics, the one

24   that we're speaking about now.

25        THE COURT:  Mr. Ercolini, if you were to get a

1    letter from counsel on behalf of Google stating in simple

2    throws, Google has no corporate ROI policy, would that be

3    sufficient for your purposes?

4         MR. ERCOLINI:  Well, your Honor, to the extent

5    we find evidence that contradicts that there is no ROI

6    policy, following up on that would be extremely

7    important.

8         THE COURT:  I mean, that's my whole point, if

9    what they say is true, you're not going to find anything,

12:21PM 10    I'm just trying to figure out a way that we can do this

11    and make this a nonissue.

12         If you can establish for the record they have

13    taken a position on whether there is or is not a

14    corporate ROI policy, and it's about as official as it

15    gets, we've got an officer of the Court representing

16    Google who is stating to us in a letter that is being

17    written solely for this purpose to tell us one way or the

18    other whether it exists.

19         I can tell you, if you then find something that

12:21PM 20    suggests something in opposite to what's in that letter,

21    yeah, you'll have a basis for asking the Court to do

22    something.

23         My question is, okay, if you get that letter

24    though now, does that diffuse this as a potential issue

25    because otherwise I think the way we're going to have to

1    deal with this is it will have to be briefed.

2            I mean, that's just time and money, you know,

3    because I'm hearing you could have asked about this in an

4    interrogatory.  You didn't.  It was raised prior to the

5    deadline.  You still didn't ask.  You were actually told

6    in a meet and confer it doesn't exist, and so, gee, we

7    don't think we should have to bring a human being in and

8    put them under oath just to affirm something we already

9    told you.

12:22PM 10        MR. ERCOLINI:  Judge, Ms. Ybarra said there were

11    a number of agreements prior to the motion to compel that

12    we filed, but we filed a motion to compel on several

13    topics that they claimed we had agreed to.

14            The requirement is that they designate someone.

15    If they say that something doesn't exist and we disagree

16    that it does, we're not at an obligation to put that into

17    another form of discovery.  They have to designate

18    someone, and if it's just to designate someone to testify

19    that it doesn't exist, I can tell you, your Honor, we

12:23PM 20    have indications that that does exist.

21            THE COURT:  That's different.  So, 1, I don't

22    know whether I agree with you that if they tell you

23    something doesn't exist, they still have an obligation to

24    produce somebody to talk about it.  I don't know that

25    that's true, but here's the part that matters.

1          I mean, you're telling me, do you know what, I

2     have a basis to believe it's not true, so that's the

3     concern.  If that's the concern, I would say, you know,

4     what, Google, you should just have somebody prepared to

5     come in and spend five minutes to say, I don't care what

6     you heard, it doesn't exist, but, Singular, if you think

7     it does, show them what you got.  I mean, tell them

8     here's why we think there is something there.

9          Maybe the lawyers don't know what somebody else

12:23PM 10     in the company might know, and maybe this is just a

11     matter of, all right, a little more conversation,

12     internal conversation on their side, and, you know,

13     something might come up, and that might, again, help this

14     move along, but I don't want something as simple as this

15     to all of a sudden end up being the subject of a whole

16     bunch of motions back and forth where you guys are sort

17     of close to the end of things.

18          MR. ERCOLINI:  It sounds like according to

19     Google, they think it's relatively noncontroversial, so I

12:24PM 20     don't think it should be if what they're saying is

21     correct, but, you know, if we have countervailing

22     evidence, I think we have an obligation to our client to

23     look into that.

24          THE COURT:  Are there still depositions to take

25     place on subjects where the likely designee for those

1   subjects would also be somebody who with credibility

2   would be able to say whether there might exist or does

3   not exist a corporate ROI policy because if the answer is

4   yes, we're still going to be deposing somebody on the

5   corporate side of things to talk about A, B and C, why

6   not just throw this in and with an understanding that all

7   the person is going to be prepared to do on that is state

8   one way or the other whether there is a corporate policy?

9           Now, Mr. Ercolini, if we go that way, I mean,

12:25PM 10   here's what I wouldn't want to have happen, all of a

11   sudden some surprise where all of a sudden you bring out

12   some documents and you say, well, what about this?  I

13   mean, I'm not interested in setting up that sort of

14   exercise, but if you really have a legitimate basis, if

15   you have a legitimate basis to worry that there is a

16   policy, help them understand why that is the case, and

17   then I might be more amenable to saying, you know what,

18   in light of this past where they've already told you this

19   and you had an opportunity to explore it, I'm still going

12:25PM 20   to say, okay, go ahead and try to depose somebody on

21   this.

22           Is that something you can do, or is this sort of

23   on information or belief or your understanding of how

24   businesses operate and how it just seems to you to be

25   just so unlikely that they wouldn't --

1          MR. ERCOLINI:  No, no, I don't think it's based

2     on inference, and I have to speak with my expert about

3     it, but my understanding is there is pretty specific

4     policies, and I'll just say because you asked about the

5     witness that was available to testify on this,

6     potentially, Mr. Shafiei who did not appear on Tuesday is

7     the finance manager and capital markets analyst for

8     Google.  He's been there for 11 years.  I think if

9     there's a return on investment policy, he would probably,

12:26PM 10     if he doesn't know, he could probably be educated on it

11     fairly quickly, and it's as simple as that.

12          We're not intending to go on a fishing

13     expedition.  It's not worth our time to go in there and

14     say, oh, that's incredibly unlikely, are you kidding me?

15     We'll go in with specific evidence.

16          Giving that to counsel before the deposition

17     when they're telling us that it doesn't exist, I don't

18     know how comfortable I feel about doing that.  I don't

19     think it's entirely fair to Singular to have to disclose

12:27PM 20     why it doesn't believe what Google has told it and to

21     provide the evidence so that they can, you know, come up

22     with a prepared response for why it's undercut by that.

23          You know, impeachment really doesn't work that

24     way, but we're not trying to get anyone, we're just

25     trying to establish whether or not it's true and then,

1    you know, what are the indications that it's not when

2    they say...

3              THE COURT:  So, Google, here's what I would

4    suggest, respectfully, to you folks, to the lawyers, I

5    think you need to go back and talk to your client, and I

6    think what you have to say is, look, based on what we're

7    talking about in court, Singular really has a basis to

8    think there's a policy.  We've said there isn't.  The

9    Court thinks, the Court says if there is a policy, it's

12:28PM 10    probably okay to ask questions about it, and we'd have to

11    make somebody available.

12              We, the lawyers, don't want to have egg on our

13    faces by it becoming apparent that there is a policy when

14    we said there isn't, so maybe if you can have a further

15    conversation with somebody on this, but having said that,

16    Mr. Ercolini, I still don't know that it's appropriate

17    for me to do anything, I mean, to rule at all.

18              I mean, I take counsel -- you know, lawyers are

19    officers of the Court, and when they come in and they say

12:28PM 20    we've made a statement as to something, I don't have a

21    basis to challenge that, and I understand you don't want

22    to necessarily tip your hand by explaining why you may

23    disagree with it, but if you're not going to do that, I

24    don't really have a basis to say, well, I'm going to make

25    them designate somebody anyway.

1          Here's the principle I'm worried about because I

2    can tell you are shaking a bit.  The principle I'm

3    worried about, it can't be the case that one side can say

4    we have no policy in the following areas and then yet be

5    compelled to produce somebody under oath to talk about

6    those areas, even if it's just to say, as we indicated

7    before, or as you were told before, there is no policy,

8    absent some evidence to suggest that that first assertion

9    may be incorrect, and if you can't give me that, I just

12:29PM 10    don't know that I can do anything.

11          MR. ERCOLINI:  Your Honor, if I could just

12    respond to that.  If Google's going to go back and ask

13    its client whether or not there's a policy, I want to be

14    clear about what that means.  It doesn't necessarily mean

15    oh, well, there's a document that says here's a return on

16    investment policy or here's a one sentence return on

17    investment policy, but what Google suggested in this case

18    is that essentially a 400 to 1 capital investment to

19    profit ratio for a project that's gone for five years is

12:30PM 20    somehow within the bounds of their return on investment

21    policy.

22          We have a right to probe whether or not Google

23    would have made an investment like that and continued a

24    project whose capital expenses were 400 times the profits

25    of what they say, you know, the invention gave them.

1              I think that that's -- it's a very sensible

2     topic, and it's clearly something that smacks of

3     absurdity to suggest that probing that I think is

4     important.

5              I want to just make sure that when they go back

6     and say is there a policy, someone doesn't say, well,

7     there's no policy because the policy is defined as, well,

8     there's a document that says here's our policy.  It's

9     probably grayer than that, but I do think that we have a

12:31PM 10   responsibility to probe that, and that is a

11    responsibility to our client.

12              THE COURT:  All right.

13              MR. KAMBER:  Your Honor --

14              THE COURT:  Maybe there's a couple of different

15    things there.  One, it sounds like you're almost talking

16    about somebody said something about 400 to 1

17    differential.  That's not necessarily the same as saying

18    there's a policy, but, anyways, Mr. Kamber, what do you

19    say?

12:31PM 20             MR. KAMBER:  We can go back and talk to our

21    client about this, but the problem is it's the day before

22    the close of fact discovery and this is coming up, and

23    just to set the table, Mr. Ercolini and I met and

24    conferred on the 30(b)(6) topics on May 14th, including

25    the ROI policy, and we said there isn't somebody, we

1    can't put somebody up.

2           If Mr. Ercolini said, you know what, I think you

3    do have somebody, you should go back and figure this out,

4    then we could have done something about it at the

5    appropriate time.  That was over two months ago, but here

6    we are.

7           We had our objections.  We noted them.  They did

8    not move on the ROI topic.  They moved on various

9    different 30(b)(6) topics.  We came into this court, we

12:32PM 10   said we have a dispute about this number, I think it was

11   16 at the time, but I can't be sure.  We said there's a

12   dispute.  Do you have any other disputes?  No.

13          This was not a topic that was moved on.  We

14   listed it in that Exhibit D to our opposition as one

15   where we had met and conferred.  We had not offered a

16   witness, and they had not moved on it.

17          To be here now and to have Mr. Ercolini -- this

18   is a different issue than we had a fight about scope, and

19   there's some disagreement about what the Court may have

12:33PM 20   ruled or may not have ruled, there's no disagreement

21   here.  This was not moved on, this was not ruled on,

22   and --

23          THE COURT:  Hold on, the fact that it was not

24   moved on or ruled on is a bit of a red herring here

25   because really the issue here is a really simple one.  Is

1    there a policy or is there not a policy?  You guys say

2    no.  They say we think there might be.

3         Now, then all those other things come in and add

4    these layers to it, so we're going to trying to analyze

5    this, you know, then we might have to consider, well, did

6    you raise this timely?  Was it the subject of a specific

7    conversation?  What's your basis for thinking there might

8    be something?  You know, who was it that made the

9    statement that we don't have anything?  Is that reliable?

12:33PM 10         But it all begins with is there a policy or is

11   there not?  I guess I don't know, Mr. Kamber, why Google

12   seems to have some resistance to listening to you guys,

13   although you haven't said explicitly.

14         Having somebody prepared to say, yeah, we've

15   looked, I mean, you keep asking about this ROI policy.

16   We don't have anything like that.  So, you know, do with

17   that what you will.

18         Are you resistant to that?  I get it, you say we

19   already talked about this, but if we're going to have

12:34PM 20   Mr. Shafiei, if we are going to have a deposition that's

21   going to take place probably within the next five days or

22   so or six or seven days, and this really is a nothing

23   burger, why can't we just roll it in and say without

24   waiving any objections we have to your right to even try

25   to be exploring this at this juncture, we'll have

1    somebody there just to remove any ambiguity and to

2    declare, as we told you before, that there is no policy.

3    Is that something that you have a problem with?

4           MR. KAMBER:  A little bit for two reasons, your

5    Honor.  One is the practical one that, you know, if

6    Mr. Ercolini had thought this was an issue, we could and

7    should have been talking about it before where he said,

8    you know, sorry, counsel, we don't believe you, we think

9    there's this other thing, and we could have figured this

12:35PM 10   out over the last two months.

11          The other one is that this is clearly now an

12   attempt at sandbagging.  This isn't about a 30(b)(6).

13   He's saying I need you to put somebody up because I've

14   got dirt on you and I want to cross-examine the guy, and

15   that's the only reason.

16          He doesn't want to ask the question, do you have

17   an ROI policy, he wants to hit whatever this witness is

18   over the head with whatever documents or whatever

19   information that he has.  That's not really the

12:36PM 20   appropriate thing at this point, particularly given the

21   history here.

22          THE COURT:  I mean, well, and just sort of

23   playing that out one step further, Mr. Ercolini, kind of

24   a victory if they do not know what it is you would want

25   to probe and they thus can't -- it's most likely they're

1    going to have somebody there who is going to say we don't

2    have a policy that I know of, and then all of a sudden

3    you produce a document that suggests differently, well,

4    that witness still isn't going to be able to give you any

5    information because he or she wouldn't haven't been

6    prepped on whatever it is you've got in your hand.

7          They would have been operating on the same

8    information that Mr. Kamber and Ms. Ybarra have, which is

9    there isn't anything here, so I mean, then you'd be stuck

12:36PM 10  having to come back before the Court and saying, okay,

11   this is what happened, and now I want an opportunity to

12   probe some more about this, so, you know, I don't know

13   what to tell you guys.

14         MR. KAMBER:  Can I raise one other practical --

15         MR. ERCOLINI:  The complaint seems to be that we

16   didn't believe them enough at the time that they --

17         THE COURT:  No, no, no, that's a

18   mischaracterization.  No, the complaint is you didn't

19   raise it, you didn't put it on the radar screen.  They

12:37PM 20  told you in mid-May there's nothing there, and now all of

21   a sudden we're hearing at the eleventh hour that you want

22   to have somebody there to talk about it, and, in fact,

23   you do think there's something there.  That's the issue.

24         MR. ERCOLINI:  Your Honor, the obligation,

25   again, I hate to go back to what the requirement is for

1    depositions in 30(b)(6).  If you fail to designate, you

2    have failed to appear, and they failed to designate.  We

3    are not required to move to compel.  It is the one

4    vehicle of discovery.

5         THE COURT:  What's your authority to support

6    that proposition when what you heard from counsel was

7    there is nothing on this particular subject, so there's

8    nobody to put before you to talk about it?  Are you

9    saying that even in that instance, they need to have

10   somebody there to affirm that there is nothing there, and

11   the failure to do that would in essence be a failure to

12   appear?

13        MR. ERCOLINI:  Your Honor, during the June 30th

14   hearing, we heard the analyses that didn't exist, you

15   know, were subsequently produced.

16        THE COURT:  Okay.

17        MR. ERCOLINI:  So we can credit what counsel

18   says, but we're going to do that to a point, and to go

19   back to your point, they just say that it doesn't exist,

20   then, you know, even if it ends there, at least we have a

21   confirmation on the record that that's the case, and if

22   it proves not to be true, you know...

23        THE COURT:  Let me do this.  Why don't I do

24   this.  You guys tell me, you know, I was thinking I'm

25   offering something that's an easy way out and both sides

1    tell me, no, that doesn't work.  Why don't I authorize

2    one supplemental written interrogatory, ask the question.

3    You're going to get Google responding under oath, I mean,

4    you know, somebody binding Google.

5         You can have time to go back and formulate the

6    question that would give you the information that you're

7    looking for, and then we can proceed based on that.  You

8    guys can go back and pound that out right now and send it

9    over to them this afternoon.  How about that?

12:39PM 10    MR. ERCOLINI:  It is a different vehicle of

11   discovery, your Honor, because they can withhold the

12   response based on objections.

13        THE COURT:  No, there's no objection.  We can

14   talk about that right now.  You're right, we're here

15   right now.  I don't know what the objection would be.

16   It's relevant if it exists.  If there's a policy, I don't

17   know why it would be onerous or burdensome to produce it,

18   right?

19        We're not talking about going back and crafting

12:39PM 20   something, we're saying if you got this, you know, does

21   something exist, and, if so, I guess maybe a supplemental

22   RFP as well, give us a copy of it.

23        MR. ERCOLINI:  I can tell you what the

24   objections to that are going to be, We object to the term

25   corporate return on investment policy as vague,

1   ambiguous, overbroad, and we're going to get a response

2   that is subject to those objections.

3           THE COURT:  But you could define it, you could

4   define it, you can say when we use that term, we use it

5   to mean any number of documents that might go by a

6   similar names such as blank, blank, blank or blank.

7           The rules require a party, even if they're

8   objecting, to identify whether there is responsive

9   information, so we need to know whether it's worth it to

12:40PM 10   have a fight, so even if they object, Google would still

11   have to say there is something actually out there that's

12   responsive to this request, we just don't want to use it.

13           It gets something, but you're not wild about

14   that I can tell.

15           MR. ERCOLINI:  I expect to then see an objection

16   to the definition.  I just think a deposition just

17   answering that question, even if it's just that question.

18           THE COURT:  What's the question going to be?

19           MR. ERCOLINI:  Is there a corporate return on

12:41PM 20   investment policy?

21           THE COURT:  And if the answer to that question

22   is no, you're going to come up with a document, and

23   you're going to try to get this person to then answer a

24   series of additional questions that they're not going to

25   be in any position to answer, and then what do you do

1    with that?

2         MR. ERCOLINI:  Well, that they are not on the

3    documents, that they didn't author the document, they

4    wouldn't have had knowledge of it by some other

5    circumstantial evidence.

6         There are other reasons that they might have

7    reason to know that.  In terms of how far beyond that we

8    probe, I don't think it's anyone's interest on going on a

9    fishing expedition, but, you know, we're not trying to

12:41PM 10    hit someone over the head.  We are actually trying to get

11    at that information because it's important for expert

12    reports.

13         Even getting that they said no corporate return

14    on investment policy exists response, you know, I've said

15    my peace on that.  I'm not wild about the interrogatory

16    because I don't want to be here in a few weeks on a

17    motion to compel for response.

18         THE COURT:  I'm also not necessarily wild on the

19    principle about compelling them to have somebody prepared

12:42PM 20    to answer something where they've already told you there

21    was nothing there and you're not prepared to explain why

22    you disagree with that, so that's more from a kind of

23    middle.

24         You can imagine somebody in my position, the

25    precedent that that may create in future cases where

1   somebody will say, well, just because they represented

2   under pains and penalties of perjury they don't have

3   anything, you still should tell them to do all these

4   other things, so I'm worried about that.

5          Mr. Kamber, Ms. Ybarra, what can you offer as a

6   way to completely diffuse this?  Can you have

7   somebody -- well, if it's the person we're talking about,

8   can you have him prepared to offer any information on

9   this as to whether there is something reassembling a

12:43PM 10   policy understanding that if they say no, they may then

11   be shown a document and asked, you know, the sort of

12   standard, do you recognize this or do you not recognize

13   this?

14          MR. KAMBER:  I mean, I think I could fairly say

15   that we could have Mr. Shafiei or somebody else give what

16   they know.  Part of the issue here is that it's 30(b)(6)

17   testimony.  This is a witness who's prepared for hours.

18   He's talked to at least half a dozen, maybe 10 people in

19   preparation for the testimony because, as Mr. Ercolini

12:43PM 20   pointed out, there are a lot of spreadsheets, detailed

21   spreadsheets we produced that he has prepared himself to

22   testify on, and any of those conversations he could have

23   asked, hey, by the way, do you know of a corporate ROI

24   policy, but we can't redo that, unfortunately.

25          THE COURT:  I understand.

1          MR. KAMBER:  The problem is it's late.

2          THE COURT:  I understand.  We're not talking

3     about that, we're talking about doing it now, about

4     asking one person, giving an opportunity do you know

5     anything about this, but the difference being you guys

6     ahead of time now have the foresight and the opportunity

7     to sit down with the designee to say, look, you're going

8     to get a question in this area.  It behooves us all to

9     know whether there's something there or not.

12:44PM 10          MR. ERCOLINI:  And counsel actually already

11     knows that because they already told us that it doesn't

12     exist, they've asked Google, so whomever they asked I

13     think should probably be the person to speak with

14     Mr. Shafiei.

15          THE COURT:  Well, I don't instruct folks on how

16     to go about preparing their witnesses, but I'm sure they

17     understand how things work there and would do this

18     appropriately, so...

19          MR. KAMBER:  And we need to figure out if

12:44PM 20     Mr. Shafiei is the appropriate person.  Mr. Ercolini says

21     he is, but Google gets to pick who it is that's going to

22     testify on this topic ultimately.  As a practical matter,

23     it may be him, but it may be that we want or need

24     somebody else, for better or worse.

25          THE COURT:  Well, I was just thinking only

1     because if you guys are concerned about wrapping these

2     things up --

3              MR. KAMBER:  Right.

4              THE COURT:  -- and this really is going to be

5     the tail of the tail of a dog, it just seems to me the

6     easiest way to do it is just to have him prepared to

7     comment on it and then go from there.

8              Mr. Shafiei, I would take no position though of

9     what happens if, you know, you end up with a transcript

12:45PM 10   that shows we asked the witness, we showed the witness a

11    document, the witness was not prepared to answer all of

12    the questions we had about that document, and we now,

13    therefore, should be entitled to do more.

14             I don't know how I would react to something like

15    that in light of this record.  I'm just saying I haven't

16    had a chance to think about it, so you shouldn't assume

17    that if we go through this exercise and you get an answer

18    like that that it's going to mean that further discovery

19    is going to be appropriate, and you'd have to go very

12:46PM 20   incrementally at that point.

21             MR. ERCOLINI:  I agree, your Honor, and

22    hopefully we don't come to it.  I desperately hope that

23    we don't come to it because I would love discovery to

24    come to an end.

25             THE COURT:  All right.  So, now, again, we're

1   not ruling on anything.  I mean, we're talking about

2   possible ways to address some of these issues, and it

3   does seems to me that we have come up with some things

4   that could be a way in terms of how to deal with some of

5   these.

6          So I think, Mr. Seeve, you said you guys will go

7   back and reflect as it relates to the Friday deposition

8   and whether you wanted to do anything with respect to

9   that.

12:46PM 10          As it relates to the Tuesday deposition, maybe

11   we're going to have that take place next week and people

12   rather than sort of bear their chest and start

13   articulating all their worries at the outset will

14   actually just get into the deposition, and hopefully it

15   will go without issue, and Google will, it seems to me,

16   is going to consider having that person maybe also be a

17   person who can put to bed this issue of whether there is

18   an ROI policy, and Singular will just roll with the flow,

19   and if that gives rise to any further issues, we'll deal

12:47PM 20   with those when they arise.

21          One thing I may regret, but I'll just say it, if

22   you tell me the day the deposition is going to take place

23   and I am here, sort of like with the Superior Court,

24   where you could sometimes when a deposition issue arises

25   just reach out to the Court and get the ear of somebody

1    and saying, look, here's an issue, what do you think

2    about this, I'm okay with making myself available in that

3    regard if you want, so if you want me to sort of just be

4    loosely on standby, if you want to let Ms. Russo know

5    when the deposition is going to take place, there's no

6    obligation to reach out to me at all, and I'm also not

7    committing that I would automatically be available, but

8    if it is a day I'm working, I can offer that.

9         MR. ERCOLINI:  We greatly appreciate that, your

12:48PM 10    Honor.

11         THE COURT:  All right, so let's go that way.

12    It's 12:48, people must be hungry, so is this a good time

13    to call it a day and let people get on with their lives

14    or is there anything else?

15         MR. SEEVE:  Your Honor, there is one other issue

16    that was raised in our letter, and I hate to prolong.

17         THE COURT:  I shouldn't have asked, I should

18    have set we're all set.

19         MR. SEEVE:  I think I can cover it in 15

12:49PM 20    minutes.

21         THE COURT:  That's too long.  We would have to

22    take a break.  If it were five minutes, I'd say let's

23    rally and let's do it, but I know Ms. O'Hara has other

24    obligations, as do I.  I'm sorry, we just did not expect

25    that we were going to be actually going beyond noon

1    today.

2         MR. SEEVE:  Understood.  If your Honor would

3    allow me, I could try to cover it in five.

4         THE COURT:  The problem is there's stuff that's

5    going to be coming from the other side and it's going to

6    be a discussion, that's the part.  You might be able to

7    cover it in five, I just don't think we can resolve it in

8    five.

9         Ms. Porto, you were going to say something?

12:50PM 10      MS. PORTO:  Your Honor, I was just going to say

11   Google has some outstanding discovery requests we were

12   hoping to discuss very briefly.

13        THE COURT:  I do think that probably we're going

14   to have to resolve it now.  As it relates to outstanding

15   discovery requests, if these are things where there's a

16   request and for some reason it hasn't been responded to

17   and now they're saying to our surprise they don't have to

18   respond to it and we think that's an issue and we might

19   be filing a motion, that's what we convene these informal

12:50PM 20   conferences for, not so much is this going to be coming,

21   we haven't heard from them.  That, I think you guys need

22   to work out yourselves, so I'll leave you with this in

23   closing:

24        1, let Ms. Russo know if you want me to be on

25   standby; but, 2, in the interim, why don't you guys talk

1    and say, if we get back together with Cabell, here's sort

2    of a small list of things that we do think we can talk

3    about with him and deal with within the span of an hour,

4    and then I'll try to make time for you guys sort of

5    within the next few days.  We can't just do it anymore

6    today.

7              MR. ERCOLINI:  Thank you, your Honor.

8              MR. KAMBER:  Thank you, your Honor.

9              THE COURT:  Thanks, everybody, good luck with

12:51PM 10  things going forward.  I'm sure I'll be talking to you

11   soon.

12             MR. ERCOLINI:  Understood, your Honor, thank

13   you.

14             (Whereupon, the hearing was adjourned at

15   12:50 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing

8    transcript, Pages 1 through 83 inclusive, was recorded by

9    me stenographically at the time and place aforesaid in

10   Civil Action No. 19-12551-FDS, SINGULAR COMPUTING LLC vs.

11   GOOGLE LLC and thereafter by me reduced to typewriting

12   and is a true and accurate record of the proceedings.

13           Dated July 26, 2021.

14

15                        s/s Valerie A. O'Hara

16                   _____

17                        VALERIE A. O'HARA

18                        OFFICIAL COURT REPORTER

19

20

21

22

23

24

25