# EXHIBIT A

```
1                     UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2                             WESTERN SECTION

3

4
     Singular Computing LLC      )
5                                )              19cv12551-FDS
          vs                     )
6                                )              June 30, 2021
     Google LLC                  )
7     _____)

8

9

10   VIDEO HEARING BEFORE:  MAGISTRATE JUDGE DONALD L. CABELL.

11

12
     APPEARANCES:
13

14   On behalf of the plaintiff:  Michael Ercolini, Prince
     Lobel Tye LLP, One International Place, Suite 3700,
15   Boston, MA 02110.

16   Brian M. Seeve, McCarter & English, LLP, 265 Franklin
     Street, Boston, MA 02110.
17
     Daniel J. McGonagle, Prince Lobel Tye LLP, One
18   International Place, Suite 3700, Boston, MA 02110.

19   On behalf of the defendant: Matthias A. Kamber, Keker, Van
     Nest & Peters, LLP, 633 Battery Street, San Francisco, CA
20   94111.

21
                         Alice Moran, CSR, RPR, RMR
22                     Official Federal Court Reporter
                         United States Courthouse
23                     300 State Street, Room 303D
                           Springfield, MA 01105
24                            (413)731-0086
                         alice.moran@verizon.net
25
```

1    **(Video hearing commenced at 3:04.)**

2           THE CLERK:  This is the case of Singular

3    Computing LLC versus Google LLC, Civil Action No. 19-12551

4    will now be heard before this court.

5       Would counsel please identify themselves for the

6    record?

7           ATTORNEY ERCOLINI:  Michael Ercolini for the

8    plaintiff Singular Computing LLC of Prince Lobel.  With me

9    today is Dan McGonagle and Brian Seeve also of Prince

10   Lobel also for Singular Computing.

11          THE COURT:  Good afternoon to all of you.

12          ATTORNEY KAMBER:  Good afternoon, Your Honor.

13   Matthias Kamber of Keker, Van Nest & Peters on behalf of

14   Google and some of my other colleagues are on the line as

15   well.

16          THE COURT:  All right.  And good afternoon to

17   you.

18      With that, let me just spread everything out.  I do

19   want to say at the beginning we have another matter that

20   was continued to this afternoon at 4 o'clock in a criminal

21   case that's being done by video but where we are really

22   stuck with their window of time.  So we are going to have

23   a hard stop at 3:55 or so if we still find ourselves going

24   by then.

25      So why don't we just get right to it.  I've got sort

1    of a cheat sheet and I'm just going to kind of run down

2    that and obviously other things that the parties think we

3    need to raise as appropriate let's do it.

4        On some of the stuff I have to say, as I was going

5    through some of these pending motions, I thought that we

6    had actually already spoken about some of these but our

7    internal things show they're still unresolved.

8        So on some of these it may have a feel that we're

9    reinventing things and I hope you guys will help me

10   understand the status of some of these, especially since

11   as I read though them one side will say, well, maybe

12   things are a little bit further along than you might

13   think.

14       So with that, let's get right to it.  The first one

15   that I have, going back in time, Google had filed a motion

16   for a protective order relating to the plaintiff's notices

17   of deposition.  This is the one at 153 on the docket and

18   so that goes back I think to March of this year, and

19   that's one where I actually thought we had talked about

20   this one and worked out some sort of understanding as to

21   how things are going to proceed.  But if that's not the

22   case, Google, let me hear from you as to what is still in

23   play with respect to this motion?

24            ATTORNEY KAMBER:  Sure.  Happy to, Your Honor,

25   and I think there is nothing in play for that motion.

1      THE COURT:  Okay.

2      ATTORNEY KAMBER:  We did meet and confer

3  afterwards.  What happened was the court ordered Singular

4  to submit a single sort of amended 30(b)(6) notice.  They

5  did that.  We provided our responses and objections to

6  those.  It went down from 102 or so to 46 topics.

7      We met and conferred on that.  We have, so far as we

8  can tell, agreement on 30 of the topics at this point.

9  There are 16 that are remaining to be decided that I would

10  characterize less as an issue with our motion for

11  protective order and probably more fairly as an issue of

12  the 16 topics that Singular is pursuing by way of its own

13  motion to compel.

14      THE COURT:  All right.  So with respect though

15  to the motion for a protective order, would you agree that

16  we can deem that motion resolved or moot by virtue of an

17  understanding between the parties?

18      ATTORNEY KAMBER:  Yes, Your Honor.

19      THE COURT:  All right.  Thank you.

20      All right.  The next one that I have is Singular's

21  motion to compel responses to interrogatories and requests

22  for documents.  That's at 187 on the docket.  That's

23  another one I thought we had talked about the last time.

24  Maybe we hadn't but, Singular, what is your -- what do you

25  say to that one?  Is there still stuff to talk about on

1    that one?

2              ATTORNEY ERCOLINI:  There is, Your Honor.  And I

3    think that given the time constraints as well, I think it

4    would probably be most advantageous for everyone -- just

5    because the issues overlap so much -- to discuss the

6    motion to compel 30(b)(6) topics as well as the motion to

7    compel production of documents and interrogatory

8    responses.

9              THE COURT:  Wait.  I want to make sure I

10   understand what you're saying.

11             ATTORNEY ERCOLINI:  Sure.

12             THE COURT:  So I'm looking at docket numbers.

13   So you're saying it makes sense to talk about 187 along

14   with another pending motion?

15             ATTORNEY ERCOLINI:  With 214 as well, Your

16   Honor.

17             THE COURT:  Okay.  That's the motion to compel

18   the 30(b)(6) testimony?

19             ATTORNEY ERCOLINI:  That's correct, Your Honor.

20             THE COURT:  Okay.  I'm fine with that.  So I

21   will hear you.

22             ATTORNEY ERCOLINI:  So I just want to start,

23   Your Honor, by just giving a brief framework to frame the

24   discussion.

25        We gave some slides to the court and you're free to

keep along with those, but this is a very basic framework.
271, 35 U.S.C. 271 defines infringement, so-called direct
infringment as "making, using, selling, offering for sale,
and importing an invention in the United States without
authority during the life of the patent."

So when we talk about infringement, we usually talk
about selling and it's sometimes overlooked that use is an
infringing act.

Damages as well are tied to infringement.  Even the
statute 284 is tied to "No event less than a reasonable
royalty for the use made of the invention."  Obviously
that covers other acts but use is explicitly in there.

Unless it reads whether a damages model can track
use, the *Georgia Pacific* factors, the 15 factors the
Federal Circuit has repeatedly sanctioned in using in a
reasonable royalty analysis expressly provide for the
consideration of use of the invention.

Factor 11 explicitly says, "The extent to which the
infringer had made use of the invention and any evidence
probative of the value of that use."  This is a use case,
Your Honor.  That is, Google infringes overwhelmingly by
the use of the invention and the value to Google is
overwhelmingly tied to that use.

Google does not sell the accused TPU boards.  You
cannot go pick them up at a BestBuy.  You can't order them

1   off of Amazon.  Google uses the boards in every one of its
2   U.S. data centers, and by its own admission it uses the
3   accused boards to power nearly every one of its services
4   and products.  That includes Google Search, YouTube,
5   Google Apps, Gmail, Google Maps, Google Speech, Translate,
6   just about everything they offer, Your Honor, even the
7   Play Store.

8        And not only is their use of the boards extensive,
9   including all its data centers, all its services, its use
10  is also extraordinarily profitable to Google.  In the case
11  of its data centers using Singular's technology has
12  enabled Google to enjoy vastly more machine learning
13  compute power at a fraction of the cost, at a fraction of
14  the energy consumption, at a fraction of the footprint of
15  alternatives.

16            THE COURT:  Mr. Ercolini, is that demonstrable?
17  How do you know that?

18            ATTORNEY ERCOLINI:  This is based on Google's
19  own statements.  Google has admitted that it uses
20  Singular's invention, what is accused, the accused product
21  to power all of these services.  And if you look at our
22  interrog -- sorry -- our slides, the last slide is from an
23  interrogatory response directly from Google.

24        As to the data centers, Your Honor, Google has made
25  public statements about how its TPU products basically

1   avoided having to build -- to double its data center

2   footprint at a cost of almost a billion dollars apiece and

3   that's ten data centers.  That's a lot of money.

4        So knowing all of this, Your Honor, Google --

5   Singular has served in many cases almost a year ago

6   production requests, interrogatories, and a notice of

7   30(b)(6) deposition to get at this information.  How

8   valuable is Google's use of the invention?  What are its

9   cost savings?  This is a well accepted methodology for

10  looking at a royalty, and we can discuss in detail every

11  one of these requests but they're basic information.

12       The bottom line though is, Your Honor, we're three

13  weeks away from the close of fact discovery and despite

14  having served many of these requests or topics nine months

15  ago in the case of the deposition topics, eleven months

16  ago in the case of the request for production, three

17  months in the case of interrogatories, we still don't have

18  responses.  We don't have a single witness who has been

19  designated on a single topic, Your Honor.

20            THE COURT:  This is all designed just to help

21  one understand how valuable is this product to you?  How

22  much money does it help you save?  How much time does it

23  help you save?  How much more efficient are you by virtue

24  of using this product?

25            ATTORNEY ERCOLINI:  That's correct, Your Honor.

1          THE COURT:  All right.  Mr. Kamber, in

2     principle, let's stay away from the specifics in terms of

3     the scope of material that might be sought and whether

4     that might be considered onerous or the like, in principle

5     do you object to providing discovery that would allow them

6     to understand how Google assesses the value of this

7     product as used in the various things that Google does?

8          ATTORNEY KAMBER:  No, and we haven't limited

9     discovery in that way, Your Honor.

10          THE COURT:  We are here on a motion so what

11     would they say -- I mean, we're here.  You say you haven't

12     limited discovery.  There's a motion to compel in front of

13     me that tells me that they've tried to get something and

14     you haven't given it.

15          So what is it that you find objectionable about these

16     efforts to obtain this sort of discovery?

17          ATTORNEY KAMBER:  We have a practical issue of

18     the fact that we haven't really met and conferred on a

19     number of these so let me just start with that.  I think

20     unfortunately we're doing some of that here live, but --

21          THE COURT:  Hang on for a second because that

22     may matter.  I saw that in your papers.

23          ATTORNEY KAMBER:  Yes.

24          THE COURT:  It's been a recurring thing, but I

25     guess I assumed that prior to coming in here today the

1    parties would maybe have spoken on some of this stuff so

2    that part of it at least would be not an issue any longer

3    and we'd actually only be dealing with what the parties

4    actually agree is in dispute.

5         ATTORNEY KAMBER:  Unfortunately I think we're

6    going to be dealing with that live in front of Your Honor.

7         THE COURT:  Mr. Ercolini?

8         ATTORNEY ERCOLINI:  That's incorrect, Your

9    Honor.  I met and conferred with Mr. Kamber on the

10   deposition topics right after they served the objections

11   and Google was categorical in its response.

12   Your Honor, just to be clear when they say that

13   there's -- these issues haven't percolated enough and

14   there's no impasse and we're coming to the court

15   prematurely, you can look at their oppositions to the

16   motion because it flies directly in the face of what

17   they're saying.

18   They are objecting across the board to the

19   information we are requesting and they're basically trying

20   to pin us to a smallest saleable unit.  They've agreed to

21   produce information and witnesses in response to one of 17

22   services.  They think that it's completely

23   disproportionate to the needs of the case and it's not

24   relevant.  They think it's a fishing expedition.

25   If there's any doubt about that, Your Honor, their

1    motions -- their oppositions opposing our requests make it

2    very clear.  They're trying to have it both ways.

3           So we have met and conferred.  We are at an impasse

4    and again we're three weeks out from the close of

5    discovery.  These requests have been out there for a year

6    and we still don't have witnesses; we don't have any

7    documents; and we don't have responses to interrogatories.

8           THE COURT:  All right.  So, Mr. Kamber, you

9    listened to Mr. Ercolini's presentation a few minutes ago

10   when he described the sort of information they're seeking

11   and you were starting to tell me that in principle you

12   don't find it to be objectionable.

13          Where do you draw the line?  Where is it that you say

14   this request is either over broad or goes too far?

15          ATTORNEY KAMBER:  Where we draw the line, Your

16   Honor, is that there is a business unit that handles the

17   design and the production of these accused products.

18   There are these TPU chips.  What's at issue is actually

19   something that's deep inside the TPU chip inside,

20   something called the MXU and then there are these little

21   execution units in there.

22          There's a group that designed that.  They built it

23   and they have tried to value that technology in various

24   different ways.  We have produced all of those documents.

25   We've produced all of that from the core group that works

1    on it.  We are willing to produce a witness on that.

2                THE COURT:  Can I stop you just for my

3    clarification?

4                ATTORNEY KAMBER:  Sure.

5                THE COURT:  When you say they have tried to

6    value it, figure out how to value it, what are you talking

7    about when you say that?  Meaning they've tried to

8    quantify how much Google actually saves by not having to

9    spend more, use more power to use a different type of

10   component that would go onto the chip, or do you mean

11   something else?

12               ATTORNEY KAMBER:  No.  I mean that there are

13   analyses from that group that have tried to -- whether you

14   can say it's quantified, I don't know.  It's more

15   qualified I would say in that these documents, some of

16   which we've produced and on which we are willing to

17   provide a witness as we have said in our papers, those --

18   that material, that discovery material is out there that

19   basically says, yes, we use these TPU chips to run various

20   different things in various different product lines.

21        We're willing to produce a witness on that as well as

22   the business unit -- there is one business unit as Mr.

23   Ercolini said, he's right, that sells these services.

24   That is, it's true you can't go to a BestBuy and buy a TPU

25   chip, but you can basically rent one over the internet and

1    run your programs on it like people used to run things on

2    big super computers kind of remotely.  That's how this

3    works.

4         So there is a market for these things.  It's used.

5    It's being sold in that way, and we have said we are

6    willing to provide you with the cost and the financials

7    and the performance of that business group.

8         Where we have the objection, where we have the issue

9    it really turns out to be a practical one, sort of what is

10   reasonable.  What they're saying is you need to go out to

11   each and every business unit.  You need to provide the

12   financials, the raw financials for Google's apps, for

13   Google Search, for YouTube, for things that somehow may

14   use -- mind you they're not using it for everything and

15   there's no way if they have the raw financials, they

16   couldn't tell -- there's no way to be able to tell what is

17   coming from the use of the TPUs or anything else.

18        That's why this is of very marginal relevance, if

19   any, frankly because the data that they're seeking, the

20   documents or the testimony, doesn't get at the value of

21   either the TPU itself.  It doesn't get at the value of the

22   patented technology that is of a subpart.

23             THE COURT:  I think you just froze.  You froze

24   about maybe 12, 13 seconds ago so you may want to repeat

25   your last couple of sentences.

1           ATTORNEY KAMBER:  Sure.  I'll try my best, Your

2      Honor.

3           What they appear to be looking for here, Your Honor,

4      is the financials for all of Google's business units

5      without any showing of the extent to which they're using

6      this for.  How it would even demonstrate the value of the

7      use.

8           We are willing to provide the testimony and the

9      evidence and the documents that we think actually try to

10     get at this.  We don't think there's anything to be gained

11     and certainly there's nothing to be -- it would be a

12     various onerous task to say you need to provide the

13     financials for all of Google's business in effect.  That

14     is just not called for.

15          THE COURT:  I agree that that would -- just like

16     that, that's just too out there.  That's too broad.

17     However, isn't there somewhere in the middle?

18          I mean, after all if Google is making statements to

19     the effect this component is really valuable to us in a

20     number of ways and it has saved us money and it has made

21     us more efficient, I find it hard to believe that Google

22     wouldn't be able to show that by, say, comparing costs

23     from the time before they were using the component to

24     costs now or to output if this is allowing machines to

25     operate more efficiently.

1       So maybe that stuff is not as sexy to Singular.

2   Maybe they are interested in raw financials.  But if we

3   are focusing on information that would allow them to

4   determine how Google assessed the value of this product,

5   that sort of data, which I do think might include some

6   financials, would be germane.

7       Do you disagree with that?  And do you disagree that

8   there might be information like that that you have not yet

9   produced that would bear on that?

10      ATTORNEY KAMBER:  Some of it we have produced.

11  There is some more of it that we have found in response to

12  these requests that we are willing to produce, and there

13  is a witness that we have identified who would testify as

14  to those things.

15      That is, there is a witness -- there is somebody that

16  we know and who's produced documents on this and who could

17  explain those documents who has tried to evaluate the

18  value and the benefits of the TPUs, not this particular

19  technology because no one is getting that into the weeds,

20  but the TPU chips in general to some of the other business

21  units.  That's a person that we are willing to provide to

22  testify and documents that we already have and will

23  continue to provide.  We have no problem with that, Your

24  Honor.

25      THE COURT:  You say to some of the business

1    units, what about with respect to some of the others?  Is
2    it there's nobody who's yet kind of undertaken an
3    assessment or what?
4              ATTORNEY KAMBER:  That's right, Your Honor.
5    Based on what we have seen of the 16 business units, we've
6    looked around and there are not people who -- they're not
7    doing that work.  It's kind of like the work is being done
8    within the TPU.  The group that it comes out of is called
9    the Platforms Group, Your Honor, and they have done a
10   valuation -- I hesitate to call it a valuation because
11   it's not a hard number or anything like that, but they
12   have try to qualify the benefits because that's their job.
13   Right?  They're trying to sell that product internally to
14   people on the other side of it based on thus far our
15   reasonably diligent search.
16        We're not aware of other product units having done
17   any kind of final analysis or any kind of analysis for
18   that matter of the value of these TPU products to the
19   businesses.
20             THE COURT:  What about at a higher level of the
21   company -- and I have no idea how Google operates or how
22   this part of the world operates -- but would there have
23   been discussions where somebody said, yes, let's go with
24   this component versus another component that's out there?
25   So all of our different centers are going to use this and

1    we think this is great for all of the following reasons,

2    and maybe there are board meeting minutes; maybe there

3    were reports that were submitted in support of the pitch

4    to use this component.  Is there stuff like that out

5    there?

6              ATTORNEY KAMBER:  Not that I've seen, Your

7    Honor.  Now, the answer is -- I qualify it a little bit

8    because these TPUs that are being used, the other thing

9    that's often used for machine learning at Google and in

10   general are Graphic Processing Units, GPUs.  It turns out

11   they're very good at doing machine learning as well as

12   playing games on computers, and there are some comparisons

13   that have been done and we've produced this material as

14   well of the TPUs and the GPUs.  That is an issue and in

15   patent law damages sometimes the next best non-infringing

16   alternatives and how things compare to other technologies.

17       We've said in response to other topics that aren't at

18   issue and that aren't a subject of the motion to compel

19   that we're providing documents and we're providing a

20   witness on that type of comparison.  So I think we are

21   already providing that, Your Honor.

22             THE COURT:  Okay.  But circling back, there's

23   not necessarily one place where somebody can look at to

24   understand from Google's vantage point how much of a

25   financial benefit it is to have this component in place as

1     opposed to another component?

2              ATTORNEY KAMBER:  There's certainly not -- I

3     would say the answer is no setting aside the analyses that

4     were done by the Platforms team on the benefits of the

5     TPUs to some of the other business units.

6              THE COURT:  And that you said you have no

7     objection to?

8              ATTORNEY KAMBER:  That's right.  Absolutely.

9              THE COURT:  All right.

10        So, Mr. Ercolini, just help me understand.  So you've

11    been listening to all of this and you're more kind of

12    keenly attuned to this, what category of information of

13    discovery is missing that you say no, no, no, there is an

14    area I'm not probing into that you know is out there that

15    you think should also be out there?

16             ATTORNEY ERCOLINI:  So, Your Honor, the first

17    thing we would say is cost savings from reduction at data

18    center infrastructure and construction.  That's enormous.

19        So this is -- you can say it's a great technology.

20    This is a technology that Google itself has said avoided

21    building ten new data centers at a cost of up to 750

22    million dollars -- up to a billion when you factor in

23    maintenance.  That's enormous.  We need to know what that

24    is because --

25             THE COURT:  Hang on.  What do you mean you need

1    to know what that is?  You've got the statement.  You said

2    we no longer have to build these.  So what more do you

3    want?

4              ATTORNEY ERCOLINI:  Well, the statement is great

5    but actually getting to ask someone about who did this

6    analysis, where are the documents that are generated?

7              Google does not make an investment of this size with

8    this big a leap without having papered it up to the gills.

9    So the suggestion that no one has looked at this, there's

10   no way that hasn't happened.

11       The cost savings in the reduction from the operating

12   costs of the data centers, which is enormous because again

13   this is a fraction of the power draw.  It is a fraction of

14   the footprint, the operating costs.

15             THE COURT:  On that let me ask you a question.

16       When you say that the cost savings, you're really

17   looking for not cost savings.  You're looking -- it seems

18   to me you're going to be looking for two sets of sort of

19   financial lists or information or whatever because the

20   only way to make that -- the only way to determine there's

21   been a savings is to look at what they were paying or what

22   were thinking they were going to have to pay versus what

23   they actually ended up paying, right?

24             ATTORNEY ERCOLINI:  Well, Your Honor, that may

25   be true but we're actually looking at forecasts and

1    projections because with a hypothetical negotiation we

2    start at the date of first infringement.  So forecasts

3    would have been tremendously important; analysis that was

4    done in advance would have been tremendously important

5    because that's what the parties would have known at the

6    time of the hypothetical negotiation.  So we do need those

7    forecasts; we need those analyses.

8         THE COURT:  All right.  Mr. Kamber, do those

9    exist?

10         ATTORNEY KAMBER:  So let me try to just back up

11    for one second, Your Honor.

12    Before we were talking about the revenues, cost

13    financials with respect to -- there are a lot of topics

14    with respect to the accused products and then they kind of

15    have this accused services by which they mean actually

16    just anything that happens to use it as part of the

17    running of the business.  That's one category of problem.

18    Mr. Ercolini just changed gears in response to your

19    question and is now talking about the cost saving stuff so

20    let me talk about that.

21         THE COURT:  He didn't change gears.  I actually

22    asked him -- hang on, Mr. Ercolini.

23         ATTORNEY ERCOLINI:  Sorry.

24         THE COURT:  He didn't change gears.  I asked him

25    to tell me what other things out there, assuming we dealt

1    with the one we were talking about, did he -- was he also

2    interested in?  So that's on me; that's not on him.

3              ATTORNEY KAMBER:  Fair enough, Your Honor.

4         With respect to cost savings here's the issue, a few

5    of the issues actually.  So the cost savings theory that

6    they have is based on there was a first version of these,

7    TPU version one.  It was called Sea Star and the statement

8    about saving money was based on that version.

9         Notably that version is not accused.  It works very

10   differently.  It works for something called the actual

11   Inference and not for Training, which is what the chips

12   that are accused of in our case.  So it's a bit of a leap

13   to say, you know, you save ten billion dollars because of

14   these chips because the chips about which that statement

15   was made are explicitly not accused in this case.

16        Beyond that, what we've said is we are going to give

17   you a witness.  We have identified a witness from the

18   technical infrastructure group.  They are the ones that

19   allocate resources and costs to deploying the TPUs in the

20   data centers.  We're going to have somebody who can speak

21   to the financials, the costs with respect to that.

22        Now data centers are profit centers.  There are costs

23   and so it's really more just costs associated with them,

24   and we are going to produce and producing plans back to I

25   think 2015 is what we've proposed that show what it looked

1    like before and what it looked like afterwards.

2        Where we've gotten into a fight about this is they

3    say, well, we want everything about a data center.  We

4    don't want just the stuff about the TPUs and how you

5    deploy them.  We want the price of pouring the concrete

6    and we want the price for the light bulbs for the data

7    centers and that's just getting way too far afield of

8    what's going on here.

9        I mean, there's an accused product here.  Data

10    centers have a lot of stuff in them and there's no reason

11    why we have to do everything.  That's just well beyond the

12    scope of this case.

13          THE COURT:  Mr. Ercolini, where do you think is

14    a fair place to draw the line?  I understand your theory

15    and in theory I understand how one can get to a point

16    where the cost of building the data center theoretically

17    might be encompassed, but I also do think that's going a

18    little too far afield.  So what do you propose?

19          ATTORNEY ERCOLINI:  Your Honor, I want to back

20    up for a second to what Mr. Kamber said.  I want to back

21    up on two points.

22        On the services we had a list of things that we did

23    want.  We do have things on the services that we would

24    like to address, but to address the data center issues.

25    Mr. Kamber made reference to Sea Star which was TPU-1,

1    which they're saying all of the savings, the cost savings

2    that they were referring to, the ten million dollars,

3    that's all on Sea Star.

4        What he's neglected to mention is that Sea Star does

5    Inference.  It doesn't do Training.  There are two parts

6    to machine learning.  There's Inference and Training.

7    Inference is one third of the problem.  Two thirds of the

8    problem -- two thirds of the cost is Training and that's

9    what the TPU that's accused, the TPUs that are accused

10   that's what they do.

11       So the gravaman of the -- or at least the bulk of the

12   ten billion dollars that we're talking about, I think it's

13   more than that, that is from Training and that is largely

14   because of the improvements made by Singular's invention.

15       This is, this is -- when we talk about avoiding

16   building data centers, I'm not sure where to stop there,

17   Your Honor, because if you have to build a data center,

18   you have to build it.

19           THE COURT:  I'm not -- listen, we're not going

20   to get into something where how much for the concrete?

21   How much for this?  It could be how much to build a

22   center.  Do you really need it down to how much plywood is

23   being used and all of that?

24       I mean, isn't there's an easier way for you to assess

25   the damages without getting reams and reams and reams of

1    details on what it takes to build a center?

2           ATTORNEY ERCOLINI:  So what Google literally

3    said was just to keep up with the demands of people using

4    Google Voice for three minutes a day, if everyone used it

5    for three minutes a day, it literally would have had to

6    double its data center footprint.  That means pouring

7    concrete; it means buying plywood; it means buying land;

8    it means all the infrastructure that goes into that.  It

9    doesn't have to do that.  It has saved the cost of doing

10   that largely because of this.

11          THE COURT:  All right.  So all you have to do

12   though is know how much it cost to make one data center.

13          ATTORNEY ERCOLINI:  That's correct, Your Honor.

14          THE COURT:  All right.  So that's digestible.

15   That's easy enough.

16       Mr. Kamber, isn't that something that Google can

17   readily provide?

18          ATTORNEY KAMBER:  Honestly, Your Honor, I don't

19   know because these aren't -- these are custom built.  Not

20   every data center is the same.

21          THE COURT:  Look, you can't have it both ways.

22   Because the hard way is, look, all right.  Let's look at

23   all of your data centers.  Let's average the cost of them.

24   Let's come up with a figure and then we'll go with that.

25   Or you can if it's -- well, maybe that's not the hard way.

1      Even if what you're saying is true, it seems to me

2   that's probably the easiest of the things that we're all

3   talking about to come up with an average figure for a data

4   center.  Of course, not every one is going to be identical

5   in size and shape and cost, but there's got to be an

6   average figure that reasonable minds would agree could

7   represent the value of a data center.

8      Beyond that it's whatever Singular can ultimately

9   show if we get that far as to how many data centers would

10  have had to have been built and thus what damages might

11  look like.  But we can avoid having to require Google to

12  provide all of the underlying details regarding the

13  construction of a data center, which I just don't think is

14  necessary here.

15          ATTORNEY KAMBER:  What I think I can do right

16  now, Your Honor, is represent that we would have that

17  witness from the technical infrastructure team try to

18  provide a number -- try to provide testimony on whatever,

19  an "average" data center cost all in in terms of what that

20  number is.  I don't -- sitting here today I haven't seen

21  that number.  I've never heard of somebody talk about it

22  or seen a document about it.

23          THE COURT:  Let me deal with that this way.  If

24  that information is available, I think that's reasonable

25  in terms of --

1           ATTORNEY KAMBER:  Fair enough.

2           THE COURT:  -- what Singular is looking to do.

3    So I would say if it exists in document form and it's been

4    requested through a request for production of documents,

5    it should be answered that way as well as an interrogatory

6    and as well if it's going to be a topic for a 30(b)(6)

7    designee I think that's fair game.  So Google should

8    proceed accordingly in that regard.

9       Now, just before we go forward, with respect to the

10   earlier stuff you were talking about, to the extent we

11   didn't get resolution, Mr. Kamber, on all those things

12   that you said Google has been willing to make somebody

13   available to talk about certain things and information

14   that you have that you're ready to produce, yes, please

15   do.  Please do produce the information that you said you

16   would produce.  Please do have the witness prepared to

17   talk about those subject matter areas.  Okay?

18           ATTORNEY KAMBER:  Yes.  Absolutely, Your Honor.

19           THE COURT:  Okay.  So, Mr. Ercolini, then what

20   still remains with respect to this?

21           ATTORNEY ERCOLINI:  The incremental revenues

22   from advertising and profits on those as well, they have

23   actually done these studies.  We've seen snippets of

24   documents that have looked at profitability.  They've

25   looked at incremental revenues attributable to the accused

1    products.

2        So if that analysis has been done, it really should

3    be produced for as many services as they can.  We don't

4    need to get all of the raw data.  We don't need them to

5    open the books.  But if they've done these analyses, we

6    need to see them because they are a large measure of the

7    use that Google puts the TPUs to.

8            THE COURT:  Mr. Kamber, I'll give you a chance

9    to respond.  I agree with Mr. Ercolini that if that data

10   exists and in particular if there is data that is so, so,

11   you know, finally honed that it actually allows one to

12   determine how revenues were affected by the use of this

13   product, I think that's core to what we're talking about

14   here.  And so if it does exist, it seems to me that's fair

15   game and should be produced.

16       Do you have an issue with that?

17           ATTORNEY KAMBER:  I don't have an issue.

18   Hopefully you can hear me, Your Honor.

19           THE COURT:  I can hear you fine.

20           ATTORNEY KAMBER:  I don't have an issue in terms

21   of whether that analysis has been done or that -- I'm not

22   sure what analyses Mr. Ercolini is referring to.

23       Again, I'm aware of some efforts to try to qualify/

24   quasi-quantify these benefits or these impacts, and for my

25   commitment earlier that is something for which we

1    anticipate providing a witness and having him testify.

2              THE COURT:  Okay.  So if that information

3    exists, I am ordering that it be included both in document

4    form.  So these analyses --

5              ATTORNEY KAMBER:  Right, of course.

6              THE COURT:  -- please produce it and as such the

7    witness should be prepared to comment on them during any

8    deposition.

9              ATTORNEY KAMBER:  Yes, both.  I didn't mean to

10   suggest that it was only one of those, Your Honor.

11             THE COURT:  No, I know.  I'm just doing this in

12   the interest of thoroughness just making sure because once

13   we go past these things, I hope we don't have to come back

14   to them.

15        All right.  So, Mr. Ercolini, you got that.  What's

16   next?

17             ATTORNEY ERCOLINI:  I will just say that to the

18   extent it doesn't exist, you know, these -- we're not here

19   on a *Daubert* motion.  These are services that Google has

20   admitted that it uses in conjunction with the accused

21   product.  It uses to power it and it has made those

22   products more profitable.  If they haven't done that

23   analysis, I think that we should be allowed to do that

24   analysis from, you know, revenues and profits.

25             THE COURT:  Well, hang on.  Hang on.  Now you're

1   talking about something else.

2        You started by saying you understand these analyses

3   have been done and if they have been done, we ought to get

4   this stuff and I'm agreeing with you.  I don't know what

5   happens if it turns out they haven't been done.  That's

6   not before me.  So I don't know how to respond to that

7   last part of what you said, which is we ought to be

8   permitted to do something, to do our own.

9             ATTORNEY ERCOLINI:  I won't snatch the victory

10  from the jaws --

11            THE COURT:  I was just going to say --

12            ATTORNEY ERCOLINI:  It's the other way around.

13  Okay.  Thank you, Your Honor.

14        We did, we did -- if there is time, we did want to --

15  we have another motion that's currently pending.  Again,

16  Your Honor, we have three weeks left in the schedule.

17            THE COURT:  Hang on.  Does that mean, Mr.

18  Ercolini, that we're done with basically 187 and 214?

19            ATTORNEY ERCOLINI:  To the extent that Google is

20  going to provide witnesses, broad responses, and documents

21  and soon because again we've got three weeks left and any

22  follow up we need, we really want to do in a hurry.  We've

23  had these pending for a year but we do have another motion

24  that is urgent.

25            THE COURT:  I understand, but you're just not

1    giving me a simple answer.  I want to make sure because

2    what we're always concerned about is did we deal with this

3    motion and I just want to hear you say that of the things

4    that you wanted to raise, we've kind of addressed them and

5    then I will happily move on to the motion you're referring

6    to.

7              ATTORNEY ERCOLINI:  Yes.  Correct, Your Honor.

8    We believe we are done with those motions.  Thank you.

9              THE COURT:  Okay.  So the one that you are then

10   referring to is I think at 288, which is your motion for

11   expedited briefing and to compel a production of

12   documents.

13             ATTORNEY SEEVE:  I believe it's 228, Your

14   Honor.

15             THE COURT:  I'm sorry, 228.

16        On that one you've moved to compel to produce

17   documents responsive to your second set of requests to

18   several requests for production.

19        You also want Google to identify previously produced

20   documents that are responsive to those same numbers.

21   Google hasn't opposed this motion yet.  I don't know if

22   you guys have conferred on this one yet, but let me hear

23   you, Singular, and then I will hear from Google.

24             COURT REPORTER:  Could you identify yourself

25   please?

1          THE COURT:  Whoever is speaking, please identity

2     yourself.

3          ATTORNEY SEEVE:  This is Brian Seeve on behalf

4     of plaintiff Singular LLC.  Thank you, Your Honor.

5       So we have conferred and met regarding this motion,

6     the topics that are covered therein.  It's a simple issue

7     and one that I think we can get through quite quickly.

8       We have a set of requests for production and a set of

9     -- a set of requests for production, excuse me, that are

10    directed very, very narrowly to very specific documents

11    that relate to two topics.  First the topic of

12    infringment, which is obviously a key topic in a patent

13    infringement lawsuit; and, second, the topic of damages,

14    which we've just gone through in some detail.

15       The documents --

16          THE COURT:  Could you just try to keep your

17    voice up?  Because the court reporter is taking everything

18    down and I think you're some distance away so every once

19    in a while you --

20          ATTORNEY SEEVE:  We can switch a little bit.

21       So let me first talk about the documents that relate

22    to infringment.  These are fundamental documents that go

23    directly to the question of how the accused products work

24    and in particular the underlying mechanisms that deal with

25    the accused portions of the products and how they relate

1    to the claims at issue.

2         One of them, for example, is called -- and I don't

3    want to get into more detail than is necessary -- the TPU

4    microarchitecture specification.  The TPU is a crucial

5    component of the accused product and this

6    microarchitecture specification is essentially a blueprint

7    document that describes how it works.  These documents are

8    crucial in order to meet our burden of proving that

9    infringment of the asserting claims is in fact the case

10   and so we need these documents.

11        They were required to be produced under the local

12   rules back in October as part of the defendant's

13   obligation to produce documents that detail the workings

14   of the accused products as part of their non-infringement

15   contentions.  They weren't.

16        They weren't produced in any of Google's subsequent

17   productions.  The only reason we know that such documents

18   exist is because as attachments to various emails that

19   have been produced we've received drafts of these

20   documents, and these drafts are very much works in

21   progress.

22        As exhibits to this motion show, we've received one

23   draft of the MXU architecture specification that's 30

24   pages long; another draft that's 60 pages long.  I'm

25   speaking from memory but I believe that's the case, and

1   both drafts have comments in the margins that make it very

2   clear that these are works in progress.

3        What we have asked for are the final versions of

4   these documents that actually detail how the accused

5   products work.  We've been told either that Google refuses

6   to produce such documents because they've already been

7   produced, in which case we asked them for the Bates

8   numbers and they refused to give them to us.  Or we've

9   been told in some cases that these requests are over

10  broad, and in some cases we've been told that these

11  requests -- Google is unwilling to satisfy unless we have

12  a further meet and confer, which we've already had one of.

13            THE COURT:  Let me ask you a question.  To the

14  extent that you have gotten drafts or sort of works in

15  progress as you described them previously, what sort of

16  requests were those in response to?

17            ATTORNEY SEEVE:  So I believe that most of those

18  were in response to requests for custodial emails and

19  these documents that we received, these drafts happened to

20  be attached in draft form to emails that various people at

21  Google were passing back and forth.  So we know that these

22  documents exist and that's how we know that they exist.

23       We also know where they exist because Google has a

24  system that we've seen from these documents, an internal

25  system of links that it uses to reference documents and

1    share them and collaborate with other people.  And so

2    these requests for production have asked for documents at

3    very particular links that we know exist and Google has

4    yet to provide those documents to us and for reasons that

5    aren't clear to us since Google has yet to oppose our

6    motion.

7            THE COURT:  If you get these documents, how

8    voluminous would they be?

9            ATTORNEY SEEVE:  So in part I don't know the

10   answer to the question because we haven't yet gotten the

11   documents.  But given that one of the drafts of these

12   documents was 30 pages long and another was 60 pages long

13   and there's approximately ten such documents at issue here

14   at least regarding infringment, we wouldn't expect these

15   documents to be more than a few thousand pages at most.

16      They're complicated specifications that describe

17   complicated electronic products and so they're not tiny,

18   but it's not a fishing expedition type of request.

19           THE COURT:  So, Mr. Kamber, what I heard in

20   short order is that these are documents that appear to be

21   relevant to this lawsuit.  They already exist.  People

22   know where they are.  Versions of them have been produced

23   previously.

24      So is there an objection to producing the final

25   blueprints to use the word that was offered here?  And if

1    so, what is the nature of the objection?

2           ATTORNEY KAMBER:  So we haven't had a chance to

3    file our opposition yet, but I'm going to try to do this

4    based on what I know would be in there, Your Honor, and

5    that is the blueprints for how these chips are built is

6    the system Verilog code.  That's a hardware description

7    language that defines how the circuits look.

8        We have made that available for inspection since

9    November and I believe they have had multiple

10   opportunities to look at that and have looked at it.

11   Those are the blueprints.

12       From those blueprints, Google created these

13   microarchitecture specifications.  Sometimes it goes the

14   other way around but the engineer who was the lead

15   architect can explain and has a declaration ready that

16   says in this particular case we designed the chip first

17   and we documented it after.

18       So there is no necessarily hard and fast thing that

19   got sent to a manufacturer that is the ground truth.  The

20   ground truth is the system Verilog code.  There are

21   different drafts of this microarchitecture specification

22   and we have provided -- in fact, I think we provided this

23   as well back in November -- the thing that -- the

24   "closest" thing to final that we have.  It might --

25           THE COURT:  I get that.  I mean, well, I'm

1    hearing that.  That's good.  That's good.  So if you've

2    gone that far, is there a problem with just sort of

3    completing the loop and providing the final

4    specifications, the final iteration of those?

5              ATTORNEY KAMBER:  The point is we don't think

6    there is such a thing, Your Honor, based --

7              THE COURT:  If there isn't -- I don't mean to

8    cut you off, but I'm also looking at the clock.  I want to

9    make sure we really hone in on this.

10             ATTORNEY KAMBER:  That's fine.

11             THE COURT:  And this is part of the rules.  I'm

12   not lecturing the lawyers, but you guys understand this.

13   One key component of the discovery process is if the

14   documents don't exist, you tell the other side they don't

15   exist.

16             ATTORNEY KAMBER:  We have, Your Honor.

17             THE COURT:  Okay.  Again, I'm not lecturing you.

18   I'm just saying that's often -- I mean, we encounter this

19   a lot.

20         The other is telling them they do exist, we're just

21   not going to give them to you.  If it's as simple as, look

22   we've given you what we've got.  I know what you're asking

23   for.  I'm not refusing to give it to you.  I just don't

24   have it to give to you.  All right.  That should go into a

25   response and then we can go accordingly from there.

1    If Singular has a basis though to believe that's not

2    correct, well, then we can deal with that.  But are you

3    saying, Mr. Kamber, there is -- you understand what Mr.

4    Seeve was just talking about.

5        You're saying that that doesn't exist?  I know what

6    you want, but we don't have it?

7            ATTORNEY KAMBER:  With respect to the

8    specifications, I know what you want.  I agree it's

9    relevant.  I think it's already been produced.  We've done

10   a reasonably diligent search.  We are not aware of any

11   other final complete whatever version, whatever he wants

12   to call it.

13       We've talked to the engineer, the lead architect

14   about this.  We are not aware of anything else that we

15   could or would be able to produce in response to his

16   request.

17       As to the other things, just very quickly, Your

18   Honor, because I think this will be mooted perhaps by the

19   time we file a response is, yes, there were documents that

20   we produced that had links to other documents.  That's the

21   other category that Mr. Seeve mentioned.

22       They said, hey, we want what is linked to these

23   particular documents and they were very specific and it

24   was helpful to have that list, but it's onerous.  It takes

25   a long time to manually go through these.  Sometimes you

1    need to get internal access and permissions to pull them.

2    It's on the order of hundreds of documents and so it's a

3    laborious process.

4        I think we're most of the way through it and I am

5    hopeful we're actually able to produce it by this Friday,

6    though it might take over the weekend and the holiday to

7    get that out, but there's no issue there.  We've always

8    said we are producing those.  We will produce those and

9    it's just taking time, and again we noted that in the meet

10   and confer process as well.

11            THE COURT:  All right.  So, Singular, what

12   you've heard is with respect to the first batch you've got

13   what they've got.  And with respect to the second those

14   links, you're going to get it very soon within the week.

15       What do you say to that?  Does that effectively deal

16   with the concerns raised in your motion?

17            ATTORNEY SEEVE:  It does not, Your Honor, and

18   I'll take both of those points separately if I may.  I'm

19   conscious of the time and I will try to speak quickly and

20   succinctly.

21            THE COURT:  Okay.

22            ATTORNEY SEEVE:  First with regard to this

23   notion that they start with the code and then make the

24   documentation, that is simply not true.

25       Not only is that not how engineering works, that's

1    putting the cart before the horse, but also we can see
2    from some of the comments in these documents that they are
3    debating different design choices that might be made in
4    the final product.
5         If the final product already existed as Mr. Kamber
6    appears to be claiming, no such comments would make sense.
7    So that's what we have to say about these final
8    specifications.
9         These specifications of this type -- and I speak as a
10   former engineer, although I'm not an expert.  How
11   engineering works is these specifications are made and
12   finalized and then the chip is created.
13        It's just common sense and that common sense is borne
14   out by all of the evidence we've seen in these draft
15   documents that have been produced we believe accidentally
16   by Google.  So that is what we have to say to the first
17   point.
18        To the second point as to the documents that we are
19   going to be receiving soon maybe this week but as I heard
20   Mr. Kamber say maybe after the July 4th weekend, you know,
21   we want the documents and we're happy to get them.  But
22   the depositions in this case I think we have an average of
23   a deposition a day between now -- I'm exaggerating perhaps
24   but not by much -- between now and July 23rd.  And many of
25   those crucial depositions, especially the ones involving

1    issues relating to infringement, are going to occur right

2    after the July 4th holiday.

3         So for Mr. Kamber to say that our concerns would be

4    assuaged because we're about to receive the documents

5    maybe just before these depositions, that does not assuage

6    our concerns.  It does not help us much.

7              THE COURT:  Well, if they're being compiled and

8    they're going to be produced, I don't know what more I can

9    do about that.  I take him at his word when he says it's a

10   manual process, several hundred they have to go through.

11   It's happening and maybe it might mean -- even as I'm

12   listening to you, it might mean a deposition or two might

13   have to be put back or rescheduled.

14        I think the best way to deal with this is to ask

15   Google to expedite this process as much as possible,

16   understanding it's at risk of disrupting the discovery

17   schedule near the end of the discovery process.

18        And so to the extent you can get your client to

19   appreciate the court is concerned that this production

20   take place immediately, please convey to them that this

21   really does need to happen.  You know, if it means

22   somebody working a little later, an extra person on the

23   shift or whatever, this is one of those circumstances

24   where it's probably reasonable to go that way.

25             Going back to the first batch and whether these

1    specifications would never have been created afterwards or
2    before, I have no idea.  You were an engineer.  I've never
3    been an engineer.  I have no idea how any of that works
4    and I don't have a basis to challenge Google's assertion
5    here as to how it took place here.
6         I guess what I would say is this to Google.  You need
7    to be really deliberate and precise on this and maybe just
8    go back and convey to your client, look, here is the issue
9    as it played out and if there is a final specification, we
10   need it now.  It needs to be produced now and then it
11   becomes moot whether it was made before or after.
12        But all of this -- I mean, I think these are
13   reasonable requests and I understand, Mr. Kamber, you're
14   saying you don't have any objection to turning over what
15   you've got.
16        So to this extent I will try to moot this in this way
17   to the extent possible.  I do allow the motion to compel
18   to the extent Google does not object to producing the
19   requested information.
20        If it turns out, Mr. Kamber, that there is requested
21   information that you contend does not exist, you must
22   affirmatively state that in a response to Singular so
23   Singular can make whatever they want to make out of that,
24   but at least we won't be fighting any longer about whether
25   there is actually something there.  You will have answered

1    that question by stating yes or no as to whether there is

2    something there.

3        But otherwise if you are going to be taking the

4    position that you should not have to produce something

5    that has been requested -- and I don't understand you to

6    have taken that position -- then I would be asking you on

7    an expedited basis to submit your response so we can

8    assess that in light of Singular's motion.

9        Am I correct that you are not objecting to anything

10   that is being sought?

11           ATTORNEY KAMBER:  That's correct.  We are not

12   objecting.  We can try to make the representation and

13   certainly Mr. Seeve or whoever else on behalf of Singular

14   can ask the engineer about this documentation and I'm sure

15   will be doing so.  So I'm happy to do that, Your Honor.

16       I'm just going to ask the practical question about

17   what should we do with our draft opposition?  It sounds

18   like we can -- you don't need it in light of what's been

19   discussed today?

20           THE COURT:  I don't because again I am basing it

21   on my understanding from you that you're not opposing any

22   of the information that is being sought.  So for that

23   reason there's no need to file your opposition.

24           ATTORNEY KAMBER:  Your Honor, I know it's four

25   o'clock right now.  Can I just ask -- can I just make two

1   points of clarification in terms of --

2               THE COURT:  Yes.

3               ATTORNEY KAMBER:  -- what I am doing?

4       In terms of the data center costs, what we are going

5   to do, if my understanding is correct just for the record,

6   is to get the average cost to build a data center.

7       I say that because they also asked about the cost of

8   designing and the cost of operating a data center.  I just

9   want to be very specific in terms of what I'm trying to

10  get in terms of information for the order side.

11              THE COURT:  To me, to me that's all part of the

12  costs of a data center.  So there is -- I mean, money that

13  is going to have to be spent to have a functioning data

14  center is going to include design, construction, and

15  operation costs.  So this is just me.  I would take the

16  broad view on this, not the narrow view.

17              ATTORNEY KAMBER:  Okay.  And I think perhaps

18  design and build might be easier than operation because

19  these are different sizes but we'll do our best to answer

20  that with respect to sort of the one whatever single data

21  center, the hypothetical average data center that exists.

22              THE COURT:  And part of the -- yeah, I think

23  that's reasonable for now because I say this, and I say

24  this to you, Singular, because if at the end of the day

25  down the road you're successful in this suit and there

1    really is this heightened need to calculate damages with
2    way more precision, it seems to me you'll have -- there
3    would be the opportunity there to tweak some of this stuff
4    and maybe to get some more information.
5        I think this is a good way to start by giving you a
6    general cost that includes not just what it takes to build
7    one of these things but for the brain power to design it,
8    build it, and operate it.  So thank you for that question,
9    Mr. Kamber.
10            ATTORNEY KAMBER:  One other one which is just to
11   clarify in terms of what we are committing to do, we are
12   going to produce -- supplement really because we've
13   already produced a number of documents as they've
14   recognized, supplement our production with respect to
15   analyses that were done by the TPU team and the Platforms
16   Group of the benefits of the TPUs to the other business
17   units and have a witness prepared to speak on those
18   topics.
19            THE COURT:  That sounds right I mean the way you
20   said it.
21            ATTORNEY KAMBER:  Okay.
22            THE COURT:  Okay.
23            ATTORNEY ERCOLINI:  Your Honor, could we just
24   ask to the extent that that analysis for the accused
25   products has been done by anyone at Google because, you

1    know, we're specifically talking about the analysis, if

2    someone there has done it and it's not just on the TPU

3    team, we don't know how big that is.  We don't know what

4    the purview is, but if someone who has a financial bend

5    there has done an analysis on these products, we think

6    that that would be especially relevant.

7         THE COURT:  I'm not sure what is it you're --

8         ATTORNEY KAMBER:  I think what he's saying is we

9    need to ask everybody else at Google whether they've also

10   done the analysis, which is exactly why I am trying to

11   clarify it.  Because it's sort of we're obligated to do a

12   reasonably diligent search.

13        THE COURT:  Right.

14        ATTORNEY KAMBER:  I know where I think I should

15   look, but what Mr. Ercolini is saying look everywhere else

16   too and I don't think we can practically do that.

17        THE COURT:  Well, right.  I think you're right

18   in that your obligation is to do a reasonably diligent

19   search.  Obviously if you have a basis to believe you

20   might be able to find information in a certain area, yeah,

21   you have an obligation to search that area.  But beyond

22   that, yes, I guess I tend to agree with you.

23      Mr. Ercolini, if you're saying something different --

24        ATTORNEY ERCOLINI:  Mr. Kamber just said the TPU

25   team and it sounds like once we stop with the TPU team and

1    we don't find it, we're going to stop looking.  So the

2    reasonably dilligent search is do a reasonably diligent

3    search and don't limit it to the TPU team, what a

4    reasonably diligent search is.

5            THE COURT:  Okay.  Fair enough.  It's not

6    limited to the team.  It's limited to whatever your

7    reasonably diligent search would suggest.  That's how

8    broad it needs to be.  Wherever that reasonably diligent

9    search leads you and it may lead you to somebody beyond

10    the team who may have had some involvement who may be able

11    to have -- be able to provide information bearing on this.

12       I honestly don't think we're disputing anything here.

13    I think everybody is just saying you just need to make

14    sure your search is spiritually a genuine search designed

15    to locate this information, and don't just focus on the

16    human beings who are part of the team in a narrow sense if

17    it would make sense to look elsewhere and you know where

18    to look.  Just make sure you look in all of those areas.

19            ATTORNEY KAMBER:  Understood.  I was just trying

20    to say that we know -- I know personally that that exists

21    there that I would look there; that there's somebody there

22    who can speak to that.  That doesn't mean we won't look

23    elsewhere.  I'm just trying to clarify that that's where I

24    would start and will start.

25            THE COURT:  Okay.  All right.

1      With that, everybody, thank you.  We are going to

2   have to leave it there, but I think we've actually hit

3   everything we needed to hit on this.

4      So in the future I think I've said this before and

5   maybe you guys have availed yourself of this offer before,

6   if you encounter a blip in this whole discovery process

7   and you just think it would be helpful to get on the

8   phone, not so much as a motion, just get on the phone and

9   talk it through.  We do that often.

10     We have no problem with that.  All you need to do is

11   reach out to Ms. Russo.  We can usually get you on the

12   phone within 24 hours and talk about this in an informal

13   way and just work through whatever it is.  We find that

14   that actually helps prevent a lot of motions from being

15   filed.  So please do not be shy about reaching out to her.

16   Okay?

17               ATTORNEY KAMBER:  Thank you, Your Honor.

18               ATTORNEY ERCOLINI:  Thank you, Your Honor.

19               THE COURT:  And with that, we are going to have

20   to bring it to a close.  Thank you, everybody.  Have a

21   safe holiday and we will be in recess.

22   **(Hearing concluded at 4:06.)**

23   ----------------

24

25   (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the

```
1   direct control and/or supervision of the certifying
    reporter.  I assume no responsibility for the accuracy of
2   any reproduced copies not made under my control or
    direction.)

3

4                      CERTIFICATION

5

6        I certify that the foregoing is a correct

7   transcript of the record of proceedings in the

8   above-entitled matter to the best of my skill and ability.

9

10

11

12  /s/ Alice Moran                    July 2, 2021
    Alice Moran, RMR, RPR
13  Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```