IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
SINGULAR COMPUTING LLC,          )
                                 )
              Plaintiff          )
                                 )
        -VS-                     )  CA No. 19-12551-FDS
                                 )  Pages 1 - 80
GOOGLE LLC,                      )
                                 )
              Defendant          )
```

**HEARING BY VIDEO**

BEFORE THE HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

United States District Court
1 Courthouse Way
Boston, Massachusetts  02210
August 24, 2021, 2:00 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
leemarz@aol.com

1    A P P E A R A N C E S:

2         BRIAN M. SEEVE, ESQ., McCarter & English, LLC,
     265 Franklin Street, Boston, Massachusetts, 02110, for the
3    Plaintiff.

4         KEVIN GANNON, ESQ., Prince Lobel Tye LLP,
     One International Place, Suite 3700, Boston, Massachusetts,
5    02110, for the Plaintiff.

6         ANDREW BRUNS, ESQ., ANNA PORTO, ESQ., and
     MATTHIAS A. KAMBER, ESQ., Keker, Van Next & Peters LLP,
7    633 Battery Street, San Francisco, California, 94111, for the
     Defendant.
8
          ANANT K. SARASWAT, ESQ., Wolf, Greenfield & Sacks, PC,
9    600 Atlantic Avenue, Boston, Massachusetts, 02210, for the
     Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2            THE CLERK:  Okay, everyone, the Judge is about to join

 3    us.  We'll be starting in a minute.

 4            Good afternoon, Judge.

 5            THE COURT:  Good afternoon.

 6            THE CLERK:  It looks like we're all ready to begin.

 7            THE COURT:  Okay.

 8            THE CLERK:  So this is the case of Singular Computing

 9    LLC v. Google LLC, Civil Action No. 19-12551, will now be heard

10    before this Court.  Would counsel please identify themselves

11    for the record.

12            MR. SEEVE:  Good afternoon, your Honor.  This is Brian

13    Seeve of Prince Lobel Tye arguing on behalf of Singular

14    Computing LLC.

15            THE COURT:  Good afternoon.

16            MR. GANNON:  Good afternoon, your Honor.  Kevin Gannon

17    for Singular, also of Prince Lobel.

18            THE COURT:  Good afternoon.

19            MR. KAMBER:  Good afternoon, your Honor.  Matthias

20    Kamber of Keker, Van Nest & Peters on behalf of defendant,

21    Google LLC.

22            THE COURT:  Good afternoon, Mr. Kamber.

23            MR. BRUNS:  Good afternoon, your Honor.  Andrew Bruns,

24    also of Keker, Van Nest & Peters on behalf of Google.

25            THE COURT:  Good afternoon.
</pre>

1          MS. PORTO:  Good afternoon, your Honor.  Anna Porto,

2     also of Keker, Van Next & Peters, on behalf of defendant

3     Google.

4          THE COURT:  And good afternoon.

5          MR. SARASWAT:  Good afternoon, your Honor.  Anant

6     Saraswat of Wolf Greenfield, also on behalf of Google.

7          THE COURT:  Okay, and good afternoon to you.  I know I

8     recognize one of the names is Court Reporter, somebody else

9     connected with my chambers, and I assume everybody else is

10    either spectating or is not arguing, so we don't need to have

11    them announce who they are.

12          All right, so there are a few different matters that

13    are pending.  I'd just like to see if we put our heads down and

14    see what we can get through and resolve today.  Some of these I

15    swear are things it sounds like we've talked about before in

16    part, maybe not entirely, but you guys will help me understand.

17          The first thing I have on my list is Singular's motion

18    to compel, which is at 262 on the docket.  And I just want to

19    begin with respect to this one, and I'm going to ask the same

20    question with respect to any of the motions, but I'll start

21    with this one, which is, have the parties done any further

22    talking, discussing, or anything that has changed the scope or

23    narrowed the scope of what is in the motion itself?

24          MR. SEEVE:  Your Honor, this is Brian Seeve on behalf

25    of plaintiff, and I don't think since this motion was filed

1  there has been any headway that has narrowed the scope of any

2  of the three topics that we raise here.

3          THE COURT:  Okay.  All right, so, as I understand it,

4  according to this one, following a hearing that was at the end

5  of June, Singular and an expert flew to San Francisco, and this

6  was going to be to do an inspection, and you found that none of

7  the source code specifically requested had been produced.  I

8  understand you say it's relevant to the claims and defenses,

9  and you say there's little burden here, since everything is

10 going to be done through the cloud.  And this is one of those

11 where I thought maybe we had talked about this, even if only

12 tangentially in talking about some other stuff, but maybe we

13 hadn't.  So I don't know from Google who wants to respond to

14 this, but I guess what I'm trying to understand -- I've read

15 Google's responses in its opposition.  I'm just trying to

16 understand, is this an objection in principle?  Is it an

17 objection to the scope of what the inspection was going to

18 cover?  Because I thought there was an understanding an

19 inspection was going to take place, people were flying out; and

20 I would have assumed that the extent of what was going to be

21 done during that visit would have been talked about and agreed

22 to ahead of time, but apparently that's not the case.  So who's

23 going to respond for Google on this one?

24          MR. BRUNS:  That's me, your Honor, Andrew Bruns.  So I

25 do think that some of this is fairly easy to resolve, and maybe

1    it's been resolved already.  So Singular requested two specific

2    sets of code in their motion.  One is a variable, essentially a

3    constant value that identifies a variable in the code.  And as

4    we indicated in our opposition, we don't really believe that's

5    necessary or relevant, but in order to avoid an unnecessary

6    dispute, we're happy to make that available to them.

7              THE COURT:  Okay.

8              MR. BRUNS:  So I think that should meet Singular's

9    concern.  It is a very narrow scope, as I think you've already

10   alluded to, and it's already available on our source code

11   computer, and have offered it to them in a letter, I think

12   almost a month ago now, or maybe a little more than a month

13   ago -- maybe it's the day they filed their motion -- and never

14   heard back about their willingness to take us up on that offer,

15   but we extended again.  And given the narrowness of the scope,

16   we think, you know, by the end of next week, if they can review

17   it by then, that's ample time, and, again, it's available now

18   for them to review.

19             THE COURT:  Okay, so you're saying that's part of it.

20   It doesn't take care of everything that's in the motion to

21   compel.  It takes care of what, two things that you think are

22   at issue?

23             MR. BRUNS:  Well, I think there's a third.  The third

24   we should be able to all agree and resolve rather quickly.  So

25   that the second is code referred to by one of Google's

1    witnesses during his deposition.  That's Dr. Jeff Dean, and in
2    that same letter I've already referred to, we made clear that
3    all such code has already been produced.  Everything he
4    referred to has been produced in May, and so we don't, you
5    know, see any reason to produce anything else because there's
6    nothing more to produce.  Given, however, that we've agreed to
7    allow Singular to review the first piece of code I referred to,
8    that constant representing the variable, you know, they're free
9    to look at the code again and see anything that Dr. Dean did
10   refer to, but we think that the fact that there's no more code
11   to produce essentially moots this issue as well.
12            THE COURT:  Okay.  And you said there was a third one.
13            MR. BRUNS:  Well, so then there is a third request in
14   their motion which is not nearly so narrow as the first two
15   issues we've addressed, and so --
16            THE COURT:  And before you get to that one, Mr. Bruns,
17   let me just see if Singular agrees with you on one and two,
18   that those could effectively be resolved by virtue of what you
19   have said and proposed here.
20            MR. SEEVE:  So I don't think that's quite the case,
21   your Honor, and let me explain in more detail.  As your Honor
22   alluded to, after our hearing in June, we went to San Francisco
23   to review the code and found that there was a substantial
24   portion of the code that had not been produced which we
25   identified to Google.  And then some weeks later we came back

1    to San Francisco again, and we found that none of the code was

2    on the source code review machine, and we spoke with Google's

3    counsel, and we got some of it produced.  I believe Mr. Bruns

4    has referred to some code that's been available since May.

5    There was no such code, but there is some code that has been

6    available since July 17, I think, or thereabouts, and we did

7    look at that code.

8            Now, I think Mr. Bruns mentioned three requests that

9    we have, one referring to this variable.  It's a

10   num_lanes_per_tensor_core variable.  We did identify that

11   variable as an example of source code that is missing from the

12   current production, merely an example of some code that we know

13   exists that is not present on the source code review machine.

14   So merely producing that one narrow variable would not actually

15   deal with any of Singular's broader requests in this case.

16           As to the Jeff Dean code that Mr. Bruns referred to,

17   what Google has produced are two files that are labeled "change

18   list file."  Now, in source code terms, a change list is the

19   difference between one version of the source code and the next

20   version of the source code, specific changes that have been

21   made, so, by definition, a change list does not represent the

22   entirety of any body of source code.  And so for those reasons,

23   we don't think that these sort of narrow offers by Google to

24   produce this one file here and let us review these other two

25   files that it's already produced really move any of these

1    issues or resolve them.

2         MR. BRUNS:  So to respond to the second part first, we

3    have reviewed the source code computers and Singular's motion

4    and have confirmed that essentially that what Mr. Seeve just

5    said is inaccurate.  It is not just the change list files.  We

6    have included the code itself as well.  And it's on a source

7    code computer, which again I have indicated we're willing to

8    let them look at along with the one specific piece of code that

9    they've requested in addition.

10        I'm not sure what Mr. Seeve is referring to when he

11   says a number of files that were missing.  I believe there is a

12   single file that they requested in between their visits, and we

13   provided it.

14        THE COURT:  He says they gave that to you as an

15   example of the sort of file that is missing, but that it wasn't

16   meant to be that's the only thing that's missing.  I mean, I'd

17   love to be a fly on the wall to see some of the communications

18   that have been going back and forth because as I'm listening to

19   this, clearly things are getting lost in translation here on

20   both sides.  I don't want to go back in time, but I'm just

21   curious what the mutual understanding was as to what was going

22   to happen when folks went out to San Francisco the first time

23   to do the inspection.  I mean, are there not conversations that

24   take place ahead of time about exactly what code or what

25   product is going to be there to be inspected?

1    MR. SEEVE:  So, your Honor, I think I can speak to

2    that.  It was our understanding, Singular's understanding

3    before both of these visits that took place in July that the

4    source code that would be made available would include all of

5    the source code corresponding to the accused products in this

6    case, and that's a relatively narrow ask for source code.

7    We're not asking for any source code that's related to other

8    products or any source code that's only tangentially related to

9    each of these products.  We're looking for the source code that

10   Google itself has described as the blueprint, the one and only

11   source of information that can accurately define how the

12   accused products work.  It was our understanding that all of

13   the source code would be available to Singular and its expert

14   when it arrived in San Francisco, and what we found was that

15   there were large gaps in the source code that was available in

16   the source code computer, and we know that because we can see

17   source code that is available that refers to source code, other

18   source code that's missing.  And one of the examples of the

19   source code we found that was missing was this variable,

20   num_lanes_per_tensor_core.  We saw that source code refer to it

21   that was on the source code computer, but we didn't see where

22   that variable was defined.

23        Now, we can't give a complete list of all of the

24   missing source code files for the simple reason that we don't

25   know what they are.  We expected Google to provide us with the

1    source code that corresponds to the accused products.  We can

2    sleuth out and sort of deduce what files might be missing from

3    here and what files might be missing from there, but ultimately

4    we view this obligation as one that rests on Google to provide

5    us with a complete set of source code.

6          THE COURT:  And I'm being driven in sort of a more

7    lineal way, which is, well, whether it's their obligation or

8    not, if there was an understanding that Google was going to be

9    making the source code available, I start from there and say

10   that if there are any issues, it should be then about resolving

11   the issues so that what the parties agreed was going to happen

12   can happen.  So I don't want to revisit whether Google should

13   be obligated to make the source code available, but, Mr. Bruns,

14   if it is something you agreed to and they are able to

15   articulate why there are gaps, I mean, the conversation should

16   be, "All right, how do we fill those gaps?"  You know, "Help us

17   understand if something is missing, and let's rectify it."

18         MR. BRUNS:  Sure, your Honor.  I just want to clarify

19   one thing which I think is important, that there was no such

20   understanding that we would be producing all source code that

21   corresponds to the accused products, and I think that's all

22   that the local rules require; it's not what a number of cases

23   that we cited in our brief that Singular has addressed.

24         THE COURT:  Not to cut you off, but that's why I asked

25   the question.  What's the understanding?  I mean, before people

1    got on a plane, surely there had to be some conversation so

2    that, "Hey, just so we don't all be disappointed and, you know,

3    we end up getting upset and you guys thinking that, you know,

4    you didn't have to do this, let's make sure we're on the same

5    page.  We're coming up there next week.  This is what we expect

6    to be able to look at.  Do you guys agree?"  Was there a

7    conversation to that extent, to that degree where somebody

8    could show me something, correspondence, emails, and I could

9    agree, "Ah, yes, here is what the parties apparently at this

10   moment in time agreed was going to happen during that visit"?

11   Is there something like that?

12             MR. BRUNS:  I think that our briefing includes some of

13   that correspondence, but the point I was trying to make was

14   that -- well, let me scratch that.  I think worth noting, they

15   came to review code in December as well, never raised any of

16   the issues that are coming up now.  Also, the characterization

17   of this num_lanes file that we've been discussing as exemplary

18   of things that are missing is also not in Singular's brief.

19   What Google has produced here is what is consistent with the

20   local rules and the parties' communications, which is not

21   everything that corresponds to the accused products but

22   everything that is related to the infringement claims here, and

23   that's what the local rule calls for.  Extrapolating from that

24   to everything in Google's code that relates to the accused

25   products is just drastically overbroad and inconsistent with

1    both the local rules and all the case law we cited.

2         We have worked cooperatively with Singular over the

3    ten months.  We've had code available and produced additional

4    pieces that they have suggested were necessary, even when we

5    thought they weren't really relevant to that analysis.  And so

6    the notion that we now a month after fact discovery is closed

7    need to give them all of the code that relates to every piece

8    of the accused products, regardless of their connection to the

9    relevant claims here, I think is a nonstarter.

10        THE COURT:  Well, Mr. Seeve, to his point, I mean, if

11   we talk about number one and two for a moment, on number one,

12   as you've said, you don't necessarily know what you don't have

13   until you find something that either refers to it or gives you

14   some basis for understanding there's a gap.  So identified

15   something; Google has said, "Fine, we'll make that available

16   for you to see."  So I don't know how much more on number one

17   we can do except to say let's start with that, and you can

18   review it.  And then maybe if you're sleuthing suggests there

19   are others, other gaps, other things that are missing, you can

20   bring that to Google's attention as well.

21        On number two, I understood Mr. Bruns to be saying

22   they are prepared to make the code referred to by Mr. Dean

23   available anew, so you can now review it with the benefit of

24   whatever added perspective you'll get from the new material,

25   the new code in number one.

1          So, yeah, you know, maybe there have been some

2     disagreements along the way, but would you agree that for

3     number one and number two, that that probably is about as good

4     as we can do for the moment?

5          MR. SEEVE:  So I wouldn't agree with that, your Honor,

6     because we have started there.  We've visited now San Francisco

7     twice, and both times we've discovered that whatever standard

8     Google is using in determining what source code is relevant and

9     what source code is not, it's clearly not picking up source

10    code that's relevant.  And this isn't just our opinion.  This

11    is also the opinion of Google's witnesses or Google's 30(b)(6)

12    witness for technical issues, Dr. Norman Jouppi, referred to

13    source code, precisely the source code that was missing that we

14    identified as an example.

15         THE COURT:  And so what are you asking?  I just want

16    to make sure I understand.  What is it you are seeking to

17    compel them to do?

18         MR. SEEVE:  So we are seeking to compel them to

19    produce the source code that corresponds to the accused

20    products.  We don't think that's an overbroad request.  We

21    don't think that the local rules don't require that.  We think

22    that it's actually a relatively narrow piece of source code

23    that Google can produce.  There's relatively little source code

24    in the accused products that wouldn't relate to the functionality

25    that's at issue here in this case.

1          THE COURT:  Mr. Bruns, what's the local rule you're

2    referring to when you say, "Hey, all we're required to do is to

3    produce code relating to the infringement claims"?  So what's

4    the rule?  What's the rule you're referring to?  Because maybe

5    this is just going to be driven by me looking at the rules.  I

6    obviously, you know, don't know anything about the code itself,

7    so --

8          MR. BRUNS:  Sure.  I'm referring to local

9    Rule 16.6(b)(4)(A) which Singular quotes part of in its reply

10   brief, but omits the portion that narrows the scope to what is

11   claimed in the patentee's infringement charts, which is what I

12   was referring to earlier, your Honor.

13         THE COURT:  Okay.

14         MR. BRUNS:  And again I just want to reiterate:  The

15   notion that without identifying any specific shortcomings in

16   our source code production beyond this variable file, which,

17   again, we agree to make available to them -- it's on a computer

18   in Boston ready for them today -- without any sort of

19   justification for us to produce all of the code for these chips

20   in their entirety just is very overbroad; and we think, you

21   know, what's on a computer in Boston today should resolve any

22   concerns they have.

23         THE COURT:  All right.  Well, I'll take a look at the

24   rule.  Honestly, I don't know as I sit here how I can make a

25   judgment either way.  I'm trying to figure out, first, what the

1    parties understood the inspection was going to cover.

2           MR. BRUNS:  And, your Honor, sorry, just to follow up

3    on that note, a colleague helpfully pointed me to Exhibits 7

4    and 8 in our opposition reference a list that Mr. Seeve

5    provided and then a follow-up letter we provided to him.

6           MR. SEEVE:  Your Honor, I'd just like to note that

7    Mr. Bruns referred to the source code computer in Boston just

8    now, and we aren't aware that there's any source code computer

9    in Boston.  One of the chief drivers of this dispute is the

10   fact that we have to go to San Francisco and our expert has to

11   go to San Francisco to even look to see whether the production

12   was sufficient.  The last time we went to San Francisco, our

13   expert and I arrived on day one, and it wasn't until day two

14   that Google even put the source code that it said it would put

15   onto the source code computer.  And, you know, this is borne

16   out by correspondence between Google and Singular.  Even today,

17   Google says that it produced the source code by Jeff Dean in

18   its entirety.  We have asked in numerous emails what file names

19   we should be looking at so they can point us to the source code

20   on the source code computer, and Google has point-blank refused

21   to tell us.  So this is one of the reasons why this dispute,

22   we're loathe to just kind of, you know, take this one file and

23   then go back and see if there's more because every time we go

24   back, we have to fly to San Francisco.  Mr. Bruns just referred

25   to a source code computer in Boston.  That would make our lives

1      a lot easier.

2              THE COURT:  Is there something in Boston, Mr. Bruns?

3              MR. BRUNS:  Yes.  And, your Honor, I wish Mr. Seeve

4      was -- Exhibit 8 to our opposition, which is a letter we sent

5      to him on July 23, offers Singular a source code computer in

6      Boston, and we also emailed them, I believe on August 2, to

7      reiterate that offer.  So there's no dispute that they can look

8      at a source code computer in Boston.

9              MR. SEEVE:  So a source code computer in Boston would

10     make this issue go more smoothly, but our expert in Texas would

11     still have to fly to Boston, and we still don't know what

12     standard Google is using to determine whether source code that

13     corresponds to the accused products in this case is or is not,

14     quote, as they say "relevant to the infringement claims."  If

15     we look at the local rules and the local Rule 16.4(c) that

16     Mr. Bruns specifically referenced, there's no such limitation

17     that limits the source code to specific arguments made in claim

18     charts or elsewhere.  It's source code that is sufficient to

19     disclose the operation of the accused products.

20             MR. BRUNS:  Sorry, Mr. Seeve.  Did you say 16.4(c)?

21     That's not what I said.

22             MR. SEEVE:  I'm sorry.  What did you say?

23             THE COURT:  16.6(d)(4)(A).

24             MR. BRUNS:  And I have it pulled up right here.  It

25     says it limits it to the functionality identified in the

1    patentee's infringement claim charts.

2         THE COURT:  And I have to tell you both, if when we're

3    done and we go back and we debrief and we talk about this I'm

4    still unable to really understand the difference between what

5    Singular is seeking and what Google is prepared to offer and

6    what's kind of missing in the middle, I am going to be guided,

7    at least initially, by the rule.  I mean, Google has to comply

8    at least with the rule.  That's the minimum.

9         Now, I don't necessarily think that the rule means

10   therefore, once you comply with that, you're done and there's

11   never a need to go beyond it; but I think I would have to

12   understand, Mr. Seeve, what beyond what the rule calls for is

13   missing and then its relevance here.  And I understand you to

14   be saying there's really no burden to them, but I'd need to

15   understand its relevance here.

16        And I guess, Mr. Bruns, that would ultimately mean

17   whether you are or are not providing access to source code

18   relating to the accused product.  And if you say "We're not,"

19   well, then I can at least, you know, proceed with that

20   understanding.

21        MR. BRUNS:  Can you repeat that?

22        THE COURT:  I hear Mr. Seeve to be saying, drawing the

23   distinction between code relating to the accused product versus

24   the infringement claims, as though one is narrower and one is

25   broader, and that maybe what you guys are doing is narrowing

1    the scope of what you are giving them access to inspect.

2         MR. BRUNS:  Well, I think that is a fair description,

3    your Honor, that it's narrower in scope than all of the code

4    for the entirety of the chips on which the, you know, much

5    narrower claims are targeting a specific portion of.  I just,

6    you know, before I turn away from this, I just want to

7    reiterate:  We produced all the code related to the accused

8    functionality, so exactly what the rule calls for, in November.

9    They reviewed it multiple times in December.  They never raised

10   any issue with any shortcomings until July.  You know, on the

11   eve of the close of fact discovery, they identified a single

12   file in the brief that we have agreed to produce, and I think

13   previously requested a single file which we supplemented our

14   production to respond to.  So I think what we've done is

15   consistent with the rules and what the parties had agreed to

16   beforehand, and these eleventh-hour requests for an incredibly

17   broad production of all of the code for things that are

18   irrelevant here is just not proper, and for all the reasons

19   identified in our brief and the cases we've cited therein.

20        THE COURT:  All right, so let's turn to the third one.

21   We've talked the first two to death.  There was a third one I

22   don't think we --

23        MR. BRUNS:  Well, I think the third -- sorry, your

24   Honor -- I think the third is what we were just discussing.

25        THE COURT:  Oh, it is.

1           MR. BRUNS:  So the two specific issues, which I think

2     are largely resolved, the source code referred to in the

3     deposition, which is available, again, on a source code

4     computer in Boston; the specific file they've requested, which

5     again is available on that computer, and, like I said, I think

6     maybe a week and a half, just given the scope of what's left to

7     review.

8           The third issue is just then the catchall that

9     Singular has added to its brief asking for all of the code,

10    regardless of its relationship to the actual accusations in the

11    case.

12          THE COURT:  All right, on that third point, Mr. Seeve,

13    are you looking for all code regardless of whether it's, you

14    know, linked to the accused product, or is that just kind of a

15    boilerplate phrase just in case the clever lawyer might try to

16    parse the comma and say you didn't ask for something that you

17    really thought you were looking for?

18          MR. SEEVE:  So it's not a very broad category of code

19    as Mr. Bruns is suggesting it is.  The code that corresponds to

20    the accused products, which, as Google has said, is the only

21    way that we can determine how the accused products work, is the

22    code that corresponds to this chip.  And this chip, all it

23    does, broadly speaking, is what the claim of the patents in

24    suit talks about.  But for them to snip off this file here and

25    that file here under the claim that it's not relevant to our

1    infringement claims, well, that's clearly wrong, as we've shown

2    with a number of files that we've found to be relevant that

3    their witnesses have testified about.  And given the fact that

4    we don't know what files they might be holding back that we

5    don't have these references to, we don't see, you know, why

6    they would be permitted to use their own private standard of

7    relevance in determining what we can and can't see, especially

8    given the fact that we have no way of knowing the universe of

9    code at that point.

10        THE COURT:  So it does no good for me to enter

11   something that says "Google has to allow you to inspect all

12   source that corresponds to the accused product" because it

13   doesn't matter; you say that includes the entire chip, and

14   Google says it doesn't, right?  Am I getting that right?

15        MR. BRUNS:  I didn't hear Mr. Seeve to be saying it

16   doesn't include the whole chip.  I think he was just saying

17   they think they need the code for the whole chip.  And I just

18   want to give a little bit of context on what that type of

19   expansion would mean.  Essentially they're asking us to

20   increase our production by roughly a thousand times of what we

21   have already produced, given the complexity of the chip.  It's

22   not as if this is a small undertaking to expand the way

23   Mr. Seeve is suggesting.  It is a substantial and unnecessary

24   expansion.

25        MR. SEEVE:  So that just doesn't correspond

1    technically to the realities of the case.  We're talking about

2    a chip that has three main components, all of which are

3    implicated in our infringement argument, three main components.

4    If they've produced all of the code corresponding to these

5    three components of the chip, then what is the thousand times

6    of the rest of the code that supposedly corresponds to other

7    parts of the chip?

8            We've also seen that Google's idea about what's

9    relevant and what's not is self-serving and erroneous.  They

10   have several times now been informed that their source code

11   that's relevant that's missing from their source code computer,

12   and where they say, "Oh, it's not relevant, but we'll produce

13   it anyway," one time after another, eventually these dribs and

14   drabs of source code have to stop.  We have a chip that has a

15   few components in it.  All of those components interrelate, and

16   they're all related to the accused functionality in this case.

17   For Google to say that the accused functionality corresponds

18   only to, like, a thousandth of the source code that's comprised

19   in these chips, that's troubling in itself because it shows

20   that they're withholding a broad category of source code that,

21   in our view, must be relevant to the functionality that we

22   describe in our infringement claims.

23           THE COURT:  Well, I don't know, honestly, and I don't

24   want to spend all of our time on this because we've got other

25   things, but I don't know how this gets resolved -- I'm going to

1    go back and look at it -- because, Mr. Bruns, I heard you said

2    you didn't think Mr. Seeve was saying that he wants everything

3    that corresponds to the chip.  That's what I'm hearing.

4            MR. BRUNS:  I was going to say I agree with you, your

5    Honor.

6            THE COURT:  I don't know where I draw the line here; I

7    don't know where the balancing is.  And to say that, "Yeah,

8    they're only two components but they're all interrelated, and

9    therefore we need everything," I don't know enough to know

10   whether that's a reasonable statement or not.

11           MR. SEEVE:  Your Honor, I will point out that the

12   accused products in this case are boards, what are called TPU

13   boards that combine many chips and interconnects and the

14   cooling systems, et cetera, that are plugged into these

15   computers and data centers.  We're not asking for everything

16   corresponding to the entire board.  We have narrowed our

17   request for source code to this one chip, this actually portion

18   of a chip on a single board.  There are many chips on a board.

19   We're looking at half of one of those chips, and we're saying,

20   "Please give us the source code corresponding to this part of

21   this one chip."  So our request actually comes pretty narrowly

22   to exactly the source code that we think is relevant to the

23   accused products, and --

24           THE COURT:  As it relates to that, Mr. Seeve,

25   Mr. Bruns, do you understand -- when Mr. Seeve says, "Look,

1  we're only looking for part of one chip," do you as you sit

2  here, do you guys understand that one part of that one chip

3  that he is looking for such that you can say, "We think that's

4  unreasonable, we think it's reasonable, we think it's overbroad

5  or not," and help me understand why?

6        MR. BRUNS:  Well, I think we do understand the accused

7  functionality here, and we've produced the code that relates to

8  it.  We've worked with engineers to identify the code and have

9  produced it.  I just want to be very careful here with the

10  notion that, you know, the boards are the universe, and so the

11  scope of what they're now requesting is narrow.  He could start

12  saying, "Google is a company that does search engines, and

13  we're not asking about the code for search engines."  The

14  reality is that what he's still requesting is overbroad.  He's

15  carved out something a little narrower to make it seem

16  reasonable, but what we've produced is all the code that

17  relates to the accused functionality.

18        THE COURT:  Well, here's the conundrum.  And I'm sorry

19  to keep interrupting, but I really don't want us just to bog

20  down on the first pending motion.  The conundrum for them is,

21  you're in the driver's seat in terms of determining what you

22  think is relevant for them, and it makes them uncomfortable

23  that you're making those judgment calls because later they find

24  they don't even have the entirety of what they thought they

25  were getting from you, and they only find that by deducing from

1    what they've got that something is missing.  What can we do

2    that maybe might strike somebody in the middle as more

3    objective that would allow them to do the sort of inspection

4    they're looking to do, but that doesn't necessarily, you know,

5    require just making the whole thing available because otherwise

6    we don't have a comfort level that we're getting access to the

7    nub of it?

8         MR. BRUNS:  Well, I think, your Honor, we're already

9    in the process of that, short of this extra third request.  We

10   made this production available in November, allowed them to

11   inspect it numerous times, and responded to any specific things

12   they felt were missing.  You know, I think they took

13   depositions of our engineers.  They could have asked for

14   anything relevant that they thought was missing then as well.

15   They could have inquired about the source code specifically

16   with the engineers.  I just think we already have gone through

17   the process that you're identifying.  There's really nothing

18   more for us to produce that is targeted in a way we've been

19   discussing.

20        THE COURT:  I feel like we're sort of talking past

21   each other, but I think what they're saying is, yeah, you're

22   making that judgment call in the first instance; you're not

23   giving them the slightly broader access that they're looking

24   for that might help them agree with you but might also allow

25   them to find some stuff that they think is germane.  You might

1    still disagree, but they might say, "This is kind of what we

2    were talking about."  But I see Mr. Kamber wants to also wade

3    in here.  What do you say, Mr. Kamber?

4        MR. KAMBER:  Mr. Bruns is doing a fine job, and I

5    don't mean to interject but just try to move things forward.  I

6    do think fundamentally that there's not much of a -- there's

7    not a great place to go here in terms of a compromise, which I

8    hesitate always to say.  They have asked us for code; we've

9    produced a lot of code.  I've talked to engineers.  We put that

10   code on a computer for seven months, eight months, nine months.

11   There was no issue with the scope of that production.  They

12   looked at it.  They didn't say "We see missing pieces" or

13   anything along those lines.  They then did say, "There's an

14   instantiation file.  We see your files, but they are

15   instantiated in a certain way."  And we said, "We don't think

16   that's relevant, but we'll give that to you," and we did.  And

17   then they pointed out on other files this constant definition.

18   The fact that we're talking about these dribs and drabs, these,

19   like, single files where they say, "Oh, we'd like this constant

20   definition," I think shows that we've essentially reached the

21   limits or the bounds of the functionality that is accused, and

22   that we have been nothing but cooperative in trying to

23   supplement that production.  To the extent that they say, "Hey,

24   there's a file here that refers to a different file, we'd like

25   to see that," we've given them that in both the instances where

1    they've been specific.

2         What we're now facing, and why I think your Honor is

3    having a difficult time with this, and I'm sympathetic, is, the

4    next request is, "Give us everything related to the chip."  And

5    I also don't know where I would draw the boundary beyond what

6    we've provided and what we've been supplementally provided,

7    which, you know, already gets into what I would call the

8    "nebulous zone" and the entirety of the chip.  And, you know,

9    that's something for your Honor to decide.  It's not about us

10   choosing, if we're picking and choosing at this point.  I think

11   we've done it.  We think they've looked at it.  We think

12   they've poked whatever holes they can in it and identified a

13   problem.  But beyond that, I don't know what we could or would

14   do, as a practical matter, absent providing the code for the

15   entirety of the chip, which really is a large undertaking.

16   This is not -- it's not just these three components.  These

17   chips are very complicated and have a lot of components, and

18   there's a lot more to it.

19        THE COURT:  I'll give you the last word on this,

20   Mr. Seeve, and then I'm going to have to take this one under

21   advisement.  I can give you a sense of what I'm likely to do,

22   but I'll take that under advisement.  Go ahead.

23        MR. SEEVE:  So I'd just like to respond to some of the

24   points that Mr. Kamber has made.  You know, he admitted himself

25   that the source code that they failed to produce on the second

1    and third visits falls into what he called the "nebulous zone."

2    So he admits, even under Google's own view of this, he thinks

3    that might be relevant.  "Nebulous zone" sounds like he thinks

4    that might be relevant.  And, you know, we're in a situation

5    where we have to sleuth out what pieces of the code might be

6    missing, what pieces might not be missing.  Mr. Kamber

7    represents that Google has been cooperative throughout this

8    process.  Google has in fact been anything but.  You know, we

9    arrived in San Francisco, as I said, last month, our expert and

10   I, and it took two days of peppering Google with emails before

11   we even got the code that had been promised before our visit.

12   And that two days represented the majority of the time we had

13   to review the code in San Francisco to start with.  So this is

14   a situation where the reason we're seeing dribs and drabs, far

15   from what Mr. Kamber suggests, which is that the reason we're

16   seeing dribs and drabs is because the source code is

17   substantially complete in its production, we're seeing dribs

18   and drabs because Google is being very, very withholding when

19   it comes to what source code it views as relevant and what

20   source code it views as not relevant.

21          There's no need to draw a line, an arbitrary line

22   between relevance and not.  There's no problem with just giving

23   us the source code corresponding to the narrow part of the

24   accused products that we've identified, this tensor portion of

25   the chip.  That's what we've asked for.  And by giving us that,

1    Google can avoid the need to draw this arbitrary line between

2    source code that's relevant and not relevant.

3         They say it would increase their production a

4    thousandfold.  I personally find that very hard to believe, but

5    if there's a thousand times more code than what they've showed

6    us, that alone is a topic of concern for us, and we think that

7    it could be avoided simply by acceding to our request.

8         THE COURT:  All right, I'm going to have to go back

9    and -- well, we'll go back, we'll look at the papers, and I'll

10   take this under advisement.  Obviously there's a genuine

11   disagreement here.  And I don't know, Mr. Seeve, whether they

12   would agree that splitting it as you're suggesting, which is

13   not the entire chip but just the portion we're talking about,

14   is a balance they say that is a fair balance.  They say that

15   still would require them not only in terms of arguments to do

16   something that's unreasonable, but that it clearly would be

17   having them provide you with material that has nothing to do

18   with the case, and I just want to go back and reflect on that.

19   So I'm going to take this under advisement.

20        I do like the fact that there is now the capacity

21   perhaps to review material in Boston rather than San Francisco.

22   I also like the fact that to the extent there have been

23   communications back and forth pointing out things that appear

24   to be missing, Google has made an effort to make those pieces

25   available, and I hope that would continue regardless of what we

```
 1    are doing here and what we do with the motion.

 2            So with that, let's just go on to the next one, which

 3    is at 266 on the docket.  This is Singular's motion to modify

 4    the scheduling order to take two depositions and a 30(b)(6),

 5    and Singular wants to depose Johnnny Chen and Richard Goodin,

 6    and, with respect to the 30(b)(6) depo, depose the author of

 7    the invalidity contentions.  Has there been --

 8            MR. SEEVE:  Your Honor, I believe that this motion has

 9    been dealt with already.

10            THE COURT:  I like to hear that.  Okay.

11            MR. SEEVE:  Yes, I think these two we can take off

12    your plate, your Honor.

13            THE COURT:  Excellent.

14            MR. KAMBER:  Judge Saylor ruled on this.

15            THE COURT:  Oh, he ruled on this one?  Okay, because I

16    got a couple others, and maybe if he's ruled on those too, that

17    will make things easier.  We crossed our wires on that one.

18            Did he rule on 244, which is a request by Google to

19    compel Singular's responses to interrogatories, requests for

20    admissions, and document production?

21            MR. KAMBER:  No.  To be clear, your Honor, the only

22    one that Judge Saylor kept for himself, because it dealt more

23    with the scheduling order, was 266 that he's ruled on.  So

24    another one is one that --

25            THE COURT:  He should be more greedy next time and
```

```
 1   take them all.
 2           All right, so then let's go to Google's motion here,
 3   and I know that -- you know, I looked at this, and I see there
 4   may be -- unless you guys have talked about some of these,
 5   let's just go through each one and see if we can resolve it on
 6   the spot.
 7           Let me ask first for Google, since it's your motion,
 8   have any of these been resolved since the motion was filed?
 9           MS. PORTO:  Yes, your Honor.  RFP No. 17, which
10   requested Singular's financial production, Singular explained
11   in its opposition that it had already made that production.
12           THE COURT:  So RFP 17 is taken care of?
13           MS. PORTO:  That's right.
14           THE COURT:  Okay, anything else?
15           MS. PORTO:  No, your Honor.
16           THE COURT:  All right, so the first one I have within
17   this is Interrogatories 22 through 24 -- and you guys can tell
18   me whether any of these are groupable such that a discussion of
19   one really encompasses another -- and this has to do with
20   Singular's alleged conception, design, and use of a number of
21   formats.  And Singular appears to say that these interrogatories
22   are badly drafted, and so I don't know whether that means,
23   "Hey, we're prepared to provide you with something; we just
24   need to have a better understanding of what it is you're
25   looking for," or what.  So what's the opposition then to
```

1    Interrogatories 22 through 24?

2           MR. SEEVE:  So, your Honor, the opposition that

3    Singular has to those interrogatories rests primarily on this

4    word "conception."  As you know, "conception" has a very

5    particular meaning in patent law.  It refers to something you

6    do with an invention, the claimed invention.  And the

7    Interrogatory No. 22, for example, asks to describe Singular's

8    alleged conception, design, and use of a 14-bit approximate

9    data type, approximate float data type.  Well, that 14-bit

10   approximate float data type is not anywhere in the patent

11   claim.  It's nowhere claimed in the patents.  So the word

12   "conception," it's unclear where they're getting this

13   allegation that we conceived of such a data type or identifying

14   anything in this that relates to the invention.

15          The same thing goes for Interrogatory No. 23.  You

16   have Singular's alleged conception of a 16-bit floating-point

17   number.  Again, a 16-bit floating-point number appears nowhere

18   in the claims at issue, and --

19          THE COURT:  Well, hang on, Mr. Seeve, just so I

20   understand you.  Is your concern that they're asking you to

21   provide information about something that you say has no

22   connection to anything here, or is it that this word

23   "conception" is a loaded term, and if we answer it the way we

24   think they want us to answer, we're going to be providing

25   stuff -- I don't know, it's going to be asking us to reveal

1    deep and inner thinking?  So what's the concern there?

2         MR. SEEVE:  So I wouldn't say that it would force us

3    to reveal deep and inner thinking, but I would say that this is

4    a loaded term.  And by asking us to respond to these

5    interrogatories as they are drafted now, it would imply somehow

6    that the invention that's at issue here in this case is a

7    14-bit approximate float data type or a 16-bit floating-point

8    number.  We're happy for them to ask us about these data types

9    I guess in the abstract, but for them to imply, as these

10   interrogatories clearly do, that these are somehow coextensive

11   with the patent claims at issue in this case is simply not

12   correct.

13        THE COURT:  Well, that sounds to me more at core than

14   about relevance.  I guess I'm trying to understand still what

15   the visceral objection here is.  Is it that it's going to force

16   you to acknowledge something that you shouldn't have to

17   acknowledge, that it presumes that these things exist or that

18   they have some connection to this, and you don't want to go

19   there?  If the word "conception" was taken out, would you still

20   have a problem with the interrogatories?

21        MR. SEEVE:  It would depend what replaced it, your

22   Honor.  So currently it says "Singular's alleged conception,

23   design, and use of," and then a variety of things depending on

24   the interrogatory.  Singular has never alleged that it

25   conceived of these things, either in the patent themselves nor

1    in subsequent filings.  Conception is this idea, this very

2    specific idea of, you know, arriving at something yourself in

3    your mind.  It's a patent-related term that we simply don't

4    allege here.

5             THE COURT:  Hang on, Mr. Seeve.

6             Ms. Porto, if you get a response that says, "We've

7    never alleged anything with respect to a 14-bit or a 16-bit,"

8    are you satisfied with that?  What's your rejoinder?  What do

9    you come back with?

10            MS. PORTO:  Your Honor, so just to be clear, Singular

11   responded that its patent's application and prosecution history

12   disclose these number formats, and specifically they said the

13   patent's application and prosecution history thoroughly

14   described their design, and that these number formats are also

15   included in presentations that Singular has produced.  So this

16   idea now that Singular never claimed to have conceived of the

17   number formats is inconsistent with its current response.  So

18   if Singular's position now is that it didn't conceive of the

19   formats, then certainly it should supplement its response to

20   make that clear.

21            And just to be clear, in Singular's initial response,

22   it never objected to this term "conception."  Singular has also

23   served interrogatories using the term "conception."  So it

24   seems that this objection to "conception" was maybe thought

25   after the initial response was submitted.  But as the responses

1    currently stand, they suggest that Singular did conceive of

2    these ideas, but there was an initial problem with Singular's

3    responses that they don't make the disclosures clear enough.

4    In other words, they don't provide any citations to specific

5    portions of the patent.  They don't cite by base number any

6    specific presentation.  So Google's initial request was that

7    they provide more detail.  Now it sounds like they're saying

8    they actually didn't conceive of these number formats, which is

9    different than what they previously said.  So if that's the

10   case, we'd certainly request that they supplement their

11   response to make that clear.

12           THE COURT:  Mr. Seeve?

13           MR. SEEVE:  Your Honor, I think that was totally

14   incorrect.  So, first of all, there's no inconsistency between

15   our response, which talks about the fact that the patent does

16   indeed disclose these number formats.  And contrary to what

17   Ms. Porto says, we have provided citations to the patent

18   specification, I believe in our reply brief, which I can find

19   in a moment.  But they very clearly describe data formats that

20   include the data formats that are at issue here.  And to say

21   that we've served interrogatories that use the term "conception"

22   and therefore we shouldn't have a problem with it in these

23   interrogatories, well, as we said, "conception" is a very

24   specific patent-related term, and it can have a proper place in

25   interrogatories as we used it properly.  It's not properly

1   here.

2          And to say that our previous responses to these

3   interrogatories are somehow inconsistent with what we're saying

4   here is simply not correct.  It was clear sort of what

5   information Google might be looking for with these

6   interrogatories, and we provided it.  We state that the patents

7   disclose these data type formats, and we provided specific

8   portions of the patent that disclose these data type formats.

9   We cited to presentations that Mr. Bates gave at Google and

10   said that the data type formats were at least implicitly

11   disclosed in those presentations, as were the patents in suit

12   themselves referred to.

13          So we are not withholding information about these data

14   type formats.  What we are objecting to is this inclusion of

15   the word "conception," which is trying to sort of add

16   something, set up a straw man as to what the invention is at

17   issue in this case.

18          THE COURT:  I do not follow.  I'm sorry, I'm just not

19   following you.  Now, first of all, when I asked you a few

20   minutes ago, if the word "conception" were removed, would you

21   have an issue and you said you might, and I don't quite

22   understand it.  But more generally, if what you told me is

23   true, that previously you've provided them information, you've

24   shown them where in the record things can be found, I'm trying

25   to figure out, so what's the "there" there?  What is this

1    about?  I don't understand.  So now you don't like the word

2    "conception," fine.  If the word "conception" is taken out, is

3    this a nonissue now?  If it isn't, what still remains,

4    Mr. Seeve, that you would have a problem with such that you

5    might still be objecting to these three interrogatories?

6           MR. SEEVE:  Your Honor, if the word "conception" were

7    replaced with the word "disclosure," I think Singular would

8    have no problem with this interrogatory, and indeed in its

9    responses already answered it.

10          THE COURT:  All right.  Now, to Google, if the word

11   "conception" were removed and replaced with "disclosure," would

12   that change for Google what it was seeking through this

13   interrogatory, or would you say, "Yeah, I mean, these were just

14   terms that were used, and they've used this word before, but

15   otherwise, yeah, no big deal"?

16          MS. PORTO:  Yes, your Honor, Google is specifically

17   asking about Singular's conception and whether Singular alleged

18   that it conceived of these particular number formats.  And just

19   to be clear, in Singular's response, it doesn't simply say that

20   the patents disclose the number of formats.  It says that the

21   patents teach the number of formats and thoroughly describe

22   their design.  So I interpret that response to mean that

23   Singular's position is that it did conceive of these number

24   formats, as exemplified by the patent.  And if that's not what

25   Singular is saying anymore, then it should supplement its

1    response to make that clear.  And if Singular is struggling

2    with the definition of "conception," in its objections it can

3    provide a definition of "conception" that it's going to use and

4    respond based on that definition, as is customary in discovery

5    responses.

6            THE COURT:  And just complete a sentence for me to

7    help me understand how it matters either way if Singular were

8    to say it did or it did not conceive of these.  If they said,

9    "Yeah, either we did conceive or we did not conceive," how does

10   it matter either way?  Just help me understand from Google's

11   perspective.

12           MS. PORTO:  Sure, your Honor.  So the specific number

13   formats that are asked about in these interrogatories are

14   number formats that Singular claims are used in the accused

15   products and also that are used in the practicing products.  So

16   obviously Google is interested in whether or not Singular

17   contends that it conceived of and developed the number formats

18   that it's now accusing Google of infringing.

19           THE COURT:  Okay.  So that strikes me, as a pedestrian

20   who doesn't normally do this stuff every day, Mr. Seeve, to be

21   reasonable, right?  I mean, it goes really to your own claim.

22   They're asking you to basically acknowledge whether you are or

23   are not making a certain contention, in so many words.  So I'm

24   still trying to understand what's problematic with asking

25   Singular to respond to this as framed.

1          MR. SEEVE:  So there are two problems, your Honor.

2     First of all, this word "conception" means more than teach and

3     disclose, and Google is sort of eliding those terms and saying

4     that, well, if they teach and disclose, so they're interpreting

5     that to mean conception.  Well, that's simply not true.  We

6     mean teach and disclose.

7          Conception is something you do with an invention.  A

8     full claim, you can see the invention that backs that claim.

9     What they're referring to is a particular embodiment of a

10    particular limitation of a patent claim, and they're saying

11    Singular alleges that it conceived of that.  That just doesn't

12    make sense.  Singular never alleged that it conceived of that,

13    but we can say that Singular doesn't allege that it conceived

14    of that because --

15         THE COURT:  Well, why don't you just do that?  Why

16    don't you just do that?  Why don't you just supplement this and

17    say, "We don't allege that we conceived of this"?  And I don't

18    know whether you need to go further and say, "We didn't

19    conceive of this."  I mean, I don't know why you'd have a

20    problem if you say -- if you're prepared to say, "We never

21    alleged we conceived X," why would there be a problem with then

22    just going one step further and saying, "We didn't conceive X"?

23         MR. SEEVE:  Because, your Honor, we didn't conceive of

24    X.  Where X is not a claim at issue in the case, it wouldn't

25    make sense.  The word "conceive" in patent law refers to an

1    invention:  You conceive of an invention.  Here they're taking

2    a specific embodiment of a specific portion of a claimed

3    invention and saying, "Did you conceive of this particular

4    portion of this particular example of the claim?"  And we would

5    have a problem saying we didn't conceive of that because it

6    sounds prejudicial for obvious reasons, and legally it makes no

7    sense.

8         THE COURT:  Well, the first part I'm not too persuaded

9    by because it is what it is, right?  If you didn't conceive of

10   it, then you can say, "Yeah, I didn't conceive of that, but we

11   don't think that affects the merits of our claim."

12        On the relevance part, that to me I would be more

13   intent to listen to, which is if you're saying, "Look, you're

14   asking about something that has absolutely nothing to do with

15   anything at issue in this case," that's a fundamental ground

16   for objecting and for not responding.  But I didn't hear you to

17   be -- from the papers, it didn't sound like that was the

18   objection you were making.  It was more, "We don't like this

19   word that's being used."

20        MR. SEEVE:  It's more, your Honor, than we don't like

21   the word that's being used, and I think it's akin to the

22   precise objection you just raised, that "conception," when that

23   word is not applied to one of the claims that we have asserted

24   against Google in this case, has no legal meaning.  And it's

25   not relevant to this case whether we conceived of a particular

1    example or a particular embodiment of a particular invention.

2    What's relevant is whether we conceived of the claimed

3    invention in this case, and, of course, Singular does allege

4    that it conceived of the claimed invention in this case, or

5    Dr. Bates does rather, the inventor.

6              MS. PORTO:  If I might, just to help move things

7    along, we could offer synonyms for the word "conceived," if

8    that would satisfy --

9              THE COURT:  Why don't you, thank you, and then you

10   guys can get back to me whether that is enough to make this

11   issue moot.  And so, Mr. Seeve, why don't you just look to see

12   what the change is and whether that's something that, you know,

13   upon review you're prepared to live with.

14             MS. PORTO:  Your Honor, I was just going to suggest

15   that we could ask if Singular is comfortable with the word

16   "devised" or "formulated."

17             THE COURT:  All right, Mr. Seeve?

18             MR. SEEVE:  So Singular in its responses used the

19   words "disclose" and "teach," which I think Ms. Porto alleged

20   are synonyms for what she views as conception, and we would be

21   fine with the words "teach" and "disclose."

22             THE COURT:  That is a statement.  The question was,

23   would you be okay with "devise" and "formulate"?

24             MR. SEEVE:  So they're not words that we chose in our

25   responses.  They're not words that we --

1        THE COURT:  I understand that.  I understand that.

2   The question is, though, would you be okay with that?  If you

3   had gotten an interrogatory that instead of having the word

4   "conception" had "devised" and "formulated," would you oppose

5   the objection, or is it something that you would have just

6   tried to respond to it as best you could, understanding those

7   words -- you know, giving meaning to those words as you

8   understand a normal person would give meaning to those words?

9        MR. SEEVE:  So "devise" and "formulate" I would say

10  would not be accurate when it comes to what Singular did with

11  these data formats.  We certainly taught them; we certainly

12  disclosed them.  "Devise" and "formulate" sound like they're

13  stretching what we intended to say with our interrogatory

14  responses.

15       I'll say again, your Honor, we meant what we said:  We

16  taught them and we disclosed them.  Ms. Porto is the one who

17  said that "teach" and "disclose" she believes means conception.

18  We don't agree with that.  We think they mean teach and

19  disclose, and so that's why we objected to this interrogatory.

20  It refers to an alleged conception, and we made no such

21  allegation.

22       MS. PORTO:  Your Honor, just to be clear, I think

23  we're thinking about it backwards, and Mr. Seeve is trying to

24  explain what his answer meant, but we're trying to figure out

25  whether Singular came up with these number formats or not.  So

1    regardless of whether that's what Singular intended in its

2    response I think is irrelevant.

3         MR. SEEVE:  Well, the interrogatory does not ask

4    whether Singular conceived of these number formats.  The

5    interrogatory refers to Singular's alleged conception of these

6    number formats as a foregone conclusion and then asks Singular

7    to state the basis for a contention they never made.

8         THE COURT:  What if it's reformatted, rephrased to ask

9    whether you conceived of it?  Are you prepared to answer that?

10        MR. SEEVE:  We would answer that interrogatory.  It

11   would not be a simple "yes" or "no" answer, but, your Honor, we

12   would be prepared to answer that interrogatory.

13        THE COURT:  All right, so for Google, if you just kind

14   of retooled this and asked -- you know, it seems like one of

15   the problems is, you've bypassed -- you've made this

16   assumption, and so you've proceeded to step two, and you've

17   acted to kind of explain themselves; and they're saying, "We've

18   never even acknowledged that this is something we conceived

19   of."  So why not just start by asking them whether they have

20   conceived of this and then seeing where we go from there?

21        MS. PORTO:  Sure, your Honor, that would work.  I

22   think another option would be just replacing the word

23   "conceive" with a word like less --

24        THE COURT:  We tried.  Nobody can come up with one.

25   So let's have you -- so let's treat this as -- you know, I'm

1    doing it, I'm modifying it now, all right?  So you're going to

2    assume what these are asking in the first instance whether

3    Singular conceived of the product or the item in question.

4    Now, I don't know and I don't know whether we need to get to

5    what happens if Singular answers "yes" or "no" in a particular

6    instance, but let's just start with dealing with

7    Interrogatories 22 through 24 that way, okay?

8              I also have RFP 82 and Interrogatory 16, and so,

9    Google, let me hear from you on that.

10             MS. PORTO:  Sure, your Honor.  These two requests ask

11   for information about Singular's S2, which the subsequent

12   iteration of the practicing product that Singular asserts here

13   was called the S1.  And Singular refused to produce any

14   documents related to the S2 other than those that were produced

15   for some other reason, or respond to Interrogatory No. 16 which

16   requested a more narrative explanation of the reasons for the

17   S2's development and any attempts to commercialize the S2.  And

18   I believe that Singular's objection is based primarily on

19   relevance grounds, and Google's position is that the S2 is

20   relevant, in particular to the gross damages defenses,

21   especially in that it bears on the S1 and commercialization

22   attempts related to the S1, which are relevant to reasonable

23   royalty rates.

24             THE COURT:  I'm sorry.  Your voice dropped off at the

25   end.  I didn't hear the end of your sentence.

1          MS. PORTO:  Sure, your Honor, that's fine.  The

2     commercial success of a practicing product is relevant to the

3     reasonable royalty rate, and so Google is seeking information

4     about the S2 because of the way really that Dr. Bates described

5     it in relation to the S1.  So he described that the S2 would

6     share the same basic design as the S1, that it would be an

7     improvement, that it would be a better implementation, that it

8     would be smaller, consume less power.  So we're really

9     interested in how those improvements bear on the shortcomings

10    of S1 and Singular's attempts to commercialize the S1.

11         THE COURT:  Yes, I'm still trying to process this as

12    to why you need it.

13         MS. PORTO:  Well, your Honor, if I could just give an

14    example, Mr. Oskin, who was Singular's former CEO, testified

15    during his deposition that when Singular and Dr. Bates were

16    having conversations with customers and people who they were

17    trying to license the S1, when there were difficulties with

18    those conversations, they started developing the S2 and telling

19    the customers that there would be a smaller chip, that the chip

20    would run faster, it would consume less power, it would be

21    better than the S1.  So we're really interested in the

22    reasoning behind the S2 development and what that development

23    has to say about the S1.  In other words, we're interested in

24    how the S2 and the motivations for it being developed beyond

25    the S1 and any shortcomings that were inherent in the S1.

1          THE COURT:  All right, Mr. Seeve?

2          MR. SEEVE:  So, your Honor, as Ms. Porto herself just

3    explained, the commercial success of a practicing product might

4    be relevant here.  The S2 is neither of those things.  It's,

5    first of all, not yet a product.  It's in the very earliest

6    stages of development.  The statement that Ms. Porto cited

7    about the S2 being faster and smaller and improved aren't

8    generic statements that one might make about a future product

9    that has not yet been fully designed, as is the case here.  The

10   S2 has not even been fully designed, let alone implemented or

11   commercialized or sold.  And, second, even if it were

12   commercialized or sold, we've given no indication that the S2

13   would or would not practice the claims of the patents in suit.

14   We've said that the S1 practices the claims of the patents in

15   suit, and we've given reasoning behind that, and we've produced

16   documents about the S1 that demonstrate that fact.  When it

17   comes to the S2, the design process for the S2 isn't yet

18   sufficiently advanced even to make any statements about

19   whether, when it becomes a product, it will practice the claims

20   in suit.  So it's not relevant --

21         THE COURT:  I like that, but did you make a statement

22   like that?  The way you just encapsulated that would help a

23   party seeking information on this to understand why you think

24   it's not relevant and why this is premature in any event.  Did

25   you give a sort of response like that to Google to help them

1    understand this?

2         MR. SEEVE:  Yes.  We met and conferred on this topic a

3    number of times, and we exchanged emails and briefing on this

4    topic.  And I know that in a number of meet-and-confers in

5    which I participated in, I specifically explained that not only

6    is it not a product, not only has it not been fully designed

7    yet, but whether it practices the claims in suit is not

8    something that we're making a statement about right here, and

9    so it's not relevant, and we explained this reasoning to

10   Google.

11        Now, this seems like a fishing expedition, plain and

12   simple, on the part of Google.  This whole suit arose because

13   Dr. Bates explained his invention to Google under an NDA, and

14   we allege Google took the ideas and marketed them and turned

15   them into products and didn't pay us any licensing fees.  So

16   we're understandably reluctant to take information about a

17   future product that is not yet fully designed, that bears no

18   relationship to this case whatsoever, and give Google carte

19   blanche access to all of the thoughts and motivations and

20   designs of a product that is not yet even complete.

21        THE COURT:  All right, in the interest of time, I do

22   want us to move around.  I'm inclined to deny the motion to

23   compel with respect to these two, but as with all of these that

24   we've been talking about today, I'm formally taking everything

25   under advisement.  And it's going to be my goal ultimately to

1    enter orders that will really just give final verdicts on each

2    of these, rather than kind of drawn-out legal discussion, so

3    I'm going to have to make some judgment calls on some of these.

4         All right, so I got that one.  Let's move on to the

5    next one, which is Interrogatory 26 regarding the basis for

6    Singular's allegation in the First Amended Complaint regarding

7    the testing source code, and Singular has objected.

8         MR. SEEVE:  Yes, your Honor, Singular has objected to

9    this interrogatory as being based on a false premise, as our

10   briefing explains.  I can go into a little more detail about

11   this.

12        THE COURT:  Well, let me ask Ms. Porto, since it's

13   their motion and since she's had the benefit of hearing and

14   reading your objection, and I'm sure she's prepared to tell me

15   why that's not compelling and why I should go her way.

16        So, Ms. Porto.

17        MS. PORTO:  Sure, your Honor.  So just for a little

18   bit of background, Interrogatory No. 26 asks Singular for more

19   details about what they refer to as the "Singular test" in the

20   First Amended Complaint.  And if you look at the First Amended

21   Complaint and the citations in Google's opening motion,

22   Singular repeatedly cites Singular's test, which it says shows

23   that the accused products satisfy the claimed error rate.  So

24   what Interrogatory No. 26 is asking for is how specific

25   variables within the Singular test correspond to the accused

1    products such that it illustrates Singular's infringement

2    contentions, which Singular specifically said in the First

3    Amended Complaint.

4         Like Mr. Seeve just said, in their response to the

5    interrogatory, they said that the interrogatory was based on a

6    false premise.  Now in Singular's opposition, they have

7    explained that the false premise is that Singular contends that

8    the testing source code is an accurate model of the accused

9    products.  We think that by filing their First Amended

10   Complaint and repeatedly citing the Singular test, they've

11   suggested that they believed that the Singular test that they

12   relied on supported their infringement contentions because it

13   accurately reflects the accused products, and we think that

14   Singular should be required to explain that theory.

15        THE COURT:  Mr. Seeve?

16        MR. SEEVE:  So this testing code, as your Honor knows,

17   has been the subject of numerous motions already that Google

18   has filed and then withdrawn.  Once I believe this Court

19   pointed out that Google has misapprehended the nature of the

20   test itself, and this was at a motion back in April when they

21   asked other questions about the test and demanded other

22   information that we told Google that we had already provided,

23   and this interrogatory suffers from the same problem.

24        The interrogatory says that Singular needs to state

25   its basis for alleging that the testing code is an accurate

 1    model of the accused product.  We've been very clear this whole

 2    time about what the testing code is and isn't.  The testing

 3    code demonstrates that the accused products satisfy certain

 4    statistical limitations that are put in place by the claims;

 5    namely, the X and the Y percent limitations of the claims at

 6    issue.  We've explained exactly how they correspond to the X

 7    and the Y, communications of the claims at issue.  The testing

 8    code itself is only a couple hundred lines long, and Google has

 9    had it for almost a year now.  So to say that we're representing

10    that this few hundred lines of testing code somehow represents

11    an accurate model of the accused product that earlier in this

12    very hearing they said was a product of thousands and thousands

13    of pages of source code is a ludicrous contention.

14         As for what the testing code is and how it works,

15    we've made that very plain.  They've had their expert look over

16    it.  Their expert has run the testing code and has examined its

17    output, and has verified in fact that its output matches

18    exactly the allegations that were made in the First Amended

19    Complaint.  So as for this interrogatory, we're just not sure

20    what more information we could provide to Google.  It's not our

21    obligation to explain source code to Google.  We're not asking

22    Google to explain its own source code to us.  So short of that,

23    we're not really sure what Google is asking for.

24         THE COURT:  So, Ms. Porto, with that, what more are

25    you asking for?

1          MS. PORTO:  Your Honor, we're asking what Singular's

2     contentions are about the testing source code that it relied on

3     in its First Amended Complaint.  We're simply asking how

4     Singular believes that the testing source code that it

5     developed corresponds to the claims limitation.

6          THE COURT:  So I feel like we're all speaking English,

7     but I don't understand anything because Mr. Seeve says, "Look,

8     we've explained to you everything we can and know about this.

9     We've said what it is and what it isn't."  What's missing, all

10    right?  What is it that they haven't said for an example?  Give

11    me an example of something that they conceivably might say that

12    they haven't talked about as far as these contentions go.  Just

13    so I can understand, when you say this is an incomplete

14    response, that they haven't told us everything they can, what's

15    missing?

16         MS. PORTO:  Sure, your Honor.  So just to be clear,

17    the entirety of their response is that the interrogatory is

18    objected to because it's based on a flawed premise, and as to

19    the source code, it speaks for itself.  So Singular hasn't done

20    anything to explain why in their First Amended Complaint they

21    repeatedly said that the Singular test illustrates that

22    Google's products were infringing Singular's patents.  What we

23    asked for specifically in the interrogatory was how the inputs

24    correspond to the accused inputs that are in the asserted

25    claims.  And if there are particular limitations or ways that

1    Singular is unable to respond, it can explain those, but its

2    current response, which is just that the source code speaks for

3    itself, is clearly insufficient.

4          THE COURT:  Okay, all right, I'll also take that under

5    consideration.

6          I'm inclined, I think, Mr. Seeve, to ask Singular to

7    do something more.  You know, at a minimum, I found it helpful

8    to hear what you were saying here.  That should probably be in

9    the form of a response to help Google understand as well.  I

10   can understand their basis for posing the interrogatory where

11   it appears in the complaint, but I want to go back.  I'm going

12   to look at the complaint itself.  I'm going to look at what the

13   parties say on this.  That leaves -- huh?

14         MR. SEEVE:  I was just going to say "understood," your

15   Honor.  I will point out just that Google has not objected to

16   any aspect of the testing code in the First Amended Complaint.

17   It hasn't pointed to any flaw that it believes is present,

18   which we could address if it were to bring up some flaw in

19   detail.  If Google alleged that the testing code was

20   insufficient in some way, we would certainly be willing to

21   respond to Google's allegation; but Google has made no such

22   allegation in this case and is just asking for a blanket

23   explanation, which has sort of put us at a loss.

24         THE COURT:  Okay, so that leaves then RFP 2 regarding

25   an admission that the patents in suit do not encompass

1    execution units using an 8-bit integer format, and Singular

2    appears to object on the ground that it has not yet determined

3    this?  Do I understand that right?  What's the nature of this

4    one?

5          MR. SEEVE:  So I think, your Honor, this is another

6    interrogatory that's drafted using the sort of terms like

7    "encompass" that have unspecific meanings in patent law and

8    that don't relate actually to the subject of the interrogatory.

9    So here we're being asked whether the claims of the patent in

10   suit -- so this is sort of fundamentally a claim construction

11   exercise, you could think of it as being -- whether the claims,

12   quote, "encompass execution units using an 8-bit integer

13   format."

14         Well, the claims encompass what the claims said.  You

15   know, what the claims are and are not is a major subject of

16   patent litigation, and the claim construction has been fully

17   briefed before this Court.  And, you know, if there's a certain

18   term that Google thinks is related to this, then Google has yet

19   to identify it.  But as for whether the claims encompass, and

20   then this language that doesn't appear anywhere in the claims

21   themselves, yes, theoretically the claims could encompass an

22   execution unit that uses an 8-bit integer format if that

23   execution unit satisfies all of the limitations of the claims

24   at issue.  There might be other execution units that use an

25   8-bit integer format that don't satisfy the limitations of the

1    claims at issue, and so the claims wouldn't encompass those.

2    And so it's essentially an incomplete type of etiquette.  We're

3    asked about this execution unit using an 8-bit integer format.

4    We're told nothing else about the execution unit, and then

5    we're asked whether the claims encompass it.  It's pretty

6    difficult to respond.

7              THE COURT:  Ms. Porto?

8              MS. PORTO:  Sure, your Honor.  Just to be clear, this

9    is the first that I've heard of the objection to the word

10   "encompass" specifically.  In Singular's stated objections and

11   in meet-and-confers have said that it couldn't respond because

12   there is no claim construction ruling yet.  So as we have

13   explained to Singular, we think they should respond to the

14   extent they can now, and if the claim construction ruling bears

15   on their response, they can supplement later as necessary.

16             THE COURT:  If you had gotten an answer like the one

17   Mr. Seeve just gave me, it could, you know, provided certain

18   factors are present.  It might not, you know, if it doesn't

19   satisfy other factors or other requirements; you know,

20   something a little more general.  It could, it might, you know.

21   Would that have prompted a motion from Google for something

22   more, or would you have lived with that?

23             MS. PORTO:  Well, your Honor, in general, I think it's

24   customary for parties to respond "yes" or "no" to a request for

25   admission, but certainly if Singular had provided more

1    information, other than that it can't answer because it lacks

2    sufficient information based on the claim construction ruling,

3    that would have been more helpful than what they did, certainly.

4          THE COURT:  Yes, it seems to me, Mr. Seeve, this is

5    another instance where I think, you know, listening to you, it

6    sounds like that probably would have been an adequate response

7    to the request had it been provided, rather than just saying,

8    you know, "This is flawed, and so I'm not really going to

9    answer it," even if your answer is, "I can't give you a 'yes'

10   or 'no,' and here's why I can't give you a 'yes' or 'no,'" and

11   then providing the explanation you just gave.

12         MR. SEEVE:  If that were enough, we would be willing

13   to supplement our responses to say what I just said, but I

14   actually did not hear Ms. Porto say that that would be enough.

15   I heard Ms. Porto say that they would really prefer a "yes" or

16   "no," which --

17         THE COURT:  No, she did, she did, but I also think

18   what Ms. Porto said -- I thought I heard you to say you would

19   certainly want a "yes" or "no," but if it can't be answered

20   "yes" or "no," then you would want to understand why, or you

21   would want some explanation why it can't be answered that way,

22   and then we go from there.  So I would say, on this one,

23   Mr. Seeve, I think you should just essentially take what you

24   said here and supplement this response to encapsulate that.

25         Again, if the question is asking for a "yes" or "no"

```
 1    and you can't give a "yes" or "no," you begin by saying, "I
 2    can't give you a 'yes' or 'no,'" and then proceeding to explain
 3    why.
 4              MR. SEEVE:  We have no problem doing that, your Honor,
 5    with the understanding that it's not going to be a "yes" or a
 6    "no," that it's going to be what I said here.
 7              THE COURT:  Okay, that's fine, but my point is, you
 8    say, "We can't give you a 'yes' or 'no,'" and then explain why,
 9    okay?
10              MR. SEEVE:  Uh-huh.
11              THE COURT:  Okay, I think that's it then, right?
12              MR. SEEVE:  Your Honor, there were a couple of
13    additional issues in Singular's motion that we haven't dealt
14    with yet, that --
15              THE COURT:  Whose motion was that, Mr. Seeve?
16              MR. SEEVE:  The same motion to compel that the source
17    code issues were in also raised two additional issues.  Let me
18    get the docket number for your Honor.
19              THE COURT:  Oh, oh, okay, you're right.  This is --
20              MR. SEEVE:  262.
21              THE COURT:  Yes, 262, right, the claim inspection and
22    testing.  Okay, yes, all right, so let's go through those, okay.
23              MR. SEEVE:  So these issues I think are hopefully
24    relatively simple compared to the issues that we've already
25    dealt with in this hearing.  The first, inspection of the
```

1    accused products, deals with Google giving us access to a data
2    center, an operational data center where the accused products
3    are actually used.  This is a case where the accused products
4    are not sold to third parties.  You can't go to a store and buy
5    one.  These accused products operate only within the confines
6    of Google's data centers.  And, you know, Google has been
7    somewhat cagey about data centers; you know, what they cost,
8    how many of them there are, even what they are.  And we think
9    it's important in this case, both for Singular and ultimately
10   for the jury, to be able to see what these data centers look
11   like and be able to understand the operation of the accused
12   products and how it fits into Google's business.  And as we
13   explained in our briefing, this is related to three key issues
14   that are central to the case:  Infringement, I mean, the action
15   of the accused products in the data centers, these are what
16   makes them infringing products in this case; validity because
17   the commercial success of Google's data centers drives
18   secondary considerations of nonobviousness; and also damages
19   for reasons that we've explained in previous hearings.
20          THE COURT:  Right.
21          MR. SEEVE:  It's the cost savings in data centers that
22   drives I think our damages theory.
23          THE COURT:  And we've already green-lighted certain
24   discovery on the data centers, correct?  We're not revisiting
25   any of that today?

1        MR. SEEVE:  We are not, your Honor.  This is simply a

2   request to inspect the data centers in which these accused

3   products operate with our expert so we can have a look for

4   ourselves as to the context in which these accused products are

5   functioning.

6        THE COURT:  The devil is in the details.  I'm sure

7   you've spelled it out in greater detail, but some would say

8   inspection is walking into the front door and just keep going

9   straight down the hallway, and then you walk out the back door.

10  And then others would say, you know, you peel up the carpet;

11  you look into all the nooks and crannies.  What's the extent of

12  this inspection?  What are you really looking to do?

13       MR. SEEVE:  So I think it's somewhere in between the

14  two extremes that your Honor has identified and I think closer

15  to the first one.  Really what we're looking to do is to see

16  the server X with the accused products in them, be able to

17  photograph them and have our expert examine those photographs

18  and use them as potential evidence later down the road.  We're

19  not looking to disassemble anything.  We're not looking to poke

20  into nooks and crannies or to obtain detailed technical

21  specifications of anything, but we do think it's important for

22  our expert, and potentially ultimately the jury, to see how

23  these accused products are used, how they fit into Google's

24  business, and how they're responsible for all of these billions

25  of dollars of revenue that Google talks about in its documents.

1    THE COURT:  And if somebody goes through and you take

2    pictures, you will be able to see how the alleged accused

3    products are used in the course of Google's business?

4    MR. SEEVE:  What we'll be able to see is in part a

5    mystery to us, your Honor, because we haven't yet inspected the

6    data centers, but we do think that looking at the accused

7    products, even in the general way that I just described, will

8    provide context for our expert and for the jury to understand

9    what these accused products are and how they fit into a broader

10   system of products that Google makes.

11   THE COURT:  And are you looking to inspect a center

12   chosen by Google, or is it something where you're looking more

13   for kind of a sampling and looking to go through more than one?

14   MR. SEEVE:  We would be willing to inspect a center

15   that Google represents is a representative data center that

16   employs the accused products as they're generally employed

17   throughout Google's operations.  We're not looking for anything

18   that would be burdensome, like inspection of every single

19   Google data center or only the Google data centers that are

20   selected by us.  As long as the data center is representative

21   and Google represents that it is, we would have no problem with

22   limiting our inspection to that data center.

23   THE COURT:  All right.  And Google?

24   MR. KAMBER:  So, your Honor, Matthias Kamber on behalf

25   of Google.  The motion to inspect the data center should be

1   denied for both practical and procedural reasons here.  Let me

2   start, though, with the practical reasons, which basically boil

3   down to really high burden and super low, if any, relevance to

4   the issues that even Mr. Seeve identifies here right now.

5   Notably, they aren't requesting inspection for purposes of

6   seeing the accused infringing products.  We've talked about

7   that.  They have samples of those accused infringing products.

8   They have the related chip architecture code.  They have the

9   design documentation.  They aren't saying that there's

10  something they need to see in order to prove infringement of

11  the asserted claims by way of this inspection.

12          Instead what they're saying is, "Well, we need to see

13  them in their natural habitat," in effect, "We need to see

14  them in operation."  But, again, that's irrelevant to the

15  patent claims.  They don't argue that it relates in any way to

16  the patent claims, and that's because the patent claims deal

17  with individual arithmetic elements in these chips that you

18  would need an electron microscope to see, and you couldn't walk

19  into a data center and see it.

20          And the bigger problem is, these chips are under heat

21  sinks.  They're on boards that are in these housings.  The

22  housings, by the way, we've provided Singular the full housing.

23  And then those housings are on racks in data centers, but

24  there's no indication from or looking at the housing that it

25  contains a TPU or something else.  So you could walk into the

1   middle of a data center and wander around, and you'll never be
2   able to tell which one is a TPU and what houses a TPU and what
3   doesn't house a TPU.  There's no label, there's no sort of
4   significant marker of this, and that's noted in the declaration
5   of a data center manager that we provided with our opposition.
6   So if you walked in, you wouldn't see anything; their expert
7   wouldn't be able to discern anything.
8          You know, in terms of burden, these are industrial
9   facilities that have a lot of heat, have high power.  There is
10  mandatory safety training to go into them.  During COVID, there
11  are different zones within the data centers to keep people
12  separated for continued business operation reasons.
13         They're also fundamentally incredibly sensitive
14  facilities.  There's super-high security.  Again, it's detailed
15  in that declaration.  Google employees, essentially less than
16  one percent of Google employees will ever see the inside of one
17  of these, and most of that one percent is people who actually
18  work there.  Those people have to go through metal detectors to
19  go in and out.  There is a zero trust policy with respect to
20  electronic devices.  Photos are not allowed in these
21  facilities, given the IP concerns.  There are some photos
22  online, there's information on data centers online that I'm
23  sure Singular and its attorneys have seen.  Those have all been
24  taken on Google-approved equipment and then scrubbed, or
25  they've been analyzed for purposes of determining whether or

1    not there is any sensitive IP that might be revealed by the

2    publication of those.  So the idea of some random person

3    walking around freely in an industrial facility taking pictures

4    at will is pretty much the exact nightmare scenario that Google

5    has done everything to avoid by way of its security procedures.

6              So, in short, I mean, they're trying to get access to

7    one of the most sensitive areas in Google to wander freely and

8    take these photos, and that is a relief that they have not

9    identified any court as ever having given, even though, of

10   course, many Google products run on the data centers.

11             But let me try to give the procedural reason which I

12   think might be a more practical reason for your Honor to just

13   deny this motion.  Rule 37 allows Singular to move to compel

14   inspection requests that were made under Rule 34.  Rule 34 in

15   turn requires an inspection request that describes with

16   reasonable particularity each item or category of items to be

17   inspected, and to specify a reasonable time, place, and manner

18   for the inspection.

19             Here there was never a Rule 34 request to inspect a

20   data center, either before or after the written discovery

21   deadline.  Notably, for the requests for production, Singular

22   served formal requests identifying the rules, Rule 34 and

23   Rule 26, and gave Google 30 days to respond.  Similarly for the

24   interrogatories, they sent formal requests identifying Rule 33

25   and Rule 26, giving Google 30 days to respond.  There never was

1    and still has never been a formal request under Rule 34.  They

2    never moved the Court, as part of their request for extending

3    the fact discovery deadline, to modify the fact discovery

4    deadline or the written discovery deadline.  So there's no

5    provision for this.  There's nothing to enforce under Rule 37.

6    There is fundamentally no Rule 34 request for the Court to

7    actually compel or to tell us to compel us to answer because it

8    was never issued.  They sent us an email shortly before the

9    close of fact discovery saying, "Hey, we'd like to come visit a

10   data center."  That doesn't count.  It's not a formal request.

11          And the reason this matters, of course, and I don't

12   need to be explaining this to your Honor, but courts don't want

13   to be in the business of enforcing email requests.  It's bad

14   enough probably from your perspective to be in the position of

15   having to enforce formal discovery requests, but there's a

16   reason why Rule 37 requires underlying formal discovery

17   requests, and it's to avoid exactly the type of scenario we're

18   talking about here.  We've cited a number of cases in our

19   brief, including the *Schwartz* case from the District of

20   Connecticut that says, without a formal request, it must be

21   denied under Rule 37; there's nothing to enforce.  I think the

22   language is, "Rule 37 does not by its terms apply."  And they,

23   "they" Singular, have not identified a single case where an

24   inspection would have been allowed or a request like this would

25   have been allowed without an actual underlying Rule 34 formal

1    discovery request.

2         THE COURT:  All right, so I'm probably going to be

3    inclined for that reason to deny the motion to inspect, but,

4    again, I will formally take it under advisement.  I'll review

5    the papers.

6         And I think then there was still an additional issue,

7    Mr. Seeve?

8         MR. SEEVE:  Yes, there is.  Just on the subject of the

9    inspection of the data centers, I just want to point out that

10   Mr. Kamber's arguments contradict themselves.  On the one hand,

11   he's saying that inspecting a data center wouldn't be useful

12   for us; and, you know, we think you should be the judge of

13   that.  But, on the other hand, he's saying that inspecting a

14   data center would potentially put them at great risk and expose

15   their IP, and those arguments seem to be in tension with each

16   other.  On the one hand, you know, he's saying a walk through a

17   data center clearly doesn't show you anything, and, on the

18   other hand, he's saying it would be unduly burdensome because

19   walking through a data center exposes all their deep state

20   secrets, and that just seems, you know, squaring that circle is

21   a tough thing to do.

22        As for the Rule 34 request, we view that as a

23   formality.  Google seemed to acknowledge that there was a

24   Rule 34 request in earlier stages of this litigation, and only

25   in response to this motion did it suddenly decide that this

1    formality had not been observed, and so I think --

2         THE COURT:  I think the problem is that even if we had

3    started with the rule first, we would probably end up at a

4    certain point where, for the inspection to be of any value to

5    Singular, it would require that you have access at such a level

6    that the concerns raised by Google would then be true, that you

7    would be getting access to things that are sacrosanct that

8    nobody gets access to.  And then on top of that, the physical

9    conditions at the centers is such that so many precautions

10   would have to be taken that the issue of burden is one we would

11   have to grapple with too.

12        So I do think at a certain level they are

13   reconcilable, those positions that he was staking out, but I'm

14   going to, again, to give both sides full benefit, review

15   everything.  I'm just giving you what I'm inclined to do, and

16   then I'll do it more formally.

17        So let's then move to that last one that you have on

18   your list.

19        MR. SEEVE:  So this last issue, your Honor, relates to

20   the use of a cloud TPU account to perform tests, software

21   tests, you know, that run on the hardware that's accused here.

22   Now, Google offered the use of a cloud TPU account, as our

23   briefing explains, last January and February, and we took

24   Google up on its offer and expressly said that we would like

25   access to the cloud TPU account and we would like to run tests.

1    We were unable to access the cloud TPU accounts, and Google

2    essentially told us that we couldn't.  And then we reiterated

3    that request before the end of fact discovery, just last month,

4    and Google is now saying that our request is untimely and that

5    it lacks a Rule 34 basis.  We think that it's an offer Google

6    made that we accepted, and Google needs to make good on its

7    offer.

8          And I would further add, just as an aside, you know,

9    we just saw Google's objections to the tests that were present

10   in the First Amended Complaint.  Google doesn't actually object

11   to them in any specific way, but it's demanding explanations

12   from Singular.  Running a test on the accused products

13   themselves would be one way to put these issues to bed for once

14   and for all, and the fact that Google is not allowing us or not

15   giving us access to the accused products to run tests directly

16   on the accused products sort of makes us wonder what Google's

17   purpose in objecting to these tests really is.

18         THE COURT:  Well, and with Google, let me just start

19   with the first thing Mr. Seeve started with, which was, at some

20   point in the past, you had offered the cloud TPU to do these

21   tests -- that is, to run on the hardware that's at issue

22   here -- and then at a certain point changed your mind.  Is that

23   correct or not?

24         MR. KAMBER:  That's not correct, your Honor.  We did

25   offer them -- the issue about the sample boards that your Honor

1    decided and granted their motion to compel on, our proposed

2    compromise at the time was, "In lieu of providing you the

3    sample boards and the housings, which we don't think will be of

4    much use to you, we can give you a cloud TPU account, and we

5    can give you a dummy board where the actual chip wouldn't be

6    underneath the heat sink."  That was the two-pronged compromise.

7          Singular rejected that.  They went ahead with their

8    motion, and then in their motion they said, "Oh, and, by the

9    way, we accept their compromise offer."  In other words,

10   "We'd like to have our cake, and then we'll eat it too."

11         Your Honor recognized that.  When you heard that

12   motion, and this is quoted in our briefing, your Honor asked

13   whether Singular would be fine with just a copy of the two

14   boards at issue with nothing more, including no longer the

15   offer of access to a program where you can run simulations, and

16   then they said -- I think their response was, "Well, we still

17   accept the offer of the TPU access."  And I think the Court

18   recognized that was a bit underhanded and said, "Are you just

19   seeking that they provide you with copies of the boards with

20   the chips, or are you also saying, 'And I want you to compel

21   them to continue to offer us this access'?"  And Singular said,

22   "Just the boards.  We're not asking you to compel this access."

23         Now, since then, they seem to have opened a cloud TPU

24   account.  They're commercially available.  The price list is

25   available online.  You can buy this service just like you can

1    buy computing from Amazon Web Services or Microsoft Azure or
2    any number of things.  So they can do this.  We're not
3    withholding it.  They can run whatever tests they want.  They
4    can run it on the hardware.  You can actually select on that
5    cloud TPU site whether you want to run on a version 2 chip or a
6    version 3 chip.  Both of them are accused in this case.  They
7    could choose an account for each one of those to run whatever
8    tests it is that they want to run.

9         And what they're saying now is, "Well, we tried to run
10   it, and we were limited by the quota."  Their briefing -- they
11   didn't say before in their letter what limit did they run into,
12   how much more do they need, what tests are they looking to run.
13   And this is the practical problem that we're facing.  They're
14   now telling us that they want to compel us to provide some
15   monetary amount of cloud compute services but won't tell us how
16   much.  They didn't do it in their opening; they didn't do it in
17   their reply, even after we pointed out this error.  They're
18   essentially saying, "We want unlimited compute power from
19   Google to run our tests," which they don't know what they are.

20        By the way, these accounts online, some of them are a
21   few thousand dollars for a month, I think; some of them are
22   about $2 million a month, depending on how much compute power
23   you want.  I don't know what Mr. Seeve is looking for, and he's
24   never told us.  He's never told the Court, for that matter.
25   What he seems to have asked the Court to order is an unlimited

1    account to run unlimited stuff that we don't know what it is,

2    and that's just simply not practical when this is a

3    commercially available commodity that they could go out and

4    buy, and probably should have some economic incentive to not

5    waste or try to take down Google's data centers.

6              THE COURT:  If somebody runs into these so-called

7    quota resource issues or quota limitations, can one simply buy

8    more power or more time so they can continue, or they have to

9    start from square one again if they reached a limitation?  I

10   mean, would it ruin the integrity of whatever testing they were

11   trying to do?

12             MR. KAMBER:  You know, your Honor, I don't know the

13   precise answer to that, but I imagine, just as a user, that one

14   could buy more.  I'm sure Google would love to sell more if it

15   had the opportunity.  Mr. Seeve, frankly, may be the one most

16   knowledgeable about that because he's the one who's been in a

17   cloud TPU account who had a quota limitation, or whatever it

18   was, cited to him.

19             THE COURT:  So, Mr. Seeve, what's the issue?  And I'll

20   be really transparent about what I'm musing about here, which

21   is, if ultimately what Singular needed was a little more power

22   or a little more time and the cost was not substantial, whether

23   Google, in the context of this case and understanding where we

24   are, would be able to facilitate getting them that additional

25   time or power?  Now, Google may say, no, go and buy it

 1    yourself, I don't know, I don't care.  But that's what I'm

 2    wondering as a way because I am reminded, you know, based on

 3    what Mr. Kamber says, that there's a history to this issue.  We

 4    did have this conversation, and it would seem a little unfair

 5    for me to sort of switch horses midstream and compel something

 6    where previously you guys said, "No, no, no, we're going to be

 7    fine with Option A," and then you've undertaken yourself to do

 8    this testing, which is fine; and now you're finding that when

 9    you're doing it on the market, so to speak, where you have to

10    pay, there are these limitations.  So why not you guys just --

11    why don't you just continue to do what you've been doing, which

12    is continuing to work with the retail side of Google's computer

13    servicing options or products to continue this testing?  Why

14    should I be compelling them to do this for you, or at least to

15    give you the resources you need to complete this?

16            MR. SEEVE:  So, first of all, when it comes to the

17    communication between the parties and the hearing last January,

18    I don't think that Mr. Kamber's characterization is accurate.

19    I think that Google attempted to frame these as an either/or

20    proposition:  "Either you get samples of the TPU boards or you

21    get testing time."  And when we said, "No, we're not accepting

22    that premise," we were not accepting the fact that it's an

23    either/or proposition.  Our motion was about samples of the

24    boards, and Google said, "Well, if they would accept this

25    instead, would they agree to that?"  And we said "no," we

1    wouldn't agree to that instead.  This motion is about samples

2    of the boards, and that's what in this motion we were asking

3    the Court to compel, and that's what we made clear.

4          We also made it clear that we expected access to a

5    cloud TPU as well.  It wasn't the subject of the motion to

6    compel, but it was something that we expected, and we made it

7    clear during that hearing, and we made it clear in subsequent

8    communication last February.

9          Now, as far as the questions about if we run into a

10   quota limit, is it possible then to simply continue, or is it

11   possible to quantify the amount of compute power that we need

12   for a test, we don't know the answers because we're not Google.

13         Now, as of yet, we have not yet, I think, bought

14   compute time on a cloud TPU service, and it is something that

15   we would expect within reason Google to provide for the purposes

16   of testing in this case.

17         Now, I say "within reason," and I don't know exactly

18   what that means in terms of the amount of computation required

19   because, again, we're not Google, and we can't make that kind

20   of determination.  But if Mr. Kamber is saying that Google

21   would be willing to enter into a dialogue with us where it

22   explains how much compute power might Google be willing to

23   provide for testing in this case and how much we might need and

24   the parameters thereof, we would be happy to negotiate.

25         THE COURT:  Well, I think it was I who kind of threw

1    out this idea, you know, why not just you guys sort of talk

2    about what more you might need?  So I was under the impression

3    you had begun, you had run some tests, but you weren't able to

4    complete them.  But you say you haven't gotten that far yet,

5    you haven't purchased anything yet, so you don't know what's --

6    so how do you know then -- I mean, so help me understand how it

7    is that you know that there's these limitations, there's this

8    issue that's keeping you from doing all the testing you would

9    want to do.

10        MR. SEEVE:  So it's my understanding -- and contrary

11    to what Mr. Kamber said, it wasn't me personally who ran into

12    this quota limit, but I believe it was one of our consulting

13    experts -- it's my understanding that there's a certain amount

14    of computation that you get for free, and Mr. Kamber can

15    correct me if I'm wrong, but I believe there's a certain amount

16    of computation that's available with a free cloud TPU account,

17    and that quota was used up in our initial test.  And we are

18    just looking for a little more leeway.  And what a little

19    means, again, it's a subjective term, and I think we would be

20    happy to enter into a dialogue with Google about how much is a

21    little and whether compute power and compute speed mean the

22    same thing, and what we might, if anything, be willing to

23    compensate Google for this.  We just want enough to be able to

24    test the accused products as thoroughly as we would like to be

25    able to test them to make sure that our infringement theories

1    are borne out in this case, and --

2         THE COURT:  When you did your initial tests before you

3    ran into the limit, whoever it was on your side that was doing

4    that, was that with the assistance of Google in connection with

5    this case, or was that going to the retail side of Google and

6    purchasing or setting up an account and doing this the way any

7    person would do it in the marketplace, if that's what they

8    wanted to do?

9         MR. SEEVE:  My understanding is that it was the

10   latter, that we created -- you say retail, but --

11        THE COURT:  That's the term, you know, my low-brow

12   term for not -- not as part of this case but doing it the way

13   anybody else who would be interested in doing it would do it.

14   You know, that's how typically you would approach Google and

15   say, "I'd like to avail myself of this service that you guys

16   offer."  So if you did it that way to begin, why not do it that

17   way to continue?  It sounds like what you're essentially doing

18   is saying, "We now would like to have it done under the

19   auspices of this suit and to compel Google's assistance rather

20   than us doing it the way we started out doing it," which is

21   essentially purchasing this as a product or a service they

22   offer.

23        MR. SEEVE:  Well, I think the short answer is that

24   Singular doesn't think it should have to pay for the rates to

25   test the accused products in this case that it brought against

 1    Google.  The right to test accused products is sort of

 2    co-extensive with the right to access the accused products and

 3    to get documents related to the accused products.  And, as

 4    Mr. Kamber said, some computations require $2 million; some are

 5    only a few thousand.  We don't know which of these exactly this

 6    is, but --

 7         THE COURT:  Why can't we figure that out?  Why can't

 8    we have a sense?  You guys are really, really smart, and you

 9    have really, really smart people working with you.  We can't

10    drill down on this and get an idea of how much this would cost?

11         MR. SEEVE:  So we think that in a dialogue, your

12    Honor, with Google, we would be able to explain what we're

13    looking for and how much it might cost and what the parameters

14    of that testing might look like.  There's been no offer of such

15    a dialogue.  Google has merely responded to our request for the

16    refusal, which is what brings us to this task here.  But we

17    would, again, be happy to open a dialogue with Google about

18    exactly what amounts of testing we think would be reasonable

19    for Google to offer us in this case; but we do think that there

20    is at least a reasonable amount of testing power that we're

21    entitled to as a plaintiff in a patent infringement suit that

22    goes beyond it.  I'm sorry.

23         THE COURT:  No, no, that's fine.

24         To Google, I guess my question is this:  Let's pretend

25    we hadn't had that history from last January that you reminded

1   me of and this were a request that were being made in the

2   context of this case, which is, "Look, we want to test, we need

3   enough to test the accused products here, so let us do that,

4   you know, as part of discovery," would you have objected on

5   principle, or would you have found a way, "Let's talk, let's

6   figure out the mechanics, let's talk about the logistics and

7   how that's going to take place"?  Do you have a sense of how

8   you would have behaved then?  Because if it's that, "Yeah, we

9   would have tried to work something out," I guess I'm just

10  wondering now, as the parties try to end discovery here, is

11  there a way we can just reach some sort of compromise and allow

12  this testing to take place; again, you know, not extensive, not

13  wild stuff, but enough for them to get some meaningful data for

14  purposes of the suit to test their theory?

15         MR. KAMBER:  Your Honor, I hesitate to answer this way

16  and just to say that "it depends."  Listen, we're always up for

17  talking.  In fact, when they sent us this request for the

18  Google TPU account a week before the fact discovery deadline --

19  mind you, we had this hearing back in February; they didn't

20  raise it again until July 16.  And they said we've reached a

21  quota, and we said, "Well, what quota?  We don't know what

22  you're talking about."  And their brief says, "When Singular

23  attempted to access the Google TPU account, however, the system

24  would not provide the quota of resources to allow Singular to

25  conduct its tests."  We've been asking them.  We asked in our

1    response, "What quota are you talking about?  What do you need?

2    What tests do you want to run?" and they've never answered that

3    question.

4        So what they said is, they informed Google that

5    Singular needed additional access beyond what was commercially

6    available to run its tests.  That's on the top of Page 9 of

7    their brief.  What they have represented to the Court is that

8    they can't buy, like, there's no way to even get commercially

9    whatever quota it is that they need to run.  That's troublesome

10   when there are accounts that are worth $2 million.

11       THE COURT:  Well, do we need to get clarity on that?

12   Does that phrase mean not so much that Google has said, "We

13   know what you need, and that's not commercially available,"

14   but, rather, where their person used as much as you can get for

15   free, maybe that has now been kind of phrased maybe a little

16   inaptly as they can't get what's commercially available.  Maybe

17   they got what was free, and that's all they got.  So this is

18   not about them having been told by Google, "What you want is

19   not commercially available"?

20       MR. SEEVE:  That is correct, your Honor.  That is what

21   we meant to say, and I think that's a good clarification.

22       MR. KAMBER:  So in terms of the quota, Mr. Seeve keeps

23   saying, "Well, they should tell us what they're willing to give

24   us, and then we'll figure it out."

25       THE COURT:  Well, they say they don't know -- well, I

1    guess I'm sort of hearing both sides.  I hear Singular in part

2    to be saying, "We don't know how much we need, and we don't

3    know how much it will cost."

4         MR. KAMBER:  If they're saying that they know that --

5    I mean, they know their tests; they know what quota of

6    computing that test should require.  I mean, I don't think --

7    this isn't a world where, you know, if they get partway through

8    a test and then they decide, like, the test that they're

9    running uses too much, then sort of what happens?  I think it's

10   better for them to articulate, "We want $10,000 of compute

11   time, and we'd like to run half of it on version 2 and half of

12   it on version 3.  Please give us an allocation in our account."

13   Then we're happy to talk to them about that.  But it seems a

14   little bit weird.  Like, they say to conduct its tests.  They

15   know what they have.  They should know what it's going to

16   require, and we are more than happy to discuss with them

17   whether that amount of commercially available compute time is

18   reasonable for us to give or not reasonable.

19         But it's also not true that just by accusing something

20   of infringement, you just sort of get it for free.  If I sue GM

21   for a crumple zone patent, I don't just get to get a car to

22   crash.  I can maybe buy one, but you don't automatically just

23   get it.

24         THE COURT:  That's why what I'm asking you guys to

25   consider is just talking because it could conceivably be -- you

1    know, this is a horrible analogy, but I'm thinking sometimes of

2    my credit card.  I go to use it, and if my credit card limit is

3    $1,000 and I want to buy something that costs $1,010, the card

4    gets declined, and I'm thinking "Oh, my God," and it turns out

5    all I needed was $10 more.  So if you guys talk, it may turn

6    out that what Singular is looking to do, putting aside for the

7    moment whether you should be compelled to do it, if what

8    they're looking to do, whether measured in terms of power or

9    time or money, is not unreasonable, is not patently

10   unreasonable, then I would just ask you guys to talk to see

11   whether Google can facilitate --

12            MR. KAMBER:  Absolutely, absolutely.

13            THE COURT:  And then on that part of it, just get back

14   to me, just report back to me what you're able to do.  And I

15   have to believe that just from what I've heard, we're not

16   talking about, you know, needing some major, major amount of

17   power or major, major amount of time to do something like this,

18   and that's not $2 million to do something.  Maybe I'm wrong.

19            MR. KAMBER:  I hope not, but, again, we don't know the

20   tests that they want to run.  Only Singular knows that, and,

21   you know, we have been and stand ready to be reasonable and to

22   provide some degree of complimentary, so to speak, compute

23   power here.  But I think it's a matter of them telling us what

24   quota they think they need because these accounts are defined

25   in that way, and we can be reasonable in providing it or not.

1    We're telling them we can provide up to X, and what you want

2    beyond that, you should procure like anybody else would have to

3    on the open market.

4            THE COURT:  Okay, all right, so please, yes, talk and

5    then report back to me, all right?

6            MR. SEEVE:  We will, your Honor.

7            THE COURT:  So otherwise what we're going to do is,

8    we're going to go back, we'll sort of collect our thoughts, and

9    then within the next couple of days we'll just kind of issue

10   sort of a tally on these pending matters.  And then on this

11   last one, we'll wait for you guys to get back to us on.  Okay.

12           MR. KAMBER:  Yes, your Honor.

13           THE COURT:  All right, thank you.  So it's coming up

14   to 4:00 o'clock.  Probably a good time to call it for a day

15   unless anybody has anything else to raise.  Not seeing or

16   hearing anything, all right, thank you, everybody.

17           MR. KAMBER:  Actually, your Honor, one thing just for

18   purposes of clearing your docket, and this may have been done,

19   but there was a motion for a protective order that we had

20   filed.  We had said by way of reply brief that those issues

21   were mooted.  I think you can now -- I don't know, it may have

22   already been done, so I apologize.

23           THE COURT:  No.  Thank you.  If it hasn't been done --

24   I think we got that.  I think we did at one point try to go

25   through and clear off our little gavels, sort of internal

1    signals that show us something is pending.  I thought we had

2    taken care of that, but if we haven't, thank you, Mr. Kamber,

3    we will.

4           MR. KAMBER:  Thank you, your Honor.

5           THE COURT:  All right, and with that, thank you,

6    everybody.  If I don't see folks before Labor Day, enjoy the

7    remainder of the summer.

8           MR. SEEVE:  Thank you, your Honor.

9           MR. KAMBER:  Thank you, your Honor.  You too.

10          THE COURT:  Court is in recess.

11          (Adjourned, 3:57 p.m.)

1                    C E R T I F I C A T E

2


3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6


7            I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 80 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 19-12551-FDS,

11  Singular Computing LLC v. Google LLC, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14            Dated this 1st day of September, 2021.

15

16

17

18

19            /s/ Lee A. Marzilli
            _____
20            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25