# Exhibit 1(

IPR2021-00179
PATENT NO. 8,407,273

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**PATENT OWNER'S RESPONSE**

Case No. IPR2021-00179

_____

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I. INTRODUCTION ................................................................. 1

II. THE '273 PATENT ............................................................ 4

III. OVERVIEW OF THE CITED REFERENCES ............................................ 7

    A. Dockser ................................................................. 7

    B. Tong .................................................................... 11

    C. MacMillan ............................................................. 13

IV. THE CHALLENGED CLAIMS AND LEVEL OF SKILL IN THE ART ........................................................................ 14

V. CLAIM CONSTRUCTION .......................................................... 15

    A. "Low Precision High Dynamic Range (LPHDR) Execution Unit" ........................................................... 15

VI. THE CHALLENGED CLAIMS ARE VALID .......................................... 20

    A. Ground 1: Claims 1-2, 21-24, 26, and 28 Are Not Obvious Over Dockser ...................................................... 20

        1. Dockser Is Not a Low Precision High Dynamic Range (LPHDR) Execution Unit ............................................. 20

    B. Ground 2: Claims 1-2, 21-24, 26, 28, and 32-33 Are Not Obvious Over Dockser in View of Tong ............................... 24

        1. Dockser With Tong Does Not Disclose or Render Obvious any Challenged Claim ........................................ 24

        2. Petitioner's Claim that Tong Teaches Using only 5 Mantissa Bits Is Incorrect, which Means a Dockser and Tong Combination Lacks the Imprecision Required to Meet the '273 Patent's X/Y Imprecision Limitations ............ 24

        3. There Is No Motivation to Combine Dockser and Tong ....... 26

C.     Ground 3: Claims 1-26, 28, 36-61, and 63 Are Not Obvious Over Dockser in View of MacMillan.................................................26

    1.     Dockser's FPP is not an "LPHDR execution unit" ...............27

    2.     Dockser and MacMillan Fail to Disclose the "exceeds" Limitation.................................................................................27

       (a)     Dockser's FPP Is a Claim 3 EU Because It Is Adapted to Execute at Least the Operation of Multiplication on Floating Point Numbers That Are at Least 32 Bits Wide.................................................28

       (b)     Petitioner's Interpretation of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" Is Inconsistent with the Specification and Wrong.............30

       (c)     A POSA Would Not Combine Dockser with MacMillan.....................................................................34

    3.     Dockser/MacMillan Fails to Disclose or Render Obvious "wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit"...........................................................36

D.     Ground 4: Claims 1-26, 28, 32-61, 63, and 67-70 Are Not Obvious Over Dockser in View of Tong and MacMillan...............37

    1.     The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation...........................37

    2.     A POSA Would Not Combine Tong, Dockser, and MacMillan.................................................................................38

VII.     PETITIONER'S "ALTERNATIVE" ARGUMENT REGARDING CLAIMS 5-6, 8, 10-18, 35-70 FAILS.........................................................38

A.     A POSA Would Not Be Motivated to Combine Dockser, MacMillan, and Tong under Petitioner's "Alternative" Argument............................................................................................40

B.    Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of the Claims ........................................................................... 43

C.    POSA Would Not Have Recognized the Utility of Petitioner's "Alternative" Combination of Dockser, MacMillan, and Tong ...... 43

VIII.   OBJECTIVE INDICIA OF NON-OBVIOUSNESS SUPPORT THE VALIDITY OF THE CLAIMS ................................................... 46

A.    Legal Standard ....................................................................... 46

B.    Google's Initial Skepticism of the Invention Shows Non-Obviousness ............................................................................. 47

C.    Praise From Leaders in the Field Shows Non-Obviousness ............ 51

D.    The Invention Is Not Obvious Because It Yields Unexpected Results ................................................................................... 52

E.    Google's Copying of the Invention Shows Non-Obviousness ........ 56

F.    The Commercial Success of Google's TPUv2 and TPUv3 Shows Non-Obviousness .......................................................... 60

IX.   GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS ................................................... 61

A.    Claim 1 .................................................................................. 62

1.    "A device" ................................................................... 62

2.    "comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value" ............................... 63

3.    "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and" ............................................................. 65

4.  "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;" .......................... 65

B.  Claim 3, 7, 9 ..................................................................... 66

    1.  "The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least [ten/one hundred/five hundred] LPHDR execution units" ................. 66

C.  Claim 5, 8, 10 ................................................................... 68

    1.  The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide. ................................... 68

D.  Claims 11-17 ..................................................................... 69

E.  Claim 18 .......................................................................... 69

    1.  "The device of claim 8, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000." ..................... 69

F.  Claim 24 .......................................................................... 70

    1.  "The device of claim 1, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit ...... 70

G.  Claim 36 .......................................................................... 71

H.      Claims 38, 42, 44..................................................................................72

    1.      The device of claim 36, wherein the at least one first
LPHDR execution unit comprises at least ten LPHDR
execution units. ........................................................................72

I.      Claims 40, 43, 45..................................................................................72

    1.      The device of claim 36, wherein the number of LPHDR
execution units in the device exceeds by at least [ten/one
hundred/five hundred] the non-negative integer number
of execution units in the device adapted to execute at
least the operation of multiplication on floating point
numbers that are at least 32 bits wide. ....................................72

J.      Claims 46-53 ........................................................................................72

X.      CONCLUSION...........................................................................................72

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Int'l Trade Comm'n*,
  725 F.3d 1356 (Fed. Cir. 2013) ...........................................................46

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006) ....................................................34, 35

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
  776 F.2d 281 (Fed. Cir. 1985) ...........................................................47

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
  672 F.3d 1335 (Fed. Cir. 2012) .........................................................17

*Bicon v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) ...........................................................17

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  783 F.3d 1374 (Fed. Cir. 2015) ...................................................16, 17

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
  No. 2020-1289, 2021 WL 3085514 (Fed. Cir. July 22, 2021) ....................36, 42

*In re Giannelli*,
  739 F.3d 1375 (Fed. Cir. 2014) .........................................................31

*Harari v. Lee*,
  656 F.3d 1331 (Fed. Cir. 2011) .........................................................18

*Kao Corp. v. Unilever U.S., Inc.*,
  441 F.3d 963 (Fed. Cir. 2006) ...........................................................52

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) .........................................................46

*KJC Corp. v. Kinetics Concepts, Inc.*
  223 F.3d 1351 (Fed. Cir. 2000) .........................................................17

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    941 F.3d 1133 (Fed. Cir. 2019) ............................................................60

*In re Man Machine Interface Techs. LLC*,
    822 F.3d 1282 (Fed. Cir. 2016) ................................................29, 30, 31

*Mintz v. Dietz & Watson, Inc.*,
    679 F.3d 1372 (Fed. Cir. 2012) ....................................................46, 51

*Neptune Generics, LLC v. Eli Lilly & Co.*,
    921 F.3d 1372 (Fed. Cir. 2019) ....................................................47, 52

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
    981 F.3d 1015 (Fed. Cir. 2020) ............................................................16

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ............................................................52

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*
    711 F.3d 1348 (Fed. Cir. 2013) ............................................................60

*TiVo, Inc. v Echostar Commc'ns Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008) ............................................................18

*Trivascular, Inc. v. Samuels*,
    812 F.3d 1056 (Fed. Cir. 2016) ............................................................36

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) ...................................................*passim*

IPR2021-00179
PATENT NO. 8,407,273

**EXHIBIT LIST**

| Exhibit No. | Description |
| --- | --- |
| 2001 | Defendant Google LLC'S Preliminary Claim Construction Brief in *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551 (D. Mass.), dated Jan. 8. 2021 |
| 2002 | SEALED |
| 2003 | SEALED |
| 2004 | SEALED |
| 2005 | SEALED |
| 2006 | SEALED |
| 2007 | SEALED |
| 2008 | SEALED |
| 2009 | SEALED |
| 2010 | SEALED |
| 2011 | Dean, J. "The Deep Learning Revolution and Its Implications for Computer Architecture and Chip Design" |
| 2012 | Transcription of YouTube Video: Domain Specific Architectures for Deep Neural Networks: Three Generations of Tensor Processing Units (TPUS), *In the matter of Google LLC v. Singular Computing LLC*, dated June 23, 2021 |
| 2013 | SEALED |
| 2014 | SEALED |
| 2015 | Wang, S, *et al.*, BFLoat16: The Secret to High Performance on Cloud TPUs, dated Aug. 23, 2019 |
| 2016 | Jouppi, N, *et al.*, "A Domain-Specific Supercomputer for Training Deep Neural Networks" *Communications of the ACM*, Vol. 63, No. 7, July 2020 |
| 2017 | Elias, J. "Google's new TPU 3.0 will be critical to company's success in the post-search world, here is why" *PCMag India Computer and Product Reviews*, May 9, 2018 |
| 2018 | "Empowering Businesses with Google Cloud AI" *Cloud TPU* |
| 2019 | Patent Owner's Discovery Requests in IPR2021-00179, dated July 6, 2021 |
| 2020 | Patent Owner's Discovery Requests in IPR2021-00179, dated June 17, 2021 |
| 2021 | Plaintiff's Preliminary Patent-Related Disclosures in *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551 (D. Mass.), |

| Exhibit No. | Description |
|---|---|
|  | dated Sept. 4. 2020 |
| 2022 | Infringement Contentions Exs. A-C |
| 2023 | Email from E. Hunt to P. Lambrianakos et al., regarding Patent Owner's Discovery Requests, dated June 25, 2021 |
| 2024 | Default Protective Order and Standard Acknowledgement for Access to Protective Order Material in IPR2021-00155, -00165, and -00179, dated July 6, 2021 |
| 2025 | Transcript of Realtime Conference Call held on July 1, 2021, in IPR2021-00155, -00165, and -00179 |
| 2026 | SEALED |
| 2027 | SEALED |
| 2028 | SEALED |
| 2029 | SEALED |
| 2030 | SEALED |
| 2031 | SEALED |
| 2032 | SEALED |
| 2033 | SEALED |
| 2034 | "Google AI with Jeff Dean," Google Cloud Platform Podcast |
| 2035 | SEALED |
| 2036 | SEALED |
| 2037 | Dean, J. i, "Build and Train Machine Learning Models on our New Google Cloud TPUs" dated May 17, 2017 |
| 2038 | Stone, Z. "Google's Scalable Supercomputers for Machine Learning, Cloud TPU Pods, are now Publicly Available in Beta" dated May 7, 2019 |
| 2039 | SEALED |
| 2040 | Metz, C. "Google Rattles the Tech World with a New AI Chip for All" *WIRED,* May 17, 2017. |
| 2041 | Wang, S. *et al.*, "BFloat16: The Secret to High Performance on Cloud TPUs" dated Aug. 23, 2019 |
| 2042 | SEALED |
| 2043 | Deposition of Richard M. Goodin in IPR2021-00155, -00165, and 00179, dated July 30, 2021 |
| 2044 | CV of Sunil P. Khatri, Ph.D. |
| 2045 | Gorner, M. Google Presentation entitled "TPUs for Developers" |
| 2046 | Jouppi, N. *et al.*, "A Domain-Specific TPU Supercomputer for Training Deep Neural Networks" dated Oct. 27, 2020 |

IPR2021-00179
PATENT NO. 8,407,273

| Exhibit No. | Description |
|:---:|:---|
| 2047 | Google Research People: Jeffrey Dean |
| 2048 | XPany Team: Astro Teller |
| 2049 | Belletti, F. *et al.*, "Tensor Processing Units for Financial Monte Carlo" dated Jan. 27, 2020 |
| 2050 | SEALED |
| 2051 | Declaration of Sunil P. Khatri, Ph.D. in IPR2021-00179, dated Aug. 9, 2021 |
| 2052 | Declaration of Joseph Bates in IPR2021-00179, dated Aug. 9, 2021 |
| 2053 | Declaration of Richard M. Cowell in IPR2021-00179, dated Aug. 9, 2021 |

## I.    INTRODUCTION

The claims of the '273 Patent are directed to computer systems which achieve high parallelism and scalability by sacrificing precision.  In particular, claims 8, 10-17, and 43-53 of the '273 Patent are directed to architecture comprising at least 100 more low-precision, high dynamic range execution units (LPHDR execution units) than full-precision (32-bit or more) units.  By sacrificing precision, individual LPHDR execution units require fewer transistors and occupy less area on a microchip, which in turn allows a computer to have lots of them and, specifically in claims 8, 10-17, and 43-53, many more than full precision execution units.  This enables such systems to perform more computations per unit of resource (*e.g.*, transistor, area, volume).

At the time of filing, the prevailing view in the prior art was that many applications require high levels of precision and can only be performed by full-precision floating point execution units.  Dr. Joseph Bates, however, realized that the conventional wisdom was wrong: he understood that a computer with many LPHDR execution units—and comparatively few full-precision execution units—could perform just as well or better than the full-precision focused systems disclosed in the prior art, even in applications that were thought to require full precision.

Dr. Bates' counterintuitive insight is based on the fact that LPHDR execution units, by virtue of their low transistor count, take up much less space than high-precision ones.  Therefore, sacrificing full-precision capability (while maintaining high dynamic range) increases the number of arithmetic units that can fit on a single chip as Dr. Bates explains in the patent specification:

> Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. . . . [S]uch algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply . . . thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources.

Ex 1001, '273 Patent, 7:17-27.

None of the references cited by Google disclose Dr. Bates' fundamental insight about the tradeoff between precision and parallelism.  Instead, Petitioner's principal references disclose reduced precision only as a means of reducing power consumption.

In particular, the primary reference cited by Petitioner teaches execution units with full-precision circuitry that can be powered-down when it is not needed

and reactivated when it is needed.  The full-precision circuitry of these execution units occupies space on the chip, even when it is powered-down.

And more generally, none of the cited art teaches an execution unit that relies on LPHDR operations to make them smaller than conventional full precision execution units, so as to drive the parallelism and scale that characterizes the computing devices of the '273 Patent which have much larger numbers of LPHDR execution units than full-precision execution units.

Petitioner's failure to find invalidating prior art is no surprise.  Indeed, it is consistent with the overwhelming evidence of objective indicia presented herein— including skepticism, praise, commercial success, nexus, and outright theft of the claimed invention by Petitioner—which collectively confirms the validity of the challenged claims.

More specifically, as explained below, ███████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████

This skepticism was followed by praise from some of the leading minds in the field of computer science.  ████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████.

3

███████████████████████████████████████

████████████████████████████████████

██████████ Google copied Dr. Bates' patented architecture in building its

infringing TPUv2 and TPUv3 products, both of which generated billions of dollars

in revenue.  The nexus between this commercial success and the claimed invention

is demonstrated by Google's own press releases and academic publications in

which Google touted the low-precision multiplication units of its TPU products

and their reliance on the brain-float 16 (bfloat16) number format to achieve

increased parallelism and scale as the chief driver of their success in the

marketplace.  At the same time, ████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████

## II.    THE '273 PATENT

The '273 Patent is entitled "Processing with Compact Arithmetic Processing

Element" and issued on March 26, 2013, Ex. 1001.  The '273 Patent claims

priority, through its parent application, to U.S. Provisional Patent Application No.

61/218,691, filed on Jun. 19, 2009.

Dr. Bates recognized that even though then-modern conventional

microprocessors contained hundreds of millions of transistors, they could perform

only a handful of operations per clock cycle. '273 Patent, 1:52-60.  Dr. Bates

explained that a large portion of this inefficiency comes from using transistor-

intensive full-precision arithmetic units:

> As described above, today's CPU chips make inefficient use of their
> transistors . . . they deliver great precision, performing exact
> arithmetic . . . standardized arithmetic with 32 and 64 bit floating
> point numbers. Many applications need this kind of precision. As a
> result, conventional CPUs typically are designed to provide such
> precision, using on the order of a million transistors to implement the
> arithmetic operations.

*Id.* at 3:7-3:22.  Ex. 2051 ("Khatri"), ¶ 39.

However, Dr. Bates realized that such full-precision, inefficient components

were not necessary for all applications, including many valuable ones:

> There are many economically important applications, however, which
> are not especially sensitive to precision and that would greatly benefit,
> in the form of application performance per transistor, from the ability
> to draw upon a far greater fraction of the computing power inherent in
> those million transistors. Current architectures for general purpose
> computing fail to deliver this power.

'273 Patent, 3:23-29.  Khatri, ¶ 40.

The '273 Patent is thus directed away from prior art computers based on

full-precision execution units that take up space and are wasteful of transistors. *Id.*,

¶ 41.

5

As Dr. Bates further explains in the specification, "[b]ecause LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other." '273 Patent, 6:51-55.  As a result, "embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (*e.g.*, transistors or volume) compared with traditional architectures." *Id.*, 8:3-7; Khatri ¶ 41.

By using a "very large number" of LPHDR execution units in parallel, computer systems are able to achieve significantly better performance than prior art systems.  Because each LPHDR execution unit requires fewer resources (*e.g.*, fewer transistors, less physical volume) than a full-precision execution unit, "there is a large amount of arithmetic computational power per unit of resource.  This enables larger problems to be solved with a given amount of resource than does traditional computer designs." '273 Patent, 23:47-55.  In particular, the claimed systems "might perform tens of thousand of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU.  *Id.*, 23:57-60; Khatri, ¶ 42.

In addition, the '273 Patent also teaches computer systems in which the number of LPHDR execution units exceeds the number of full precision execution units:

> For certain devices . . . according [to] the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits).

'273 Patent, 27:63-28:3; Khatri ¶ 43.

The increased level of compute parallelism and scale in such computer systems is necessarily achieved at the cost of precision—the vast majority of the high dynamic range floating-point operations performed by the device must be performed at low precision. Dr. Bates was the first to understand that sacrificing precision for increased parallelism/scale results in significant performance gains per unit of resource over the prior art. *Id.* ¶ 44.

## III.   OVERVIEW OF THE CITED REFERENCES

### A.   Dockser

U.S. Pat. Publ. 2007/0203967 ("Dockser") discloses the use of a full-precision floating point processor (FPP) that can selectably reduce precision in order to reduce its power draw. *See, e.g.*, Ex. 1007, Dockser ¶ [0026]; Khatri, ¶ 45.

Dockser's teaching of an execution unit that is always capable of operating in both full-precision mode (its default) and reduced-precision modes is motivated by the prevalent view in the prior art that while low-precision operation might be acceptable for "certain applications," for a general-purpose processor, full-precision capability is "needed." Dockser ¶¶ [0003, 0018], claims 1, 8, 15, 20; Khatri, ¶ 46.

The components of Dockser's FPP is shown in Figure 1, reproduced below:



**Dockser, Fig. 1 (Annotated)**

Dockser's FPP has a register file (FPR 110, shaded in **red**) comprising

registers (red boxes) that hold IEEE 32-bit full-precision values.  It also includes a

controller (CTL 130, shaded in **green**) with a control register (**green** box) that can

store "subprecision select bits" corresponding to the desired level of precision.

Dockser, Fig. 1; *see also id.*, ¶¶ [0017-18]; Khatri, ¶ 47.  The FPP performs

arithmetic operations (*e.g.*, including addition and multiplication) at full-precision – or at the desired sub-precision using values stored in the register file as operands. *See* Dockser, ¶ [0019]; Khatri, ¶ 47.

If no sub-precision is selected, Dockser's FPP performs arithmetic at "maximum precision" (*i.e.*, 32-bit IEEE full-precision). *See* Dockser, claims 1, 8, 15, 20; *see also id.*, ¶ [0018] ("the floating-point controller 130 *may* be used to select the sub-precision of the floating-point operations . . . .")); Khatri, ¶ 48. Otherwise, the operation is performed at a reduced precision. *Id.* In reduced-precision modes, Dockser's FPP reduces the mantissa size by powering-down some of the cells in the register file that store the mantissa, and also powers down parts of the arithmetic logic circuits (contained, *e.g.*, within the multiplier, shaded in **blue** above) that are not needed for the selected subprecision. Dockser, ¶¶ [0026-27]; Khatri, ¶ 48.

Unlike the '273 Patent, Dockser does not teach systems that include multiple arithmetic units operating in parallel. Ex. 2043, Goodin Dep. 70:13-21; Khatri, ¶ 49. Dockser discloses a single floating-point execution unit in isolation. *Id.* The absence of a parallel teaching is not surprising, given that Dockser's selectable low-precision unit is designed to conserve power in "battery operated devices where power comes at a premium, such as wireless telephones, personal digital

assistants (PDA), laptops, game consoles, pagers, and cameras." Dockser, ¶ [0003]; Khatri, ¶ 49.

Because Dockser's unit is capable of full-precision, it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Goodin Dep. 71:6-12; 43:21-45:9. Khatri, ¶¶ 50-51. Indeed, because Dockser's execution unit uses conventional arithmetic units and includes additional control circuits for selecting reduced-precision modes, it is likely *larger* than a conventional full-precision execution unit, making it unsuitable for scaling the compute power of conventional full-precision parallel processing arrays. *Id.*

### B.    Tong

"Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic" by Jonathan Ying Fai Tong *et al.* Ex. 1008 ("Tong") teaches that using lower-precision arithmetic can reduce power consumption. *See* Tong, 280. Tong is based on the commonly held belief that some applications can only be performed using full-precision arithmetic: "[e]ven though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears inevitable that some fraction of our operands will require full IEEE-standard precision." *Id.*; Khatri, ¶ 52.

Importantly, like Dockser, Tong is focused on reducing power consumption, and does not teach parallel processing systems that include multiple arithmetic units that operate simultaneously, let alone systems having much larger numbers of low-precision units than full-precision units. Khatri, ¶ 53. Each low-precision unit disclosed by Tong is either as large as a full-precision unit or paired with a full precision unit on a 1:1 basis (Tong, 282). Khatri, ¶ 53.

For example, Tong teaches "simply including both full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit." Tong, 282; Khatri, ¶ 54. In this approach, each low-precision unit is paired with a full-precision unit in a 1:1 ratio, requiring more physical space than a full-precision unit alone. *Id.* Indeed, this approach is presented as an option in situations where silicon real-estate is not at a premium. *See* Tong, 282 ("Given the decreasing cost of silicon area . . . ."); Khatri, ¶ 54.

In another example, Tong also teaches a "digit-serial" multiplication circuit that, using control signals, is operable to perform a reduced-precision operation in a single clock cycle. *Id.*, ¶ 55. The result of this reduced-precision operation, in which an 8-bit operand is multiplied with a 24-bit operand, can be combined with other reduced-precision results over multiple clock cycles in a process called "digit-serial multiplication," yielding a full-precision result. *Id.* When performing low-precision operations, Tong's digit-serial multiplier does consume less power

than a traditional full-precision unit. *Id.* However, it occupies *more* physical space than a full-precision multiplier, because it "require[s] extra random logic for control of the multiple passes through the digit serial structure." Tong, 281; *see also* 280 ("The lower precision digit-serial design is slightly larger [than the full-precision execution unit]"), Table V (showing that Tong's digit-serial multiplier occupies ~3% more area than a conventional full-precision multiplier); Khatri, ¶ 55. Therefore, like Dockser's FPP, the execution units taught by Tong are capable of reduced-precision operation, but they are *larger* than a conventional full-precision execution unit, making them unsuitable for increasing the parallelism and compute scale of arrays of full-precision units. *Id.*

As with Dockser, Tong is focused on power-savings, does not even mention increasing compute scale and parallelism, and certainly does not teach a computer comprised of a larger (let alone much larger) number of low-precision units than full-precision units. *Id.*, ¶ 56.

## C.    MacMillan

U.S. Patent No. 5,689,677 ("MacMillan"), Ex. 1009, is directed to a computer system that includes a host processor and "a plurality of processing elements." Macmillan, 12:39. MacMillan does not describe the capabilities of each "processing element" (PE) in detail, noting only briefly that "[i]nteger and

floating point accelerators could be included in each PE." *Id.*, 12:55-56; Khatri,

¶ 57.

Regarding arithmetic precision/imprecision, MacMillan is silent. *Id.*, ¶ 58.

It simply teaches that each PE can "perform atomic operations on data values up to

*32 bits wide*." MacMillan, 7:8-9[1]; Khatri, ¶ 58.  Unlike Dockser and Tong,

MacMillan is not focused on minimizing power consumption, and is not

specifically tailored for use in portable or mobile devices.  *Id.*  MacMillan's only

reference to power consumption relates to heat dissipation inside the "cabinet" of a

workstation.  *See* MacMillan, 3:4-6; Khatri, ¶ 58.

## IV.   THE CHALLENGED CLAIMS AND LEVEL OF SKILL IN THE ART

Petitioner challenges claims 1-8, 16, and 33 (the "Challenged Claims").  Pet.

at 1.

A person of ordinary skill in the art (POSA) would be a person with a

Bachelor's degree in Computer Science, Electrical Engineering, or Applied

Mathematics, with 2 years of academic or industry experience in computer

architecture.  Khatri, ¶¶ 36-37.  This is the same as Petitioner's proposed level of

skill, except that Petitioner's level included any number of years of experience

more than two.  Pet. at 7-8.

---

[1] All emphasis is added unless otherwise indicated.

14

## V.   CLAIM CONSTRUCTION

### A.   "Low Precision High Dynamic Range (LPHDR) Execution Unit"

| Singular's Construction | Google's Construction |
|---|---|
| "an execution unit that executes arithmetic operations only at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below" | No construction necessary |

The Board should construe the term "low precision high dynamic range (LPHDR) execution unit" as "an execution unit that executes arithmetic operations only at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below." This construction captures the plain meaning of the term as read in light of the specification.  Khatri, ¶ 59.

In its Institution Decision, the Board stated that "[t]he only limitations on the execution unit recited in the claim are that the execution unit be 'low precision,' 'high dynamic range,' and 'adapted to execute a first operation' meeting certain

criteria specified in the imprecision limitation (*i.e.*, a minimum relative error Y for a minimum fraction X of possible valid inputs in a specified dynamic range)." Paper No. 16, 21-22.  The Board further accepted, at the institution stage, Petitioner's argument that "the claim does not recite any structural characteristics of the execution unit and does not include any negative limitation precluding the execution unit from performing other types of operations."  *Id.* at 22.

As the Board noted however, the execution unit *is* limited to be "low precision" and "high dynamic range."  *Id.* at 21.  This comports with the plain and ordinary meaning of the term and necessarily excludes full-precision or mixed full and low precision units.  Khatri, ¶ 60.  To do otherwise would impermissibly read out "low precision high dynamic range" and render the limitation meaningless. *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022-23 (Fed. Cir. 2020) (construction of "low level current" was required to give meaning to "low" and noting "the word 'low' in the claim phrase 'low level current' operates to limit the upper boundary of the current level").  The remaining limitations of the claims ("wherein the dynamic range . . ." and "for at least X=5% . . .") properly explain the exact parameters of the low precision and high dynamic range, which do not allow for the execution unit to have full-precision (or high dynamic range) capability.  *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed.

Cir. 2015) ("When a 'word of degree' is used, the court must determine whether the patent provides 'some standard for measuring that degree.'"); Khatri, ¶ 60.

Indeed, Petitioner's interpretation that any execution unit that "meets each claim's recited error amount" is a "low precision" execution unit would impermissibly read the term "low precision" out of the claims entirely. *Id.*, ¶ 61. That is, under Google's construction or interpretation, the term "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute" would have exactly the same scope as "at least one execution unit adapted to execute." *Id.* The Board should decline to impermissibly broaden the claims in that fashion. *E.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (reversing construction of "rearward free end" that read "free" out of the limitation); *Bicon v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) (rejecting construction that rendered claim terms meaningless and noting that "claims are interpreted with an eye toward giving effect to all terms in the claim").

And though Patent Owner agrees with the Board's observation based on the preliminary record that a claim's recitation of an "execution unit adapted to execute a first operation" would normally not preclude that execution unit from performing other types of operations (*see* Paper No. 16 at 22, citing to *KJC Corp. v. Kinetics Concepts, Inc.* 223 F.3d 1351, 1356 (Fed. Cir. 2000)), the rule does not

apply when the specification teaches otherwise, as is the situation here. *See TiVo, Inc. v Echostar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008) ("[T]he question whether 'a' or 'an' is treated as singular or plural depends heavily on the context of its use."); *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) (There is no "hard and fast rule that 'a' always means one or more than one.  Instead, we read the limitation in light of the claim and specification to discern its meaning." Here, "[t]he plain language of the claim clearly indicates that only a single bit line is used when accessing a number of cells").

The specification supports this construction in explaining that the "LPHDR execution units" of the '273 Patent are based on a "fundamentally different approach" from the units that incorporate full-precision capabilities as taught in the prior art.  '273 Patent, 5:63-6:2; Khatri, ¶ 62.  Unlike the prior art full-precision units, the claimed LPHDR execution units are smaller and have fewer transistors:

> "For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing *using a small amount of resources* (*e.g.*, transistors or volume) ***compared with traditional architectures***."

'273 Patent, 8:3-7; Khatri, ¶ 62.

18

LPHDR execution units utilize less chip real-estate than conventional

execution units _precisely because_ they do not include full-precision arithmetic

circuits:

> "One variety of LPHDR arithmetic represents values from one
> millionth up to one million with a precision of about 0.1% . . . . One
> example of an alternative embodiment is to use a logarithmic
> representation of the values . . . _As a result_, _the area_ of the arithmetic
> circuits _remains **relatively small**_ and a _greater number_ of computing
> elements _can be fit into a given area_ of silicon . . . which gives it an
> advantage for those computations able to be expressed in the _LPHDR_
> framework."

'273 Patent, 6:3-22; Khatri, ¶ 63.

The small size and low transistor count of each individual LPHDR execution

unit is what allows a much larger number of LPHDR execution units to operate in

parallel on a single chip:

> Because _LPHDR processing elements are relatively small,_ a single
> processor or other device may include a very large number of LPHDR
> processing elements, adapted to operate in parallel with each other,
> and therefore may constitute a massively parallel LPHDR processor
> or other device.

'273 Patent, 6:51-55; Khatri, ¶ 64.  The specification contrasts the small

LPHDR units with units, like those inside GPUs, that can operate in both

high and low precision.  '273 Patent, 5:31-40; Khatri, ¶ 64.

As the specification explicitly states, the fact that "LPHDR execution units" are smaller than full-precision units is not limited to a preferred embodiment, but is an essential aspect of the invention as a whole:

> The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and _in any kind of machine that uses **compact** arithmetic processing elements_ to perform large amounts of computation using a small amount of resources (like transistors or volume).

'273 Patent, 24:19-28; _see also id_, 25:34-40; Title ("Processing with _Compact_ Arithmetic Processing Element"); Khatri, ¶ 65.

## VI.   THE CHALLENGED CLAIMS ARE VALID

### A.   Ground 1: Claims 1-2, 21-24, 26, and 28 Are Not Obvious Over Dockser

Dockser does not render obvious any challenged claim of the '273 Patent because each claim of the '273 Patent requires a **_low precision_** high dynamic range LPHDR execution unit.  Khatri, ¶ 65.  Dockser neither discloses nor renders obvious this limitation.  _Id._

#### 1.   Dockser Is Not a Low Precision High Dynamic Range (LPHDR) Execution Unit

As discussed above, the proper construction of "low precision high dynamic range (LPHDR) execution unit" is "an execution unit that executes arithmetic operations only at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below." *Id.*, ¶ 67.  Even if the Board chooses to apply the plain meaning of "LPHDR execution unit," a POSA would understand that an LPHDR execution unit is necessarily "low precision" and not capable of high or full precision. *Id.*, ¶ 68.

Dockser, by contrast, is capable of full-precision operation, and is therefore relatively large and "wasteful of transistors" (*See supra* citing '273 Patent 5:31-40); Khatri, ¶ 69.  Dockser's 32-bit FPP includes all of the circuitry needed for full precision arithmetic on data in IEEE 32-bit format, and also has additional circuitry and transistors, such as the controller and associated logic, to allow selection of sub-precisions.  Dockser, ¶¶ [0019]-[0020]; Khatri, ¶ 69; Goodin Dep. 43:21-45:9. This additional circuitry allows the FPP to perform operations, such as multiplication with selectively reduced precision, while retaining its ability to perform those same operations with full precision. *See* Dockser, ¶¶ [0026], [0028] (referring to "the full precision mode"); Khatri, ¶ 69; Goodin Dep. 37:10-17. Indeed, Dockser explicitly anticipates scenarios in which this subprecision capability will *not* be used, because for certain applications "a greater precision is

needed."  Dockser, ¶ [0003]; Khatri, ¶ 69.  Dockser does not disclose any

embodiments of an execution unit without either full-precision or the additional

circuitry / transistors for selecting a subprecision, which makes it unsuitable for

driving increases in compute scale or parallelism relative to conventional full-

precision execution units.  *Id.*; Goodin Dep. 38:3-8.

Petitioner argues that Dockser's FPP "is 'low precision' as claimed because

'the precision' of operations is 'reduced' (*e.g.*, [0014]), and because it operates

with the minimum imprecision in [1B2]."  Pet., 13-14 (citing Goodin, ¶¶ 208-209).

These arguments, which focus only on one particular low-precision mode of the

Dockser FPP and ignore the other modes, miss the key point, however, which is

that the FPP's full-precision mode makes it too big and too wasteful of transistors

to qualify as an LPHDR execution unit.  Khatri, ¶ 71.

It is beyond dispute that Dockser has a full precision mode.  Khatri, ¶¶ 45-

51; Paper No. 14, 2 ("Retaining the prior-art capability for that one 'full' operation

does not detract from the purpose of Dockser's design."); Goodin Dep. 36:16-21.

Indeed, Dockser's entire stated purpose is to provide a processor that can perform

operations at various precisions, from full precision to lower precision.  Dockser, ¶

[0003] ("Accordingly, there is a need in the art for a floating-point processor in

which the reduced precision, or subprecision, of the floating-point format is

selectable."); Dockser, ¶ [0014], [0028] ("The floating-point addition operation in

the ***full precision mode*** is performed through a succession of stages . . . ."); Khatri,

¶ 70.  A POSA, bearing in mind the foregoing excerpts, including Dockser's focus

on power-saving and maintaining full precision capability, would thus understand

that Dockser is a full-precision 32-bit FPP, capable of operating at lower precisions

to save power, that ultimately is too big and too wasteful of transistors to qualify as

an LPHDR execution unit.  Khatri, ¶ 70; Goodin Dep. 37:10-38:8.

This POSA understanding would be particularly informed by the '273

Patent's description of a variable precision GPU as background art.  Khatri, ¶ 72.

Specifically, the specification characterizes a GPU (conventionally, an array of

execution units) that supports both half-precision ("16 bit floating point") for

"those applications that want it," and full-precision ("32 bit floating point")

operations "because they are believed to be needed for traditional graphics

applications," as "*GPUs [that] devote substantial resources to 32 . . . bit arithmetic*

*and are wasteful of transistors.*" '273 Patent at 5:31-40; Khatri, ¶ 72.  Furthermore,

Petitioner does not argue or show that it would have been obvious to modify

Dockser's full-precision FPP to become such an LPHDR execution unit.  Khatri, ¶

72.

Accordingly, since the Petition fails to show that Dockser discloses an

LPHDR execution unit, and since the Petition sets forth no reason that a POSA

would modify Dockser to be an LPHDR execution unit, Petitioner has failed to

show that Dockser renders obvious any claims of the '273 Patent.  Khatri, ¶ 73.

**B.      Ground 2: Claims 1-2, 21-24, 26, 28, and 32-33 Are Not
         Obvious Over Dockser in View of Tong**

**1.   Dockser With Tong Does Not Disclose or Render
        Obvious any Challenged Claim**

Petitioner alleges Tong would have motivated a POSA to configure Dockser

to operate with 5 mantissa bits of precision.  Pet., 41 ("Tong's teachings and

empirical tests would have motivated a POSA to configure ***Dockser's FPP*** to

operate at the precision levels Tong teaches for particular applications.").

Petitioner does not argue that Tong discloses or renders obvious an LPHDR

execution unit.  *Id.*, 41-45.  Since Dockser does not disclose an LPHDR execution

unit, and Tong does not remedy that deficiency, the combination of Dockser and

Tong (even if it could be or would be used at 5 bits of mantissa) does not disclose

or render obvious any Challenged Claim.  Khatri, ¶¶ 74-76.

**2.   Petitioner's Claim that Tong Teaches Using only 5
        Mantissa Bits Is Incorrect, which Means a Dockser
        and Tong Combination Lacks the Imprecision
        Required to Meet the '273 Patent's X/Y
        Imprecision Limitations**

As an initial matter, Tong teaches that at least 11 mantissa bits are required

for consistent performance, even for "programs dealing with human interfaces

[that] process sensory data with intrinsically low resolutions."  Tong, 278 (noting

no "noticeable degradation in accuracy when the mantissa bitwidth is reduced from

23 to 11 bits"); Khatri, ¶ 77.  Petitioner makes no effort to show that arithmetic

with the "required" 11-bit mantissa is an LPHDR operation and meets the X/Y

limitations of the claims.

As for Tong's alleged teaching of using a 5-bit mantissa, Tong's

experimental results show that using fewer than 11 mantissa bits unacceptably

reduces accuracy for the benchmark applications *that were specifically selected*

(from a category of programs) for their high tolerance for imprecision (Khatri,

¶ 78):



Tong, Fig. 6 (Annotated)

These experimental results are shown above, with color annotations

denoting the precision levels suitable for general-purpose operation (**green**), those

at which a significant percentage of applications begin to produce unacceptable

results (**yellow**), and finally, levels of precision that are unsuitable for most testing benchmarks (**red**).  Khatri, ¶ 79.

### 3. There Is No Motivation to Combine Dockser and Tong

Google fails to identify any non-hindsight-based motivation to combine Dockser and Tong.  *See* Pet. at 41-45.  Google offers no differences between Dockser and the Challenged Claims that would have motivated a POSA to examine any second reference.  Moreover, since Dockser and Tong have overlapping functionality, Tong does not disclose any extra capability that would have motivated a POSA to use it with Dockser.  Khatri, ¶¶ 81-82.

Petitioner conclusorily states that Tong's teaching—that 5 mantissa bits is sufficient for some applications—would motivate a POSA to configure Dockser to use 5 bits.  Pet., 41-43.  But there is no evidence to show that a POSA would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples.  Instead, Petitioner relies on hindsight to choose 5 bits for no purpose other than to meet the claim limitations.

### C. Ground 3: Claims 1-26, 28, 36-61, and 63 Are Not Obvious Over Dockser in View of MacMillan

Petitioner argues that a POSA would combine Dockser with MacMillan by using Dockser's FPP as a "floating point accelerator" within each of MacMillan's PEs.  Pet., 47-48.

### 1. Dockser's FPP is not an "LPHDR execution unit"

As discussed above, Dockser's FPP is not a "low precision high dynamic range (LPHDR) execution unit," as recited in all challenged independent claims under Ground 3, because it does not "execute arithmetic operations "*only* at low precision and with high dynamic range."  Khatri, ¶ 83.  Petitioner does not argue that MacMillan remedies this deficiency.

### 2. Dockser and MacMillan Fail to Disclose the "exceeds" Limitation

Even if the teachings of Dockser and MacMillan were combined to produce a device with, for example, 256 Dockser units operating in parallel, such a device would fail to meet the "exceeds" limitation of claims 8, 10-17, 35, 36, 40, and 43-53.  Khatri, ¶ 84.

The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds" by various amounts "the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2]  *Id.*, ¶ 85.  As shown below, Dockser's FPP is adapted to execute at least the operation of

---

[2] For clarity, Patent Owner refers to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "full-precision multiplication execution units."

multiplication on floating point numbers that are at least 32 bits wide. *Id.*

Therefore, even if Dockser's FPP were an LPHDR execution unit (which it is not, under the proper proposed construction of that term) the Dockser/MacMillan combination cannot meet the "exceeds" limitation, because those same "Dockser LPHDR execution units" would also be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," meaning that the number of LPHDR execution units will never exceed the number of full-precision multiplication execution units. *Id.*, ¶ 86.

> **(a)      *Dockser's FPP Is a Claim 3 EU Because It Is Adapted to Execute at Least the Operation of Multiplication on Floating Point Numbers That Are at Least 32 Bits Wide***

There is no dispute that Dockser is an execution unit. Pet., 12. And there can be no reasonable dispute that Dockser is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide under the plain meaning of the term.[3]  Goodin Dep. 23:17-22; Khatri ¶¶ 90-91.

---

[3] Petitioner and Patent Owner agree that "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" means that the execution unit performs multiplication in "traditional"—*i.e.*, full—precision. Pet., 50.

Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format.  *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format.")  Khatri, ¶ 92.  Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions."  Dockser, ¶ [0019]; Khatri, ¶ 92.  These points are not in dispute; Petitioner and its expert both admitted as much.  Reply at 2; Goodin Dep. at 36:16-21; 38:18-39:15.

Nothing more is required for a Dockser FPP to be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  *See In re Man Machine Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) ("[T]he phrase 'adapted to' generally means 'made to,' 'designed to,' or 'configured to,' though it can also be used more broadly to mean 'capable of' or 'suitable for.'"); Khatri, ¶ 92.

Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would still fail to satisfy the "exceeds" limitation.  Khatri, ¶ 93.  In one example, the Dockser/MacMillan device would have 256 LPHDR execution units (counting each Dockser FPP as an "LPHDR execution unit").  However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on

floating point numbers that are at least 32 bits wide," the Dockser/MacMillan

device would therefore also have <u>at least</u> 256 execution units "adapted to execute

at least the operation of multiplication on floating point numbers that are at least 32

bits wide." *Id.* As a result, the Dockser/MacMillan would not meet the "exceeds

limitation." *Id.*

> **(b) *Petitioner's Interpretation of "adapted to
> execute at least the operation of multiplication
> on floating point numbers that are at least 32
> bits wide" Is Inconsistent with the Specification
> and Wrong***

Petitioner attempts to put Dockser's FPP outside of the "exceeds" limitation

by arguing that units are full-precision multiplication execution units ***only if*** they

are "'traditional precision' execution units that do not 'sometimes' produce results

different from the correct traditional-precision result." Pet., 50. The Board

preliminarily accepted this argument.

Petitioner's implicit construction of "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

is inconsistent with the plain and ordinary meaning of the claim and at odds with

the specification. Khatri, ¶¶ 94-95. The Board should thus reject it.

A POSA would understand this term to include all units in the device that are designed to perform "multiplication on floating point numbers that are at least 32 bits wide," even if those units can perform other operations as well.[4]  *Id.*, ¶ 95.

First, Petitioner's interpretation directly contradicts the claim language itself which encompasses every execution unit adapted to perform "*at least*" the operation of 32-bit multiplication.  Khatri, ¶ 96.  Petitioner not only ignores this inclusive language, but also proposes a construction that would explicitly *exclude* units adapted to perform additional operations.  *Id.*

Second, Petitioner's interpretation contradicts the teachings of the specification.  *Id.*, ¶ 97.  For example, while the specification does not disclose an

---

[4] While the term at issue here includes the phrase "adapted to," Patent Owner's construction does not depend on any particular construction of this term. Depending on context, "adapted to" can be construed broadly (to mean "capable of") or narrowly (to mean "designed to").  *See In re Giannelli,* 739 F.3d 1375, 1379 (Fed. Cir. 2014); *see also In re Man Machine Interface Techs. LLC*, 822 F.3d at 1286 (citations omitted).  In this situation, both of these constructions boil down to the same thing: if a unit is "capable of" performing 32-bit multiplication, then it is "designed to" perform 32-bit multiplication—the ability to perform full-precision multiplication is not something that happens by accident.

execution unit that can be both a full-precision multiplication execution unit and an LPHDR execution unit, it *does* disclose an execution unit that can be both a full-precision multiplication execution unit and *a* unit (which is not an LPHDR execution unit, as explained below) that 'sometimes' produces results different from the correct traditional-precision result:

> "When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point . . . That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, *existing GPUs devote substantial resources to 32 . . . bit arithmetic and are wasteful of transistors* . . . ."

'273 Patent, 5:31-40; Khatri, ¶ 97.

A POSA would understand that the "graphics processor" described in the passage above includes multiple execution units operating in parallel, each of which can be configured to perform both full-precision ("32 bit floating point") and half-precision ("16 bit floating point") operations.  Khatri, ¶ 98.  Such execution units are *both* "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" *and* "capable of performing *"*operations that 'sometimes' produce results different from the correct traditional-precision result" (*i.e.*, half-precision operations that produce results in

the "16 bit floating point" format often referred to as "fp16," which is not to be

confused with the earlier-mentioned bfloat16/bf16 (*brain* float 16) format used by

Google's products). *Id.*

As the passage explains, these execution units are "wasteful of transistors"

because, like the execution units of Dockser and Tong, they retain the *capability* of

performing 32-bit multiplication, even if they can be configured to "sometimes"

operate at lower precisions. *Id.*, ¶ 99. A POSA would understand that such

conventional execution units having full-precision *capability* (whether or not they

execute other precision operations) are precisely what the "adapted to execute at

least the operation of multiplication on floating point numbers that are at least 32

bits wide" limitation is intended to capture, and more importantly, precisely what

distinguishes these conventional execution units from "LPHDR execution units"

that perform *only* low-precision arithmetic operations (and thus use "a small

amount of resources"). '273 Patent, 8:3-7; Khatri, ¶ 99.

More generally, the specification describes full-precision multiplication

execution units only by reference to their "high dynamic range arithmetic of

traditional precision." *See* '273 Patent at 28:14-19; *see also id.* at 27:63-28:52;

Khatri, ¶ 100. Nowhere does the specification ever preclude a full-precision

multiplication execution unit from being able to produce incorrect results. *Id.*

Petitioner imports that requirement from a completely different section of the

patent, taken completely out of context. *See* Pet., 50 (citing '273 Patent, 26:50-60); Khatri, ¶ 100. That section uses "sometimes" to describes the imprecision limitation of an LPHDR execution unit, as expressed in the X=5% limitation of the Challenged Claims. That section says nothing about full-precision multiplication execution units. *See id.*; Khatri, ¶ 100.

Petitioner's argument tacitly hinges on the idea that if a component is an LPHDR execution unit (*i.e.*, the Dockser FPP as construed by Petitioner, not as construed by Patent Owner), it cannot also be a full-precision multiplication execution unit. Pet., 50. That is, Petitioner tacitly argues that one device—the Dockser FPP—cannot meet two limitations in a claim. But the law is clear that the same structure can meet two limitations. *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different *meanings,* not that they necessarily refer to two different *structures.*") (emphasis in original). Therefore, even if the Dockser FPP were an "LPHDR execution unit" (which it is not), it would *still* be a full-precision multiplication execution unit for the reasons explained above.

### (c)   *A POSA Would Not Combine Dockser with MacMillan*

Even if the combination of Dockser and MacMillan had all the elements of the Challenged Claims – which it does not, for the reasons explained above – a

POSA would not make that combination because it would not be operable for its intended purpose.  Khatri, ¶ 101.

Dockser is focused on the objective of reducing power consumption and is not in any way concerned with the objective of achieving high compute scale, while MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption (indeed, MacMillan's only reference to power consumption relates to heat dissipation inside the "cabinet" of a workstation).  *See* MacMillan, 3:4-6; Khatri, ¶ 102.

Incorporating Dockser's FPPs into MacMillan would also defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at "lower system cost."  *See* MacMillan, 5:58-59 ("The invention of this shared memory results in lower system cost . . . .");  Khatri, ¶ 103.  As explained above, Dockser's FPPs are even _larger_ than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes.  *Id.*; Goodin Dep. 70:6-12 (explaining that Dockser does not reduce space compared to conventional units), 43:21-45:9 (additional circuitry required to reduce precision).  As a result, replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit.  Khatri, ¶ 104.  A POSA would not be motivated to destroy the objectives of the prior art.

IPR2021-00179
PATENT NO. 8,407,273

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016); *Chemours Co.*

*FC, LLC v. Daikin Indus., Ltd.*, No. 2020-1289, 2021 WL 3085514, at *4-*5 (Fed.

Cir. July 22, 2021).

> ### 3. Dockser/MacMillan Fails to Disclose or Render Obvious "wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit"

Claims 24  and 59 require "that "the device further comprises a digital

processor adapted to control the operation of the at least one first LPHDR

execution unit."  Petitioner identifies MacMillan's "Host CPU" as the "digital

processor."  Pet., 55; Khatri, ¶ 87.

However, MacMillan makes clear that the SIMD Controller, not the Host

CPU, controls the operation of the PEs.  MacMillan, 13:35-36 ("Since the PEs

operate under the control of the SIMD Controller . . . ."); 8:1-10 (explaining that

SIMD Controller "contains the program counter used to step through the list of

instructions that may include instructions to be executed by the PEs"); 10:65-11:5

("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Khatri,

¶ 88.  Indeed, while the PEs are executing, the SIMD Controller takes control of

the host bus; thus there is no way for the Host CPU to control (or even

communicate with) the PEs.  MacMillan, 10:53-11:5; Goodin Dep. 126:3-129:6;

142:14-143:21; Khatri, ¶ 88.  Not only is the Host CPU not disclosed as controlling

the PEs, it is merely optional.  Goodin Dep., 116:6-18; Khatri, ¶ 88.

Petitioner's expert, Mr. Goodin, agreed that the SIMD Controller controls the operation of the PEs.

> Q. And MacMillan says that the processor elements are controlled by the SIMD controller?
> A. Yes, that's correct, that the processing elements are controlled by the SIMD controller 252.

Goodin Dep., 124:18-22.

Since Petitioner has provided no other argument with respect to the "digital processor" limitation as recited in claims 24 and 59, Petitioner has failed to show those claims are obvious over Dockser and MacMillan. *See* Pet., 55. Khatri, ¶ 89.

**D.     Ground 4: Claims 1-26, 28, 32-61, 63, and 67-70 Are Not Obvious Over Dockser in View of Tong and MacMillan**

As discussed above with respect to Grounds 2 and 3, the combination of Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR execution unit.  Similarly, as set forth with respect to Ground 3, the combination does not disclose or render obvious the "at least one first computing device" limitation.  Finally, as set forth with respect to Ground 2, Tong does not teach using only 5 bits of mantissa.  Petitioner sets forth no further argument or evidence with respect to any of these limitations.

**1.    The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation**

Even under Petitioner's construction of "LPHDR execution unit," the combination of Dockser, MacMillan, and Tong would still fail to satisfy the

"exceeds" limitation.  As explained above, each Dockser FPP, even when operating at 5-bit precision, is an "execution unit[] adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  Thus, even under Petitioner's construction, a device with 256 (or any number) Dockser FPPs operating at 5-bit precision would have *at least* as many full-precision units as "LPHDR execution units."  Khatri, ¶¶ 105-06.

## 2. A POSA Would Not Combine Tong, Dockser, and MacMillan

A POSA would not be motivated to combine the teachings of Dockser, MacMillan, and Tong.  As explained above, a person of ordinary skill in the art would not have been motivated to incorporate Dockser's FPP into MacMillan, nor to combine Dockser with Tong.  Khatri, ¶ 107.  Tong supplies no additional motivation to combine the teachings of Dockser and MacMillan.

## VII. PETITIONER'S "ALTERNATIVE" ARGUMENT REGARDING CLAIMS 5-6, 8, 10-18, 35-70 FAILS

Recognizing that a system with Dockser's FPPs can never meet the "exceeds" limitation, Petitioner posits that it would be obvious to completely redesign Dockser's FPP to carve out all support for its basic and default mode, namely full-precision operation (*see supra* Section VI.A.1).  Specifically, Petitioner posits that it would be obvious to cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width, and further perform some

unspecified modification to Dockser's multiplier logic "to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth."[5]  Pet., 59-60. Petitioner further states that Tong suggests a precision of "between 5 and 11 mantissa fraction bits" for "five signal processing applications."  Pet., 59.  And because two of the many applications of an embedded system disclosed in MacMillan are "signal processing" and "voice recognition," Petitioner states that a POSA would use "Dockser's FPPs in MacMillan's architecture with Tong's precision levels."  *Id.*

Petitioner is wrong.  Far from being obvious, a POSA would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability based on a single, cherrypicked data-point in Tong, and then incorporate the re-

---

[5] In its decision instituting trial, the Board suggested that Dockser would not meet the adapted-to limitation because "it has registers and multipliers with less than 32 bits."  Paper Nos. 16, 37.  However, as Petitioner recognizes (Pet., 59-61), and its expert admits (Goodin Dep., 26:16-23, 38:18-39:15), Dockser explicitly states that its registers and multipliers are 32-bits wide.  *E.g.*, Dockser, [ ¶0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number . . . ."); Dockser, ¶ [0019] (describing multiplication on the 32-bit numbers stored in the registers).

engineered Dockser unit into the system of MacMillan because both MacMillan and Tong happen to mention "signal processing." Khatri, ¶¶ 108-09.  Petitioner concocted this convoluted and implausible scenario in an attempt to sidestep the Dockser FPP's full-precision capabilities.

## A. A POSA Would Not Be Motivated to Combine Dockser, MacMillan, and Tong under Petitioner's "Alternative" Argument

Petitioner's assertion that a POSA would have been motivated by Tong to remove the full-precision capabilities of Dockser is wholly without merit.

Petitioner's argument is based on a fragment of a sentence in Tong, taken out of context to insinuate that full-precision operation "is not essential" to the functioning of a Tong or Dockser system.  Pet., 60.

In fact, Tong teaches the opposite.  Khatri, ¶¶ 110-111.  Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it appears *inevitable* that some fraction of our operands will require full IEEE-standard precision."  Tong, 280; Khatri, ¶ 111. Instead, like Dockser, Tong teaches systems that always have *both* full- and reduced-precision capabilities.  *See*, *e.g.*, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including *both* full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit."); Khatri, ¶ 111.  With this teaching in

hand, a POSA would not cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP." *See generally* Tong; Khatri, ¶ 111.

In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. Khatri, ¶ 112. On the contrary, Tong would only have _reinforced_ the teaching of Dockser that, while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision. *See*, *e.g.*, Dockser, ¶ [0003]; Khatri, ¶ 112. Similarly, Petitioner's "alternative" argument runs contrary to the teachings of Dockser and MacMillan.

Specifically, Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination. As discussed above, it is undisputed that Dockser is devoted solely to a general processor with selectable precision. Khatri, ¶ 113.

Nowhere, however, does Dockser teach, or even suggest, removing its full-precision capabilities. Khatri, ¶ 114; Goodin Dep. 38:3-8. A Dockser FPP is described as always needing to support a range of selectable precisions including full precision. Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations.

Khatri, ¶ 114; Dockser, ¶ [0003].  Indeed, Mr. Goodin explained that "Dockser

*requires* selectable subprecision."  Goodin Dep. 56:2-12; 57:4-12.  *See also id.*

38:3-8 ("I don't believe Dockser discloses any embodiments without floating-point

– without selectable precision.").  Mr. Goodin also explained that he did not

provide any opinions where Dockser was limited to a single subprecision.  *Id.*

69:17-70:18 ("That certainly isn't part of my opinions in my declaration.").  It is

not obvious to remove a reference's inventive concept—in this case supporting a

range of selectable precisions including full precision—in an attempt to meet a

challenged claim.  *Chemours Co.*, 2021 WL 3085514, at *5 (reversing Board

judgment of obviousness where proposed combination "would necessarily involve

altering the inventive concept" of the prior art reference).  Cleaving off circuitry

from Dockser in an alleged combination with Tong contradicts the inventive

concept of Dockser (as well as of Tong, as described in the previous subsection)

and could only be the product of impermissible hindsight.  Khatri, ¶ 114.

As for MacMillan, it warns that "[t]o meet the cost objectives, the SIMD

capabilities *should not add significant complexity* to the architecture of a

computer system for personal use."  MacMillan, 5:42-44.  Petitioner's proposed

combination, which requires special, customized registers, logic elements,

arithmetic units, and programming models (see next subsection), would increase

manufacturing costs and goes directly against the teachings of MacMillan which

relies on operating with conventional components to reduce cost.  See Khatri,

¶ 115.  *E.g.*, MacMillan, 6:24-26, 34-36.

### B.   Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of the Claims

Petitioner has not even attempted to show that the resulting combination

would meet the imprecision limitations.  Petitioner merely states that the "selected

precision levels are unchanged from Grounds 1-3."  Pet., 60-61.  However, as

shown above, Tong suggests 11 bits of precision for specific signal processing

applications, and Petitioner provides no analysis of whether 11 bits of precision

would meet the imprecision limitation.  *See id.* Khatri, ¶ 116.

### C.   POSA Would Not Have Recognized the Utility of Petitioner's "Alternative" Combination of Dockser, MacMillan, and Tong

Finally, a POSA would not have recognized the utility of Petitioner's

"alternative" combination of Dockser, MacMillan, and Tong because the combined

prior art references do not teach or suggest that it would be possible to write

programs that run efficiently on a Dockser/MacMillan/Tong device.  Khatri, ¶ 117.

As the '273 Patent explains, "programmers have come to think in terms of

high precision and to develop algorithms based on the assumption that computer

processors provide such precision . . . ."  '273 Patent, 5:55-62.  The notion that

low-precision computers can be programmed "is not obvious, and in fact has been

viewed as clearly false by those having ordinary skill in the art." *Id*., 7:27-32.  A

POSA at the time of the invention, with a Bachelor's degree and only two years of

experience, would not have known how to efficiently write a program in low

precision.  Khatri, ¶¶ 118-19.  Indeed, MacMillan specifically warns to avoid the

"need for reprogramming."  MacMillan, 2:15-16; Khatri, ¶ 120.

However, the '273 Patent explains that "in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers." '273 Patent, 7:32-49. For example, the '273 Patent teaches that the "Kahan method" can be used to reduce the accumulation of errors when summing multiple low-precision results. *Id.*, 22:6-21. The '273 Patent also explains how the additional computational power of the claimed invention can be efficiently used by processing data in a "pipelined" fashion. *See id.*, 20:62 to 21:21. The specification also describes in detail several example programs that use unconventional techniques to perform various computational tasks correctly and efficiently on the claimed low-precision systems. *See generally id.*, 17:29-23:45. Khatri, ¶ 120.

Without these teachings of the '273 Patent, a POSA would not have been motivated to combine MacMillan and Dockser with Tong according to Petitioner's "alternative" argument because it would not have been clear to a POSA that it would be possible to program such a device to execute operations efficiently and without accumulating errors. *Id.*, ¶¶ 121-22.

## VIII. OBJECTIVE INDICIA OF NON-OBVIOUSNESS SUPPORT THE VALIDITY OF THE CLAIMS

Overwhelming evidence of objective indicia of non-obviousness—including skepticism, praise, unexpected results, commercial success, and outright copying of the claimed invention—confirms that the challenged claims are not obvious over the prior art references cited by Petitioner.

### A.    Legal Standard

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).  "[W]e have repeatedly stressed that objective considerations of non-obviousness must be considered in *every* case." *Id.*  Indeed, "[s]econdary considerations evidence can establish that 'an invention appearing to have been obvious in light of the prior art was not' and may be 'the most probative and cogent evidence in the record.'" *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013).

Objective indicia of non-obviousness include skepticism, praise, unexpected results, copying, and commercial success.  *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

"For secondary considerations to have probative value, the decision maker must determine whether there is a nexus between the merits of the claimed

invention and the secondary considerations." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985).

### B. Google's Initial Skepticism of the Invention Shows Non-Obviousness

"Evidence of industry skepticism weighs in favor of non-obviousness.  If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness.  Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention." *WBIP*, 829 F.3d at 1335-36; *see also e.g.*, *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377-78 (Fed. Cir. 2019) ("Evidence of industry skepticism is a question of fact that weighs in favor of non-obviousness.").



IPR2021-00179
PATENT NO. 8,407,273

IPR2021-00179
PATENT NO. 8,407,273

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████ is evidence that the Challenged Claims are not

obvious.  There is a clear nexus between these statements and the Challenged

Claims.  Khatri, ¶ 123.  They were written in response to Dr. Bates's disclosure of

the invention, as explained above.  *Id.*  Further, they express skepticism about

utility of the low-precision arithmetic performed by the large numbers of low-

precision execution units, which is a key feature of the '273 Patent claims.

### C.     Praise From Leaders in the Field Shows Non-Obviousness

Praise of the invention by others is another objective indicator of non-

obviousness.  *Mintz*, 679 F.3d at 1379.

As Dr. Bates' ideas ████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

IPR2021-00179
PATENT NO. 8,407,273

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████

There is a clear nexus between the praise cited above and the Challenged

Claims.  It relates directly to ████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████

### D.     The Invention Is Not Obvious Because It Yields Unexpected Results

Unexpected results are further evidence of non-obviousness.   *See Ortho-*

*McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008)

("Of particular importance beyond the prima facie analysis, this court also detects

evidence of objective criteria showing nonobviousness.  Specifically, the record

shows powerful unexpected results . . . ."); *see also Neptune*, 921 F.3d at 1377-78;

*Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006).



IPR2021-00179
PATENT NO. 8,407,273



The fact that these results were unexpected is further confirmed ███████████

████████████████████████████████████████████████████.

Similarly, Dr. David Patterson of Google candidly remarked that he was "genuinely surprised" that the bfloat16 format provided useful results and improved performance, scaling, and power use.  Ex. 2012.  Dr. Patterson is a "skilled artisan" and acclaimed expert in the field of computer science and computer architecture.  Dr. Patterson's comments have a nexus to the '273 Patent because, as shown below, the TPUv2 product is coextensive with the claims.  Moreover, his comments further have a nexus because they are directed exactly to the key features of the '273 Patent claims: low precision high dynamic range arithmetic.

The fact that the '273 Patent's invention produces unexpected results is further supported by Dockser and Tong.  For example, as explained above, Dockser teaches that for "general purpose processors, however, the common situation is that . . . a greater precision may be needed."  Dockser, [0003]; Khatri, ¶¶ 124-25.  Similarly, Tong notes that in order to be "generally useful," an execution unit must be capable of full-precision arithmetic.  Tong, 280; Khatri, ¶¶ 124-25.

The fact that the prior art references cited by Petitioner in this proceeding teach that an execution unit without full-precision capability is not "generally

useful," and Google's initial reaction to the '273 Patent's invention, shows that the high performance of the '273 Patent's invention across a wide variety of applications was unexpected. *Id.* This unexpected result weighs toward non-obviousness.

### E. Google's Copying of the Invention Shows Non-Obviousness

"The fact that a competitor copied technology suggests that it would not have been obvious." *WBIP*, 829 F.3d at 1336.

As Dr. Bates was interacting with Google in 2013-14, Google had identified a "daunting and scary" problem: in order to use artificial intelligence for speech recognition, it would need to "double the computing footprint of Google just to support, like, a slightly better speech recognition model for a modest fraction of [its] users." Ex. 2034, 6.

Despite ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Google solved this problem by copying Dr. Bates' invention. Specifically, Google adopted the invention in their TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims (*see* Section VIII, *infra*). Indeed, Dr. Bates's invention is central to the operation of the TPUv2 and TPUv3 products, which use execution units designed to perform operations using a

low-precision "floating point format called bfloat16" in order to achieve increased

parallelism and scale:

> Because multipliers for the bfloat16 format require so much less
> circuitry, it is possible to put more multipliers in the same chip area
> and power budget, thereby meaning that ML accelerators employing
> this format can have higher flops/sec and flops/Watt, all other things
> being equal.

Ex. 2011 at 9; Khatri, ¶¶ 126-27.

Google describes the computing enabled by the bfloat16 format as "[t]he

secret to high performance on Cloud TPUs," noting that "Cloud TPU v2 and Cloud

TPU v3 primarily use bfloat16 in the matrix multiplication unit (MXU)" and that

"inside the MXU, multiplications are performed in bfloat16 format." Ex. 2041 at

2. The bfloat16 format maintains high dynamic range by keeping the same 8 bit

exponent as found in 32-bit IEEE floating point. *Id*. However, it reduces precision

significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of

IEEE 32-bit floating point, which is why it requires less circuitry. *Id.*



*Id.* at 1.  A nexus with the claimed invention is presumed for secondary

considerations relating to Google's TPUv2 and TPUv3 products, because these

products are coextensive with the Challenged Claims, as demonstrated in detail in

Section VIII, *infra*.  *See WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of

nexus for objective considerations when the patentee shows that the asserted

objective evidence is tied to a specific product and that product 'is the invention

disclosed and claimed in the patent.'").

A nexus between Google's products and the claimed invention is further

demonstrated ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Google's copying therefore provides clear evidence that the Challenged Claims are not obvious. *E.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019) (disclosure of patented method and later adoption of technology supported finding of copying); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 711 F.3d 1348, 1369 (Fed. Cir. 2013).

### F.   The Commercial Success of Google's TPUv2 and TPUv3 Shows Non-Obviousness

Commercial success is an objective indicator of non-obviousness. *See, e.g., id.* at 1368. The commercial success of Google's TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims, supports a finding of non-obviousness.

Since the release of TPuv2 in 2017, and TPUv3 in 2018, Google has leveraged the abundance of processing power made available by Dr. Bates' invention—its "secret to high performance" over its competitors—to power all of

its major products and services, including Search, Translate, Photos, Assistant, and Gmail.  Ex. 2018.  *See also* Exs. 2040, 2015.

Using hundreds of thousands of these low-precision TPU v2 and v3 devices to provide these AI services in its data centers throughout the U.S., Google has saved at least $10 billion dollars.  Ex. 2017.  Thus, Google's use of Dr. Bates' low-precision computer throughout its data centers has resulted in enormous commercial success for Google.

This commercial success is directly tied to the claimed invention.  Google's TPUv2 and TPUv3 products are coextensive with the Challenged Claims, as demonstrated in detail in Section VIII, *infra*.  Further, the success of these products in the marketplace is due in large part to their use of the claimed invention, which allows them to achieve increased performance and parallelism.  *See*, *e.g.*, Ex. 2016 ("BF16 delivers a rare combination: reducing hardware and energy while simplifying software by making loss scaling unnecessary;" *see also* Ex. 2011 (touting the increased efficiency and performance achieved by using low-precision multipliers).

## IX.   GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS

Google's TPUv2 and TPUv3 are coextensive with claims 1-8 of the '273 Patent.  Set forth below is an analysis mapping the claims to the TPUv2 and TPUv3 devices; a more fulsome analysis of claim 53 is also provided in Singular's

district court infringement contentions.  Exs. 2021; 2022, 13-22.  Accordingly, a

nexus is presumed between secondary considerations relating to the TPUv2 and

TPUv3 and the '273 Patent.  *WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of

nexus for objective considerations when the patentee shows that the asserted

objective evidence is tied to a specific product and that product 'is the invention

disclosed and claimed in the patent.'").

**A.    Claim 1**

**1.  "A device"**

Each of the TPUv2 boards and TPUv3 boards are devices.  Khatri, ¶¶ 129-

30.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

2. **"comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"**

Each of the TPUv2 and TPUv3 boards include at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation (multiplication) on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value (the product of the first numerical value multiplied by another value). Khatri, ¶ 131. Both versions include at least one Matrix Multiply Unit (MXU) that contains 128x128 = 16,384 execution units that each execute the operation of multiplication. Exs. 2016; 2011 ("the main computational capacity in each core provided by a large matrix multiply unit that can yield the results of multiplying a pair of 128x128 matrices each cycle").

IPR2021-00179
PATENT NO. 8,407,273



Ex. 2016 (annotations added).



Figure 5: A block diagram of Google's Tensor Processing Unit v2 (TPUv2)

Ex. 2011.

Each of the bfloat16 execution units in the MXU require "less circuitry"

than either FP32 or FP16 multipliers.  Ex. 2011, 9; Khatri, ¶ 132.  Accordingly,

each of the multipliers within the MXU is *only* able to perform low-precision, bfloat16 operations and lacks the circuitry to perform, for example, perform FP16 or FP32 operations.  Khatri, ¶ 132.

### 3.  "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and"

The dynamic range of the valid inputs to the multiplication operation in the TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating point 32 format.  Khatri, ¶¶ 133-34; Pet., 19-20; Ex. 1003, ¶ 231.  These inputs are supplied by the "scalar/vector units," also known as Vector Processing Unit (VPUs).  *E.g.*, Exs. 2016; 2049, 3-4.  As Google admits, 8 bits of exponent allow for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$ (larger than 65,000).  Khatri, ¶134; Pet., 19-20; Ex. 1003, ¶ 232.

### 4.  "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;"

Google's TPUv2 and TPUv3 boards meet this element by performing multiplication on 32-bit numbers at bfloat16 precision, which uses 7 bits for the

mantissa.  Exs. 2041, 7; 2011, 8; 2049; Khatri, ¶ 135.  Google states that utilizing 7

bits of mantissa in multiplication operations results in a minimum of 12% of valid

floating point 32 inputs producing at least 0.39% relative error compared to the

exact mathematical calculation of a full-precision multiplication on those same

inputs.  Pet., 73; Khatri, ¶¶ 135-36.  Accordingly, the TPUv2 and TPUv3 meet this

element.

> **B.    Claim 3, 7, 9**
>
>> **1.  "The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least [ten/one hundred/five hundred] LPHDR execution units"**

As discussed above, each MXU contains 128x128 execution units: a total of

16,384 LPHDR execution units in total per MXU. The TPUv2 board includes 1

MXU per core, with 2 cores in a chip, and 4 chips on a board. Ex. 2016, 6. Thus,

the TPUv2 board contains $128 \times 128 \times 2 \times 4 = 131,072$ LPHDR execution units.

Khatri, ¶ 137.

IPR2021-00179
PATENT NO. 8,407,273



TPUv2 Board – Ex. 2046 (annotations added)

The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board. Ex. 2016. Thus, a single TPUv3 board contains $128 \times 128 \times 2 \times 2 \times 4 = 262,144$ LPHDR execution units. Khatri, ¶ 138.

67



TPUv3 Board – EX. 2046

The MXU execution units perform multiplication at bfloat16 precision, and are not capable of performing full-precision multiplication, as discussed above. Khatri, ¶ 139.

### C.    Claim 5, 8, 10

> **1. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.**

Each core (whether TPUv2 or TPUv3) contains a Vector Unit (VPU). *Id.*

Each VPU contains $128 \times 8 \times 2$ 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core. Ex. 2046, 34. Khatri, ¶ 140.

32-bit ALUs are adapted to perform the operation of multiplication on 32-bit

numbers. With two cores per chip and 4 chips per board, each TPUv2 or TPUv3

board contains $2048 \times 4 \times 8 = 16,384$ execution units that are adapted to perform

multiplication on 32-bit numbers. Khatri, ¶ 141.

As explained above, each TPUv2 board contains 131,072 LPHDR execution

units, and each TPUv3 board contains 262,144 LPHDR execution units.

Therefore, in both the TPUv2 and TPUv3 boards, "the number of LPHDR

execution units in the device exceeds" by at least ***100,000*** "the non-negative

integer number of execution units in the device adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

and each board therefore meets the "exceeds" limitations of the claims. Khatri, ¶

142.

### D.     Claims 11-17

*See* above; a mantissa of 7 bits gives at least 12% X, and at least 0.39% Y,

meeting each of claim 11-17's limitations. Khatri, ¶¶ 143-45.

### E.     Claim 18

#### 1.   "The device of claim 8, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000."

As discussed above, the bfloat16 format used in the TPUv2 and TPUv3

boards contains 8 bits of exponent, which provides a dynamic range of from

IPR2021-00179
PATENT NO. 8,407,273

roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).

Khatri, ¶ 146.

### F.    Claim 24

**1.  "The device of claim 1, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit**

Google's TPUv2 and TPUv3 devices meet this limitation as well.

Each TPU device is controlled by a Core Sequencer (which, in turn, is controlled by a Host Virtual Machine that is a program running on a CPU).  The CPU is a digital processor, and by running the Host VM and issuing commands to the Core Sequencer, it controls the operation of the LPHDR execution units within the MXUs.  Ex. 2016, 4; Khatri, ¶¶ 147-48.



Ex. 2045, 2.

Die sizes are adjusted by the square of the technology, as the semiconductor technology for TPUs is similar but larger and older than that of the GPU. We picked 15nm for TPUs based on the information in Table 3. Thermal Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU. This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.



Ex. 2016, (annotations added)

### G.    Claim 36

Claim 36 claims a device comprising at least one LPHDR execution unit with the same parameters as claim 1, with the added limitation that: "the number of LPHDR execution units in the device exceeds the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

As discussed above with respect to claim 1, and with respect to claim 5, the TPUv2 and TPUv3 boards each include LPHDR execution units meeting claim 1's

limitations. Moreover, the number of LPHDR execution units exceed the "non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" by over 100,000. *See* above. Khatri, ¶¶ 149-50.

## H.   Claims 38, 42, 44

1. **The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.**

*See* above with respect to claims 3, 7, 9. Khatri, ¶ 151.

## I.   Claims 40, 43, 45

1. **The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.**

*See* above with respect to claims 5, 8, 10. Khatri, ¶ 152.

## J.   Claims 46-53

See above with respect to claims 11-18. Khatri, ¶ 153.

## X.   CONCLUSION

For the foregoing reasons, Patent Owner respectfully requests that the Board issue a Final Written Decision confirming the patentability of all the Challenged Claims.

IPR2021-00179
PATENT NO. 8,407,273

Respectfully submitted,

Dated: August 9, 2021          By:    /Peter Lambrianakos          /
                                      Peter Lambrianakos (Reg. No. 58,279)
                                      FABRICANT LLP
                                      411 Theodore Fremd Avenue,
                                      Suite 206 South
                                      Rye, New York 10580
                                      Tel. (212) 257-5797
                                      Fax. (212) 257-5796
                                      Email: plambrianankos@fabricantllp.com

IPR2021-00179
PATENT NO. 8,407,273

# **CERTIFICATE OF WORD COUNT**

The undersigned hereby certifies that the portions of the above-captioned

SINGULAR COMPUTING LLC'S RESPONSE TO PETITION FOR *INTER*

*PARTES* REVIEW OF U.S. PATENT NO. 8,407,273 specified in 37 C.F.R.

§ 42.24 has 13,804 words in compliance with the 14,000-word limit set forth in 37

C.F.R. § 42.24.  This word count was prepared using Microsoft Word 2020.

Respectfully Submitted,

Dated:  August 9, 2021

By:    */Peter Lambrianakos          /*
Peter Lambrianakos (Reg. No. 58,279)
Lead Counsel for Patent Owner
FABRICANT LLP
411 Theodore Fremd Avenue,
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796
Email: plambrianakos@fabricantllp.com

IPR2021-00179
PATENT NO. 8,407,273

## <u>CERTIFICATE OF SERVICE</u>

A copy of SINGULAR COMPUTING LLC'S RESPONSE TO PETITION

FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,407,273 and EXHIBITS

2026-2053 have been served on Petitioner's counsel of record as follows:

> Elisabeth H. Hunt
> Email: EHunt-PTAB@WolfGreenfield.com
> Richard F. Giunta
> Email: RGiunta-PTAB@WolfGreenfield.com
> Anant K. Saraswat
> Email: ASaraswat-PTAB@WolfGreenfield.com
> Nathan R. Speed
> Email: NSpeed-PTAB@WolfGreenfield.com
> Gregory F. Corbett
> Email: Gregory.Corbett@WolfGreenfield.com
> WOLF, GREENFIELD & SACKS, P.C.
> 600 Atlantic Avenue
> Boston, Massachusetts 02210

> ***Attorneys for Google LLC***

August 9, 2021             By:    */Peter Lambrianakos              /*
                                  Peter Lambrianakos (Reg. No. 58,279)
                                  FABRICANT LLP
                                  411 Theodore Fremd Avenue,
                                  Suite 206 South
                                  Rye, New York 10580
                                  Telephone: (212) 257-5797
                                  Facsimile: (212) 257-5796
                                  Email: plambrianankos@fabricantllp.com