```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2


 3


 4   SINGULAR COMPUTING LLC,            )
                                       )
 5                   Plaintiff         )  Civil Action
                                       )
 6                                     )  No. 19-12551-FDS
     vs.                               )
 7                                     )
     GOOGLE LLC,                       )
 8                   Defendant         )


 9


10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV


11


12                      MOTION HEARING


13


14


          John Joseph Moakley United States Courthouse
15                     1 Courthouse Way
                       Boston, MA 02210
16


17


                       January 11, 2023
18                        3:00 p.m.


19


20


21


22


23              Valerie A. O'Hara, FCRR, RPR
                   Official Court Reporter
24      John Joseph Moakley United States Courthouse
                     1 Courthouse Way
25                   Boston, MA 02210
                 E-mail: vaohara@gmail.com
```

APPEARANCES:

For The Plaintiff:

    Prince, Lobel, Tye, LLP, by PAUL J. HAYES, ESQ., and
KEVIN GANNON, ESQ., One International Place, Boston,
Massachusetts 02110;

For the Defendant:

    Keker, Van Nest & Peters LLP, by ROBERT A. VAN NEST, ESQ.,
633 Battery March Street, San Francisco, California 94111;

    Paul Hastings LLP, by MATTHIAS A. KAMBER, ESQ.,
101 California Street, Suite Forty-Eighth Floor
San Francisco, CA 94111;

    Kwun, Bhansali, Lazarus LLP, by ASIM M. BHANSALI, ESQ.,
555 Montgomery Street, Suite 750, San Francisco, California
94111;

    Wolf, Greenfield & Sacks, P.C., by NATHAN R. SPEED, ESQ.,
600 Atlantic Avenue, Boston, Massachusetts 02210.

<u>PROCEEDINGS</u>

1

2      THE CLERK:  Court is now in session in the matter

3  of Singular Computing LLC vs. Google LLC, Civil Action

4  Number 19-12551.

5      Participants are reminded that photographing,

6  recording or rebroadcasting of this hearing is prohibited

7  and may result in sanctions.

8      Would counsel please identify themselves for the

9  record, starting would the plaintiff.

03:01PM 10      MR. HAYES:  Paul Hayes for plaintiff.

11      MR. GANNON:  Kevin Gannon for the plaintiff.

12      THE COURT:  Good afternoon.

13      MR. VAN NEST:  Good afternoon, your Honor,

14  Bob Van Nest, Keker, Van Nest & Peters for Google.  I'm

15  here with Nathan Speed from Wolf, Greenfield; Asim Bhansali

16  from Kwun, Bhansali; and Matthias Kamber from

17  Paul Hastings.  Good afternoon.

18      THE COURT:  All right.  Good afternoon.  This is a

19  hearing on plaintiff's motion.  Mr. Hayes, are you taking

03:02PM 20  the lead?

21      MR. HAYES:  Yes, your Honor.  I submitted about

22  eight slides, which I assume you got --

23      THE COURT:  Yes, I did.

24      MR. HAYES:  -- to try to make this a little bit

25  easier to understand.  The first one, it's pretty simple,

1    it says, "Prior art references at issue," and I have

2    patents, printed publications, and devices, and that is

3    because that's our motion is to basically kick out all

4    three for a variety of reasons.

5         I noted in my Brother's slides, he just has

6    devices, and I just want to make sure that what we're

7    talking about, we're all on the same page as to what's at

8    issue here and what we filed on was to kick out all

9    patents, printed publications, and devices, so with that

03:03PM 10   said, the second page --

11         THE COURT:  Let me, before just having done at

12   least some preliminary reading or thinking about this, the

13   case law seems to use "device," "product," "system" kind of

14   interchangeably, like things that are not patents or

15   printed publications, and if there's any difference that

16   matters in this context, you should enlighten me.

17         MR. HAYES:  No, when I say "a device," I mean a

18   device, like a chip or a system is a device or, you know,

19   an ice creamer maker is a device.  A device is something

03:03PM 20   that it's not written, it's a physical thing.

21         All right.  So the next page is pretty simple is

22   that here we identify the actual patents and printed

23   publications that Google knew of as of the IPR, and they're

24   identified here, and we do that to make sure that after we

25   get through all this, if you should rule that, in fact,

1    they're out, we know what's out.  Those are out.  They

2    don't somehow filter in later on in the case so that's

3    pretty simple as to what the patents and publications are,

4    and our position as to why, in fact, they should be out is

5    set forth in the *Cal Tech* case exactly the situation, and

6    it's also, I think, affirmed by your Honor when you bounced

7    the last two patents out that we dealt with.  So that's a

8    pretty simple circumstance on the summary judgment issue to

9    whittle down the validity matter.

03:04PM 10          Now, the next page we're sort of getting into the

11   devices but not yet.  In Google's validity contentions that

12   it filed on November 6th, which is right when they filed

13   the IPR, when they cited all patents, et cetera, they cited

14   the three printed publications or four.  There are actually

15   four printed publications that are listed here.

16          These are the printed publications that describe

17   the three devices that are presently at issue.  The first

18   device that they talk about is VFLOAT.  That is described

19   in this *Belanovic/Lesser Library* publications.

03:05PM 20          The CNAPS device is described in the network of

21   adapted processors and the highly paralellized, whatever,

22   GRAPE-3 is described in that publication.  There's no

23   dispute on that.

24          And so the next issue is, as Google knew of them

25   at the time of the IPR, it is now estopped from relying

1    upon it, period, of these publications, and I think that's

2    for the same reason that they can't rely on the patents in

3    the other publications, they can't rely on these.  These

4    are not like special publications or something, they're a

5    printed publication under the law, so that's the easy part

6    of what I think the case -- of what we're here for.

7          Now, we get to device estoppel, and by device,

8    right, we're talking system or whatever they want to call

9    it, and there are three devices that are the subject we

03:06PM 10    just talked about, VFLOAT, CNAPS, and the last one,

11    GRAPE-3.

12          Now, in its invalidity contentions, Google

13    submitted claim charts, and those claim charts applied the

14    claims at issue, that's important, Claim 7 and 53, to the

15    printed publications describing the devices at issue.

16          They then, in their contentions, they represent

17    that these printed publications describing the devices at

18    issue disclose each and every limitation of the asserted

19    claims, each and every one, and, for example, I suggest if

03:07PM 20    you want to look, get a feel for that, if you look at the

21    Belanovic/Lesser claim chart -- and they're all about 20

22    pages long.  These aren't like off the cuff type of claim

23    charts.  It's 21 pages -- they applied the claimed elements

24    on an element-by-element basis, concluding that the printed

25    publications, which they didn't disclose to the Patent

1    Office, describing the products that are specifically at

2    issue here anticipate and render invalid the claims at

3    issue.

4         Now, the next portion of this slide is the case

5    law, and, obviously, Google could have submitted this

6    stated anticipatory art to the Patent Office, but it

7    purposely chose not to do it for obvious reasons.  They

8    chose it to try to hedge their bets, just in case they lost

9    the IPR, which they did, and that is a no-no.

03:08PM 10         That is prohibited under the case law that we

11   reference, and the *Wasica* case that I think is just in --

12   recently, anyways, in Delaware, Judge Stark, and the other

13   ones, they all stand for basically the same proposition

14   that you don't get two bites at the apple by just, as in

15   the next slide.  The next slide is some more case law, but

16   it's what we're thinking about, and the idea of just

17   swapping labels.  That's what the *Cal Tech.* says, you don't

18   get to do that.

19         And what Google is doing in substance is doing

03:09PM 20   nothing more than putting lipstick on the pig.  They go and

21   they represent that these publications render invalid the

22   asserted claims.  They have each and every element.

23         Now, they don't give it to the Patent Office, they

24   lose in the Patent Office, so what do they say?  Oh, well,

25   they're not publications, they're devices.  Of course

1   they're devices.  They're describing the exact device

2   that's the subject of the dispute.

3          And then we get the case law that stands with

4   *Wasica*, et cetera about how the fact that where you're

5   relying on a device that's cumulative, well, then you're

6   out.  That's the law that we cited.  And this last

7   statement on this *Oil-Dri* case gets to the argument that

8   we're talking about here.  It says, "Where there is

9   evidence that a petitioner had reasonable access to printed

03:10PM 10   publications corresponding to or describing a product that

11   it could have proffered to the IPR, it cannot avoid

12   estoppel by simply pointing to its finished product," et

13   cetera.

14          That is exactly their strategy.  That's exactly

15   what they tried to do.  They certainly could have brought

16   the printed publications to the Patent Office.  They could

17   have argued, as they did in their argument in their claim

18   charts, that it invalidates and it anticipates the

19   invention, and they chose not to.

03:10PM 20          That's exactly opposite what you're supposed to do

21   if you're going up The Hill in the Patent Office, but they

22   did it because of the strategy, the strategy of, well, if

23   we lose, we'll just go say they're all devices and go up

24   The Hill anyways.

25          And the next slide is, again, it's case law,

1   et cetera, and it's your case, but it's not directly on

2   point, but it's on the idea of estoppel here.  The idea is

3   you don't get two bites at the apple.  You don't play the

4   game and get the bites at the apple because otherwise the

5   whole purpose of estoppel is for not.  I mean, the whole

6   purpose of the IPR is for not, and, here, the next slide is

7   where it drives it home on our argument, Judge.

8        Google's devices, and, by the way, what's

9   interesting, in a 22-page brief, no one even mentions the

03:11PM 10   claim charts.  I couldn't find the word "claim chart"

11   anywhere in their brief.  They don't mention that they

12   represented that they have all the elements and that they

13   anticipate.  They forget about it.

14        Well, here there can be no dispute in this case

15   that these printed publications describe the accused

16   products.  Why do I say there can be no dispute?  They

17   represented element-by-element in a 21-page document, and

18   they said point blank in the intro they have each and every

19   element.

03:12PM 20        And the next stuff here, that comes from one of

21   the claim charts on this VFLOAT thing.  Look what it does.

22   First, before you ever get in, they say they have all the

23   elements, and then they say "a device comprising," and they

24   go through the claim.  And what do they use?  What do they

25   say, as reflected in blah, as reflected in blah.  The blah

1   is the printed publication that they say anticipates and

2   never showed the Patent Office.

3          So, when you add it all up, the last slide is

4   their -- when they tried to get a stay here, which they

5   successfully did, they tauted all the benefits of the

6   Patent Office and how it's going to speed up everything and

7   all the rest, and all it's doing is complicating everything

8   and putting us a year behind.

9          And the bottom line is they knew of anticipatory

03:13PM 10  publications, they knew they described the device that's

11  obvious.  They are, per se, cumulative of the case law that

12  we had, and they didn't cite it and that, there have to be

13  other consequences.

14         Someone's got to be at what they do here.  They

15  tried.  That was their strategy, they lost the IPR, and so

16  be it, and, thus, the way the case goes now, it's our

17  position that, in fact, they cannot, they should not be

18  able to introduce any, these three devices.

19         Why?  Because the devices are prescribed by a

03:14PM 20  printed publication that they admit is anticipatory and

21  refused to give to the Patent Office, and that's exactly

22  what the case law we have says.

23         Now, I know they get into all the rest about

24  grounds, and I can address that a little bit later, but I

25  think the *Lawson* case addresses the idea that we're not

1    going to -- this isn't going to go down on grounds, it's a

2    difference of evidence more than anything else.  It's the

3    same device, and the stuff they added was stuff they tried

4    to add and say, oh, well, we added new slides, we added

5    some new some slides, and we added some new, in those

6    declarations as to what we're going to do, new slides, and

7    then we're going to add some new source code.

8            Answer.  The slides they say they're going to add.

9    1, they never gave them to us.  Where do they come from?

03:14PM 10    Who knows.  2, we've got evidence that they're printed

11    publications anyways, so they could have given those to the

12    Patent Office.  And what they don't tell you is that the

13    source code that they're relying on, they say, oh, we've

14    got the source code, that's in the thesis.  That's in what

15    his name's thesis, Pavle's thesis.  It's an appendix,

16    20-page appendix, the slides, but they've got nothing to do

17    with the price of bread other than to try to rename this

18    thing.

19            In fact, now, Judge, they call this thing VFLOAT.

03:15PM 20    We never heard the word "VFLOAT" for any particular thing,

21    so I think that's our position.  We cite the case we cited,

22    and I think it's *Emma,* there is a time for an estoppel to

23    apply, it's here where they admit that the publications

24    anticipate and describe in detail all of the elements.

25    There's no missing elements in these publications.

1          THE COURT:  So here's one of the things I'm

2     struggling with, and I genuinely don't know the answer to

3     it.  So the statute says, in substance, you can only use

4     patents or printed publications for IPR review, so, you

5     know, what's left over, well, you know, systems, devices,

6     whatever.

7          There are probably some tinkerers out there who

8     have created systems or devices that were never described

9     in any patent or printed publication, but, in the modern

03:16PM 10     world, that's got to be pretty rare.  I would think that

11     not only do patents and publications sometimes result in

12     systems or devices, but certainly that the normal thing,

13     it's probably like 99 percent of inventions, the system or

14     device results in some form of patent or printed

15     publication.

16          MR. HAYES:  Right.

17          THE COURT:  So what did Congress intend to do

18     there?  What was intended to be left over?  Was it only

19     this little tiny sliver of things where it's a home

03:16PM 20     tinkerer who somehow their system or device never got

21     mentioned anywhere in any article?  Is that all that's left

22     over?

23          MR. HAYES:  No, your Honor.  The thing is is that

24     the case law that we cite in our argument only applies when

25     you're talking about a printed publication that describes

1   all of the elements of the claim and the device.  That's

2   different than, in fact, a lot of these cases say, well,

3   for example, if it takes you some say private information

4   to render it obvious or invalid, and if it takes some

5   private information, well then, good, you can go and try

6   your device.

7           THE COURT:  Like a trade secret sort of thing?

8           MR. HAYES:  Yes, it's nonpublic.  In fact, the

9   cases are right on that that I think the case, the only

03:17PM 10  case, whatever, four of the five elements were in a

11  publication, but one was missing, and so the one that was

12  missing, they say, ah, we can only get it through a private

13  circumstance unless we could never have argued that in the

14  Patent Office.

15          Well, the point is this case is totally different

16  in the sense that all the elements in the claim period, and

17  these devices are simply that, and the grounds, the

18  grounds, they use the word "grounds" to try to say this,

19  but, you know, the *Wasica* case talks about grounds, and

03:18PM 20  some of these other cases do, and they're talking about the

21  basic grounds that they're arguing invalidity are

22  anticipation and obviousness.

23          They're not arguing that it's just made by

24  another, period.  What's made?  It has to be anticipate.

25  The grounds that they argue in their expert report, it's

1    anticipated, and it's obvious.  They want to use, for

2    example, well, to say it's anticipated but you don't think

3    it's anticipated, we're going to combine it with some

4    publications and patents and all the rest.  That's nuts.

5    That does away with the whole concept of the estoppel

6    theory, so that's -- it's a very narrow case we're talking

7    this circumstance.

8          I mean, if they brought in, they don't have it,

9    right, but if they have a device, they bring someone in and

03:19PM 10   said I made device, and the guy comes in and he brings the

11   device and whatever, and he's describing a piece of private

12   information and all the rest, so be it, but if he's sitting

13   on a publication that has every single element that could

14   invalidate the patent in three seconds and he purposely

15   doesn't give it to the Patent Office, he's out.

16         Also, if we talk about the statute that talks

17   about TRIPOD publications, it doesn't exclude printed

18   publications that -- printed publications have to be

19   disclosed.  It doesn't include ones that describe devices

03:20PM 20   or systems or whatever.  It doesn't say, oh, you don't have

21   to disclose printed publications that show all the elements

22   of a device, no, a printed publication is all of that.

23         The point is they could have invalidated this

24   patent under their theory and we wouldn't even be here or

25   we wouldn't be having all this discussion and have to go

1    try it in validity.  That's our position.

2         THE COURT:  Can you touch on this business of

3    ground versus evidence or however you want to frame it,

4    statutory construction or anything?

5         MR. HAYES:  Yes, if you think about it, the

6    grounds, if you say to yourself how or why are they saying

7    this patent is invalid?  They're saying it's invalid, you

8    talk about a device or a system, it's made by another who

9    would not be suppressed or concealed.

03:20PM 10        You know what that means, they have to show

11   whatever was made, right, has all the elements of the

12   claim.  And the ground that you're going to eventually

13   shall we say invalidate the patent is not because something

14   is made, it's the evidence that it's obvious or it's

15   anticipated.  That's the issue.

16        So I don't think one necessarily per se excludes

17   another under any statutory interpretation, and I think

18   that's what Judge Stark and all these other courts have

19   said that you also have to balance this against the whole

03:21PM 20   statute of the estoppel issue because otherwise the

21   estoppel, under their theory -- and I would respectfully

22   say hutzpah, they think they can come in and use these

23   printed publications that they never disclosed to tell a

24   jury how this thing works or corroborate it.  I mean, that

25   renders the estoppel theory meaningless in our view.

1    Thank you, Judge.

2           THE COURT:  All right.  Mr. Van Nest, are you

3    going to take the lead?

4           MR. VAN NEST:  No, your Honor, Mr. Kamber is going

5    to take the lead on this one.

6           MR. KAMBER:  Good afternoon, Matthias Kamber on

7    behalf of Google.  As we noted in our brief, we think that

8    this broad brush motion was premature, fails as a matter of

9    law because it really wasn't directed to what's at issue.

03:22PM 10           As a practical matter, I think things have become

11    easier now, right?  Google has served its expert reports on

12    December 22nd related to invalidity, and those reports made

13    clear that the prior art that Google relies on at this

14    point has been narrowed to three prior art systems,

15    devices, products, however you want to call it.

16           I agree with Mr. Hayes that I think those

17    definitions are all sort of the same for our purposes, but,

18    most importantly, I think the reports have made clear that

19    to prove invalidity, Google is relying on the testimony of

03:23PM 20    related fact witnesses.  They're relying on documents

21    produced in response to third-party subpoenas.  These are

22    the types of evidence that the PTAB could not under its

23    mandate consider an IPR.  These were the types of prior art

24    that were specifically left to the district court, as I'll

25    explain in a moment.

1           So to that end, I want to start with just a brief

2      orientation about the relevant statutory provisions.  I

3      think they help answer some of the questions just posed to

4      Mr. Hayes, and I would like to go through and explain, you

5      know, why those three prior art systems that Google relies

6      on aren't subject to IPR estoppel because the related

7      evidence goes far beyond the four corners of any

8      publication to include the actual systems as detailed in

9      percipient testimony and other nonpublished documents, all

03:24PM 10      of which describe features that are not entirely cumulative

11      and that are critically important to the two claims that

12      remain in this case.

13           Then after that, I do want to briefly address a

14      few things that Mr. Hayes had in his slides as well, but

15      let me start with our slides, and the second slide is a

16      copy of the text of 35 U.S.C. 311, which is the statute for

17      inter partes' review, and it talks about how you can

18      petition only on a ground based under 102 or 103 and only

19      on the basis of prior art consisting of patents or printed

03:25PM 20      publications, so the grounds of 102 or 103 that are covered

21      by patents and printed publications.

22           The petition itself, the next slide is 35 U.S.C.

23      312 has the requirements of the petition in Subsection A3

24      explains that when you file a petition, you have to state

25      the grounds on which the challenge to each claim is based

1    and the evidence that supports the grounds, including

2    copies of the patents and printed publications, so the way

3    this works as a practical matter, when you're filing a

4    petition, right upfront you have to say, okay, I have a

5    ground 102 that is anticipation based on Patent Number 102,

6    3, 4, 5, 6, 7, whatever it is, right?

7         THE COURT:  Well, let's simplify, to simplify, I

8    mean, there's basically two grounds, anticipation and

9    obviousness.

03:26PM 10        MR. KAMBER:  There's anticipation and obviousness

11   based on patents and printed publications.

12        THE COURT:  Well, no, it says the ground.

13        MR. KAMBER:  Right.

14        THE COURT:  If you look at 311(b), there's two

15   grounds, 102 or 103.  Again, I'm simplifying a little bit

16   because there's sub grounds, so to speak, and then it

17   doesn't use the word "ground" again, it says "only on the

18   basis of prior art consisting of patents," so you say it's

19   either anticipated or it's obvious, and the basis for that

03:26PM 20   is patent or printed publications, it's not a ground.

21   That's a basis supporting your ground.

22        MR. KAMBER:  That's right.  I agree with that,

23   your Honor, and 102 means everything is contained in a

24   single patent or printed publication.  That is, if you have

25   a 102 ground on a printed publication, a single printed

1     publication has to disclose each and every limitation of

2     the claim.

3          103 is an obviousness combination where you're

4     allowed to combine things.  You could say X patent in view

5     of Y patent or something along those lines, but for a 102

6     ground, you have to have everything in one publication,

7     which I think may end up being important.

8          So let me go now to the -- I think it's our fourth

9     slide, which is the text of 35 U.S.C. 315.  Now, this is

03:27PM 10    the estoppel, it contains the estoppel provision and

11    language, and 315 makes it clear that what a petitioner is

12    estopped from is pursuing a ground that it raises under 102

13    or 103 as distinct from the evidence, that is, potentially

14    the publication or whatever the evidence might be.

15         Turning to 102, as we were just talking about,

16    your Honor, I think it explains the different bases for a

17    102 for an anticipation argument to say that everything was

18    disclosed in a piece of prior art, and I have the regular

19    text just in section, on slide 5, but I think it might be

03:28PM 20    more useful to look at slide 6 and 7 because slide 6 kind

21    of explains or calls out in red text what is estopped, what

22    is not allowed under 35 U.S.C. 315, and that is if you made

23    an argument under 102(a) that something was, for example,

24    patented or described in a printed publication in this or a

25    foreign country, the same language applies in 102(b) as

1    well.

2         But what that leaves, as you see it reflected in

3    slide 7 in the blue text is other grounds to other bases,

4    other anticipation arguments that the PTAB can't hear, that

5    the invention was known or used by others in this country,

6    if it was in 102(b) in public use or on sale.  That relates

7    to products, right?

8         Then 102(g)(2), it was made in this country by

9    another inventor who had not abandoned, suppressed and

03:29PM 10    concealed it.  Those are things that the PTAB cannot hear.

11    We cited the *Becton Dickinson* case, which was a situation

12    where somebody tried to present 102(g)(2) art to the PTAB

13    and the PTAB rejected and said this is not one of the

14    categories, this doesn't qualify as a patent or printed

15    publication that we can consider in doing our analysis.

16         So let me try to distill this a little bit.  IPR

17    estoppel does not apply to art that was publicly known or

18    used for prior inventions by another.  Congress left the

19    invalidity decisions regarding those categories of prior

03:30PM 20    art under 102(a), (b) and (g) to district courts with a

21    jury evaluating the evidence.

22         The statutory language says that IPR estoppel only

23    applies to patents and printed publications, and here all

24    of the prior art that Google relies on is system prior art

25    or arguments under 102(a), (b) and (g) for which estoppel

1    doesn't apply.

2         And this is our last slide, but I'd like to go

3    through it in a little bit of detail.  This discloses the

4    three systems that Mr. Hayes also mentioned, the VFLOAT

5    system, which is the basis for 102 and 103 arguments,

6    including that Miriam Leeser, Dr. Miriam Leeser, and

7    Pavle Belanovic publicly disclosed their invention, which

8    is a 102(a) argument that they used it publicly, used it

9    under 102(b), and that they had a prior invention under

03:31PM 10    102(g) as well as the CNAPS system and the GRAPE-3 system

11    that I'll go through in some detail.

12         As to VFLOAT, your Honor, this was a library code

13    for field programmable gate arrays.  These are basically

14    reprogrammable computer chips.  Some computer chips come

15    out of the factory and they are sort of set in stone.

16    These are ones that can be kind of reprogrammed in

17    different ways, and the code library is written in a format

18    called VHDL, and it's freely distributed for people to use.

19         The system, the code, it was all developed in

03:31PM 20    Northeastern University, so sort of in your neighborhood,

21    by Dr. Leeser and Mr. Belanovic, and Dr. Leeser has been on

22    Rule 26 disclosures from the very beginning of this case.

23    Singular never chose to depose her about any of these

24    issues, but she's been out there from the beginning, and

25    this system had this board.  It was called a Wildstar Board

1    made by a company called Annapolis Micro that had three

2    MPGAs on it, and they were actually used, Dr. Leeser and

3    her research student, they implemented multipliers using

4    different formats, including low precision and high dynamic

5    range formats.

6         The purpose of the research was just to figure out

7    how many of these things they could fit onto a chip as

8    compared to a standard IEEE single-precision load fire.

9    Dr. Leeser is going to testify about the system.  She can

03:32PM 10   explain a lot of details about the system, how it was made,

11   how it was configured, how it worked, including the code

12   library that set, excuse me, that let somebody change the

13   different parameters and programmed these other LPHDR

14   execution units.

15        She can explain how she disclosed the idea to the

16   Los Alamos National Labs, which was sponsoring her research

17   as well as at different conferences, one at M.I.T., and she

18   can speak to details about the system that are relevant to

19   the invalidity issues but that are not entirely cumulative

03:33PM 20   of the printed publications, and I think that's the most

21   critical part here, your Honor.

22        The printed publications, and there are numerous,

23   not just one, we're not relying on just one, we rely on

24   different printed publications to corroborate details about

25   the system, but not a single one of those printed

1    publications could have been a ground for an anticipation

2    argument because they don't contain all the details, and

3    here's a particular example:

4         Both of the asserted claims at this point, your

5    Honor, require, and this was sort of the distinguishing

6    point, by the way, in the IPR proceedings, too, require

7    that, "The number of LPHDR execution units in the device

8    exceeds by at least 100 the nonnegative integer number of

9    execution units in the device adapted to execute at least

03:34PM 10   the operation of multiplication floating point numbers that

11   are at least 32 bits wide," so it's a bit of a mouthful,

12   but it basically says you have to have 100 more LPHDR units

13   than standard precision units, so what do you need for that

14   formula?  You need to know how many LPHDR units there were

15   in the system, and you need to know how many standard units

16   were in the system.

17        Singular hasn't shown and can't, frankly, what it

18   calls the printed -- what it's calling the printed

19   publications.  It can't show that they disclose an aspect

03:35PM 20   of the system.

21        Dr. Leeser knows what tests setup she had.  She

22   was able to go back to her notes and figure it out.  It was

23   a Pentium III computer that had up to four multipliers,

24   standard precision multipliers on it.

25        That's not disclosed in any one of the printed

1    publications that Singular is pointing to.  That's

2    information that Dr. Leeser is a percipient witness is

3    going to provide about the VFLOAT system, and it's kind of

4    similar to this court's reasoning in the *Sionyx* case, the

5    fact that certain evidence goes to proving up the physical

6    system, including maybe printed publications is fine as

7    long as it's using other evidence that wasn't known.

8         And Mr. Hayes was conceding as much during the

9    course of his argument.  He was saying, listen, if there's

03:36PM 10   other information that's coming from the documents or the

11   witnesses that's not disclosed in the printed publications,

12   then in that case, Google is allowed to pursue the

13   argument, it's not estopped from pursuing the argument.

14   That is exactly what's going on here.  I mean, that is the

15   exact situation.  It's not cumulative of anything, and they

16   won't be able to identify that in the publications.  They

17   certainly didn't in their briefing.

18        THE COURT:  Let me try to simplify it, and I

19   wouldn't assume, by any means, certainly I won't assume

03:36PM 20   that I got anything right in Sionyx or that I was not

21   painting with too broad or too narrow a brush, but let's

22   say if I'm thinking about this clearly, in an anticipation

23   argument -- I'm sorry, obviousness argument, so you have a

24   printed publication that describes W and X, and you have

25   another printed publication that describes Y and Z, and

1    Google doesn't disclose either of those publications in the

2    IPR, and then the witness comes in and says I have a system

3    that's W, X, Y and Z, oh, and, by the way, this is also

4    described in these publications, the first publication is

5    W, X, and here's the second one that says Y and Z.  That

6    strikes me as being a complete end run around the IPR

7    process and the estoppel bar.

8            In other words, Google has held back publications

9    that it could have disclosed, that, you know, were relevant

03:37PM 10    to the obviousness argument.  So it seems to me that that

11    just can't be right.

12            Now, if what you're saying, well, no, actually

13    there's U and V, and U and V have not been reduced to

14    publication publications, and they're an important part of

15    this analysis, well, maybe that's a little different

16    because your argument is not based entirely on printed

17    publications, but my first scenario, that just can't be

18    right, that first scenario, that can't be right.

19            MR. KAMBER:  So, and I'll try to keep the letters

03:38PM 20    straight.

21            THE COURT:  Sorry.  It's easier for me to use

22    these mathematical terms.

23            MR. KAMBER:  No, no, but I think you got your

24    finger on the issue here, and I'll say, I'll first give you

25    an answer, which is I think a little bit more of an

1    academic argument.  I think the question, your first

2    question, if there is one printed publication with W and X

3    and another with Y and Z and we could have combined them in

4    a 103 argument, are we estopped from making the 102

5    argument?  Again, I say that's academic because I don't

6    know.  At that point, I think the 103 argument, frankly,

7    would be different than a 102 argument.

8         And the reason I say that is there are different

9    proofs related to obviousness that require proving

03:39PM 10   motivation to combine.  There are objective indicia of

11   nonobviousness that the other side can raise, and so I

12   think that the grounds arguably are different, but I

13   think -- but it's a closer call, I agree with you, but here

14   this isn't that case.

15        What we're arguing, what we're telling your Honor

16   is that this is a case where it's much more like having, I

17   don't even know if it's a single reference, frankly, but

18   let's say multiple references that disclose.  Well, let me

19   put it this way.  Multiple printed publications that may

03:39PM 20   disclose with W, X and Y, but the fact of the matter is

21   none of those disclose Z, and the Z is one example, and I

22   think a key example is one that I just mentioned, which is

23   none of them give you that other part of the equation to

24   tell you whether or not the exceeds limitation is met, how

25   many standard precision floating point multipliers were on

1     the system, the VFLOAT system, for example.

2          It's actually a very similar issue with respect to

3     CNAPS, your Honor, where we got testimony about the whole

4     system but it's not described in the different papers.  So

5     that's much more like *Sionyx*, and it's, frankly, different

6     than the hypothetical that you pose about the two different

7     references, and I think that's the key issue here is that

8     this evidence that *Wasica* case uses a pretty stringent

9     test.

03:40PM 10          It says the evidence in the printed publication

11    has to be entirely cumulative of the system, and the

12    evidence that we're seeking to propose, seeking to present

13    to the jury ultimately is not entirely cumulative.  Not

14    only that, it addresses issues that are not disclosed in

15    any of the printed publications.

16          THE COURT:  I'm not sure I'm comfortable with the

17    word "cumulative" or "duplicative" because the statute

18    doesn't say that.  I may wind up in that place, but that's

19    not how the statute frames this.

03:41PM 20          MR. KAMBER:  Well, I agree with that, your Honor.

21    I mean, the Federal Circuit hasn't spoken on that question.

22    Some courts have applied that kind of test or that kind of

23    reasoning.  I think you, yourself, sort of applied it in

24    the *Sionyx* case to say, I don't know if it uses the word

25    "cumulative," but I do think that you were trying to

1    evaluate or grapple with the question of whether the

2    evidence that was being presented there about the sensor

3    was entirely contained in the printed publication.

4         You know, we don't think that -- I mean,

5    statutorily, you're right, that language is not there, and

6    that test is not there.  Some courts have adopted, other

7    courts have rejected it.

8         THE COURT:  It may be a sensible end point because

9    you can't have an estoppel system that gives you a great

03:42PM 10   big wide-open barn door, you know, to drive around, to be

11   able to hold back and if you lose relitigate the same

12   issue.  It can't work that way.

13        MR. KAMBER:  Right.  Our point here is this isn't,

14   and Mr. Hayes sort of suggests we're trying to pull a fast

15   one, we're trying to have another bite at this.  The fact

16   of the matter is, we couldn't have presented this 102(a),

17   102(g)[R] to the Patent Office.

18        We really couldn't have, and if he says, well, you

19   could have presented the related printed publications, for

03:43PM 20   better, for worse.  Unfortunately, they don't contain all

21   of the limitations.  For example, that exceeds limitation.

22   They don't disclose that aspect of it.  They disclose how

23   many of the LPHDR execution units are there, but they don't

24   disclose the other details, and that's a place where we

25   need to be able to bring in a witness and explain, okay,

1    what was the system, how did it work, what were the

2    details, what was the setup, how many single floating point

3    multipliers did it have, somebody who can provide that

4    level of detail, so...

5         THE COURT:  Putting aside the elements themselves,

6    are you permitted in the IPR process to put on evidence,

7    for example, of a motivation to combine, that sort of

8    thing?

9         MR. KAMBER:  You are permitted, yes, usually

03:44PM 10  parties will use expert testimony and other arguments, and

11   they'll point to literature, for example, to say that

12   there's a motivation to combine or there would have been a

13   motivation to combine, and they can and do do that,

14   obviously, for a 103 ground, right, an obviousness ground.

15        THE COURT:  Right.  Okay.

16        MR. KAMBER:  So let me just briefly touch on

17   CNAPS, your Honor, and GRAPE-3, and then I want to just

18   turn to the slides that Mr. Hayes showed because there are

19   two or three things I want to clear up.

03:44PM 20       Again, I mentioned CNAPS was a similar story.

21   This was a chip set that was developed by Adaptive

22   Solutions.  It used these low-precision formats, but they

23   were fixed point, so our argument is that somebody of skill

24   in the art would have been smart enough to switch them from

25   fix point to floating point, as the technology, the silicon

1    technology got there, and we deposed the designer and the

2    founder of the company, Dan Hammerstrom.  He was also a

3    technical advisor to Singular at one point and subpoenaed

4    him for documents about CNAPS, and those documents are

5    among the things that we cite in the related chart.

6        Our chart cites to half a dozen, maybe more,

7    publications describing different aspects of the CNAPS

8    system and cites to documents that he, himself, produced

9    that have specifications and other information about the

03:45PM 10   CNAPS system, so, again, that situation I think we submit

11   is like *Sionyx*, where we're relying on printed publications

12   in combination with other evidence that was acquired during

13   the course of the case that maybe wasn't a printed

14   publication of some sort.

15       So, GRAPE-3, that was a system that was developed

16   in Japan, was used for astrophysics simulations.  It used a

17   logarithmic number system, kind of what's described in the

18   patents as well in Singular's device.  That was on sale in

19   the United States.  I mean, it was developed in Japan, but

03:46PM 20   we had percipient witness testimony about it being used and

21   sold in the United States, somebody who saw it at a

22   conference, somebody who knows the developers.

23       So, again, it was undoubtedly disclosed as a

24   system in our invalidity contentions, and so that it

25   shouldn't be subject to estoppel either.

1           Turning to the slides, your Honor, slides 3 and 4

2      of Singular's presentation, I just want to call this out.

3      They say in the second or the last bullet on each page,

4      they say, "Google knew of each of these references when it

5      filed.  It is now estopped from relying on these references

6      in the case."

7           And, again, I think that's not true.  We've looked

8      at the statute.  Estoppel applies to grounds and not the

9      evidence, and they are sort of taking this and twisting it

03:47PM 10      just slightly to say, oh, you're estopped from using any of

11      these printed publications, but if your Honor's going to

12      rule it has to be we're estopped from submitting a ground

13      and we submit these printed publications are evidence,

14      they're corroboration, or what have you about the system,

15      again, as you found in the *Sionyx* case.

16           Slide 5, the third bullet mentions this Docket

17      Number 377-21.  It was Exhibit R about the 21-page chart,

18      right?  And they say, "Where Google applied the claims on

19      an element-by-element basis concluding that the printed

03:48PM 20      publication describing the device anticipated and rendered

21      invalid of the claims at issue," that's not true.

22           Our chart and our cover pleading says that the

23      VFLOAT was a system that was made and used.  There's no

24      statement in that chart where we say -- and, by the way, we

25      couldn't have submitted that system, right, to the PTAB?

1    And I pulled it out after I saw the slides, and let me just

2    get to the right page here.

3         What it says is, "As reflected in the thesis and

4    related article, they made and used the system that

5    consists of a device."  That's for the first element.

6    That's kind of the language that's repeated where we say,

7    "As reflected in the thesis, the article, otherwise they

8    made and used a system."

9         These charts don't say, look, there isn't a single

03:49PM 10   publication that discloses all of the elements of this

11   patent.  They don't even say taking these two things

12   together, it's all disclosed, what they're saying is

13   there's corroborating evidence, and it's talking, but we're

14   calling out the fact that they made and used something.

15   These are the other statutory provisions of 102(b).

16        And I think that is critically important in this

17   case, as is the fact that -- and this is where I think it's

18   perhaps I think most daunting is on slide 8, Mr. Hayes

19   showed this bullet, he says, for example, VFLOAT claim

03:50PM 20   chart.  He's citing to that same claim chart, Exhibit R.

21   It's 377-21.  He says, "Publication disclosed every

22   element," and then he says "device comprising, as reflected

23   in the thesis," then period.

24        That's expressly not the argument that is

25   contained in the charts.  It's not saying this thesis

1    discloses each and every element of the prior art.  We

2    didn't chart and pointing to the thesis as evidence, but we

3    didn't say this thesis is a printed publication and that

4    invalidates under 102(a) or (b).  That was never something

5    we said, and I think put these things together and the

6    argument becomes a bit of a house of cards on the Singular

7    side.

8         So, your Honor, let me just close by saying we're

9    talking about physical products here, physical products.

03:51PM 10    They can't be raised during IPR proceedings.  Singular says

11    as much in their brief.  The *Wasica* case says as much as

12    well, and these VFLOAT, CNAPS and GRAPE-3 systems are

13    undoubtedly systems, and Google is using a different form

14    of evidence above and beyond the printed publications, like

15    witness testimony and unpublished documents, to prove them

16    up, and the additional thing is that it's not cumulative.

17         Whether you want to apply that test or not, it

18    certainly is not in the statute, we agree with you there,

19    but the point is that those printed publications don't get

03:52PM 20    us all the way there.  They didn't get us all the way there

21    back in the day when we wanted to file the IPR petitions.

22         Frankly, if we could have found all the

23    limitations in one of these theses or in two of the

24    documents together, we could and would have brought it, as

25    Mr. Hayes said, but because they don't disclose everything,

1    that sort of would have been a Kamikaze mission, and we had

2    to save this argument.  We had to reserve these arguments.

3         We're not trying to be cute or have another go at

4    this.  This is a situation where the district court was

5    really not just the best place but, frankly, the only place

6    under Congress's intent to present system art, to put in

7    front of a jury an actual working system described by the

8    witnesses and buttressed by the corroborating evidence.

9    This is our only opportunity to actually ever present this

03:53PM 10    evidence.

11         THE COURT:  All right.  Mr. Hayes, response?

12         MR. HAYES:  Yes, your Honor.  I'll start from the

13    end, and with all due respect to my client, to the other

14    side here, some of the statements made are just 100 percent

15    opposite to what was done in writing by Google beforehand.

16         The first thing I would like to point out, as my

17    Brother said, oh, we never said that there's anticipation.

18    False.  I've cited to where it is, and I'd like to read it

19    to you.  It says, "The attached respective claim charts,

03:54PM 20    (Exhibits 1-17) identify how the prior art discloses each

21    limitation of each asserted claim, period."

22         That's written by Google.  That's written before

23    they lost.  Now they lose and they come and tell you

24    exactly the opposite, oh, no we didn't think it

25    anticipated.  Of course, they did.  Then they say, oh,

1    well, if we did, we would have given it to them.  Bananas.

2         I have a Law Review article written by Google's

3    own counsel, Nathan Speed, detailing how to circumvent the

4    IPR proceeding, exactly what they did.  So, and that is

5    cited, "Litigation Invalidity After IPR Resolution."  So

6    we're going on it.

7         The next thing is, and it points out the identical

8    strategy, the identical strategy that Google is now doing,

9    and you can find that on Volume 190, it looks like 1942,

03:55PM 10   page 27 of the Chicago-Kent J, Intellectual Property Bar

11   Association, where he talks about one potential strategy is

12   to insulate litigation from the impact of the IPR, make

13   all -- take all your publications that in fact look like

14   devices and save them until later.  That's basically what

15   their strategy is, that's what they did, and it's not

16   genuine, what they just said to you.

17        Next, they say, oh, this couldn't be, this is not

18   cumulative, oh, no, couldn't be.  That's wrong.  Your

19   Honor, it's per se cumulative.  They give a claim chart.

03:55PM 20   We have the claim chart, and as each and every element, my

21   Brother says, oh, we don't have the last element.  That's

22   what he told you.

23        Let me show you the claim chart, which my Brother

24   never brings up, never tells anybody about it.  Can you

25   pull up the claim chart that relates to that last element,

1    please.

2              Judge, can you see that?

3              THE COURT:  Yes.

4              MR. HAYES:  That's the claim chart for Claim 53

5    offered by Google.  The element on the left is the element

6    that my Brother said, oh, no, we don't think that's

7    anywhere in the publication, we couldn't have done that.

8    Look what they said, as reflected in blank.  That's it.

9    They applied that element and every single other element,

03:56PM 10   and so if this isn't putting, with all due respect to the

11   other side, (unintelligible).  And it's sort of like

12   makeup, as we talked now.

13             The other thing, he is talking about, oh, we have

14   other stuff, nonpublic stuff.  They don't have any

15   nonpublic stuff that is, in fact, in any declaration that's

16   been cited.  They have source code, which lessens, and this

17   is a printed publication.  It's published.  They have

18   charts, which are printed publications.  They could have

19   given them to them, and the charts show -- slides, and the

03:57PM 20   slides show nothing more than what's in the printed

21   publications.

22             I mean, you don't even have to get into that,

23   given the fact that the claim chart and the fact is what

24   they're trying to do I think is relatively self-apparent,

25   with all due respect.

1          They could have invalidated this patent or tried

2    to in the Patent Office with those printed publications on

3    both 101, 102 and 103.  That's the same grounds, by the

4    way, that they now say they invalidate but with the system

5    because the system has to either anticipate or render it

6    obvious to invalidate.  That's what invalidates the system,

7    not the fact that it's made.  It's the same thing that's

8    made.  It's the same thing that's in the publications.

9    They admit it.

03:58PM 10          There can be no dispute of this on the record, and

11    it's per se cumulative, and they're per se just trying to

12    avoid.  The statute was never intended to allow this.  I

13    don't know how you could interpret the statute to allow

14    someone not to disclose to the Patent Office a printed

15    publication you admittedly agree is anticipatory, hold it

16    back.

17          How does that help the court?  How does that limit

18    the issues?  How does that shrink or help anything?  It

19    doesn't.  It only helps Google.  That's it.  So that's my

03:59PM 20    position.

21          THE COURT:  Okay.

22          MR. KAMBER:  Your Honor, may I address a few

23    points?

24          THE COURT:  Yes, last word.

25          MR. KAMBER:  Thank you.  I want to go back to

1    there's three arguments in order.  Mr. Hayes started by

2    saying, look, they said this in their cover pleading, and

3    he read you some language, and it's true, what we said was

4    the attached respective claim charts, Exhibits 1 through 7

5    identify how the prior art discloses each limitation of the

6    asserted claims.  We didn't say how each printed

7    publication discloses them.  That would be saying

8    everything is anticipated by a prior art printed

9    publication.

03:59PM 10          We're saying the prior art discloses each

11    limitation.  That's fully consistent with the argument that

12    we're making here before your Honor today as well as the

13    invalidity reports that were submitted.

14          We are saying the prior art, VFLOAT, CNAPS and

15    GRAPE-3 systems, actually the prior art VFLOAT and GRAPE-3

16    systems we argue disclosed each limitation.  It's a 103

17    argument with respect to CNAPS, as I mentioned before, so

18    there's nothing that we said there that is inconsistent,

19    that is somehow belied by our argument.

04:00PM 20          Then there's this argument, there was a mention of

21    Mr. Hayes is constructing an argument I have not otherwise

22    seen that something is per se cumulative.  And I think what

23    he is saying or what that title is meant to encompass is

24    the idea that if you use a printed publication in your

25    claim chart, then as a per se matter, you can't use that

1    printed publication as evidence to support a prior art

2    system.  That's not what the law is.

3         The law is you can use printed publications to

4    describe or as evidence of a system.  Again, there's

5    sometimes the cumulativeness exception, but there's no such

6    thing as saying it's per se cumulative.

7         He points to again that chart that they pulled up

8    377-21.  It's very clear, we never said that the printed

9    publication describes each and every element of the claim.

04:01PM 10    What we said was that the printed publication describes a

11    system that was made and used, and it doesn't cut to all of

12    the details of the system, including the exceeds limitation

13    that I talked about before.

14         This was something that was done as part of the

15    discovery process, as part of putting them on notice of the

16    theory, but to turn around and then use a chart and say,

17    well, this means because you relied on a printed

18    publication, and, by the way, not just a single one,

19    multiple ones to describe the system that somehow that's

04:02PM 20    per se cumulative, that just doesn't stand, and it's not a

21    legally recognized theory or argument.

22         And, finally, I want to talk about the source code

23    just briefly.  I had meant to mention this before.

24    Mr. Hayes said, well, look, the source code was attached to

25    the thesis.  You can look at the -- I think it's been

1    submitted as one of the exhibits.  The thesis has two

2    appendices, Appendix A, that talks about the potential

3    inputs and the different parameters that the VFLOAT library

4    could use, and Appendix B was the code for an Adder

5    circuit, an additional circuit.

6         This case is all about a multiplier circuit, and

7    as that exceeds limitation that I read out before makes

8    clear, it's all about preparing multiplication circuits,

9    and that code is not part of the thesis.  It wasn't part of

04:03PM 10   the printed publication, and the code, there's hundreds of

11   pages, or at least 100 pages, I would say, I would venture

12   of code that's not included in the Pavle Belanovic's thesis

13   and isn't part of the written record or part of the printed

14   publication.

15        THE COURT:  All right.  Here's what I'd like to

16   do.  I'm going to call an end to this.  I'm going to give

17   the parties an opportunity to file brief, nonrepetitive

18   post-motion or post-hearing supplemental briefs if you

19   choose.  You don't have to.  Why don't I give you until a

04:04PM 20   week from Friday, which I think is January, the 20th.  In

21   light of the Martin Luther King holiday, I'll give a little

22   extra time if there's something you want to elucidate or

23   explain or emphasize arising out of this argument, and

24   otherwise I'm going to take it under advisement.

25        MR. KAMBER:  Is there a page limit for that brief,

1    your Honor?

2         THE COURT:  The page limit is having mercy on the

3    Judge and his law clerks.  I will ask you to exercise

4    common sense.  If you give me something that's 30 or 40

5    pages long, I'm going to groan inwardly and maybe

6    outwardly, so pick your spots.  If you have a point that

7    you think you need to make that wasn't made quite as

8    clearly as you would have liked in your opening brief in

9    light of how this has unfolded or whatever, I'll give you

04:05PM 10    an opportunity do that, and you can take a pass for that

11    matter if you want to stand on your briefs.  It's just an

12    opportunity, that's all.

13         MR. KAMBER:  We'll exercise good discretion, your

14    Honor.

15         THE COURT:  It's not the first time a lawyer has

16    made that promise to me.  I'm not going to give an

17    artificial deadline because I don't know what you want to

18    say, if anything.

19         Mr. Hayes, does that work for you?

04:05PM 20         MR. HAYES:  Yes, sir.

21         THE COURT:  Thank you, all, and, again, I'll take

22    the motions under advisement, the motion.  Thank you.

23         (Whereupon, the hearing was adjourned at

24    4:05 p.m.)

25

1                    C E R T I F I C A T E

2

3      UNITED STATES DISTRICT COURT )

4      DISTRICT OF MASSACHUSETTS ) ss.

5      CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8      Pages 1 through 42 inclusive, was recorded by me

9      stenographically at the time and place aforesaid in Civil

10     Action No. 19-12551 -FDS, SINGULAR COMPUTING LLC vs. GOOGLE LLC

11     and thereafter by me reduced to typewriting and is a true and

12     accurate record of the proceedings.

13             Dated January 16, 2023.

14

15                           s/s Valerie A. O'Hara

16                      _____

17                      VALERIE A. O'HARA

18                      OFFICIAL COURT REPORTER

19

20

21

22

23

24

25