```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4    SINGULAR COMPUTING LLC,            )
                                        )
 5                     Plaintiff        )  Civil Action
                                        )
 6                                      )  No. 19-12551-FDS
      vs.                               )
 7                                      )
      GOOGLE LLC,                       )
 8                     Defendant        )

 9

10    BEFORE: CHIEF JUDGE F. DENNIS SAYLOR, IV

11

12

13                          MOTION HEARING

14

15         John Joseph Moakley United States Courthouse
                        1 Courthouse Way
16                      Boston, MA 02210

17

18                        June 28, 2023
                           9:00 a.m.
19

20

21

22

23            Valerie A. O'Hara, FCRR, RPR
                    Official Court Reporter
24    John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com
```

1    APPEARANCES:

2    For The Plaintiff:

3        Prince, Lobel, Tye, LLP, by ADAM R. DOHERTY, ESQ.,
     One International Place, Suite 3700, Boston, Massachusetts
4    02110;

5        McCarter & English, LLP, by BRIAN M. SEEVE, ESQ.,
     265 Franklin Street, Boston, Massachusetts 02110;

6
         Sunstein LLP, by KERRY L. TIMBERS, ESQ.,
7    100 High Street, Boston, Massachusetts 02110;

8    For the Defendant:

9        Keker, Van Nest & Peters LLP, by ROBERT A. VAN NEST, ESQ.,
     RACHAEL E. MENY, ATTORNEY, and DEEVA SHAH, ATTORNEY,
10   633 Battery March Street, San Francisco, California 94111.

11       Kwun, Bhansali, Lazarus LLP, by ASIM M. BHANSALI, ESQ.,
     555 Montgomery Street, Suite 750, San Francisco, California
12   94111;

13       Wolf, Greenfield & Sacks, P.C., by NATHAN R. SPEED, ESQ.,
     600 Atlantic Avenue, Boston, Massachusetts 02210.

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  You may be seated.

3   Court is now in session in the matter of Singular Computing

4   LLC, vs. Google, LLC, Matter Number 19-12551.

5          Would counsel please identify themselves for the

6   record, starting with the plaintiff.

7          MR. TIMBERS:  Good morning, your Honor, Kerry Timbers

8   from Sunstein for plaintiffs, Singular.

9          THE COURT:  Good morning.

08:59AM 10          MR. SEEVE:  Good morning, your Honor, Brian Seeve,

11   Prince, Lobel, Tye for plaintiff, Singular.

12          THE COURT:  Good morning.

13          MR. DOHERTY:  Good morning, your Honor, Adam Doherty,

14   also Prince, Lobel, Tye for Singular.

15          MR. VAN NEST:  Good morning, your Honor, Bob Van Nest

16   of Keker, Van Nest & Peters here for Google.  I'm here with

17   Rachel Meny and Diva Shah from our firm, with Asim Bhansali

18   from the Kwun, Bhansali firm and with Nathan Speed from Wolf,

19   Greenfield, and we do have two Google representatives here

09:00AM 20   today with us, Ken Maikish and Mann Howlander, who are seated

21   here in the gallery.  Good morning.

22          THE COURT:  Good morning, all.  This is a hearing on

23   multiple motions.  We've got a lot of ground to cover.  I have

24   a sentencing at 11 a.m., which means we have until 10:45,

25   10:50, so I'm not sure what the right way to structure this is.

1    I don't want to put artificial limits on you, except I want to

2    divide the time roughly equally, so let's call it 55 minutes

3    apiece, and I'll let you emphasize what you want to emphasize.

4        I don't know if you've talked about what makes sense

5    in going first, it probably makes sense to begin with Google's

6    motion to continue the trial and then do the summary judgment

7    motions and then the Daubert motions, but, Mr. Van Nest, does

8    that work for you?

9        MR. VAN NEST:  That's fine, your Honor.

09:01AM 10        THE COURT:  All right.  Why don't we do that.  Don't

11    be afraid or worried about talking down to me but treating me

12    like a kindergartner, I will appreciate that very much.  Don't

13    assume I know anything, and the point of this is to summarize

14    and to hit the high points of things that you think I really

15    ought to focus on and you really care about.  Obviously, I have

16    a stack of material.  Some of this is quite technical, but the

17    floor is yours.  Mr. Van Nest.

18        MR. VAN NEST:  Thank you, your Honor.  If I may, could

19    I start with our non-infringement motion?  I don't have

09:01AM 20    anything to add to the motion to continue other than --

21        THE COURT:  That's fine.

22        MR. VAN NEST:  -- what I nix in the papers.  So this

23    is the motion for summary judgment of non-infringement on

24    behalf of Google, and before I get into the slides, just by way

25    of introduction, your Honor, Singular alleges that Google's

1    Tensor Processing Units, or TPUs, infringe the two remaining

2    claims in the case.  Those claims, which are Claim 53 of the

3    '273 patent and Claim 7 of the '156 are both device claims, and

4    our motion is based on a purely structural limitation present

5    in both claims.

6         The claims both require that the number of

7    low-precision, high-dynamic range execution units in the

8    product exceed by at least 100 the number of 32-bit processing

9    units.

09:02AM 10         Now, the Court has construed the term, "low-precision,

11   high-dynamic range execution unit" to mean "a processing

12   element comprising an arithmetic circuit paired with a memory

13   circuit."  And you observed in your order that the

14   specification teaches that the processing element is a tangible

15   object, hardware, in other words.

16         Now, there's no dispute between the parties about

17   what's necessary to satisfy the claims.  The parties both agree

18   that each TPU contains 8200 circuits capable of performing

19   operations on 32-bit inputs, therefore, there must be at least

09:03AM 20   8300, 100 more, low-precision execution units to satisfy this

21   limitation.

22         The accused TPUs simply don't meet this requirement,

23   your Honor, based on the physical structure of the chips.

24   There's no dispute there that needs to be submitted to the jury

25   because the parties agree on what the structure is.

1        According to the opinion of their expert and the

2   undisputed facts they stipulated to, there only exists no more

3   than 1,000 such units in the TPUv2 and roughly 2,000 units in

4   the TPUv3, far fewer than the claims require.

5        I have some slides, your Honor, which we're going to

6   display.  I can also hand out a set to your Honor and your

7   clerks.

8        THE COURT:  All right.

9        MR. VAN NEST:  So let's begin.  This is a literal

09:04AM 10  infringement claim.  Let's go to our first slide.  So to

11  establish literal limitation, as your Honor knows, every

12  limitation must be found in the accused product exactly, and

13  what we're talking, as we are here, about an apparatus claim,

14  the device must meet all structural limitations, and we're

15  focusing on one that is present in both of the claims.

16       And as your Honor is aware, on our next slide, the

17  burden of establishing infringement is on the plaintiff, and so

18  if they can't put forth evidence to support a finding that one

19  of the limitations is met, that's it, non-infringement is out

09:05AM 20  and summary judgment is appropriate.

21       Here's the claim language.  This is the relevant.

22  I've added the A and the B to simplify it a little bit, so this

23  is, wherein the number of A, that's the low-precision units in

24  the device, exceeds by one hundred the nonnegative integer

25  number, that's just setting a minimum, of B, execution units,

1    adapted to execute at least the operation of multiplication on

2    floating point numbers at 32 points, 32 bits wide, so that's

3    more full precision.

4         Now, your Honor -- let's go to the next slide.  Your

5    Honor has construed this to be hardware.  There was a debate

6    about this at the Markman.  Your Honor accepted the plaintiff's

7    instruction, which is what this is, a low-precision,

8    high-dynamic range execution unit is a processing element

9    comprising an arithmetic circuit paired with a memory circuit.

09:06AM 10        That's what plaintiffs requested, and they urged the

11   Court to find that this was physical hardware, and you did, the

12   specification uses the term, "processing element," as though it

13   were a tangible object, and the specification teaches that the

14   processing element is a tangible object that comprises

15   arithmetic and memory circuits.

16        Now, this is not any limitation, your Honor, it's an

17   important one, as this next slide shows, because since the

18   Patent Office found that low-precision, high dynamic range

19   units were known, this limitation is the one that Singular is

09:07AM 20   pressing as the main inventive feature in their structure, so

21   you can see these are excerpts from the briefing.

22        They refer to it as a specific structural limitation

23   and very specific limitation.  The bottom quote pertains

24   directly to the limitation that we're talking about right now.

25        Now, there is no dispute between the parties about

1    what's required to meet this limitation.

2         Next slide, please.  Dr. Khatri reports that there are

3    8200 execution units in each device capable of 32-bit

4    multiplication, so that's our base line.  That's the base line.

5    According to the claims, you have to have at least one hundred

6    more than that, and Singular agrees with that as well, in order

7    to meet the exceeds by at least one hundred requirement, an

8    accused TPU board needs to include at least 8300 low-precision,

9    high-dynamic range execution units.

09:08AM 10        Now, in his effort to establish infringement, I'm

11   showing you a picture there, your Honor.  We've blacked it out

12   on the public screen.  This is Dr. Khatri's attempt to read the

13   claim on Google's TPUs, and as you can see there, he's created

14   a drawing.  This was in his deposition.  I think it's in his

15   report.  The above figure shows the components of a

16   low-precision, high-dynamic range execution unit.  They include

17   the precision reducer circuits, those are the box labeled R,

18   and you can see, your Honor, there are two of those, a memory.

19        THE COURT:  And, I'm sorry, what are the boxes on the

09:09AM 20   left?

21        MR. VAN NEST:  They're providing simply inputs.

22        THE COURT:  Okay.

23        MR. VAN NEST:  Data coming in, and these are rounding

24   circuits that are rounding down --

25        THE COURT:  Okay.

1          MR. VAN NEST:   -- from 32 to 16.   The GMR is the

2    memory, and one multiplication circuit that's indicated by the

3    X on the right.

4          So according to Dr. Khatri, in order to have an

5    arithmetic circuit, you need two rounding circuits and a

6    multiplication unit.   That's what's shown here.   And in their

7    brief, they refer to this as a specific physical hardware in

8    each unit, a specific physical hardware in each unit.   That's

9    what he has defined.

09:10AM 10          Now, I will say that this is his diagram.   There's no

11    circuit that looks exactly like this, but we'll accept it for

12    the purpose of today.   As your Honor knows, we've mentioned

13    before there are different components in the chip, but this is

14    his attempt to read it on the TPUs.

15          Unfortunately for him -- oh, go to the next slide.

16    It's also stipulated in connection with this motion as to how

17    many rounding circuits there are in each product.   In the

18    TPUv2, there are only 2,048 rounding circuits all in.   That's

19    how many exist on the chip.

09:10AM 20          In the TPUv3, there's more than that, 4,096, basically

21    twice as many, but the parties are in agreement that that's all

22    there is on these two products.   That's the limit, that's the

23    total of the rounding circuits on the TPUv2 and the TPUv3.

24          Therefore -- let's go to our next slide -- since each

25    unit requires two rounding circuits to establish the arithmetic

1    circuit that's necessary in the processing element, the TPUv3

2    cannot have any more than 1,000 purported low-precision,

3    high-dynamic range execution units.

4         Now, I'll pause here and say, your Honor, we don't

5    agree that there are any such units because the Google products

6    perform exact precise math, but we'll accept his representation

7    for the purpose of this motion.  That's for another day, if we

8    get there.

9         And in the TPUv3, just doing the math, and looking

09:12AM 10   again at the hardware, there can only be 2,048 low-precision,

11   high-dynamic range execution units according to Dr. Khatri in

12   the TPUv3, not enough to hit the 8300 minimum required number

13   present in both of these claims.  None of the responses by

14   Singular change this, your Honor, because the physical

15   structure of the chip is, as I indicated.  There's no debate

16   about that.

17        Dr. Khatri is claiming that because the chips perform

18   a certain number of operations, that's enough, but that's not

19   the case under clear Federal Circuit law.  This is not a method

09:12AM 20   claim, it's an apparatus claim.  In an apparatus claim,

21   infringement is determined not by what the structure does but

22   what the structure is, what are the components in the

23   structure.

24        We cited the *Hewlett-Packard* case and the *Edgewell*

25   case, and I think Singular essentially agrees with that because

1    they've more or less abandoned abandoned that in their

2    opposition.  That's the theory that he posited in his report

3    and in his deposition, but that theory clearly doesn't work

4    under Federal Circuit law.

5         Now, their newfound theory, the so-called, "unique

6    pairs theory -- "  let's go to the next slide.  This is

7    redacted, but you see the image on the page there, your Honor.

8    This theory was not disclosed in his reports, it was not

9    disclosed in his contentions, but it fairs no better.  The only

09:13AM 10   way for him to try to reach this 8300 minimum required circuit

11   structure is to not only double count rounding circuits but

12   count each one 128 times.  That's absolutely clear from the

13   argument.

14        Take a look at what's on the page there, your Honor.

15   This wasn't even in Dr. Khatri's report.  He's borrowed it from

16   Dr. Walker.  You see at the bottom there, there are three pairs

17   of circuits.  Those are the rounding circuits, the so-called

18   precision-reducing circuits.  There are three pairs.

19        Above that in the grid, you see nine multiplication

09:14AM 20   units, MXUs.  And those three pairs are sending multiple

21   signals, inputs to those nine.

22        Now, Singular wants to count this as nine circuits,

23   but it's not.  It's at most three circuits because there are

24   only three pairs of rounding circuits depicted here.

25   Obviously, the chip has many more, but they all fall into this

1    sort of diagram.  They are wanting to count over and over and

2    over 128 times the same rounding circuits in order to meet the

3    requirement, but that flies in the face of the claim itself,

4    which requires a minimum number of units.  It flies in the face

5    of your Honor's claim construction, which doesn't talk about

6    emulating a circuit or virtual circuits, it's talking about

7    hardware circuits, arithmetic circuits paired with a memory

8    circuit, and these are units.

9         We know it's hardware because we argued about that at

10   the Markman, and so the only way that Dr. Khatri can get there

11   is by imagining that one circuit with two rounding circuits and

12   an MXU is, in fact, 128 because of the way it operates.  That's

13   just not the way the law operates.  That's not the way your

14   claim construction was written.  That's not the way the

15   requirement is written, it's a structural requirement, not a

16   method claim, and based on that, your Honor, summary judgment

17   is appropriate.

18        There's not a question here to be submitted to the

19   jury, given your Honor's claim construction, the clear language

20   of the claim itself, and the parties' agreement as to what the

21   structure of the TPUs is.  There's no dispute.  Dr. Khatri is

22   not claiming that there are 16,000 circuits here because he

23   knows there are only 2,000 rounding circuits in the TPUv2 and

24   4,000 in the TPUv3.

25        He's saying because this device creates a hundred,

1    whatever 16,000 outputs in a clock cycle, that meets the claim.

2    It doesn't.  You can't -- if you have a coffee maker that can

3    make five cups of coffee in a minute, so be it, it's only one

4    coffee maker.

5         The fact that these rounding circuits may send more

6    than one signal doesn't matter.  The claim requires a

7    particular structure, a minimum number of elements, and they

8    can't meet the claim based on what's indisputably there in the

9    TPUs.

09:17AM 10    THE COURT:  All right.  Let me hear, who is going to

11    take the lead for Singular?

12         MR. SEEVE:  I am, your Honor.  Good morning.  So I'd

13    like to begin just with the assertion that there's no dispute

14    of material fact here.  There very much is a dispute of

15    material fact, and so we have printed copies of the slides.

16    Much of them are confidential, and we didn't redact them, so I

17    don't think they're going to appear on the screen, but you

18    should see them, the packet with just two or three slides.

19         THE COURT:  I think I have a paper copy.

09:18AM 20    MR. SEEVE:  Okay, great.  So in the first slide that's

21    not the title slide, you can see what the factual dispute here

22    is.  You have Singular's position as set forth by Dr. Khatri,

23    Singular's expert, which says there are 131,000 LPR execution

24    units in one of the accused products, and in the other accused

25    product, there are 262,000 of these things.  Google's position,

1        by contrast, and this is a quote from Google's expert,

2        Dr. Walker, he said that there are 1,000 LPDHR execution units

3        in the first accused product and 2,000 in the second.

4              Now, that's not only a dispute of fact, that's a huge

5        difference between the opinions of Google's experts and

6        Singular's experts, and it's material to the question because,

7        as Mr. Van Nest explained, this is about the exceeds

8        limitation, and the question is how many of these LPHDR units

9        are there, and that very fact is clearly in dispute.

09:19AM 10             Now, Google didn't include this fact in its steepened

11       supposedly undisputed facts in the hope that no one would

12       notice, but Singular in its reply to Google stated in its

13       undisputed facts it did include these two facts that you see

14       here as disputing.

15             And in Google's reply, it made no response whatsoever

16       to those facts.  It didn't dispute them, it didn't not dispute

17       it, it merely referred generally to these facts as immaterial,

18       right, but they couldn't be more material.

19             Now, Google also admits that it didn't cite in its

09:20AM 20       entire motion for summary judgment or its reply the testimony

21       of its expert, Dr. Walker.  It said that this testimony was

22       irrelevant to the question, it's only about the testimony of

23       Dr. Khatri.  Well, that makes their entire argument attorney

24       argument.

25             Here, we have Dr. Khatri explaining why there are

1    hundreds of thousands of these things in the accused products.

2    On the other hand, we have Google with no expert support

3    whatsoever asserting that there's only a thousand or two

4    thousand.  That's clearly a dispute of material fact, it's

5    something that should go to the jury, and that alone should end

6    the inquiry here about whether Dr. Khatri's testimony gives

7    rise to summary judgment for non-infringement.

8          Now, the second point Mr. Van Nest made was about this

9    conflation of a method claim with a system claim.  He said that

09:21AM 10   Dr. Khatri's infringement argument relates to operations per

11   cycle, and that's improper because it's a device claim, it's a

12   tangible thing, et cetera.

13         Dr. Khatri's opinions are perfectly consistent with

14   the fact that this claim, the asserted claims in this case, are

15   device claims, Singular explaining very detailed why that's the

16   case in its opposition, and Google offered no response.

17         I'll explain now the idea here, your Honor, is that

18   the number of operations per cycle that a device can perform is

19   evidence of how many units are in that device.  Think about it

09:21AM 20   like a violin.  If you have a violin and you hear that violin

21   play a single note, well then, you only know that that violin

22   has at least one string.  Maybe it has more, but you only know

23   that it has one string.  If you hear that same violin play two

24   notes at the same time, suddenly you know that violin must have

25   at least two strings.  There's no other way a violin could play

1    two notes at the same time.

2            Similarly, with Dr. Khatri's argument, Dr. Khatri is

3    saying this device does 16,384 low-precision operations at the

4    same time.  Just like the violin, that means it must contain at

5    least 16,384 execution units.

6            Dr. Khatri is not saying it infringes because of the

7    operations that it performs, Dr. Khatri is saying that the

8    operations it performs are evidence of the structure that's

9    necessary, and I think Mr. Van Nest showed a slide.  I can't

09:22AM 10   remember which number it was, but that actually shows the

11   structure that Dr. Khatri pointed to that corresponds to this

12   low-precision, high-dynamic range execution unit.

13           No one is denying it's a physical structure.

14   Dr. Khatri was very clear on this at all times, so this idea

15   that Dr. Khatri's testimony should be excluded or there should

16   be a summary judgment in this case because of the conflation of

17   method claims with system claims is simply false.

18           So that, I think, goes to the second point that

19   Mr. Van Nest raised.  As for the third point, the question of

09:23AM 20   whether the claims limitations are purely structural versus

21   functional, Google started out by saying the claim is a purely

22   structural claim, Dr. Khatri talking about operations is

23   irrelevant to the question of infringement, and in our

24   opposition, we point out that, yes, it's a device claim, but

25   that device has to do something, and, in particular, it has to

1    do with this low-precision operation.

2         The claim is very specific as to what that operation

3    implies, so the idea that Dr. Khatri talked about operations in

4    his infringement report makes it irrelevant, that is simply not

5    true.  The claim requires operations.  Dr. Khatri needed to

6    talk about those in proving infringement.

7         And, finally, I'll deal with this question, I believe

8    it was the last issue that was raised of the question of

9    whether there's some new argument in Dr. Khatri's report,

09:24AM 10   whether Singular is shifting arguments from an operations per

11   cycle argument to a unique pairs argument.

12        First of all, this Court held correctly just a few

13   weeks ago that Dr. Khatri's infringement opinions are not new.

14   These are not new, they're not new things that Dr. Khatri came

15   up with, they were disclosed during fact discovery.  They were

16   clearly disclosed in Dr. Khatri's report, so this isn't a new

17   thing at all.

18        Singular's arguments have remained the same

19   throughout, and those arguments rest on this idea that rounders

09:24AM 20   can be shared.  You've got two rounders that supply inputs to a

21   multiplier, but one of those rounders also supplies inputs to

22   another multiplier.  That doesn't mean that it's not two LPHDR

23   execution units.

24        Google never contends or offers any expert testimony

25   or any claim construction whatsoever by the Court, doesn't

1    point to anything in the Court's Markman order that contradicts

2    this basic principle, and, indeed, the patent specification

3    specifically talks about how circuitry can be shared.

4         So the structure of the accused products, we also have

5    a slide showing that actually it's the last slide, it's the

6    same figure that Mr. Van Nest showed.  He said, oh, it's very

7    clear, he said that there are three circuits in this diagram.

8    Well, that might be clear to Mr. Van Nest, but to me, it looks

9    like there are nine circuits.  In the diagram, you see that

09:25AM 10   grid with nine circuits.  There's six rounders at the bottom.

11   They're little colored squares, but as you can see in the

12   diagram, and this is Google's own diagram, in the above grid,

13   each of those rounders is arranged in a unique set of pairs.

14        You've got those nine colored pairs of rounders in the

15   above grid, and each one of them is unique, so, yes, the units

16   that Dr. Kahtri points to are physically distinct.  None of

17   them contains the exact same circuitry.

18        We can get more into the technical details of the

19   argument, if your Honor has questions about it, but I think the

09:26AM 20   fact that there's a clear dispute of fact should short-circuit

21   that whole discussion.

22        THE COURT:  Let me, I think an analogy would help me

23   understand the two positions, and this may not work, so let me

24   toss this out and get your reaction.  Let's picture a subset of

25   the island of Manhattan.  You want to go from Penn Station to

1    Grand Central, and let's say hypothetically we'll call it

2    12 by 12, 12 streets, 12 avenues.  It's a grid.  The structure

3    of that part of Manhattan has 24 things, 12 streets, 12

4    avenues.  I don't know how many thousand different ways you

5    could do that walk or whatever the right number is, but the

6    physical structure is this grid and the function is you can

7    walk in different ways and whatever that number is, the

8    different possibilities.

9         Are you saying that the right number, I mean, this is

09:27AM 10    a device, right?  I think Google is saying, no, there's only 24

11    because that's a physical structure, and you're saying no, it's

12    I'll pick a number, I don't know what the right number is, one

13    thousand ways that you can do that walk, including two people

14    could do that walk without encountering one another.

15         MR. SEEVE:  I liked that analogy, your Honor, but I

16    would make a slightly different analogy about that same set of

17    grid of streets.  So there's 12 avenues and 12 cross streets,

18    and Google is saying that means there are 24 -- sorry, a total

19    of 12 street corners, right?  A street corner requires an

09:28AM 20    avenue, it requires a cross street, you know, 42nd and 5th,

21    that's a street corner, right?  So if you have 12 avenues and

22    you have 12 cross streets and each corner requires a pair, you

23    have 144 street corners, and those are physical things.  You

24    can go to the corner of Third Avenue and 212th Street.  You can

25    go to that corner, that's a thing, and Google is saying, no,

1    you've got 10 avenues, you've got 10 cross streets, you've only

2    got 12 street corners, and that totally ignores the remaining

3    90 street corners that clearly exist in New York.  It makes

4    New York a lot more smaller than it is.

5         Singular's argument recognizes that you compare an

6    avenue, Fifth Avenue with multiple cross streets.  It's not

7    counting it twice because it corresponds to a whole bunch of

8    different, physically different tangible street corners, and

9    just like that, we're arguing that this rounder grid, it's the

09:28AM 10  third slide in our slide.

11        You see that grid.  It's very much like the streets of

12   New York, and you see there's one round set of rounders that it

13   sort of feeds the cross streets.  There's one set of rounders

14   that feeds the avenues, and together you can look at the

15   physical structure -- and that diagram is physical -- of those

16   units, and you can count that there are nine of them, nine

17   physical things.

18        So that I think is a -- if we're making an analogy to

19   street corners, I think that analogy is the one that Singular

09:29AM 20  would go with.

21        THE COURT:  Okay.  Mr. Van Nest, your response?

22        MR. VAN NEST:  I think you hit the nail on the head,

23   your Honor, with your analogy, that is the debate.  Under

24   Dr. Khatri's theory, you have to have two avenues, right, two

25   rounding units.  There are only a certain number of streets and

1    avenues.  That's the structure.  This is a structural claim.

2          I'm talking now about the limitation that we're

3    focused on, the exceeds limitation is a structural limitation,

4    and we all agree on that, and the claim itself is an apparatus

5    claim.  Your Honor's claim construction makes very clear we're

6    talking about hardware here.

7          Can I have slide 9 from our deck, please.  Nothing I

8    heard changes what I said at the beginning.  This is not a

9    dispute about facts.  Dr. Khatri's got an argument, but it's

09:30AM 10   just an argument, and it's improper based on the claim

11   requirement, based on your Honor's claim construction, and

12   based on common sense.

13         They've agreed that there are only 2,048 rounding

14   circuits on the board.  That's the avenues of Manhattan, the

15   lower side.  They've agreed on that, and they've also agreed

16   that on the TPUv3, there's only 4,000 and unique, too, for each

17   arithmetic circuit.

18         So they've confirmed what I said at the beginning that

19   they are double counting, triple counting, 128 times counting

09:31AM 20   the operation in order to try to meet a structural limitation,

21   and that's simply improper under Federal Circuit law.

22         There's no dispute about the avenues and the street

23   corners.  They're saying that because you can walk it any

24   number of different ways, therefore, there must be more.  Well,

25   there aren't more.  Just like the violin, there are five

1    strings, six strings.  It may play hundreds of notes, but

2    there's only six strings and one violin.  That's the point that

3    I'm trying to make.

4          Now, we had a debate at the Markman about how to

5    define these low-precision, high-dynamic range units, and we

6    talked about whether they could be virtual, they could be

7    software, they could be anything else.  No.  What was decided

8    based on what the plaintiff wanted was a clearly structural

9    hardware construction, and that's what we have.

09:32AM 10         You have to have an arithmetic circuit paired with a

11   memory, and according to Dr. Khatri, the only way that he can

12   read this on the TPUs is by saying that arithmetic circuit

13   requires two rounding circuits and a multiplication circuit.

14         That is immutable.  That's his theory, and they've now

15   confirmed that the only way they can even argue, and it is just

16   an argument, not a dispute of fact, is by saying that because

17   we perform multiple operations with that circuitry, therefore,

18   there must be more.  There aren't more.  There aren't more.

19   They can't create more on the device, and they've stipulated to

09:32AM 20   what's there, so that's why I say summary judgment is

21   appropriate, your Honor.

22         There's no question for the jury to decide here based

23   on a claim construction, the limitation itself, the agreed upon

24   structure of the device.  They simply cannot meet this

25   limitation, and it's a required limitation in both of the

1    remaining two claims before the Court.

2           If you have any further questions, your Honor, I'm

3    happy to answer them, but I think you have clearly in mind the

4    dispute.

5           THE COURT:  All right.  Mr. Seeve, last quick word on

6    this topic.

7           MR. SEEVE:  I mean, I think I've largely said my

8    piece, your Honor, except I'd just like to reiterate we're not

9    talking about how to walk from one street corner to another,

09:33AM 10    we're talking about the street corners themselves, which are

11    physical devices, and there's four strings in a violin, and

12    that's also a disputed fact, but I don't think it's material in

13    this case.  Thank you, your Honor.

14           THE COURT:  All right.  What should we take up next?

15    Mr. Van Nest.

16           MR. VAN NEST:  I think we'd like to take up the

17    Daubert on Dr. Green, Mr. Green, and Ms. Meny is going to argue

18    that.

19           MS. MENY:  And, your Honor, I have some slides there

09:33AM 20    as well.  May I bring them to yourself and the clerks?

21           THE COURT:  Yes.

22           MS. MENY:  As your Honor knows, Mr. Green's damages

23    opinion in this case proffers a massive royalty base and a vast

24    range of huge royalty numbers.  The size of Mr. Green's huge

25    numbers warrant the Court's special attention here because it

1    is unprecedented, especially given the narrow allegations of

2    the allegedly unique invention at issue here.

3         This is a classic case, your Honor, of where a

4    plaintiff is trying to put forward a large royalty base, number

5    in its base so that its rate number, ultimate rate number looks

6    small.  It is Singular's burden to prove that Mr. Green's

7    damage model is appropriate, and it cannot do that here, and so

8    Mr. Green's motion, Mr. Green's opinion should be excluded.

9         I want to focus your Honor on two key issues today.

09:35AM 10   There are numerous problems with Mr. Green's opinion, but I

11   think the two most important ones to focus on are his cost

12   savings hypothesis that 100 percent of the purported costs

13   would go to Singular in the base, and also the fact that he

14   creates his base without -- by using the entire market value

15   rule instead of the smallest saleable patent practicing unit.

16        So the first reason that Mr. Green's opinion should be

17   excluded is because Mr. Green's base calculation gives 100

18   percent of the alleged cost savings from the TPU to Singular in

19   the base.

09:36AM 20        And I'll put forward the first slide, please.  Your

21   Honor, this is a redacted version of how Singular creates its

22   cost savings analysis.  They do essentially the same analysis

23   in Exhibit C, F and I, and they do it for different versions of

24   the pod and the donut, but as it shows, your Honor, the top six

25   lines essentially show what they are doing, and they use four

1    costs.

2              The saved accelerator cost and volume is essentially

3    their chip purchase cost number, and then the operating expense

4    savings, the electric expense savings, and the data center

5    construction costs, your Honor, are all data center related

6    costs.  They are assuming, Mr. Green is assuming that the TPU

7    system in the data center saves a certain amount of costs.

8              The only reduction -- the top line numbers, your

9    Honor, are the total numbers, and the only reduction that

09:37AM 10   Mr. Green makes to those numbers is what is shown in the

11   middle, which is that he applies a weighted average cost of

12   capital of 12.5 percent when he does his cost savings analysis,

13   and he applies a weighted average cost of capital of 26 percent

14   for his excess returns analysis, and so that means that

15   Mr. Green's base, when you take the total amount minus the

16   discount, gives 100 percent of the costs allegedly saved to

17   Singular, and that is clearly erroneous under clear Federal

18   Circuit law.

19             Federal Rules of Evidence says that expert testimony

09:37AM 20   has to be based on specialized knowledge and a reliable

21   foundation, and at its core, that means it must be economically

22   rational, but Mr. Green's decision here unilaterally to give

23   100 percent of the cost savings to Singular in the base is not

24   economically rational, and Federal Circuit law makes clear that

25   it must be economically rational to go to the jury.

1          And I point your Honor to the *Uniloc* case, in which

2     the Federal Circuit rejected the plaintiff's 25 percent rule

3     saying it was not grounded in economics and also

4     *Laser Dynamics*, in which the Federal Circuit rejected a

5     plaintiff's one-third apportionment rule that the Federal

6     Circuit found was plunked out of thin air and lacked credible

7     economical analysis.

8          And the *Looksmart* case that we cited in our brief,

9     your Honor, shows exactly why Mr. Green's royalty calculation

09:38AM 10    in this way is economically irrational and unfounded.  That

11    case actually involves almost the exact same calculation, your

12    Honor, that Mr. Green did here.

13         The *Looksmart* expert calculated the cost.  He

14    calculated what he believed were the total cost savings, and

15    the only discount he applied was a 12 percent discount rate.

16    And what the *Looksmart* Court said was that that damage opinion

17    needed to be excluded because giving 100 percent cost

18    allocation is unsupported under rudimentary economic and common

19    sense because if a defendant gains nothing by using the

09:39AM 20    invention, the defendant would never engage in the hypothetical

21    negotiation, and I point your Honor to the *Looksmart* case at

22    star 3.

23         And lastly, your Honor, *Looksmart* also addresses

24    Singular's other argument on this issue, which is that they

25    gave Google other benefits by not including revenue within this

1    cost number, and Federal Circuit cases like *Uniloc* and

2    *LaserDynamics* are perfectly clear that you can't start with a

3    faulty premise and fix that premise by saying your intermediate

4    assumptions are okay, and that's what Mr. Green and Singular

5    are doing here, and *Looksmart* rejected the same opinion for the

6    same reasons.

7    The second reason that Mr. Green's damages opinion

8    here should be excluded, your Honor, is because he did not use

9    the smallest patent practicing unit to calculate his huge

09:40AM 10   royalty base.  And Federal Circuit law is clear that unless the

11   plaintiff shows that there is a basis to use the entire market

12   valuable here, the smallest patent practicing unit must be used

13   as the base, and that is required in order to avoid skewing the

14   damage horizon and in order to ensure that the ultimate number

15   is isolating to the value of the limited alleged patented

16   improvement.

17   And Mr. Green is attempting to present a huge royalty

18   base here because he uses a broad TPU system number to create

19   his cost savings base, not the cost of the smallest saleable

09:41AM 20   patent practicing unit, which is the chip, and I want to walk

21   your Honor through why that is.

22   So, first of all, your Honor, there is no dispute in

23   this case -- next slide, please -- that Singular's alleged

24   patented invention is at most a subcomponent of the TPU chip.

25   This is from Dr. Khatri's report, and Dr. Khatri concedes that

1    what's at issue are the TensorCores, that those are included

2    within the chips, and that the devices comprise at least one

3    VPU, one MXU, and one Core Sequencer, which are in the

4    TensorCore in the chip, and that each and every limitation of

5    Claim 7 is met by the circuits contained within those three

6    modules, so within the chip.

7         Next slide, please.  And, your Honor, there's two

8    versions of the TPU chip at issue here, but they're essentially

9    the same.  This is a publicly-available version of the TPU

09:42AM 10   chip, and your Honor at Motions 2 to 3 and Ybarra Exhibit C at

11   617 has a much more detailed version than this, but this shows

12   just at a public level, right, that there are two TensorCores

13   but there are also numerous unaccused components to the chip

14   that are at issue here.

15        Next slide, please.  But even, your Honor, if we look

16   at what Mr. Green said, Mr. Green says that the smallest

17   saleable practicing unit is the TPU board.  He says that in his

18   deposition, and even if we take that assumption, which we

19   should not because Dr. Khatri is the one who should determine

09:42AM 20   what the SSPPU is here, even if you take Dr. Green's

21   assumption, at most, it's the TPU board that's at issue here.

22        Next slide, please.  This is the slide of the TPU

23   board.  Again, this is a public version, and your Honor has a

24   much more detailed version in the motion, but there are four

25   chips on the TPU slide, and there's no dispute that there are

1    numerous unaccused components contained within the TPU board.

2         Next slide, please.  It's also there's no dispute,

3    your Honor, that the boards are put together into what's called

4    a TPU system.  That's what Mr. Green calls in his report,

5    either a donut or a pod, and the system itself has numerous

6    unaccused features, including software in the interconnect, and

7    Mr. Green actually admits that because he reduces the value of

8    those features or says he does from the rate because he says

9    that they have some relevance to the rate.  He includes them in

09:43AM 10    his base.

11         Next slide, please.  So, your Honor, the TPU chip is

12    where the infringing, alledgedly infringing technology is.

13    That's incorporated into a board.  That goes into a system.

14    The system goes into the data center, and what Mr. Green's

15    damages opinions on are based on here is the TPU system and the

16    data center, not the TPU.

17         And I'll say, your Honor -- next slide, please -- when

18    you look at this damages analysis by Mr. Green, it is clear

19    that the fact that he is using TPU systems is driving his

09:44AM 20    massive royalty base.

21         Next slide, please.  And we know that because

22    Mr. Green's system is based on TPU pods and TPU donuts.  This

23    is his title of his exhibits on how he calculated it.

24         Next system, please.  And Mr. Green admits that the

25    TPU system includes items other than the chip including

1    interconnects.

2          Next slide, please.  And Singular's opposition at 16,

3    your Honor, admits that using the chip would give you a much

4    smaller royalty base, and that's an important admission here.

5    We disagree with their statement that the way this was

6    calculated is based on a per chip level, but they admit, your

7    Honor, in their opposition at 16 that if Mr. Green had used the

8    chip as the smallest saleable patent practicing unit, the

9    royalty rate would be much lower here.

09:45AM 10          And I'll point, your Honor, to the *Ericsson* case.

11   We've cited a bunch of our cases in our motion on this, but

12   what *Ericsson* says is the evidentiary principle that is

13   specifically applicable to the royalty base is that courts must

14   insist on a more realistic starting point for our royalty

15   calculation, often the smallest saleable unit, and at times

16   even less, and we've cited numerous Federal Court cases that

17   say when you are calculating a base, you cannot use more than

18   the smallest practicing unit unless you can establish the

19   entire market value rule applies, and that's the *LaserDynamics*

09:46AM 20   case, the *Ericsson* case, the *Commonwealth* case, the *Power*

21   *Integrations* case, the *VirnetX* case, and then the District

22   Court case from *Microchip*, your Honor.

23          And as *Microchip* shows, when we are talking about the

24   alleged invention being within a chip level, the plaintiff has

25   to show how the accused functionality in the chip creates cost

1    savings across the system as a whole in order to use the TPU,

2    in order to use the system as the base, and there is absolutely

3    no showing by Mr. Green that the chip or the board creates to

4    the cost savings, and it's clear from his report at page 63

5    that his cost savings analysis is based on the cost savings

6    benefit from the deployment of the quote, unquote, "systems,"

7    your Honor, the pods and the donuts, not the chips or the

8    board.

9           For that reason, Mr. Green's damages opinion is

09:47AM 10   subject to Daubert and should be excluded.

11          THE COURT:  Okay.  Thank you.  Who is going to

12   respond?

13          MR. DOHERTY:  Good morning, your Honor.  I believe you

14   have my slides.  There's confidential information, so they

15   won't be on the screen.  I have copies for the clerks.

16          THE COURT:  Yes, I have it.

17          MR. DOHERTY:  Your Honor, I'll start with the entire

18   market value rule.  Mr. Green's opinions do not implicate that

19   rule at all.  The entire market value rule seeks to prevent the

09:47AM 20   patentee from inflating the royalty base, as counsel stated, in

21   order to then apply a smaller royalty rate and make it look

22   like what was done was reasonable.

23          Mr. Green's approach on the other hand is a straight

24   cost savings methodology.  It's a cost savings methodology that

25   Google's damages expert, Ms. Stamm, does not dispute.  In fact,

1    Ms. Stamm applies her own cost savings methodology, she just

2    disputes the non-infringement alternative that Mr. Green used.

3         Now, Google's entire presentation ignored the use that

4    Google makes of the invention, and if you look at our first

5    slide, it's basic that under Section 284, upon a finding of

6    infringement, the patentee is entitled to no less than a

7    reasonable royalty for the use made of the invention.

8         That's as basic as it gets, and a well-accepted

9    methodology, as I said, is the cost savings methodology.  We

09:48AM 10   know that from *Prism* and the other cases that we cite in our

11   briefs, and it's perfectly acceptable to do exactly what

12   Mr. Green did, which was to say how else could they have

13   achieved what they were seeking to achieve, which was to

14   generate much more compute power than they were able to at the

15   time.

16        And it's perfectly acceptable to determine the cost

17   savings that the infringer avoided by infringing, and if you go

18   to the next slide, we know the use that Google makes of this

19   invention.

09:49AM 20        Google does not use TPUs in isolation.  They're always

21   used in conjunction.  As they state in their brief, a single

22   TPUv2 chip would take 60 to 400 days to run typical

23   machine-running workloads.  Thus, Google designed its TPU

24   systems to be networked so that multiple chips would work in

25   conjunction.

1          Now, Mr. Green analyzes the TPU vs. the GPU in the

2    system because that is how Google uses it.  The GPU is also

3    used in systems, and it's never used in isolation.  It's also

4    used on boards.  It's also used with interconnects, just like

5    the TPU, so to say that analyzing is used in the system is not

6    a chip-to-chip comparison doesn't hold water.  You're comparing

7    the capability of the chip in the context in which Google uses

8    it, and this is exactly what Google does itself.

9          If you go to slide 5, your Honor, this is the document

09:50AM 10    that we call the Patterson memo.  Dr. Patterson is a Turner

11    Prize winner.  It's equivalent of a Nobel Prize in computer

12    science.  He's one of the most well-respected computer

13    scientists in history.  He also works for Google.  He prepared

14    an analysis that's in this document that's called, What If

15    Google Deployed V100s Instead of DragonFish, which is the V3

16    chip, and Dr. Patterson did not analyze it on a one-to-one

17    chip-to-chip basis, he analyzed it, as Mr. Green did, which is

18    the context in which Google uses it, which is required by the

19    law.

09:51AM 20          And if you look at the chart at the bottom of that

21    slide, what Dr. Patterson figured out is that the number of GPU

22    chips it would take to equal a compute power of 180,000 VG

23    chips, and he concluded that in a small-scale system for every

24    183 DragonFish chips, it would take 625,000 GPUs, and in a

25    medium scale system, it would take 862,000 GPUs to equal the

1    compute power they were able to generate with 180,000 TPUs.

2           Now, if you ignore that volume and you ignore the use

3    made of the invention, I think what Google's arguing is that

4    what Mr. Green should have done was simply take the number of

5    deployed TPUs and figure out the cost differential between that

6    number of TPUs and that number of GPUs.

7           The problem with that approach, your Honor, is that it

8    ignores the use that Google makes because you could never

9    generate the same compute power using the same number of GPUs.

09:52AM 10   It's a 5X number for the V3, and if you go to the next slide,

11   this is an exhibit from Mr. Green's report, and it shows that

12   Mr. Green was able to use Google's own documents to come up

13   with a multiplier for both the V3 and the V2 and using medium

14   scale pods and multipliers for small scales training in donuts.

15   That shows the numbers of GPU chips that would be necessary to

16   equal a compute power.  That's a non-infringing alternative.

17          If you just use the same number of GPUs as they used

18   in the deployed TPUs, the GPU is not a non-infringing

19   alternative because it cannot come close to generating the

09:53AM 20   compute power that Google needs.

21          Now, all of Mr. Green's cost savings analysis starts

22   with the chip.  If you go to the next slide, the top line shows

23   the number of TPUs deployed in each quarter.  Mr. Green takes

24   that number and the TPU cost, $2500.  He shows the multiplier

25   of the number of GPUs you'd need to generate the equivalent of

1    compute power, and he applies the cost of the GPU, which is

2    $6,000, and that cost differential is what Mr. Green uses to

3    determine how much Google would have had to spend to buy GPUs

4    and what the cost differential is between what they would have

5    had to pay for GPUs and what they actually paid for TPUs.  And,

6    again, this is all from Google's own documents.

7         If we can go to the next slide.  This shows the total

8    cost savings.  Again, the first line shows the cost

9    differential.  It's a very large number, but that's only a very

09:54AM 10   large number because Google deployed so many TPUs.  The numbers

11   here are large because of Google's massive use of the

12   invention.

13        So that first line is a direct chip-to-chip

14   comparison, and we didn't admit, contrary to counsel's

15   assertion in that last slide, our point was in our brief, if

16   your Honor was to accept the argument that you can only compare

17   the chips, well then, Mr. Green has done that math.

18        Now, that's not proper because in order to generate

19   the same compute power using GPUs, it takes a lot more energy,

09:55AM 20   and, in fact, using Google's own documents again, we were able

21   to show that they would have had to actually build additional

22   data centers, and that's where the additional cost savings come

23   in that slide, and it's all rooted in Google's own documents,

24   your Honor.

25        As in any case, Mr. Green was required to tie the

1    proof of damages to the footprint of the invention in the

2    marketplace, and *Prism* says you can do that by tying it

3    directly to the evidence in the case, and here everything that

4    Mr. Green does is tied back to a Google document.

5          Now, Google argues that Mr. Green allocated all of the

6    cost savings to Singular.  That's not true.  Now, counsel said

7    that in the *LaserDynamics* case, the Court rejected the patentee

8    from plucking out of thin air a percentage.

9          We plucked out of Google's own documents the twelve

09:56AM 10   and a half percent weighted average cost of cap.  Mr. Green's

11   application of the twelve and a half percent weighted cost of

12   capital is what Google uses when it models an investment

13   internally, and they may call it a discounting.  They use it as

14   a hurdle rate.  It's what they need to make in order to have a

15   return.  It's their normal return on investment.

16         Now, Mr. Green applies the twelve and a half percent

17   weighted average cost of capital exactly the same way that

18   Google does internally.  He also applies the 26 percent mean

19   sharp percentage, which is what they use, Google uses for its

09:57AM 20   more risky, its riskier investments.

21         Now, those are both hurdle rates, and, in fact, what

22   counsel didn't mention is that Ms. Stamm, Google's own expert,

23   takes the exact same approach.  You'll see in the next slide in

24   paragraphs 99, 108 and 185 of Ms. Stamm's report, she applies

25   the weighted average cost of capital to her bf20 analysis.  She

1    claims that the non-infringing alternative is not the GPU, it's

2    a chip using bf20 instead of bf16.

3           She applies the weighted average cost of capital,

4    excuse me, your Honor, to reduce the cost savings related to

5    the design and development of a bf20 chip down to 12.9

6    millimeters.  She says that's a starting point.  That's the

7    same thing Mr. Green did.  He's not telling the jury what the

8    reasonable royalty is, he's saying this is where it would have

9    started in a hypothetical negotiation.

09:58AM 10           All of this challenge to the appropriate discount rate

11   or hurdle rate is for the jury to decide.  It goes to the

12   weight, not the admissibility, your Honor.

13           Eventually in her report, Ms. Stamm actually comes out

14   and says that the $12.9 million number is the amount that the

15   parties would have agreed to in a hypothetical negotiation.

16   That, according to Ms. Stamm, gives benefit to Google, and

17   that's the result of a 12.5 percent, or, I'm sorry, a lower

18   weighted average cost of capital of 11.08 percent, so Mr. Green

19   is actually providing more benefit to Google.

09:58AM 20           And then the last slide, your Honor, shows that

21   Ms. Stamm also applies the 26 percent rate, the Moonshot rate,

22   and at the end of paragraph 12, she states, "The upper end of

23   the range gives all the benefits to Singular, whereas the low

24   end  of the range allows Google to share in the benefits based

25   on Mr. Green's proposed hurdle rate of 26 percent."

1          So when Ms. Stamm applies that hurdle rate, it

2    provides benefit to Google.  When Mr. Green does the same

3    thing, it provides all of the benefit to Singular.  It just

4    doesn't hold water, and that illustrates more, your Honor, that

5    that goes to the weight, not the admissibility of Mr. Green's

6    opinion.

7          With that, I'll rest on my papers, your Honor.

8          THE COURT:  All right.  Ms. Meny.

9          MS. MENY:  Your Honor, quickly.  First of all, on

09:59AM 10   their entire market value rule argument, Federal Circuit law

11   that we cited to you is perfectly clear that it is the

12   plaintiff's obligation to apportion in every single case, and I

13   would point your Honor to the *VirnetX* case, which says that no

14   matter the form of the royalty, the plaintiff must only seek

15   those damages attributable to the infringing features, and

16   that's our precise point here, your Honor, is that the

17   infringing features are in the chip.

18          Mr. Green has clearly used symptoms-based numbers, not

19   chip-based numbers, and he is therefore taking value that are

10:00AM 20   found from the system, adding it to his base so that he can

21   provide a huge base number and then trying to say that that

22   number isn't so bad once you look at it as a rate, and the

23   *VirnetX* case and the *LaserDynamics* case make clear that that is

24   not allowed.

25          And the other thing, your Honor, I will say is they

1     keep saying that Mr. Green relied only on Google's own

2     documents.  Mr. Green admitted in depo, and we provided your

3     Honor with the citation that Google's own documents actually

4     have performance numbers at both the chip level and the system

5     level.  He said that in his deposition at page 169, and we

6     provided your Honor that quote in Exhibit D.

7          Mr. Green chose to ignore the chip level information

8     and instead used the system level information, and he chose to

9     ignore it, your Honor, because if you look at those documents,

10:01AM 10   those documents show that there is a very small difference

11    between TPU chips and GPU chips on power issues, which is what

12    they claim their invention does when you look at it at a chip

13    level, and the only significant difference shows up at the

14    system level, and that is because there are a lot of nonaccused

15    features at a system level like the interconnects.

16          And the other thing, your Honor, that I'll point out

17    is they keep saying also that they need, that Mr. Green

18    appropriately looked at it in the use that Google makes, and,

19    again, I would point, your Honor, to the *VirnetX* case on that

10:01AM 20   because that's exactly the argument that the plaintiffs made

21    there, and what the Court said there is that the plaintiff

22    can't hide behind Apple sales model to avoid the task

23    apportionment and that the plaintiff needs to identify the

24    patent practicing feature with a sufficiently closed

25    relationship to the claimed functionality, and if they haven't

1    done that, their base is in error, and so Mr. Green has not

2    done that.  He has not given any reason for this court to

3    believe that the entire market value rule applies here, and

4    instead what he's done is applied the entire market value rule

5    and given a large base so that the large base can go to a jury.

6    That is error, and our Daubert should be granted.

7              MR. DOHERTY:  Just quickly, your Honor.

8              THE COURT:  Yes.

9              MR. DOHERTY:  Your Honor, the cases that Google relies

10:02AM 10    on are inept.  For example, *LaserDynamics* involved an optical

11    disk drive.  The plaintiff in that case used the total revenues

12    on the sales of the entire laptop and then just applied a two

13    percent running royalty to that and ignored comparable licenses

14    that weren't based on a percentage of total revenues.  It's

15    completely inept.

16              Now, coming back to the chip level vs. System level

17    bringing you back to the Patterson memo, your Honor, that

18    document, Dr. Patterson directly attributes the 180,000 TPUs

19    versus the 825,000 GPUs to the invention.  He says it's because

10:03AM 20    of bfloat16 app scale, so to argue that Mr. Green should have

21    simply compared performance at the chip level, it ignores the

22    use of the invention.  They don't use it that way.  They use

23    TPUs instead of GPUs because TPUs perform much better in fewer

24    numbers at scale.  That's how they use it, and that's how

25    Singular -- it's on that basis that Singular is entitled to

1    recover.

2         And, again, if Mr. Green wanted to rely on the entire

3    market value of the TPU systems, he would have relied, like the

4    plaintiffs in all those other cases did, on the total revenues

5    generated by TPUs.  TPUs since 2017 have powered all of

6    Google's main products, and as publicly disclosed in SEC

7    filings, that revenue between I believe it's 2017 and 2021 or

8    2022 is upwards of $900 billion.  Mr. Green didn't start at

9    $900 billion dollars.  He was able to isolate the cost savings

10:04AM 10   directly attributable to Google's choice to use TPUs instead of

11   GPUs.  Thank you, your Honor.

12         THE COURT:  All right.  Thank you.

13         MR. VAN NEST:  If time allows, your Honor, we have one

14   more motion we'd like to address with the Court today.

15         THE COURT:  All right.

16         MR. VAN NEST:  And that's our Daubert on Dr. Khatri,

17   and Mr. Bhansali is going to handle that.

18         MR. BHANSALI:  Your Honor, may I approach to hand up

19   slides?

10:05AM 20   THE COURT:  Yes.

21         MR. BHANSALI:  Good morning, your Honor, Asim Bhansali

22   for Google.  In the interest of time, your Honor, I will be

23   brief.  There are quite a few problems with Dr. Khatri's

24   opinion.  We've laid them out in our briefing in the Daubert

25   motion.  I'm, of course, happy to answer any questions that

1    your Honor has and will want to address anything that Singular

2    refers to.  I want to also focus with respect to Dr. Khatri's

3    opinions today on the apportionment issues.

4         You've heard debate between counsel with respect to

5    Mr. Green's opinion and how he was using a system level

6    analysis rather than a chip level analysis.  Dr. Khatri's

7    opinions have the same problem.  He also uses a system level

8    comparison, and we've included in our papers and you also have

9    at slide 5 in the slide deck where Dr. Khatri admits to using a

10:06AM 10   system level comparison, and like Mr. Green, he also ignores

11   the chip level comparison documents that were available to him

12   and that he even cited in his report.  We've again cited those

13   in our papers and also included one of the chip level documents

14   as cited by Dr. Khatri in his report at slide 3 of the deck.

15        I won't belabor the sort of legal framework around

16   that because I think it's been quite appropriately addressed.

17   I will make one point, which is that at the end of his

18   argument, counsel referred to the Patterson document and how in

19   counsel's view, the Patterson document attributes all these

10:07AM 20   benefits to the bfloat16 format.

21        Even if that were an appropriate read of the document,

22   your Honor, I would just note that Dr. Khatri himself, nowhere

23   in his report says that bfloat alone is practicing the patent

24   claim, so even if Dr. Patterson is somehow attributing these

25   benefits to bfloat, Singular and its experts have not tied

1      those benefits adequately to the patent claim.

2          But Dr. Khatri's apportionment analysis suffers from

3      yet another problem, and that problem is that he fails to

4      apportion to the patentable improvement, so we've already heard

5      and there's no dispute that apportionment is required when the

6      accused product includes patented and unpatented features, but

7      as the *Omega's* patent case that we cited in our papers holds,

8      apportionment also requires that where there are patented and

9      unpatented features, and where a claim may include -- the claim

10:08AM 10   limitations themselves may include both conventional and novel

11     features, the damages apportionment, in this case, the

12     technical apportionment that feeds into the damages opinion has

13     to apportion to the patentable improvement.  That makes sense

14     because you don't want a party claiming value based on

15     something that was already conventional and known in the art.

16          And so the question here, your Honor, is whether

17     Dr. Khatri's apportionment analysis appropriately applied that

18     standard.  The answer is fairly clear that he did not.

19          And the reason is this, your Honor, following the

10:09AM 20   PTAB's decision in the Patent Trial and Appeal Board decision

21     in the IPRs in this case, it was determined that the

22     low-precision, high-dynamic range execution unit that's claimed

23     in the Singular patents was actually known in the art.

24          So, in other words, that was found to be an element

25     that was not a patentable improvement on the prior art.  The

1    only aspect of the claims, the only element of the claims that

2    were found to be novel by the PTAB were the exceeds claims that

3    Mr. Van Nest discussed this morning in his argument.

4         Now, Singular is not appealing the PTAB's decision, so

5    under the precedent that we've cited, including a District of

6    Massachusetts case, *Intellectual Ventures vs. Lenovo*,

7    370 F. Supp. 3d. 251, Singular is bound by that PTAB decision

8    and, therefore, Singular is estopped from taking the position

9    that the LPHDR execution unit itself is a patentable

10:10AM 10   improvement.

11        Singular is bound to the position that the LPHDR

12   execution unit is conventional and known in the art, therefore,

13   under the *Omega* patent's decision, Dr. Khatri was not allowed

14   to apportion value to the LPHDR execution unit itself.  He had

15   to apportion value just to the exceeds claims.

16        Dr. Khatri does not do that.  If we could show slide

17   2, please.  Slide 2 has multiple excerpts from Dr. Khatri's

18   opinions regarding apportionment.  In all of those excerpts,

19   Dr. Khatri is basing his apportionment on the value that he

10:11AM 20   says is provided by the LPHDR execution unit.

21        What is notable, your Honor, is nowhere in those is it

22   five different paragraphs from Dr. Khatri's opinion does he

23   offer an opinion as to the value that's provided by the exceeds

24   limitation, but the exceeds limitation is the only patentable

25   improvement and, therefore, that is all that Dr. Khatri can

45

1   apportion value to.

2          Now, Singular doesn't dispute any of this.  What

3   Singular says is, oh, well, that doesn't matter because the

4   exceeds claim just requires a lot of LPHDR execution units, and

5   since Dr. Khatri is apportioning to LPHDR execution units, then

6   it's okay because the novel portion of the claim is just that,

7   it's a lot of execution units.

8          Well, your Honor, that's not true as a matter of

9   Dr. Khatri's opinions, nor is it an accurate application of the

10  law.  As a matter of Dr. Khatri's opinions, as you can see in

11  these paragraphs, he is not attributing value to having 100

12  more LPHDR execution units than units that perform 32-bit

13  multiplication, which is what the patent requires, he's just

14  attributing value to LPHDR execution units.

15         Moreover, the law does not give Dr. Khatri that amount

16  of leeway.  The *Omega* patents case is clear that the

17  apportionment has to be based on the patentable improvement,

18  and the patentable improvement here is very narrow, it's this

19  having the LPHDR units and not just having a lot of them but

20  having 100 more than units that do 32-bit multiplication.

21         There's nowhere that Singular cites that Dr. Khatri

22  bases an apportionment analysis based on that improvement, and

23  for that reason, in addition to his application of the system

24  level comparison, Dr. Khatri's opinion is properly excluded

25  under the Daubert standard.

1          And, your Honor, subject to that, we will rest on our

2    papers with the remaining issues that we've raised with regard

3    to Dr. Khatri's opinions.

4          THE COURT:  Okay.

5          MR. SEEVE:  I will be responding to Mr. Bhansali's

6    arguments.  I do have slides.  I believe your Honor has a copy.

7    If the clerks would like copies, I have extras.

8          So let me start with Mr. Bhansali's theory that

9    because of the IPR, somehow the scope of the asserted claims in

10:14AM 10    this case, which were upheld in the IPR are narrowed somehow

11   because of some other claims that got invalidated.

12         The idea here that Mr. Bhansali seems to be espousing

13   is that if one claim gets invalidated somewhere and that claim

14   has a limitation of X, that every other claim in the world that

15   includes that same limitation, you just cross that limitation

16   out because it's been found to be conventional, the claim no

17   longer includes X.  That's what Mr. Bhansali's position

18   essentially is, and there is literally no support in the law.

19   There's no statute, there's no case law that has ever applied

10:15AM 20   this standard in apportionment in a damages calculation

21   generally or anywhere else.

22         The *Omega* patent case that Mr. Bhansali just

23   mentioned, the other cases that Google cited, not in a single

24   one of them is there an IPR decision where one claim was

25   invalidated and another was upheld where the damages analysis

1    found that you needed to take into account invalidating that

2    one claim and cross those line items out of the claim that was

3    upheld, simply no law whatsoever.

4           In fact, the patent statute, 35 U.S.C., Section 282

5    clearly states that claims stand on their own.  It says -- and

6    this is the first slide in my slide presentation.  It

7    specifically says that dependent or multiple dependent claims

8    shall be presumed valid even though dependent upon an invalid

9    claim, and that's exactly the same situation we have here.

10:16AM 10    The independent claim that is not asserted in this

11    case was invalidated in the IPR, the dependent claim, which was

12    also a challenge in the IPR, was upheld, and that claim is

13    asserted.  It's valid regardless of the decisions in the IPR.

14    The IPR decision has absolutely no bearing on apportionment.

15           Now, Google cited the *Omega* patent case and a number

16    of other cases, and these cases actually stand for a totally

17    different proposition from the one that Mr. Bhansali is

18    asserting.  This is at page 3 of my slides.  You can see these

19    three cases are the very cases that Google's brief relies on.

10:17AM 20    In *Omega* patents, which is the middle one, it says

21    that you have to adequately and reliably apportion between the

22    improved and conventional features of the accused product, not

23    the claim, the accused product.

24           So that means that, okay, there's a feature in the

25    accused product that isn't part of the invention, sure, you

1    don't get damages for that feature.  That's not part of your

2    invention.  What it doesn't mean is that you take the claim and

3    you cross out the features that some other decision might have

4    invalidated, limitation by limitation, and you don't get

5    damages for those particular features.  None of the cases that

6    Google cited stand for that proposition.

7         You can see *Ericsson*, which is the top of the slide,

8    also cited by Google, again, the value to be measured is only

9    the value of the infringing features of an accused product.

10:17AM 10   Now, the exceeds limitation, the LPHDR execution unit, all of

11   these features are in the asserted claims, which are valid.

12   The PTAB upheld their validity, and they, therefore, are part

13   of an apportionment analysis, part of the value that is

14   ascribed to the patents-in-suit.

15        The *Micron* case, also cited by Google, says pretty

16   much the same thing.  There's literally no law that supports

17   Google's novel proposition that some claim somewhere is

18   invalidated in an IPR, then you get to take a line item

19   analysis of other claims in other patents maybe or in the same

10:18AM 20   patent and cross out those limitations because they no longer

21   matter, simply not supported by law.

22        It also doesn't make sense as a matter of policy.

23   Everyone knows that inventions are built on what has come

24   before.  Concrete, for example, as we mentioned in our briefs

25   is water, it's sand, and it's gravel, three components that

have been known since antiquity.  Concrete was invented later,

and it's a hugely useful product.  It's a mixture of those

three things.

Under Google's theory, if a person invented concrete,

let's say today, even though it was invented long ago, a claim

directed to a mixture of water, gravel, and sand.

THE COURT:  There's cement in there, I think water,

gravel and sand.

MR. SEEVE:  You're right.

MR. BHANSALI:  I didn't want to interrupt, but that's

correct.

THE COURT:  A castle would wash away with the waves.

Anyway.

MR. SEEVE:  Fair.  So the three components of

concrete, whatever they may be are known, they're conventional,

and under Google's theory, a claim directed to combining those

three elements to make concrete would essentially be worth

nothing.  You cross out the water, you cross out the cement,

you cross out the gravel, and then I guess they say in their

reply brief what you have left is the mixture.  I don't know

what mixture means exactly.  The claim limitation of mixing

things together, only that gets value.  It's unclear what

exactly that would mean, but, as you said, for example, without

the cement, it would wash away, but the cement, I guess,

wouldn't be included under Google's damages theory, so it just

1    doesn't make sense, your Honor, as a matter of policy that

2    patent claims would be subjected to this line item veto

3    analysis based on what elements are supposedly conventional and

4    what elements are supposedly not.

5        Sorry, just one second.  So I think that pretty much

6    is it except the brief mentions I think that Mr. Bhansali made

7    about the system and the chip comparison, which I also believe

8    is related to apportionment.

9        Dr. Khatri clearly cites chip level comparisons in his

10:20AM 10   report and uses them in his analysis.  I'm not sure what the

11   objection is there that Mr. Bhansali is raising, but as our

12   briefing explains, computers have chips in them, and that's how

13   chips are used.  You can't isolate a chip, stick a chip on a

14   table and evaluate its value, you have to isolate them as part

15   of -- or evaluate them, I'm sorry, as part of a computer

16   system.  That's exactly what Dr. Khatri does in his

17   apportionment analysis.

18       Google also alleged, I don't believe Mr. Bhansali

19   mentioned it now but mentioned it in both of their briefs that

10:21AM 20   Dr. Khatri's apportionment analysis should be stricken because

21   he never explains in his report or at his deposition the proper

22   standard for apportionment.  I think they knew that that was

23   untrue when he said it.  It seems like they've backed off.  I'm

24   not sure if they've withdrawn that allegation, but as we

25   explain in our briefs, Dr. Khatri very clearly explained the

1    correct standard for apportionment.

2         There were some other arguments in Google's briefing

3    that Mr. Bhansali didn't touch on, which I'll respond to

4    briefly, the question of whether Dr. Khatri's commercial

5    success testimony should be allowed because he's not an expert

6    on commercial success.  This is what Google said.  Google's

7    brief said that Dr. Khatri cited no evidence of commercial

8    success, but that's simply not the case.

9         Dr. Khatri -- just one moment.  Dr. Khatri cited a

10:22AM 10   Google document that said, and I quote, "Google's best known

11   products and services, including Android apps, gmail maps,

12   photos, robotic search speech time and translate," et cetera,

13   "are powered by the accused TPU devices," so clearly the

14   flagship products of one of the largest companies in the world

15   are powered by the accused devices.  You don't have to be an

16   economist to understand that that product is commercially

17   successful.

18        Dr. Khatri also ties his commercial success to his

19   technical opinions.  He says, "The performance advantage of the

10:22AM 20   TPUs, and by extension the commercial success, is due in

21   significant part to the use of low-precision arithmetic."

22        Now, Dr. Khatri is an expert in computer science.

23   He's an expert in the evaluation of computer systems, so he's

24   talking about performance analysis and how it relates to

25   commercial success is perfectly within the purview of his

1      testimony.

2              Google also objected to Dr. Khatri's testimony and

3      described as relating to Google's state of mind.  Now, this I'm

4      not sure if Google is withdrawing this.  It didn't come up in

5      Mr. Bhansali's arguments.

6              MR. VAN NEST:  No, we're not.

7              MR. SEEVE:  In that case, I won't address it.  First

8      of all, Dr. Khatri doesn't offer any technical or scientific

9      opinions about anyone's state of mind.  Dr. Khatri reads

10:23AM 10   documents, he quotes those documents in his report, and some of

11     those documents relate to the rationale behind why Google did

12     certain things.

13             Now, many of these opinions are technical in nature.

14     For example, Dr. Khatri talks about quote, "The rationale

15     underlying Google's decision to use LPHDR execution units."

16     That's not a question about state of mind, that's a question

17     about architecture design in computers, a subject about which

18     Dr. Khatri is an undisputed expert.

19             Other statements that Google objected to in its brief

10:24AM 20   are merely statements that come directly from Google documents,

21     and Dr. Khatri is certainly allowed to read documents.  There's

22     some examples that I have in my slides that relate to this

23     question of objective indicia of nonobviousness.  Objective

24     indicia of nonobviousness, of course, are indicia that show

25     that a patented invention isn't obvious, and some of those

1    objective indicia involve states of mind.

2          As you can see on slide 4, we've got copying by

3    others.  Well, whether something is copied, you know, requires

4    knowledge, and that's a thing of state of mind issue.  Praise

5    is a question of state of mind, and skepticism is a question

6    that relates to state of mind.  All of these are secondary

7    considerations of nonobviousness, and so Dr. Khatri is

8    definitely qualified to testify, and it's totally proper.

9          THE COURT:  I'm not sure we quite call it state of

10:25AM 10   mind, which is subjective, but maybe objective manifestations

11   is state of mind.  In other words, it's not what someone was

12   thinking, it's what someone said.

13         MR. SEEVE:  You're absolutely right, your Honor.

14   You're absolutely -- yes, couldn't have been said better, and

15   it is what someone said, not what they were thinking that

16   Dr. Khatri opines on.

17         So if you look at, for example, page 5, this is what

18   Dr. Khatri cites to relating to copying.  This is a Google

19   document, and it's a Google engineer saying, "My gut reaction

10:25AM 20   is nervousness."  Well, as you said, your Honor, Dr. Khatri is

21   not inferring anything about anyone's state of mind, Dr. Khatri

22   is reading that e-mail and concluding from it that this guy's

23   gut reaction is nervousness.

24         It goes to the question of copying.  If you look at

25   the next slide, praise, another objective indicia of

1   nonobviousness.  You have a Google scientist, very

2   distinguished researcher called Andrew Yng e-mailing and

3   saying, "This is incredibly cool," again, not his state of mind

4   but what someone actually said in this case to the inventor

5   himself.

6   Another example of praise, and this one was one that

7   Google objected to in its brief.  One second, I'm having

8   trouble with my pages here.  These are contemporaneous notes

9   from Dr. Bates about a meeting he had with Google, and in his

10:26AM 10   contemporaneous notes, he reports that a Google engineer told

11   him that Jeff Dean is more excited than he has been for awhile.

12   Now, Dr. Khatri's not making any inferences here, he's

13   not a psychologist, he's merely reading the e-mail and

14   processing the information it contains.  And, finally, when it

15   comes to skepticism, we have here a quote from a Google

16   engineer that says, this is slide 8, "I think that implementing

17   approximate arithmetic is a bad idea."

18   So these are the kind of statements that Google is

19   objecting to as being related to Dr. Khatri's state of mind.  I

10:27AM 20   think they're clearly proper.  It's clear why Google might want

21   them to be excluded from the case, but there's no legal basis

22   for doing so.

23   And, finally, I'd like to briefly address the headline

24   issue in Google's motion, which is this idea that Dr. Khatri

25   engaged in improper claim construction.  Mr. Bhansali didn't

1    talk about it much, so I'll just address it briefly since he

2    didn't provide in a lot of detail, Dr. Khatri didn't construe

3    his term, "processing element," which is the core dispute,

4    simply didn't construe it.

5         Google itself defines the word "construe" as "provides

6    a definition of."  Dr. Khatri never provided a definition of

7    processing element.  Google doesn't point to one.  I would

8    expect that if there were one, Google would only respond to me

9    and point it out, but I don't think there is one, and so, you

10:28AM 10   know, that alone should put this issue to bed.  Dr. Khatri did

11   not construe the term.

12        Second, processing element isn't even a claim term.

13   If you look at the claim, "processing element" never appears.

14   It appears in this Court's instruction of the term, "execution

15   unit."  None of the cases, none of the arguments that Google

16   makes addressed this factor.  This isn't actually a claim term

17   that they're saying Dr. Khatri improperly construed, this is

18   part of the Court's construction of another claim term, so that

19   should, too, should put the issue to bed.

10:28AM 20        Third, Google doesn't make any actual objections to

21   what Dr. Khatri says about processing elements, it's purely a

22   procedural question.  They say that because Dr. Khatri admits

23   he considered the specification in interpreting the term, his

24   entire report essentially should be included -- or excluded.

25        Well, that's simply not the case.  Singular cited law

1    that says it's perfectly proper to consider the meaning of

2    plain terms in light of the specification.  In context, Google

3    offered no response to this.

4         Again, I believe this is just sort of Google's attempt

5    to do an end-run around the Court's construction of "execution

6    unit," which does not include all of these limitations that

7    Google talks about in its briefs that it's trying to import

8    into this term, the limitation that memory needs to be

9    addressable, the limitation that the processing element can't

10:29AM 10   overlap with other processing elements.  All of these are

11   things that Google is attempting to import into the claim, and

12   now they're saying because Dr. Khatri didn't import them

13   himself, his testimony should be excluded, and I believe -- so

14   there's so many issues that they raise, I just want to make

15   sure I've touched on all of them.  I believe I have, so thank

16   you.

17          THE COURT:  All right, Mr. Bhansali.

18          MR. BHANSALI:  Thank you, your Honor.  I'll start from

19   the end and work back up.  If we could see slide 6 of the deck,

10:30AM 20   please.  Your Honor, there's a theme I think that goes to my

21   responses to a number of the points that Mr. Seeve made, which

22   is that Dr. Khatri is an expert, he's an expert witness who is

23   subject to particular strictures on the rules of evidence and

24   case law on what he can testify to.  He's not an advocate, he's

25   not a fact witness, and he's certainly not the Court, and that

1    limits what Dr. Khatri can do.

2           So let's start with the claim construction issue.  If

3    we look at slide 6, with Dr. Khatri in his report, nowhere in

4    his report, having said that he was applying the plain and

5    ordinary meaning of "processing element," I asked him at his

6    deposition, "Do you have an person as a person of ordinary

7    skill in the art of what a processing element is?"  And this is

8    actually one of his more succinct responses, it's only three

9    paragraphs.  Most of them were far more perplex.  What does he

10:31AM 10    say?  He says -- well, first he just recites the Court's

11    construction, which doesn't answer the question of how he's

12    interpreting "processing element," and then he says, "For

13    further edification in terms of what the processing element

14    was, they would refer to, you know, the specification, which is

15    the intrinsic evidence, they would first look at rather than,

16    you know, just apply their own sort of understanding of what a

17    processing element is or was."

18           Well, what Dr. Khatri, the process he's describing

19    there is the exact opposite of what the law requires.  The law

10:31AM 20    requires that whether it's a claim term or a claim

21    construction, if it hasn't been further construed by the Court,

22    an expert has to apply the plain and ordinary meaning.  We

23    don't disagree that a term can, and in patent law, as we all

24    know, often is defined by reference, by consideration of the

25    specification, but that's a province of the Court, and under

58

1    Federal Circuit law, interpreting a claim term or a term that's

2    part of a construction in light of the specification is

3    reserved exclusively for the Court.  That's not an issue that

4    an expert can testify to the jury about because that would mean

5    that you're asking the jury to interpret claim terms, which is

6    improper under a line of Federal Circuit cases that we cite in

7    our papers, including the '02 *Micro* case.

8         That's the problem with Dr. Khatri's opinion, and,

9    again, he's an expert.  He didn't say in his report that he was

10:32AM 10   applying the plain and ordinary meaning, and I asked him at his

11   deposition because that wasn't clear, and under oath, he would

12   not say that his understanding that he applies in his report of

13   a processing element is the plain and ordinary meaning that an

14   expert applies, and so we're all left to wonder what Dr. Khatri

15   is applying, what standard he's applying because actually, as

16   Mr. Seeve points out, he doesn't really explain that in his

17   report, but the problem is if Dr. Khatri is allowed to testify,

18   what is he going to do?  He's taking his interpretation of the

19   specification and offering an opinion to the jury that's based

10:33AM 20   on that.  That's improper.

21        If they wanted to further interpret "processing

22   element," rather than applying the plain and ordinary meaning,

23   the time to do that was in the claim construction process, but

24   we all agreed that -- both sides agreed, we had some other

25   disputes around execution unit, but we agreed that it was

1    "processing element," and the further application of that would

2    be based on -- thus, based on the plain and ordinary meaning.

3            As far as the state of mind issue, your Honor, I was a

4    little unclear on what Mr. Seeve's argument was because he said

5    that he wasn't offering any -- Dr. Khatri is not offering any

6    technical or scientific opinions.

7            Well, he's a technical and scientific expert.  If he's

8    not offering technical or scientific opinions, then he

9    shouldn't be testifying about it.  That's very clear under the

10:34AM 10   Rule 702 that an expert witness, particularly when you're

11   providing the imprimatur of expert testimony, your expertise is

12   limited to matters within their expertise, and I think the

13   series of documents that Mr. Seeve pointed to and that are in

14   the slides underscore this point.  It doesn't require an expert

15   to interpret when somebody is saying, "Oh, that looks pretty

16   cool" or "Jeff is more excited than he's been for awhile,"

17   that's fact testimony.

18           Now, we may have a discussion or a debate later on as

19   to relevance of those documents as factual evidence, but one

10:35AM 20   thing is clear, there's no expert opinion being offered as to

21   those documents.

22           He's simply serving as a mouthpiece for factual

23   documents, and we cited a number of cases, your Honor, in our

24   briefing saying that that's improper, they didn't respond to a

25   single one in their opposition or attempt to distinguish it,

1    and they don't -- and even today, I didn't hear any suggestion

2    of where Dr. Khatri is offering any technical opinion that

3    would aid the jury in understanding those documents.  The fact

4    that they may believe they're relevant to a particular issue

5    doesn't allow Dr. Khatri to testify about them.

6           As to commercial success issue, your Honor, the law is

7    actually quite clear that Dr. Khatri as a technical expert, and

8    we don't challenge his qualification as a technical expert,

9    lacks the expertise to testify about commercial success, and

10   his opinion is about commercial success.  He has several

11   opinions about the technical aspects of the chip, which we are

12   challenging on our apportionment points that we raised, but he

13   is not qualified as a computer scientist and engineer to

14   testify on commercial success.

15          And, your Honor, getting back then to the

16   apportionment issues, I think it might be worth just in the

17   context of the cement, water, gravel analogy actually going

18   back to the case law because the *Exmark* case, which we cited in

19   our papers, which is another case where the Federal Circuit

20   says that apportionment has to be based on the patentable

21   improvement gives a nice example.

22          There you had a claim that a ride-on lawnmower -- and

23   lawnmowers have been around for awhile.  I remember having to

24   mow the lawn when I was in middle school at my house, but, more

25   recently, there was a patent at issue in this case that had an

1   improved flow control baffle, and the Federal Circuit made it

2   clear that the patentee could not apportion value to an entire

3   lawnmower, they had to apportion value to the patentable

4   improvement, and the patentable improvement was the flow

5   control baffle.

6       And, similarly here, the only patentable improvement

7   they can claim is the exceeds claim.  The rest of the device is

8   either something that's not even claimed in the patent or it's

9   something that's claimed in the patent that the PTAB has

10  already found to have been known in the prior art, and,

11  therefore, conventional, and the fact that it's covered in the

12  claims, just as the claim in *Exmark* covered the entire

13  lawnmower, doesn't allow Dr. Khatri to apportion value based on

14  th full claim.  He has to apportion based on the patentable

15  improvement.

16      Now, Mr. Seeve said, well, we haven't pointed to any

17  case that followed an IPR decision where apportionment was

18  limited to the elements that were found to be novel, but the

19  fact that that's not come up in the IPR context, your Honor, is

20  simply irrelevant.

21      The IPR decision, which is part of the file history of

22  the patent and is binding on Singular, because they're not

23  appealing it, establishes what the novel element subject to our

24  appeal of and our invalidity case here, but for purposes of

25  Singular's expert, establishes what the novel elements of the

1    claim are, and the only novel element of the claim is the

2    exceeds claim, and under *Omega* and *Exmark*, Dr. Khatri was

3    required to apportion based on that novel element, your Honor.

4         THE COURT:  I haven't read the lawnmower case, but

5    it's a little trickier than just saying it's the entire

6    lawnmower or it's the improvement because, of course, things

7    are systems.  I assume a flow control -- I don't even know what

8    you're controlling, the fuel to cut grass, I have no idea, air,

9    but presumably it has things like an on-off switch or a

10:39AM 10  butterfly valve or something that is conventional, and it's a

11   combination of things, right, it's the invention, whatever it

12   is you've invented, even if you are combining completely

13   conventional elements, it's still everything together, you

14   know, whatever your improvement is, right, so it's not quite as

15   simple as one narrow thing, right?

16        So if you take a conventional processing unit and you

17   add the exceeds thing and that's your invention, isn't it the

18   two taken together?

19        MR. BHANSALI:  No, your Honor.  I would say a couple

10:40AM 20  of things on that.  First, in the lawnmower case, the claim

21   covered the whole lawnmower, right, and so you have the same

22   issue, right?  I mean, you could say, well, I can't be limited

23   to the flow control baffle because you're adding that to the

24   lawnmower, and the point of the Federal Circuit was it's the

25   job of the expert to isolate the value that's added by the flow

1    control baffle, so to take our --

2         THE COURT:  The improvement really, right, the thing

3    you have invented?

4         MR. BHANSALI:  Exactly, your Honor.  And here, that's

5    a lot easier.  This is a lot easier case than the cement,

6    water, and sand case because in cement, water and sand, you

7    would have to say, well, okay, you know, how do I value

8    concrete relative to any one of those alone, to your sand

9    castle analogy, right?  So what's the value of concrete versus

10:40AM 10  a sand castle?  Well, one washes away, one doesn't, right?  So

11   there is still some degree of isolation here that's required,

12   but it's a lot simpler in this case because we know what we

13   have, right, we have an LPHDR unit that's conventional.

14        They're estopped from taking a contrary position, and

15   so all Dr. Khatri had to do is say, okay, well, how much value

16   is being added by taking the rest of the claim, which has these

17   other elements, the LPHDR unit principally and adding this

18   exceeds piece to it, and he doesn't even attempt to do that,

19   and that's really the problem, your Honor.

10:41AM 20        The fact that it might be a difficult task does not

21   make -- does not excuse the patentee under the case law from

22   apportioning only based upon the patentable feature because

23   Mr. Seeve mentioned policy, right, and I think the policy

24   rationale here is quite clear.  They are not allowed, they

25   don't have monopoly on the conventional features, and,

1    therefore, they cannot claim damages based upon any

2    conventional feature, and so if their point is that the exceeds

3    limitation has been combined with this conventional feature,

4    then the thing that Dr. Khatri was obligated to do was to say,

5    okay, here's what's conventional, here's what's been added,

6    here's the value that's been added by that, and maybe he may

7    say, well, the combination creates some value, and we have to

8    see what that is and see whether that fell within the scope of

9    proper apportionment, but he never did that, so there's

10:42AM 10    no -- it's not as if he actually valued this combination and

11    we're challenging that, he never did that, as we saw from slide

12    2, he is simply doing his apportionment based upon the value

13    attributable to the LPHDR unit.  That's clearly apportioning

14    based upon conventional features and is outside the scope of

15    what the law allows.

16          THE COURT:  Okay.  All right.  Why don't we do this.

17    We've got about 10 minutes.  Let me turn to Singular, is there

18    something you want to take up?

19          MR. SEEVE:  There is, if I could respond very briefly

10:43AM 20    to some of Mr. Bhansali's points.

21          THE COURT:  Go ahead.

22          MR. SEEVE:  So super briefly.  Mr. Bhansali once again

23    reiterated that Dr. Khatri didn't include the standard for

24    apportionment in his report, and it's simply not true.  It's at

25    paragraphs 283 and 284.  The law that supposedly says that the

1   specification has no relevance to the plain and ordinary

2   meaning that Mr. Bhansali refers to simply doesn't exist.  The

3   law actually says, "The claims are directed to the invention

4   that's described in the specification, they do not have meaning

5   removed from the context from which they came."  That is the

6   law.

7          Google did not respond to that case which Singular

8   cited.  When it comes to the state of mind business, what I

9   said, Dr. Khatri wasn't providing a technical opinion, I meant

10:44AM 10  the technical opinion as a psychologist about someone's state

11  of mind.  Of course, Dr. Khatri's opinions are technical and

12  relate to technical issues of the case, and Dr. Khatri is

13  eminently qualified to testify about that.

14         And when it comes to the *Omega* patent of that

15  lawnmower issue, it is a slightly complex issue, but I think

16  your Honor hit the nail on the head when you said, you know,

17  it's complicated, the claim is directed to the lawnmower, it

18  has this baffle, but it also has an on-off switch.  That's the

19  key difference here.

10:44AM 20         It's not like the Court in the lawnmower case looked

21  at the claim that had an on-off switch and said, ugh, but

22  that's conventional because some IPR some time found it

23  invalid.  It simply wasn't in the claim.  The claim only talked

24  about a lawnmower --

25         THE COURT:  My point, and maybe it's a silly and

1   obvious one is let's say you had a patent with five claims,

2   water, sand, cement, gravel and concrete.  The IPR is like, no,

3   you don't get to patent water, sand, gravel, so the first four

4   claims are out, but even though they're all conventional, your

5   combination is patentable and the improvement is all those

6   things put together.

7        Now, Google says Khatri didn't opine on the

8   combination, and maybe that's a separate issue, but the

9   conventionality of the component itself is what it is.  I mean,

10:45AM 10   it doesn't mean that it can't be part of something that is

11   itself improvement.

12        MR. SEEVE:  That's exactly right, your Honor.

13        THE COURT:  All right.  Anything else you want to take

14   up, and I suppose if need be, we can postpone this by video,

15   although I would like to sort of get moving on all of this.  Is

16   there something else that -- I've let Google set the agenda

17   here.  Yes.

18        MR. TIMBERS:  Yes, your Honor,  I know your time is

19   very short, so I'd like to take two minutes on the Section 101

10:46AM 20   issue, which is cross-motions.

21        THE COURT:  Yes.

22        MR. TIMBERS:  One thing I really want to emphasize is

23   Step 2, Google has the burden of proof on this defense to prove

24   well-understood, routinely conventional by clear and convincing

25   evidence.

1    Google has not proven it by any evidence, and I would

2    point your Honor to the two-page, sorry, four-page, if you

3    count the top, the four-page statement of facts that Google has

4    applied in their motion.  They do not address well-understood,

5    routine, and conventional either in their motion or in response

6    to ours.  They have the duty to do so, and I want to clarify

7    something that's very important.

8    Just because something is in the prior art does not

9    make it well understood, routine and conventional.  *Berkheimer*

10:47AM 10   makes this very, very clear.  It says, "Whether a particular

11   technology is a well-understood, routine and conventional goes

12   beyond what was simply known in the prior art."  This is a

13   question of fact.  They have to prove it, and if you look at

14   the citation to their expert's report, he does not say the

15   ordered combination is well understood, routine and

16   conventional.  Instead, he just says it's not a technological

17   innovation.  That's not what they have to prove.  They have to

18   prove that the absence of that evidence here at the summary

19   judgment stage means that their motion has to be denied and

10:47AM 20   Singular's motion has to be granted.  Thank you.

21   THE COURT:  Mr. Van Nest, do you want to respond?

22   MR. VAN NEST:  I'll respond very briefly, your Honor,

23   and thanks again for your patience this morning and for your

24   accommodation on our schedules.  We appreciate that.

25   The only thing really left to debate as you've heard

1    on this issue is whether the exceeds limitation, which is all

2    that's left of inventiveness after the PTAB ruling is anything

3    other than conventional and well understood, and as we pointed

4    out in our brief, both our opposition to their motion, which

5    their motion didn't address Section 2, it just addressed

6    Section 1.

7            Our motion addressed both, but our motion points out

8    that mixing different precision units was well known in the

9    art, as their patent concedes.  In the '273 patent at column 5,

10:48AM 10   lines 31 to 33, they admit that mixing precision units, i.e.,

11   higher precision and lower precision was well known in the art

12   and was used in pyrographic processors.

13           They didn't dispute that.  They didn't dispute that in

14   their opposition.  Dr. Khatri doesn't have an opinion that the

15   exceeds level is anything other than arbitrary, only opinions

16   that the claims as a whole are unconventional.

17           So they concede also that this exceeds limitation

18   covers a vast range of different things.  None of them are

19   unconventional.  None of them are new.  They don't provide any

10:49AM 20   evidence from Dr. Khatri or anywhere else that there's anything

21   unconventional because they concede in the patent itself, in

22   the file history, in the patent that mixing precision support,

23   having a device with both higher and lower precision was well

24   known and used in pyrographic processors.

25           And the idea that 100 is anything other than an

1    arbitrary number isn't supported anywhere either.  There's no

2    opinion by anyone that that number is significant or inventive

3    or meaningful in any way, shape or form.  It is a requirement,

4    as I pointed out at the top of the hour, it is a requirement of

5    the limitation, but it doesn't add anything to the abstract

6    idea, and it's not unconventional in the least, so those are

7    the issues that we wanted to call your Honor's attention to

8    this morning, and, again, we appreciate your time and

9    attention.

10:50AM 10            MR. DOHERTY:  Your Honor, does your Honor have one

11   more minute just so I can address the motion to exclude certain

12   testimony of Ms. Stamm and Dr. Walker?  I'll keep this very

13   brief.  We asked in the contention interrogatory for Google to

14   identify non-infringing alternatives it contends exist, and

15   they identified GPUs, they identified CPUs, they identified a

16   host of other things, which are consistent with their document

17   production.  Those are the things they analyzed and tested.

18            They then have a catch-all that identifies alternative

19   number formats, quote, "an exponent of 8 bits, a sign bit, and

10:51AM 20   a fraction of up to 15 bits," and then they conclude that

21   paragraph by saying, "or any other format."  That's a

22   catch-all.  It doesn't identify a single specific format.  It's

23   15 different combinations, and we now know from Dr. Walker,

24   their own technical expert, that 10 of those 15 actually

25   infringe, so it's not up to -- it's not on Singular to try to

1  figure out what Google's contention is.  They have to tell us.

2  They didn't.  It was never disclosed until after our expert

3  reports were served, and they served their rebuttal reports,

4  and the prejudice can't be overstated, it can't be overcome.

5  We've got no fact discovery on bf20, as they call it, and it

6  should be excluded.  Thank you.

7        MR. VAN NEST:  Your Honor, Ms. Shah is going to deal

8  with that.

9        THE COURT:  All right.

10:51AM 10        MS. SHAH:  Good morning, your Honor.  I have a

11  slightly longer presentation that I won't give, I'll just

12  respond to it briefly, but I can give the slides to the clerks

13  afterwards, if it's helpful.

14        THE COURT:  And me, too.

15        MS. SHAH:  And you, your Honor.

16        THE COURT:  Not just the clerks.

17        MS. SHAH:  With regard to whether this was disclosed

18  or not, your Honor, Google's interrogatory response did

19  disclose what its experts now refer to as bfloat20.  For people

10:52AM 20  who are skilled in the art, referring to these number formats

21  by the number of bits is how they do that, and that's exactly

22  what Google disclosed.  It wasn't 15 separate number formats.

23  What Google said was "non-infringing number formats with up to

24  15 bits," and that's exactly how Singular's own patents

25  describe these ranges.  They give a range, and that's exactly

1        why Google responded in that way.

2              Singular's interrogatory asked for any acceptable

3        non-infringing alternatives, and that's why Google provided a

4        list, a range of those acceptable non-infringing alternatives.

5        And now for them two years later to claim that they didn't have

6        enough information when there was no prejudice during the fact

7        discovery, they had the opportunity to ask further questions,

8        they could have moved to compel, they could have sought more

9        information, and they did none of that.

10:53AM 10       The *Steady* state case says that, "when you do nothing

11       to alleviate the prejudice, then at this point claiming

12       prejudice cannot be something that weighs in favor of

13       preclusion," which is a very weighty sanction, and so for that

14       reason, that was disclosed, your Honor, and if there was an

15       issue about the sufficiency of the disclosure, it was two years

16       too late to make that argument.  It was in Google's

17       interrogatory response, and I'm happy to provide more

18       information.  We'll rest on our briefs otherwise though.

19             THE COURT:  All right.  Do you want to hand that up?

10:53AM 20       MS. SHAH:  Yes, your Honor.

21             THE COURT:  Let's talk about where we go from here.

22       First I want to set another conference, ballpark three weeks

23       out.

24             THE CLERK:  Tuesday, July 18th at 3:30.

25             THE COURT:  Tuesday, July 18th, 3:30 eastern time by

1   video, or we can do it hybrid if people want to show up.  If I

2   deny the motion to move the trial, and I'm not expressing an

3   opinion, I haven't made that decision yet, but let's assume the

4   trial date holds means I need to resolve all of these, and,

5   obviously, not the Friday before we impanel a jury, and so I'm

6   not quite sure what I'm going to do.

7           I expect that some of these rulings are going to be

8   less than model opinions.  They may even be delivered orally or

9   I will issue electronic orders.  I have to do a triage here and

10  figure out what I'm going to do and in what order and in what

11  level of detail, but I guess I'm apologizing in advance.  This

12  may be something less than an opinion that will be quoted for

13  millennia to come, but I'll see.  I have a lot of work to do in

14  a short period of time, and we'll see where we are in three

15  weeks.  It's possible I may render some or all of those

16  decisions orally at that conference.  I need to just figure out

17  what I need to do going forward.

18          And I recognize, obviously, people have summer

19  schedules, even patent lawyers, I think, take vacations, so I

20  understand that there's a lot to do in the time we have

21  remaining, but that's where things are as they stand, but I

22  will take all of this under advisement, including the motions

23  that were not argued.

24          I'm certainly not going to assume because you didn't

25  argue something you've waived it, that is, you didn't orally

1    argue it, and I recognize that some of these issues were

2    perhaps given short shrift in light of the time allotted, but

3    I'll take it under advisement.  All right.  Anything further,

4    Mr. Van Nest?

5         MR. VAN NEST:  Your Honor, just to clarify, we will be

6    together on Zoom on July 18th at 3:30 eastern?

7         THE COURT:  Yes.

8         MR. VAN NEST:  That's fine, thank you.

9         THE COURT:  Again, if some or all of you want to

10:56AM 10    appear in person, we can do it in hybrid.  I don't care, to be

11    honest.

12         MR. SEEVE:  I think since it's a CMC, we're happy to

13    do it over Zoom, as we've been doing it.  It saves time and

14    money and travel for everybody.

15         THE COURT:  And people ask me this question all the

16    time.  It literally makes no difference to me.  Maybe something

17    is wrong with me, but I don't care if we do it by video or

18    live.

19         MR. SEEVE:  I think it's been working well.  Thank

10:56AM 20    you.

21         MR. TIMBERS:  Your Honor, just one other thing.  The

22    parties are trying to work on a pretrial exchange schedule.

23         THE COURT:  Okay.

24         MR. TIMBERS:  I'm hopeful that we'll work that out.

25         THE COURT:  Okay.

1          MR. TIMBERS:  But if we don't, we'd want to come to

2    you immediately to see if we need any help on that.  I just

3    wanted to raise that.

4          THE COURT:  Okay.  As you're thinking about the trial,

5    again, you're experienced.  I don't need to tell you how to do

6    your jobs, but get out your scalpel and your machete, your

7    chain saw, your excavating equipment, whatever it is you need

8    to cut this down to what really matters, what is important, and

9    what these poor lay jurors are going to understand.

10:57AM 10          All right.  With that, we'll stand in recess.  Thank

11    you.  It was well argued on both sides.

12          (Whereupon, the hearing was adjourned at 10:57 a.m.)

13                  C E R T I F I C A T E

14    UNITED STATES DISTRICT COURT )

15    DISTRICT OF MASSACHUSETTS ) ss.

16    CITY OF BOSTON )

17          I do hereby certify that the foregoing transcript,

18    Pages 1 through 74 inclusive, was recorded by me

19    stenographically at the time and place aforesaid in Civil

20    Action No. 19-12551 -FDS, SINGULAR COMPUTING LLC vs. GOOGLE LLC

21    and thereafter by me reduced to typewriting and is a true and

22    accurate record of the proceedings.

23          Dated July 5, 2023.

24                    s/s Valerie A. O'Hara
                   _____
25                    VALERIE A. O'HARA
                   OFFICIAL COURT REPORTER